UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, <br><br> Plaintiff <br><br> v. <br><br> SPOTIFY USA INC., <br><br> Defendant. | No. 24 CV _____ <br><br><br> **COMPLAINT** |

Plaintiff Mechanical Licensing Collective (the "MLC"), for its complaint against Spotify USA Inc. ("Spotify"), upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, alleges as follows.

**Nature of the Action**

1.     This case is brought to compel Spotify—one of the largest music streaming services in the United States—to comply with the Copyright Act and to pay the mechanical royalties it owes to songwriters, composers, lyricists and music publishers (collectively, "Songwriters and Music Publishers") who create, own and administer the musical works upon which Spotify's business is based.  Under Section 115 of the Copyright Act and its implementing regulations (collectively, "Section 115"), Spotify receives a compulsory blanket license that allows it to offer tens of millions of musical works on an on-demand basis.  That blanket license is the foundation of a multibillion dollar business with tens of millions of subscribers paying monthly fees, typically $10.99, for access to Spotify's Premium music service ("Premium").[1]  In return,

---

[1]     In addition to its "Individual" Premium plan (priced at $10.99 per month), Spotify also offers a "Duo" Premium plan for couples (priced at $14.99 per month) and a "Family" Premium plan for family members (priced at $16.99 per month).  *See* Spotify, https://www.spotify.com/us/premium/ (last accessed May 16, 2024).

Spotify is obligated to make monthly royalty payments to the MLC, a non-profit organization that has been designated by the U.S. Copyright Office to ensure that Spotify and other music streaming services accurately and timely pay the mechanical royalties they owe to Songwriters and Music Publishers.  The amount of those royalty payments is dependent in part on the "Service Provider Revenue"[2] that Spotify earns from music-related "Subscription Offerings"[3] such as Premium.

2.      On March 1, 2024, without advance notice to the MLC, Spotify unilaterally and unlawfully decided to reduce the Service Provider Revenue reported to the MLC for Premium by almost *50 percent*, by improperly characterizing the service as a different type of Subscription Offering and underpaying royalties, even though there has been no change to the Premium plan and no corresponding reduction to the revenues that Spotify generates from its tens of millions of Premium subscribers.

3.      Neither the Copyright Act, nor its governing regulations, countenance Spotify's underreporting of Service Provider Revenue.  The financial consequences of Spotify's failure to meet its statutory obligations are enormous for Songwriters and Music Publishers.  If unchecked, the impact on Songwriters and Music Publishers of Spotify's unlawful underreporting could run into the hundreds of millions of dollars,  if estimates by industry publications are correct,[4] upending a central premise of Section 115 that Songwriters and Music Publishers should be paid in strict accordance with Section 115 and its regulations for the compulsory use of their works.

---

[2]  "Service Provider Revenue" means "All revenue from End Users recognized by a Service Provider for the Offering"; "All revenue recognized by a Service Provider by way of sponsorship and commissions . . . *i.e.*, advertising"; and "All revenue recognized by a Service Provider . . . as a result of the placement of third-party advertising . . ."  37 C.F.R. § 385.2.

[3]  A "Subscription Offering" is an "Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle."  37 C.F.R. § 385.2.

[4]  *See Billboard*, "Spotify to Pay Songwriters About $150 Million Less Next Year with Premium, Duo, Family Plan Changes,"        https://www.billboard.com/business/streaming/spotify-songwriters-less-mechanical-royalties-audiobooks-bundle-1235673829/.

4.      Spotify's rationale for reducing the amount of Service Provider Revenue is that, on March 1, 2024, Premium became a "Bundled Subscription Offering"[5] when Spotify launched Audiobooks Access ("Audiobooks Access"), a purportedly new product that allows Audiobooks Access subscribers to listen to up to 15 hours of audiobooks per month in return for a monthly $9.99 fee.  Section 115 instructs how Service Provider Revenue is to be reported when music offerings are sold or "bundled" together with non-music products or services in a single transaction.  Mechanical royalties for a Bundled Subscription Offering are only paid on the pro-rata portion of the music-related component of the Bundled Subscription Offering.

