Alli Stillman
Direct Dial: 212.906.1747
alli.stillman@lw.com

1271 Avenue of the Americas
New York, New York 10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

**LATHAM & WATKINS** LLP

July 19, 2024

**VIA ECF & EMAIL**

Hon. Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   Mechanical Licensing Collective v. Spotify USA Inc., No. 1:24-cv-03809-AT (S.D.N.Y.)

Dear Judge Torres:

Pursuant to Rules III.A and III.B.iii of Your Honor's Individual Practices, Defendant Spotify USA Inc. ("Spotify") respectfully submits this pre-motion letter in support of dismissal of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

This case concerns whether Spotify has paid the correct amount of royalties for the use of musical works under the compulsory mechanical license under 17 U.S.C. § 115, pursuant to regulations adopted by the Copyright Royalty Board ("CRB") ("*Phonorecords IV* regulations"), by reporting Spotify's Premium subscription offering ("Spotify Premium") as a "Bundle" under those regulations. Plaintiff, the Mechanical Licensing Collective ("MLC"), which administers this license, alleges that Spotify Premium is not a Bundle, and that Spotify underpaid royalties by treating it as such. This is contrary to the facts as pled and the plain text of the *Phonorecords IV* regulations. Spotify Premium is a Bundle because it provides both (a) paid, ad-free interactive music streaming and (b) 15 hours of audiobook listening per month, for a single monthly fee. The Complaint should be dismissed with prejudice.

**I.   BACKGROUND**

Spotify is one of the largest streaming services in the United States. Compl. ¶ 1. In addition to providing music streaming—including through Spotify Free, its ad-supported, limited functionality music streaming tier, and Spotify Premium, a fee-based monthly subscription that offers ad-free music listening and enhanced functionality—Spotify recently expanded into the growing audiobook market. *Id.* ¶¶ 36–38, 44.

After launching an initial audiobook offering through which users purchase audiobooks a-la-carte for download,[1] in late 2023 Spotify added 15 monthly hours of access to more than 200,000 audiobooks to its Spotify Premium subscriptions, allowing subscribers to discover and

---

[1] Spotify Audiobooks, https://www.spotify.com/us/audiobooks/ (cited in Compl. ¶ 45).

enjoy audiobooks with flexibility. Compl. ¶¶ 38, 45. On March 1, 2024, Spotify launched a new standalone "Audiobook Access" subscription, providing access to 15 monthly hours of audiobook content.[2] *Id.* ¶¶ 43, 46.

The issue here relates to the royalties that Spotify owes to MLC for Spotify Premium after the launch of Audiobook Access. In general, the royalties paid by digital streaming services like Spotify under the Section 115 license are based on a regulatory formula that depends, in part, on the revenue that Spotify earns from streaming music. *Id.* ¶¶ 1, 27. Specific to the disagreement here, it has long been the case that when a digital music provider bundles a music service and some *other* product or service together in a single transaction, only that portion of the revenue attributable to the music streaming component is included in the "revenue base" subject to royalty.[3] The same is true under the *Phonorecords IV* regulations. Compl. ¶ 23. Indeed, during the *Phonorecords IV* ratesetting proceeding, music publishers insisted that offerings including music streaming with some other product or service "should be treated as bundles" for royalty calculation.[4] The proceeding was resolved by a settlement that was implemented in the *Phonorecords IV* regulations and touted by music publishers for achieving the "highest royalty rate in the history of streaming anywhere" in exchange for, among other concessions, "favorable language on bundles . . . that allows [the services] to get more subscribers into the ecosystem."[5]

Spotify began reporting Spotify Premium as a Bundle in its March 2024 monthly royalty report, which it submitted to MLC on April 14, 2024. Rather than giving Spotify any prior notice or otherwise engaging (contrary to what would be, and is, expected of this government-appointed entity[6]), on May 16, 2024, MLC filed this lawsuit, challenging Spotify's characterization of Spotify Premium as a Bundle.

## II. THE COMPLAINT MUST BE DISMISSED

MLC's core theory as to why Spotify's Bundle treatment is improper is that providing consumers with 15 hours of access a month to a library of more than 200,000 audiobooks lacks "more than token value." Compl. ¶¶ 8, 52. That argument is facially implausible and wrong as a matter of law. Audiobooks—as part of Spotify Premium, and elsewhere in the market—have significant, demonstrable value, and MLC's effort to rewrite the very royalty terms to which copyright holders agreed, and which the CRB enacted into law less than two years ago, should be rejected out of hand.

---

[2] An Audiobook Access subscription includes access to Spotify's free, more limited music offering that falls outside Section 115. *See* Compl. ¶ 46. The naked allegation that, notwithstanding that Spotify marketed Audiobook Access as only including this free, limited music tier (*id.*), Spotify in fact provided Audiobook Access users with Premium tier, ad-free music (*id.* ¶ 48), is implausible and unsupported by any evidence.
[3] *See, e.g.*, 37 C.F.R. § 385.11 (2013) (*Phonorecords II*).
[4] Kokakis Written Rebuttal Testimony ¶ 39, *at* https://app.crb.gov/document/download/26550.
[5] https://www.nmpa.org/publishers-streamers-reach-deal-for-highest-streaming-royalty-rate-ever-heres-how-it-works-billboard/.
[6] 17 U.S.C. § 115(d)(3)(B) (governing designation of MLC by the Register of Copyrights).