5.      Spotify's assertion that Premium is now a Bundled Subscription Offering is directly at odds with the Section 115 regulations that the MLC has primary responsibility for interpreting and applying.  Premium is exactly the same service that Spotify offered to its subscribers before the launch of Audiobooks Access.  Nothing has been bundled with it.  In the months before the purported transformation of Premium into a Bundled Subscription Offering, subscribers could listen to unlimited ad-free music and up to 15 hours of audiobooks each month in return for a $10.99 monthly payment, as well as other non-music audio content available on Spotify's platform, such as podcasts, comedy shows and spoken word performances.  The launch of Audiobooks Access resulted in no change at all in Premium.  And prior to March 1, Spotify paid mechanical royalties on the entirety of Premium revenues, subject to certain specific reductions identified in Section 115, despite the fact that Premium subscribers also had access to the same number of hours of audiobooks as Audiobooks Access subscribers now have.  Nothing changed on the day Audiobooks Access launched:  Premium subscribers continue to get the same single product, providing the same on-demand access to tens of millions of musical works (along

---

[5]   A "Bundled Subscription Offering" is "a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads included within a Bundle."  37 C.F.R. § 385.2.

with other audio content) at the same price.  The only change is that Spotify, by erroneously recharacterizing its Premium service as a Bundled Subscription Offering, is violating Section 115 and its regulations with respect to its reporting of Service Provider Revenue and, as a result, underpaying mechanical royalties.

6.     In fact, the relevant Section 115 regulations, which are reviewed in detail below, specifically provide that, to qualify as a "Bundle," there must be a combination of *at least two* products: a "Subscription Offering," that is, a subscription music offering, plus "one or more other products or services having more than token value."  37 C.F.R. § 385.2.  Premium did not become a Bundled Subscription Offering when Spotify launched Audiobooks Access because Premium already consisted of unlimited music and access to other audio products, including up to 15 hours of audiobook listening.  To qualify as a Bundled Subscription Offering, an offering must include at least two distinct products or services.  Premium does not.

7.     There are numerous other flaws in Spotify's position.  Spotify informs potential Audiobooks Access subscribers that, unlike Premium subscribers, they will not have access to unlimited, ad-free, on-demand music.  But in rolling out its Audiobooks Access plan, Spotify neglected to create a different product.  It appears that new Audiobooks Access subscribers are being granted access to 15 hours of audiobooks listening and the *same* access to unlimited, ad-free, on-demand music that Premium subscribers are provided.  The only difference is that subscribers to Audiobooks Access are paying $9.99 per month, rather than $10.99, to receive the same product.

8.     But even if Audiobooks Access were a differentiated product, Premium still would not qualify as a Bundled Subscription Offering.  That is because the audiobooks component of Premium does not have more than the "token value" required to qualify as a Bundled

Subscription Offering under Section 115.[6]  Spotify did not raise the $10.99 monthly price of Premium when it added audiobooks to its service in November 2023 and allowed Premium subscribers to listen to 15 hours of audiobooks with no additional charge.  The fact that the price did not go up is powerful evidence of the "token value" of audiobooks to the Premium subscribers.

9.     The manner in which Spotify has launched Audiobooks Access also demonstrates that it has no more than "token value" to Spotify.  The Audiobooks Access subscription page does not appear to be directly accessible from Spotify's website.  Nor is Audiobooks Access among the plans that Spotify advertises to potential subscribers at the foot of every single page of its website.  Accordingly, there is little doubt that the number of subscribers who will sign up for Audiobooks Access is likely to be a fraction of the Premium subscribers.  The principal value of Audiobooks Access to Spotify is to support Spotify's claim that Premium is now a Bundled Subscription Offering.  That does not and cannot satisfy the "more than token value" requirement of Section 115.

10.     In sum, and as shown below, Spotify's attempt to reduce its mechanical royalties has resulted in a clear breach of its obligations under Section 115.  As a result, the MLC, which is specifically authorized under the Copyright Act to bring actions to enforce the royalty obligations of compulsory blanket licensees such as Spotify, brings this suit to compel Spotify to adhere to the clear and specific reporting and payment obligations that Section 115 imposes.

### The Parties

11.     Plaintiff the MLC is a non-profit corporation formed and existing under the laws of the State of Delaware with its headquarters at 333 11th Avenue South, Suite 200, Nashville,

---

[6]     As noted above, under Section 115 a "Bundle means a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and one or more other products or services *having more than token value*…."  37 C.F.R. § 385.2 (emphasis added).