MLC's Complaint fails to state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Resolution of this case turns on a single question of law that can be resolved on the face of the Complaint: Does Spotify Premium—which, as the Complaint acknowledges, packages paid access to both music streaming and audiobooks for one monthly fee—meet the definition of a "Bundle" under the *Phonorecords IV* regulations? Because the answer to that question is "yes," and Spotify indisputably paid the correct amount of royalties associated with the Bundle, the Complaint should be dismissed.

As explained in the Complaint, under the *Phonorecords IV* regulations, a "Bundle" is "a combination of *[1]* a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and *[2]* one or more other products or services having more than token value, *[3]* purchased by End Users in a single transaction."[7] Even taking the Complaint's factual allegations as true, Spotify Premium satisfies each of the foregoing criteria.

First, the music streaming component of Spotify Premium indisputably is a Subscription Offering providing Eligible Interactive Streams to consumers. That is why Spotify must pay Section 115 royalties in the first place. Second, 15 hours of audiobook streaming plainly constitutes an "other product or service." Books are not music, and audiobook streaming is not music streaming. Books are mainstream products offered both by Spotify and competitors via downloads and subscription streaming and, importantly, they are created and licensed by *different rights holders* (*i.e.*, book authors and publishers) who charge separate license fees. Third, there is no dispute that the monthly charge for Spotify Premium is a single transaction.

That leaves only the question of whether 15 hours of audiobook streaming carries more than "token value." On this question, there can be no genuine dispute either. As the Supreme Court has emphasized, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. It is common sense that 15 hours of audiobook streaming has more than token value, and MLC's contrary claim is facially implausible. Americans pay over $2 billion for audiobooks annually.[8] Amazon's Audible service alone generates more than $1 billion of annual U.S. revenue[9] from two subscription services priced at $7.95 and $14.95 respectively.[10] Access through Spotify Premium to over 200,000 audiobooks—including new releases and best sellers—has obvious and significant independent

---

[7] 37 C.F.R. § 385.2.

[8] https://www.audiopub.org/surveys.

[9] https://goodereader.com/blog/audiobooks/audible-has-a-65-market-share-for-audiobook-sales-in-the-united-states.

[10] https://www.audible.com/ep/memberbenefits. That audiobooks carry economic value is not a fact that this Court needs to ignore for purposes of Spotify's anticipated motion. The general size of the U.S. audiobooks market and the prices charged by competitors for products are generally known, not subject to dispute, and appropriate for judicial notice. *See Floyd v. City of New York*, No. 08-cv-1034-AT, 2020 WL 3819566, at *4 n.17 (S.D.N.Y. July 8, 2020) (taking judicial notice of demographics based on information found on the internet); *see also, e.g.*, *23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of content of website).

value. Fifteen hours of audiobook streaming is typically sufficient to complete at least one book every month.[11]

MLC's contrary arguments find no basis in the text of the *Phonorecords IV* regulations and are meritless. MLC argues that because Spotify waited several months before calculating its royalties at the Bundle rate, it must not actually believe that Spotify Premium is a Bundle. Compl. ¶¶ 5, 38–41, 50–51. That baseless speculation as to Spotify's intent is irrelevant to the legal question, which is whether at the time Spotify reported Spotify Premium as a Bundle, it met the regulatory criteria cited above. On the face of the Complaint, the answer is "yes."

MLC also takes issue with how Spotify initially marketed Audiobook Access, suggesting that it was hard for potential customers to find on Spotify's website, which seems designed to "steer subscribers to Premium." *Id.* ¶ 45. But again, even accepting those allegations as true, they have no bearing on whether Spotify Premium meets the legal definition of a Bundle. Spotify is not required to make available its separate Audiobook Access product *at all*, let alone market it in any particular way.[12]

Finally, MLC tries to make much of the fact that Spotify did not *immediately* raise the consumer subscription price of Spotify Premium upon adding audiobook access to that offering. Compl. ¶¶ 8, 41, 52. This too is irrelevant. The relevant question is whether 15 hours of audiobook streaming has "more than token value" to consumers, not whether Spotify chose to immediately leverage that value by raising prices, or to keep prices constant for a time in order to attract and retain more subscribers (the kind of business decision companies routinely make).[13]

It is simply implausible to suggest that streaming of books created and licensed by another set of copyright owners is worthless. Under *Iqbal* and *Twombly,* the Complaint has failed to state a claim, and it would be a substantial waste of time and resources to litigate through discovery what is abundantly clear—and widely recognized—from the face of the Complaint and publicly noticeable sources: that 15 hours of audiobook streaming offers more than token value. The Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/ *Alli Stillman*
Alli Stillman

cc: All counsel of record (via ECF)

---

[11] For instance, the audiobook of *Camino Ghosts* by John Grisham is sold by Barnes & Noble for $17.50, and is 10 hours and 17 minutes in duration. *See* https://www.barnesandnoble.com/w/camino-ghosts-john-grisham/1144158890?ean=2940159216021.

[12] The regulations contemplate Bundles even where there is "no standalone published price for a component of the Bundle." 37 C.F.R. § 385.2. A service provider is thus permitted to create a Bundle by adding a new product or service to an existing Subscription Offering without offering that new product or service on a standalone basis.

[13] The regulations do not tie the "token value" to a consumer price. 37 C.F.R. § 385.2.