Tennessee 37203.  The MLC is the sole entity authorized to offer and administer compulsory blanket licenses under Section 115, and to collect the ensuing royalties due from blanket licensees. *See* 37 C.F.R. § 210.23(a); 17 U.S.C. § 115(d)(3)(B)-(C).  The MLC is explicitly authorized by statute to engage in legal action to enforce the royalty obligations of licensees.  *See* 17 U.S.C. § 115(d)(3)(C)(i)(VIII).

12.     Defendant Spotify is a corporation formed and existing under the laws of the State of Delaware with its headquarters at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007.  Spotify is one of the largest music streaming services in the U.S. and undertakes substantial business activities throughout the country, including in this District.  Spotify obtained a compulsory blanket license, as of January 1, 2021, by operation of law because it was already operating under the previous statutory mechanical license, which was superseded by the compulsory blanket license.  *See* 17 U.S.C. § 115(d)(9)(A).  Spotify filed a Notice of License with the MLC confirming its operation under the compulsory blanket license on or about December 1, 2020.

### Jurisdiction and Venue

13.     This Court has subject matter jurisdiction over this action, which arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq*., pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14.     This Court has personal jurisdiction over Spotify because its principal place of business is located within this District, and because it has conducted systematic and continuous business in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(a) because Spotify has its principal place of business within this District and has committed, and continues to commit, the wrongful acts alleged herein within this District.

## The Facts

### *The Section 115 Compulsory Blanket License*

16.    Section 106 of the Copyright Act grants the owner of a copyright in a musical work certain exclusive rights, including the exclusive rights to reproduce and distribute the work.  *See* 17 U.S.C. § 106(1) and (3).

17.    Since 1909, the Copyright Act has also made these exclusive rights subject to compulsory licensing in certain situations, provided that there is compliance with applicable statutory and regulatory requirements.  In particular, the Copyright Act provides that the exclusive rights to reproduce and distribute musical works are subject to compulsory licensing in situations involving audio-only sound recordings, or "phonorecords," of "nondramatic musical works."  17 U.S.C. § 115(a)(1).

18.    From 1909 until 2021, this compulsory mechanical license generally required that the licensee first send notice to the copyright owner of each musical work to be used under the compulsory license, and then account and pay monthly royalties directly to each copyright owner.

19.    With the advent of digital music providers and their need for libraries of sound recordings embodying tens of millions of musical works, many new problems developed around the system of individualized notice and payment.  In 2018, the Copyright Act was amended by the Music Modernization Act (the "MMA"), which created a new compulsory blanket license for certain uses of musical works.  *See* 17 U.S.C. § 115(d).  The compulsory blanket license became available on January 1, 2021.  Digital music providers who obtain a blanket license are permitted

to reproduce and distribute musical works[7] in certain covered activity[8] that includes digital streaming by services such as Spotify that provide on-demand access to music.

### The MLC and Its Standing to Bring Legal Claims to Enforce Rights and Obligations under a Section 115 Compulsory Blanket License

20.     The MMA directed the Register of Copyrights to appoint a single non-profit "mechanical licensing collective" to administer the compulsory blanket license, collecting the royalties owed by licensees and distributing those royalties to the Songwriters and Music Publishers to which the royalties are due.  17 U.S.C. § 115(d)(3).[9]

21.     Plaintiff the MLC is the non-profit organization that was designated by the Register of Copyrights, pursuant to the MMA, to serve as the mechanical licensing collective under the MMA.[10]

22.     The MMA gives the MLC standing to "[e]ngage in legal and other efforts to enforce rights and obligations under" the Copyright Act,[11] and specifically contemplates that the MLC may "enforce rights or obligations under a blanket license, including through a bankruptcy proceeding or other legal action."[12]

---

[7]     The right to reproduce and distribute musical works that are eligible for statutory licensing under 17 U.S.C. § 115 is also known as the "mechanical" right.

[8]     "Covered Activity" is defined in the MMA to mean "the activity of making a digital phonorecord delivery of a musical work, including in the form of a permanent download, limited download, or interactive stream, where such activity qualifies for a compulsory license under this section."  17 U.S.C. § 115(e)(7).

[9]     The royalty rates and terms for the compulsory blanket license are set by the Copyright Royalty Board in quinquennial administrative proceedings and codified in the Code of Federal Regulations.  *See* 17 U.S.C. Chapter 8; 37 C.F.R. Part 385.

[10]    *See* 37 C.F.R. § 210.23(a); U.S. Copyright Office, Library of Congress, Designation of Music Licensing Collective and Digital Licensee Coordinator, 84 Fed. Reg. 32274 (July 8, 2019).

[11]    17 U.S.C. § 115(d)(3)(C)(i)(VIII).

[12]    17 U.S.C. § 115(d)(3)(G)(ii).

***The Definitions of "Bundle" and "Bundled Subscription
Offering" under the Section 115 Regulations***

23.     Under the relevant regulatory provisions, "Bundle" is defined as "a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and one or more other products or services having more than token value, purchased by End Users in a single transaction (*e.g.,* where End Users make a single payment without separate pricing for the Subscription Offering component)."  37 C.F.R. § 385.2.  A "Bundled Subscription Offering" is defined as "a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads included within a Bundle."  *Id.*  And a "Subscription Offering" is defined as "an Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle."  *Id.*

24.     Other subscription services illustrate the type of Bundled Subscription Offering the Section 115 regulations are meant to cover.  For example, some subscription services make Bundled Subscription Offerings available in multiple pricing tiers that include different services.  One tier might include cloud storage, television streaming and music streaming; another might include those same products, plus additional ones such as news and fitness content.  Potential subscribers are encouraged to subscribe to a Bundled Subscription Offering at a discounted price relative to the aggregate price of subscribing to each of the bundled services individually.

***The Calculation of Royalties under Section 115***

25.     Section 115 provides detailed steps governing the calculation of royalties payable to the MLC on a monthly basis.  *See generally* 37 C.F.R. § 385.21 *et seq*.  The royalty calculation process set out in the applicable regulations involves four steps, with certain important

distinctions (as discussed below) between standalone Subscription Offerings and Bundled Subscription Offerings.

26.     Step 1 requires that licensees "Calculate the all-in royalty for the Offering" by determining the greater of "[t]he applicable percent of Service Provider Revenue" and "[t]he Result of the TCC[13] Prong Calculation for the respective type of Offering."   37 C.F.R. § 385.21(b)(1)(i)-(ii).  Where a "Service Provider makes available different Offerings, royalties must be calculated separately with respect to each Offering . . . ." 37 C.F.R. § 385.21(b).

27.     The methodologies for calculating both the "applicable percent of Service Provider Revenue" and the "TCC Prong Calculation" are expressly set out in the governing regulations.  *See id.*  For example, the Percent of Service Provider Revenue set forth in the regulations varies by royalty year, from 15.1% in 2023 to 15.35% in 2027 (the final year encompassed by the existing the regulations).  *See* Table 1 to 37 C.F.R. § 385.21(b)(1).  For 2024, the provided amount is 15.2%.  *Id.*

28.     The TCC Prong Calculation, meanwhile, varies based on the type of Offering at issue.  As an example, a "Standalone Portable Subscription Offering" has a TCC Prong Calculation of "(i) the lesser of 26.2% of TCC for the Accounting Period or (ii) the aggregate amount of $1.10 per subscriber for the Accounting Period."  *See* Table 2 to 37 C.F.R. § 385.21(b)(1).  A "Bundled Subscription Offering" has a TCC Prong Calculation of 24.5% of TCC for the Accounting Period.  *See id.*

---

[13]   "TCC" is defined as "the total amount expensed by a Service Provider . . . in accordance with GAAP for rights to make Eligible Interactive Streams or Eligible Limited Downloads of a musical work embodied in a sound recording . . ." 37 C.F.R. § 385.2.

29.     Step 2 requires the Licensee to subtract applicable "Performance Royalties," as defined in the regulations, from the amount determined in Step 1 for each Offering of the Service Provider.[14]

30.     Step 3 involves the determination of the payable royalty pool, which is calculated by determining the greater of "(i) The result determined in step 2 . . . ; and (ii) The royalty floor (if any) resulting from the calculations" specific to certain types of products (such as Bundled Subscription Offerings) identified in the applicable regulations. 37 C.F.R. § 385.21(b)(3).

31.     Step 4 requires the calculation of per-work royalty allocations. *See* 37 CFR § 385.21(b)(4). Per-work allocations can vary for reasons including, among other things, the length of the specific work at issue. *See id.*; *see also, e.g.*, 37 C.F.R. § 385.21(c) (specifying "Overtime adjustment[s]" for use in calculating per-work royalty allocations for works beyond certain lengths of time, starting at 5 minutes).

32.     As noted above, there are significant differences between the royalty calculation process for standalone Subscription Offerings and Bundled Subscription Offerings. One critical distinction is the Service Provider Revenue figure that a digital service provider must report for use in Step 1 of the royalty calculation process. For standalone Subscription Offerings, the digital service provider must report "all revenue from End Users recognized by a Service Provider for the provision of the Offering," subject to certain enumerated reductions. For Bundled Subscription Offerings, the digital service provider must report an amount determined by using "the aggregate of the retail price paid for the Bundle (*i.e.*, all components for one retail price) multiplied by a fraction where the numerator is the standalone retail price of each of the components in the Bundle and the denominator is the sum of the standalone retail prices of each

---

[14]     *See* 37 C.F.R. § 385.2; 37 C.F.R. Part 385, Appendix A at 385.2.

of the components in the Bundle. . . ." 37 C.F.R. § 385.2.  Where "there is no standalone published price for a component of the Bundle, then the Service Provider shall use the average standalone published price for End Users for the most closely comparable product or products in the U.S. . . . ." *Id*.

33.     For example, in a situation where a standalone Subscription Offering costs $10 per month, the Service Provider Revenue that the digital service provider must report is $10 less certain permissible reductions (advertising expenses, etc.).  By contrast, in a situation where a standalone music Subscription Offering costs $10 per month and a standalone video streaming subscription costs $10 per month, and a Bundled Subscription Offering containing both costs $18 per month (a discount of $2 per month), the Service Provider Revenue would be calculated by multiplying the $18 bundled price by a fraction where the numerator is the price of the standalone music Subscription Offering ($10) and the denominator is the sum of the price for each of the standalone services in the bundle ($10 for music and $10 for video), *i.e.*, $20.  In other words, $18 x $10 ÷ $20.  Thus, in this illustrative example, the monthly revenue per subscriber subject to mechanical royalties for that Bundled Subscription Offering would be $9 out of the bundled $18 subscription price.

34.     Another important distinction, as noted above, is that the percentage used in the TCC Prong Calculation differs between Bundled Subscription Offerings (24.5%) and standalone offerings (26.2%).  In addition, Step 3 of the royalty calculation process requires identification of so-called royalty floors for certain types of offerings.  With respect to a Bundled Subscription Offering, the applicable regulations provide for a royalty floor in "the aggregate amount of 33 cents per Accounting Period for each Active Subscriber," as compared to 60 cents per subscriber for Standalone Portable Subscription Offerings.  37 § CFR § 385.21(d)(3)-(4).

35.     Section 115 requires that licensees such as Spotify "report and pay royalties on a monthly basis," and further specifies that "royalty payments shall be made on or before the twentieth day of each month and shall include all royalties for the month next preceding."  17 U.S.C. § 115(c)(2)(I).  The content of the reports submitted to the MLC are governed by statute, and such reports must include all of the information necessary for the MLC to calculate and distribute royalties to Songwriters and Music Publishers, including "usage data for musical works used in covered activities."  17 U.S.C. § 115(d)(4)(A)(ii).  Failure to provide materially accurate and timely reports or royalty payments to the MLC can result in default by the licensee and, ultimately, termination of its blanket license and other penalties.  *See* 17 U.S.C. § 115(d)(4)(E)(i)-(ii).

### The Spotify Premium Offering

36.     Spotify launched its Premium subscription offering in the United States in July 2011.[15]  A Premium subscription provides unlimited on-demand access to tens of millions of musical works.  Since its launch, Premium has grown to become one of the largest on-demand music subscription services in the United States, with more than 44 million subscribers and annual revenues in excess of $5 billion.

37.     In July 2023, Spotify increased the monthly cost of a Premium subscription to $10.99.[16]

38.     In November 2023, Spotify began to provide Premium subscribers with up to 15 hours of audiobook listening per month as part of their Premium subscription.  As with its

---

[15]   In addition to Premium, Spotify also offers a free, ad-supported music service with more limited functionality.

[16]   The monthly subscription costs cited herein are for an individual Premium subscription.  As noted above in footnote 1, Spotify also offers a discounted Premium subscription rate for qualifying students, and higher monthly Premium subscription rates for couples (or "duos") and families.

prior additions of features and enhancements to Premium,[17] Spotify provided *all* subscribers with access to audiobooks at no additional charge, giving those subscribers no choice as to whether or not they wanted access to audiobooks in addition to the unlimited, ad-free on-demand music that is the core of Premium.[18]

39.     As a result, and as has been the case with other added features and enhancements to Premium, Spotify made no claim that the addition of audiobooks transformed Premium into a Bundled Subscription Offering.  Nor did Spotify discount the Service Provider Revenue subject to mechanical royalties.

40.     In its revenue and royalty report for March 2024, however, Spotify declared, for the first time, that Premium comprised a new Bundled Subscription Offering.   Spotify made this change without any advance warning to the MLC, and indeed the MLC only learned of Spotify's claim that Premium had become a Bundled Subscription Offering when Spotify submitted its March monthly usage report to the MLC on April 15, 2024, along with a cover email pointing out the change.

41.     Although Spotify maintains that Premium has become a Bundled Subscription Offering, nothing about the Premium service has actually changed.  The name of the service remains the same.  The functionality of the service remains the same.  The content available on the service—including unlimited on-demand access to tens of millions of musical works, along with up to 15 hours of audiobook listening and many other features and enhancements—remains

---

[17]   In 2015, for example, Spotify added short-form videos and podcasts to its Premium offering.  *See* Sam Thielman, *Spotify moves into video and podcasts with major media partnerships*, The Guardian, https://www.theguardian.com/technology/2015/may/20/spotify-video-podcasts-media-partnerships  (May  20, 2015).

[18]   Spotify's own Paid Subscription Terms, which state that Spotify can "at its discretion" change the number of audiobook listener hours offered to subscribers, further suggest that access to audiobooks is a feature or enhancement that can be modified or even revoked at any time.   *See* Spotify Paid Subscription Terms and Conditions, available at https://www.spotify.com/us/legal/paid-subscription-terms/ (accessed May 16, 2024).

the same.  The subscription price of Premium remains the same.  The only change is Spotify's decision to reduce its reported Service Provider Revenue and accordingly its payment of mechanical royalties.

42.     The financial impact of Spotify's recharacterization of Premium as a Bundled Subscription Offering is enormously consequential for the MLC and to the Songwriters and Music Publishers to whom the MLC accounts and distributes mechanical royalties.  Although the MLC is precluded by Section 115 from disclosing to the Court the amount of potential mechanical royalty underpayments by Spotify until an appropriate protective order is put in place,[19] a leading industry publication estimates the impact at about $150 million, just in the next year.[20]   That impact will be compounded if Spotify continues to erroneously report Premium as a Bundled Subscription Offering.

***Audiobooks Access***

43.     Spotify's claim that Premium is a Bundled Subscription Offering coincided with the March 1, 2024 launch of Audiobooks Access, a purported standalone audiobooks subscription service, priced at $9.99 per month.

44.     Although Spotify launched Audiobooks Access more than two months ago, Spotify's homepage, which lists Spotify's available subscription plans, does not even mention it:

---

[19]     *See* 17 U.S.C. § 115(d)(12)(C); 37 CFR § 210.34.

[20]     *See Billboard*, "Spotify to Pay Songwriters About $150 Million Less Next Year with Premium, Duo, Family Plan Changes,"          https://www.billboard.com/business/streaming/spotify-songwriters-less-mechanical-royalties-audiobooks-bundle-1235673829/.



*Source*: Spotify.com Home Page, accessed May 16, 2024 (red rectangle added for emphasis).

45.    Rather, it appears that a potential subscriber can find Audiobooks Access only by searching for words such as "Spotify" and "Audiobooks Access" on Google or a similar search engine.  And even if a would-be subscriber can reach the Audiobooks Access webpage on Spotify's website, the primary message of that page is to steer subscribers to Premium, not Audiobooks Access.  A potential subscriber accessing the Audiobooks Access webpage is immediately presented with multiple promotions for Premium, not the Audiobooks Access standalone plan:



*Source*: Spotify.com/us/audiobooks, accessed May 16, 2024 (red oval graphics added for emphasis).

46.     Spotify does not reference the Audiobooks Access plan until two-thirds of

the way down the same webpage:



*Source*: Spotify.com/us/audiobooks, accessed May 16, 2024.

47.    And then, immediately after this brief reference to Audiobooks Access, visitors are encouraged yet again to "Explore Premium":



*Source*: Spotify.com/us/audiobooks, accessed May 16, 2024 (red oval graphics added for emphasis).

48.    Spotify discloses to potential Audiobooks Access subscribers that "the music listening experience" of Audiobooks Access subscribers "will be on our free, ad supported service," and that, while they will "[e]njoy 15 hours of listening time from our audiobook

subscriber catalog every month," they will not receive "any other Premium features."[21]  It appears, however, that Audiobooks Access subscribers are granted full access to the Premium unlimited, on-demand, ad-free music service, rather than an ad supported service.  If in fact Audiobooks Access subscribers are accessing ad-free music, the two offerings—Audiobooks Access and Premium—are identical, other than the name and the price ($9.99 versus $10.99).

***Spotify's Premium Subscription Offering Is Not a Bundle***

49.     Spotify's Premium subscription offering is not a "Bundle" within the meaning of the regulations implementing Section 115.  As a result, Spotify is not permitted, under the same regulations, to report its Service Provider Revenue as a Bundled Subscription Offering.  *See* 37 C.F.R. § 385.2.

50.     *First*, to comprise a Bundle, Premium would have to be a "combination of a Subscription Offering providing Eligible Interactive Streams . . . and one or more other products or services having more than token value."  37 C.F.R. § 385.2.  Spotify's reporting and payments to the MLC for periods prior to March 1, 2024 made no claim that Premium qualified as a Bundle, despite the fact that Premium has long included other non-music audio content, such as podcasts.  Nor did Spotify claim that Premium qualified as a Bundle for the purpose of reporting Service Provider Revenue or calculating mechanical royalties at the time it added up to 15 hours per month of audiobook listening to its Premium service in November 2023.

51.     Spotify's reports to the MLC for periods prior to March 1, 2024 accurately reflected that Premium is not a Bundled Subscription Offering.  Again, the Section 115 regulations

---

[21]    *See* https://support.spotify.com/us/article/audiobooks-access-plan/.  Spotify's "free, ad supported" music service is distinguishable from Premium in that it limits users' ability to listen to music after 14 days of traveling abroad, does not allow users to play musical works in their chosen order, does not allow users to download music to their devices for offline listening, and does not allow users to listen to music at the highest sound quality that Premium provides.  *See* Spotify, "Premium Plans," available at https://support.spotify.com/us/article/premium-plans/ (accessed May 16, 2024).

make clear that a Bundle must be a "combination" of "a Subscription Offering providing Eligible Interactive Streams," *i.e.,* a music service, and "one or more other products or services." 37 C.F.R. § 385.2.  Spotify did not combine Premium with any other product or service when it launched Audiobooks Access.  The Premium service offered to subscribers since March 1, 2024 has precisely the same music and other audio content that it offered to subscribers before.  As a result, the launch of Audiobooks Access did not result in a  "combination" of Premium with any "other products or services" that were not already available to Premium subscribers.[22]

52.     *Second*, Premium is not a Bundled Subscription Offering under Section 115 because the audiobook content has no "more than token value."  Spotify did not increase the price of Premium when it added audiobook listening in November 2023, evidencing Spotify's recognition that audiobook content has no more than token value to the tens of millions of Premium subscribers who purchase the service to get access to tens of millions of musical works on an on-demand, ad-free basis.  Similarly, Spotify's launch of Audiobooks Access, including but not limited to how it is accessed and marketed on its website demonstrates that Audiobooks Access has no more than token value to Spotify, particularly in comparison to the billions of dollars it generates each year from Premium.

53.     For those reasons, among others, Premium is not a Bundled Subscription Offering.

---

[22]   Moreover, as discussed *supra* (¶48), the two offerings—Audiobooks Access and Premium—are substantially identical, which further underscores that Audiobooks Access does not constitute "one or more other products or services" for purposes of the definition of a "Bundle" under Section 115.

## CLAIM FOR RELIEF

**Recovery of Unpaid Statutory License Royalties and Late Fees Due to Spotify's Violations of 17 U.S.C. 115 (including §§ 115(c)(2)(I), (d)(4)(A) and (d)(8)(B)); 37 C.F.R. Part 385 (including §§ 385.21(a), (d), Appendix A); and 37 C.F.R. § 210.27**

54.     Plaintiff re-alleges and reincorporates by reference the allegations in the paragraphs above, as if fully set forth herein.

55.     Section 115 establishes a compulsory blanket license for the use of musical works by on-demand streaming services such as Spotify.

56.     As a licensee, Spotify is required to report and pay royalties in accordance with the rates and terms set forth in Section 115 and the regulations promulgated in connection therewith.  *See* 17 U.S.C. § 115(c)(2)(I), (d)(4)(A); 37 C.F.R. Part 385; 37 C.F.R. § 210.27.

57.     By improperly reporting Premium as a Bundled Subscription Offering, Spotify has substantially underreported—and is continuing to substantially underreport to the MLC—the revenues generated by Premium, resulting in substantial underpayment of mechanical royalties payable to the MLC under Section 115.

58.     In addition, to the extent Audiobooks Access provides subscribers with the same access to unlimited on-demand ad-free music as Premium, Spotify has failed to properly account for and pay royalties owed to the MLC for Audiobooks Access under Section 115.

59.     Spotify also will owe late fees in connection with its failure to timely pay all royalties due under the compulsory blanket license.  Section 115  provide that royalties not paid to the MLC within 45 days after the end of the respective month in which they are due incur late fees of 1.5% per month, or the highest lawful rate, whichever is lower.[23]  Because Spotify has

---

[23]     *See* 17 U.S.C. § 115(d)(8)(B); 37 C.F.R. § 385.3; 37 C.F.R. Part 385, Appendix A at § 385.3; Fees for Late Royalty Payments Under the Music Modernization Act, 88 Fed. Reg. 60587 (September 5, 2023) ("the plain and natural meaning of the statute is that 'all royalties' for a given monthly reporting period are 'due' no later than 45 days after the end of the monthly reporting period. Thus, any royalties received by the MLC for such reporting

underpaid the amount of mechanical royalties due for March 2024, it also owes late fees for that month and each monthly reporting period in which it underpays royalties, at the regulatory rate and accruing from the statutory due date.

60.     Further, because Spotify has failed to satisfy its obligations under the compulsory blanket license under Title 17 of the Copyright Act, the MLC also is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

WHEREFORE, the MLC prays for judgment against Spotify and for the following relief:

a.     For an order declaring that Spotify's characterization of Premium as a Bundled Subscription Offering, and its resulting underpayment of royalties, is in violation of the rates and terms set forth in Section 115 and the regulations promulgated in connection therewith;

b.     For compensatory damages, in such amounts to be determined at trial, arising from Spotify's underpayment of royalties, plus late fees, as required by statute and regulation;

c.     For the MLC's costs and attorneys' fees pursuant to 17 U.S.C. § 505;

d.     For pre-judgment and post-judgment interest according to law, as applicable;

e.     For preliminary and permanent injunctive relief prohibiting Spotify from improperly characterizing its Premium subscription offering as a Bundled Subscription Offering and from underpaying royalties to the MLC as a result of that mischaracterization; and

f.     Such other and further relief as the Court deems just and proper.

---

period after this 'due date for payment' are late.  They are 'past due royalty payments' that are subject to such 'late fees' as the CRJs may adopt.").

Dated:  New York, New York
        May 16, 2024

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/ Jay Cohen
        Jay Cohen
        Darren W. Johnson
1285 Avenue of the Americas
New York, New York 10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
jaycohen@paulweiss.com
djohnson@paulweiss.com

*Attorneys for Plaintiff*