**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-03809-AT-KHP |
| SPOTIFY USA INC., | |
| *Defendant*. | |

**MEMORANDUM IN SUPPORT OF DEFENDANT SPOTIFY USA INC.'S
MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................................1

II.   LEGAL AND FACTUAL BACKGROUND .......................................................2

     A.    MLC administers the blanket mechanical license for musical works....................2

     B.    Music publishers agree to "favorable language on bundles" as a way to exclude revenue attributable to non-music services ................................................4

     C.    Spotify brings a new product—audiobook streaming—to its service, and invokes the "Bundle" regulations ..........................................................................7

III.  LEGAL STANDARD ...............................................................................................9

IV.   ARGUMENT ............................................................................................................10

     A.    Spotify Premium is a "Bundle" within the meaning of the royalty regulations............................................................................................................11

          1.    Spotify Premium combines music streaming "with one or more other products or services"—i.e., audiobook streaming ..........................12

              a.    That audiobook streaming is its own product in the marketplace is sufficient to demonstrate that it is distinct from music streaming for purposes of the Bundle definition ........12

              b.    The timing of Spotify's reporting of Premium as a "Bundle" is legally irrelevant........................................................13

          2.    Audiobook streaming has "more than token value" ...............................14

              a.    Common sense alone dictates that audiobook streaming has more than token value ....................................................................15

              b.    MLC's attempts to manufacture disputes about irrelevant facts are unavailing ......................................................................16

     B.    The complaint should be dismissed with prejudice ..............................................18

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*,
    685 F.3d 174 (2d Cir. 2012)......................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................9, 15, 17

*Averyt v. Comm'r*,
    104 T.C.M. (CCH) 65, 2012 WL 2891077 (T.C. 2012) ........................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................9

*Brown v. Prove Identity, Inc.*,
    No. 22-cv-9315-AT, 2024 WL 1195331 (S.D.N.Y. Mar. 20, 2024) .......9

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ..................................................................13

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ................................................................12

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000)......................................................................18

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992)................................................................................13

*Ekpe v. City of New York*,
    No. 20-cv-9143-AT, 2024 WL 1621207 (S.D.N.Y. Apr. 12, 2024)........9

*Eshelby v. L'Oreal USA, Inc.*,
    664 F. Supp. 3d 417 (S.D.N.Y. 2023)................................................9, 18

*Fink v. Time Warner Cable*,
    714 F.3d 739 (2d Cir. 2013)......................................................................9

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)......................................................................17

*Gallardo Solis v. Wolf*,
    No. 19-cv-5383, 2020 WL 5503651 (S.D.N.Y. Sept. 11, 2020) ............10

ii

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)......................................................................................15

*In re: Determination and Allocation of Initial Administrative Assessment to Fund
    Mechanical Licensing Collective*,
    No. 19-CRB-0009-AA..............................................................................................4

*Jeanty v. UPS United Parcel Serv. Freight*,
    No. 21-cv-8311, 2021 WL 5054439 (S.D.N.Y. Nov. 1, 2021).................................15

*Johnson v. Copyright Royalty Bd.*,
    969 F.3d 363 (D.C. Cir. 2020) ...............................................................................2, 3

*Kling v. WHO*,
    532 F. Supp. 3d 141 (S.D.N.Y. 2021).....................................................................18

*McCagg v. Marquis Jet Partners, Inc.*,
    2007 WL 2454192 (S.D.N.Y. Mar. 29, 2007) .........................................................15

*Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*,
    544 F. Supp. 3d 405 (S.D.N.Y. 2021)......................................................................9

*Rowe v. Old Dominion Freight Lines, Inc.*,
    No. 21-cv-4021, 2022 WL 2181619 (S.D.N.Y. June 16, 2022) ...............................10

*State v. Gomez*,
    673 P.2d 1160 (Kan. 1983) .....................................................................................14

*T.S. v. Bd. of Educ. of Town of Ridgefield*,
    10 F.3d 87 (2d Cir. 1993).........................................................................................14

## STATUTES

17 U.S.C.
    § 115............................................................................ *passim*
    § 115(a)(1)(A)..........................................................................3
    § 115(b)(2)(B)..........................................................................3
    § 115(c)(1)(E) ..........................................................................4
    § 115 (c)(1)(F)..........................................................................4
    § 115(d)(1) ...............................................................................3
    § 115(d)(3)(C)(i)(II)..................................................................3
    § 115(d)(3)(G)(i)(II).................................................................3
    § 115(d)(4)(a)...........................................................................3
    § 115(d)(7)(A)......................................................................3, 19
    § 801(b)(1) ...............................................................................4
    § 801(b)(7)(A)..........................................................................4

# RULES

Fed. R. Evid. 201 ................................................................................................15

Rule 12(b)(6) ..........................................................................................9, 15, 17

# REGULATIONS

37 C.F.R.
    § 210.23 .........................................................................................3
    § 210.27(a) ....................................................................................3
    § 210.29(b) ....................................................................................3
    § 385 .............................................................................................2
    § 385.2 ....................................................................................*passim*
    § 385.21(b) ....................................................................................5
    § 385.21(d) ....................................................................................5
    § 390.2(b) ......................................................................................3

87 Fed. Reg. 80448, 80448 (Dec. 26, 2022) ...................................................4

87 Fed. Reg. 80448, 80453 .............................................................................4

89 Fed. Reg. 43686, 43688 (May 17, 2024) ...................................................14

Rev. Proc. 90-12, 1990-1 C.B. 471 § 2 (1990) ..............................................14

# OTHER AUTHORITIES

*Adjusting Our Spotify Premium Prices*, Spotify (July 24, 2023),
    https://newsroom.spotify.com/2023-07-24/adjusting-our-spotify-premium-
    prices/ ...........................................................................................................18

*Adjusting Spotify Premium Prices in the US,* Spotify (June 3, 2024),
    https://newsroom.spotify.com/2024-06-03/adjusting-spotify-premium-prices-
    in-the-us/ ......................................................................................................18

Andrew Albanese, *Spotify Reports 'Exponential' Audiobook Growth*, Publishers
    Weekly (Feb. 2, 2024), https://www.publishersweekly.com/pw/by-
    topic/industry-news/audio-books/article/94253-spotify-reports-exponential-
    audiobook-growth.html ..................................................................................8

*Apple One*, Apple, https://www.apple.com/apple-one/ ....................................15

*Audiobook Revenue and the Number of Listeners Continue to Grow,* Audio
    Publishers Association, https://www.audiopub.org/surveys .........................7

https://app.crb.gov/document/download/26735 ..............................................4

https://app.crb.gov/document/download/7865 ................................................4

*Member Benefits*, Audible, https://www.audible.com/ep/memberbenefits ...............................7, 16

Michael Kozlowski, *Audible has a 65% market share for Audiobook Sales in the United States*, GoodReader (Aug. 6 2023), https://goodereader.com/blog/audiobooks/audible-has-a-65-market-share-for-audiobook-sales-in-the-united-states ...................................................................7

*Other, Collins Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/other .............................................12

*Publishers, Streamers Reach Deal for Highest Streaming Royalty Rate Ever: Here's How it Works*, National Music Publishers' Association (Sept. 1, 2022), https://www.nmpa.org/publishers-streamers-reach-deal-for-highest-streaming-royalty-rate-ever-heres-how-it-works-billboard/ ........................................................7

S. Rep. No. 100-515 (1988) .......................................................................................................14

Spotify Technology S.A, 2023 SEC Form 20-F, *at h*ttps://s29.q4cdn.com/175625835/files/doc_financials/2023/ar/26aaaf29-7cd9-4a5d-ab1f-b06277f5f2a5.pdf, at 7 ................................................................18

*Spotify to Acquire Leading Audiobook Platform Findaway,* Spotify (Nov. 11, 2021), https://newsroom.spotify.com/2021-11-11/spotify-to-acquire-leading-audiobook-platform-findaway/ ...................................................................................7

*To Kill a Mockingbird*, Barnes & Noble, *https://www.barnesandnoble.com/w/to-kill-a-mockingbird-harper-lee/1100151011?ean=2940170266890* ........................................16

*Token*, *American Heritage Dictionary of English Language*, https://www.ahdictionary.com/word/search.html?q=token; ......................................14

*Token*, *Collins Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/token; ..........................................14

*Token*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/token; ........................14

U.S. Copyright Office, *MLC and DLC Contact Information, Boards of Directors, and Committees*, https://www.copyright.gov/music-modernization/mlc-dlc-info/ ...............................................................................................................................3

*With Audiobooks Launching in the U.S. Today, Spotify Is the Home for All the Audio You Love,* Spotify (Sept. 20, 2022), https://newsroom.spotify.com/2022-09-20/with-audiobooks-launching-in-the-u-s-today-spotify-is-the-home-for-all-the-audio-you-love/. ...................................................8

## I.    INTRODUCTION

Spotify is the world's leading audio streaming platform. Although it began life as a music service, over time Spotify has invested heavily in creating and acquiring other forms of content, all to provide greater value to customers and attract and retain them on the Spotify platform, as well as to grow opportunities for creators and rights holders. The most recent example—and the subject of this lawsuit—is Spotify's expansion into the audiobook market. Today, subscribers to Spotify's flagship "Premium" tier of service have the ability to stream a catalog of over 200,000 audiobooks, as well as Spotify's industry-leading music catalog, for a single price.

At the heart of this dispute is an easily answered question: Is audiobook streaming distinct from music streaming, offering greater than token value? The answer is indisputably yes, and there is no need for federal court litigation to confirm it. Audiobook streaming is a service that has long existed in the marketplace unconnected to music streaming, attracting billions in consumer dollars. Moreover, with its expansion into audiobooks, Spotify is not only offering a new service to consumers, but is also paying a new set of rights owners—book authors and publishers.

Plaintiff Mechanical Licensing Collective (MLC), a government-appointed music license administrator, takes the opposite view, arguing that audiobook streaming is neither a distinct product from music streaming, nor does it have more than token value. In doing so, it seeks to compel Spotify to pay additional royalties for its *music* service that Spotify does not owe, under copyright regulations that govern how music streaming services pay for certain music rights they are required to obtain.

MLC's position is nonsensical and factually unsupportable. And it profoundly devalues the contributions of the tens of thousands of book authors whose works are available with a Spotify

Premium subscription—from literary luminaries, to mainstays on best sellers lists, to up-and-coming writers who are finding their audience. The creative output of these authors is not merely of "token value"; to the contrary, it is highly valuable, both to consumers and our collective culture.

Acceptance of that unassailable, commonsense proposition should end this meritless and wasteful litigation. MLC's efforts to manufacture factual disputes where there can be none fall well short of the mark, as discussed below. Because MLC has failed to state—and cannot state—a plausible claim to relief, its complaint should be dismissed with prejudice.

## II.    LEGAL AND FACTUAL BACKGROUND

The details of "how . . . copyrighted works get from [] songwriters into your ears is rather complicated." *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 367-78 (D.C. Cir. 2020) (explaining details). At issue in this case is a specific slice of the music licensing system: a federal regulatory regime by which music streaming services like Spotify, Apple, Amazon, and others pay for certain "mechanical" rights in "musical works" (*i.e.*, the underlying notes and lyrics of music as opposed to the final finished recording) that are embodied in sound recordings streamed to users. *See* 17 U.S.C. § 115; 37 C.F.R. pt. 385. The specific regulation at issue defines a particular category of product—a "Bundle"—which combines a music service with "one or more other products or services having more than token value." 37 C.F.R. § 385.2. As discussed in greater detail below, "Bundles" are treated differently from "standalone" music streaming products for royalty calculation purposes, because (naturally) only the music-streaming activity is subject to music-owner royalties. Before turning to those details, we first provide a brief overview of the Copyright Act's mechanical licensing regime.

### A.    MLC administers the blanket mechanical license for musical works

Section 115 of the Copyright Act, 17 U.S.C. § 115, creates "a compulsory license, which is a statutorily conferred authority to use certain copyrighted material in a specified manner as a

matter of law, without the actual consent of the copyright holder." *Johnson*, 969 F.3d at 367.  The Section 115 license "allows any person who satisfies certain conditions, including the payment of a royalty, to reproduce and to distribute phonorecords of a copyrighted musical work"—commonly referred to as "mechanical rights." *Id.*

Section 115 provides Spotify and other music streaming services a "blanket" license covering mechanical rights regardless of who owns them.  17 U.S.C. § 115(a)(1)(A), (b)(2)(B), (d)(1).  It requires music streaming services to report musical work usage and pay royalties to a central licensing administrator, which the statute refers to as the "mechanical licensing collective." 17 U.S.C. § 115(d)(4)(a).  The Copyright Office is responsible for designating the entity to serve that statutory role, and appointed "Mechanical Licensing Collective, Inc."—*i.e.*, the plaintiff MLC—to serve that role.  37 C.F.R. § 210.23.  Although MLC is a federally-appointed entity, its board is almost entirely composed of music publishers and songwriters, including the largest music rights owners in the world—Universal, Warner, and Sony.[1]

After collecting royalties from music services, MLC distributes them to music publishers. 17 U.S.C. § 115(d)(3)(C)(i)(II), (d)(3)(G)(i)(II); *see also* 37 C.F.R. § 210.27(a), 210.29(b).  Under the terms of Section 115—and unlike other royalty administrators in the United States and abroad—MLC's operations are not funded by rights owners.  Instead, Spotify and other companies that rely on the blanket license pay an "administrative assessment" to MLC, on top of the royalty payments MLC passes through to publishers.  17 U.S.C. § 115(d)(7)(A); *see also* 37 C.F.R. § 390.2(b) (setting the assessment at $39 million in 2024).  Among other things, the administrative

---

[1] *See* U.S. Copyright Office, *MLC and DLC Contact Information, Boards of Directors, and Committees*, https://www.copyright.gov/music-modernization/mlc-dlc-info/.

assessment is being used to fund MLC's litigation budget (such that the costs of litigation are not borne by the music publishers who run MLC).[2]

The rates and terms of the Section 115 compulsory license are determined through rate-setting proceedings held every five years by the Copyright Royalty Board ("CRB"), a federal administrative agency.  17 U.S.C. §§ 801(b)(1), 115(c)(1)(E), 115 (c)(1)(F).  Music publishers and music streaming services participate in these periodic CRB proceedings, at the conclusion of which the CRB promulgates regulations establishing the royalty rates and terms for the compulsory license.  *See* 37 CFR Part 385 [Docket No. 21-CRB-0001-PR (2023-2027)], ECF No. 26734, https://app.crb.gov/document/download/26735 (identifying the National Music Publishers' Association, Spotify, Amazon, Google, Pandora, and Apple as parties to the most recent CRB rate-setting proceeding).

**B.    Music publishers agree to "favorable language on bundles" as a way to exclude revenue attributable to non-music services**

The most recent rate-setting proceeding governing the royalty rate period of 2023-2027 (the "*Phonorecords IV* proceeding"), was resolved through a settlement agreement reached by the major music services and major music publishers, following more than a year of litigation.  87 Fed. Reg. 80448, 80448 (Dec. 26, 2022).  The settlement agreement the parties submitted to the CRB included the full set of proposed royalty rate and term regulations, and, pursuant to its statutory authority, *see* 17 U.S.C. § 801(b)(7)(A), the CRB "adopt[ed] the proposed regulations that codif[ied] the [s]ettlement" as the rates and terms that bind the entire industry (the "*Phonorecords IV* regulations," codified at 37 C.F.R. pt. 385), 87 Fed. Reg. 80448, 80453.  Those regulations are the ones at issue in this case.

---

[2] *In re: Determination and Allocation of Initial Administrative Assessment to Fund Mechanical Licensing Collective*, No. 19-CRB-0009-AA, Aguirre Test. ¶¶ 46-52, Dkt. No. 7865, https://app.crb.gov/document/download/7865.

The royalties paid by a music streaming service under the *Phonorecords IV* regulations are calculated, in the first instance, as a portion of revenue earned by the service for music streaming. The revenue base is just one of several alternative mechanisms in the royalty formula (which include other license costs, and subscriber numbers); these alternatives are structured to ensure payments to music publishers do not fall below a certain level, regardless of the licensee's revenue attributable to the use of the music rights. *See* 37 C.F.R. § 385.21(b), (d).

The regulations provide specific rules for determining the amount of revenue to be used in the royalty calculation. *Id.* § 385.2 (definition of "Service Provider Revenue"). Importantly for purposes of this case, the regulations recognize that a company providing music streaming services under the Section 115 license may also provide *other* revenue-generating services, and embody a general principle that the company may *exclude* revenue that is derived from sources other than music streaming. For instance, the regulations provide that a company may "exclude revenue derived . . . solely in connection with activities *other than* Offering(s) [of music streaming]." 37 C.F.R. § 385.2 (emphasis added). This is why Apple is not required to report revenues from iPhone sales, and Amazon is not required to report revenue from sales of audiobooks, even though they both also operate music streaming services. And this makes perfect sense: it would otherwise border on the absurd to owe music rights holders for the sale of non-music products, or to have to pay any particular set of rights holders for activity that does not depend on those rights.

In this same vein, the *Phonorecords IV* regulations provide specific rules for calculating royalties where a company offers a music service bundled with other products and services. *See* 37 C.F.R. § 385.21(b); *see also* Compl. ¶¶ 1, 27. Under those regulations, a "Bundle" is defined as "a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads" and "one or more *other* products or services having more than token

5

value, purchased by End Users in a single transaction"—in plain English, a music streaming service and something else of value, bought together.  *Id.* (emphasis added).  Thus, when consumers pay a monthly fee to access a service combining music streaming and some other product or service, the service is a "Bundle" so long as the "other" product or service has "more than token value." *Id.*

For a service that qualifies and is reported as a "Bundle," the revenue subject to mechanical licensing royalties is calculated as a proportional share of the revenue from the Bundle as a whole, based on the respective retail prices of its constituent parts.  *See* 37 C.F.R. § 385.2 ("[T]he revenue from End Users deemed to be recognized by the Service Provider . . . shall be the aggregate of the retail price paid for the Bundle (i.e., all components for one retail price) multiplied by a fraction where the numerator is the standalone retail price of the [music streaming] component in the Bundle and the denominator is the sum of the standalone retail prices of each of the components in the Bundle").  The illustrative example provided in the regulations is as follows: "if a Service Provider sells the [music streaming] component on a standalone basis for $10/month and a separate product and/or service on a standalone basis for $5/month, then the fraction shall be $10 divided by $15, i.e., 2⁄3, resulting in Service Provider Revenue of $8,000 if the aggregate of the retail price paid for the Bundle is $12,000." *Id.*  This formula—agreed to by the parties and codified in regulations—is intuitive: if a travel agent sells a $500 bundle that includes a $300 flight and a $300 hotel room, it makes sense to attribute $250 (half of the $500) to the flight.

This result is exactly what *music publishers* argued for in the *Phonorecords IV* proceeding: they insisted that offerings including music streaming with some other product or service "*should be treated as bundles*" for royalty calculation.  Written Rebuttal Testimony of David Kokakis ¶ 39, *available at* https://app.crb.gov/document/download/26550 (emphasis added).    Immediately

following the *Phonorecords IV* settlement, music publishers touted the settlement, posting an article highlighting it as achieving the "highest royalty rate in the history of streaming anywhere" in exchange for, among other concessions, giving "the services [the] favorable language on bundles," which "allows [the digital streaming services] to get more subscribers into the ecosystem." *Publishers, Streamers Reach Deal for Highest Streaming Royalty Rate Ever: Here's How it Works*, National Music Publishers' Association (Sept. 1, 2022), https://www.nmpa.org/publishers-streamers-reach-deal-for-highest-streaming-royalty-rate-ever-heres-how-it-works-billboard/.

### C. Spotify brings a new product—audiobook streaming—to its service, and invokes the "Bundle" regulations

Since 2011, Spotify has provided music streaming through an ad-supported (free to users), limited-functionality music-streaming tier, and through a fee-based monthly subscription offering that includes ad-free music listening and enhanced functionality.[3] *Id.* ¶ 36.

Over the last several years, Spotify expanded into the growing audiobook market. *Id.* ¶¶ 36–38, 44. The audiobook market overall is sizable: Americans pay over $2 billion for audiobooks annually.[4] Amazon's Audible service alone generates more than $1 billion of annual U.S. revenue[5] from two subscription services priced at $7.95 and $14.95 per month, respectively.[6]

In November 2021, Spotify announced it was acquiring an audiobook platform called Findaway,[7] to provide audiobook offerings. Beginning in September 2022, Spotify offered

---

[3] For purposes of this motion, Spotify accepts the facts as alleged in the complaint.

[4] *Audiobook Revenue and the Number of Listeners Continue to Grow,* Audio Publishers Association, https://www.audiopub.org/surveys.

[5] Michael Kozlowski, *Audible has a 65% market share for Audiobook Sales in the United States*, GoodReader (Aug. 6 2023), https://goodereader.com/blog/audiobooks/audible-has-a-65-market-share-for-audiobook-sales-in-the-united-states.

[6] *Member Benefits*, Audible, https://www.audible.com/ep/memberbenefits.

[7] *Spotify to Acquire Leading Audiobook Platform Findaway,* Spotify (Nov. 11, 2021),

audiobooks for *a la carte* download, as a distinct purchase.[8]  Next, in November 2023, Spotify added 15 hours a month of audiobook streaming (from a library of over 200,000 audiobooks) to its premier-access, paid streaming subscription product, Spotify Premium.  Compl. ¶¶ 38, 45.  Additionally, on March 1, 2024, Spotify launched a new, standalone audiobooks subscription, called "Audiobooks Access," which provides subscribers with access to 15 hours a month of audiobook streaming (and non-subscription access to free, limited music streaming).  *Id.* ¶¶ 43, 46, 48.

Spotify's foray into audiobook streaming has been a success for Spotify and book publishers.  Publishers Weekly, for instance, noted that book publishers had "confirmed that the initial returns [from Spotify's audiobook streaming service] have been solid, in terms of both revenue and reaching new consumers."[9]

Spotify began reporting Spotify Premium as a "Bundle" under the *Phonorecords IV* regulations in its March 2024 monthly royalty report, which it submitted to MLC on April 14, 2024.  *Id.* ¶ 40.  Upon receipt of Spotify's March 2024 royalty report, and without giving any prior notice to Spotify or responding to Spotify's outreach—as would be expected from a government-appointed entity administering a government-provided license, especially one funded by the streaming services themselves—MLC rushed to file this lawsuit on May 16, 2024, challenging Spotify's characterization of Spotify Premium as a "Bundle."  Following submission of pre-motion

---

https://newsroom.spotify.com/2021-11-11/spotify-to-acquire-leading-audiobook-platform-findaway/.

[8] *With Audiobooks Launching in the U.S. Today, Spotify Is the Home for All the Audio You Love,* Spotify (Sept. 20, 2022), https://newsroom.spotify.com/2022-09-20/with-audiobooks-launching-in-the-u-s-today-spotify-is-the-home-for-all-the-audio-you-love/.

[9] Andrew Albanese, *Spotify Reports 'Exponential' Audiobook Growth*, Publishers Weekly (Feb. 2, 2024), https://www.publishersweekly.com/pw/by-topic/industry-news/audio-books/article/94253-spotify-reports-exponential-audiobook-growth.html.

letters, the Court granted Spotify leave to file this motion.  ECF No. 22.

### III.    LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, 'state a claim to relief that is plausible on its face.'"  *Ekpe v. City of New York*, No. 20-cv-9143-AT, 2024 WL 1621207, at *2 (S.D.N.Y. Apr. 12, 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "Plausibility depends on 'the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable.'"  *Eshelby v. L'Oreal USA, Inc.*, 664 F. Supp. 3d 417, 422 (S.D.N.Y. 2023) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)).  And "[d]etermining whether a complaint states a plausible claim is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 13 (S.D.N.Y. 2021) (quoting *Iqbal*, 556 U.S. at 679).

"[T]he facts pleaded in the complaint 'must be enough to raise a right to relief above the speculative level.'"  *Ekpe*, 2024 WL 1621207, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citation omitted).  Further, "[a] complaint is properly dismissed where, as a matter of law, 'the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief.'"  *Brown v. Prove Identity, Inc.*, No. 22-cv-9315-AT, 2024 WL 1195331, at *2 (S.D.N.Y. Mar. 20, 2024) (quoting *Twombly*, 550 U.S. at 558).

Courts thus routinely grant motions to dismiss where the plaintiff's case turns on an erroneous interpretation of unambiguous statutory or regulatory language. *See, e.g.*, *Rowe v. Old Dominion Freight Lines, Inc.*, No. 21-cv-4021, 2022 WL 2181619, at *4, 6 (S.D.N.Y. June 16, 2022) (granting motion to dismiss where plaintiffs' interpretation of regulation was inconsistent with unambiguous textual language); *Gallardo Solis v. Wolf*, No. 19-cv-5383, 2020 WL 5503651, at *3, 6 (S.D.N.Y. Sept. 11, 2020) (dismissing complaint where plaintiff was "ineligible for relief" under unambiguous statutory provisions).

## IV.    ARGUMENT

The sole issue in this case is whether Spotify Premium is properly characterized as a "Bundle" under the terms of the federal regulations that define the mechanical licensing royalties Spotify owes to music publishers. Compl. ¶¶ 4-10. The answer turns on two straightforward questions: (1) whether Spotify Premium combines a subscription on-demand music streaming service with "one or more other products or services"; and (2) whether the "other product[] or service[]" provided in addition to music streaming—here, 15 hours per month of access to Spotify's vast audiobook library—has "more than token value." 37 C.F.R. § 385.2.

Those questions are easily answered on the pleadings. First, as MLC admits, Spotify Premium offers consumers audiobook streaming in addition to on-demand access to musical works. *Id.* ¶¶ 36, 38. Audiobook streaming is quite obviously a distinct "product or service" from music streaming. Books are not music, and audiobook streaming is not music streaming. Second, access to 15 hours of audiobook streaming a month carries more than token value, as demonstrated by the judicially noticeable fact that a robust commercial audiobook market exists, to the tune of *billions* of dollars a year—including (as MLC acknowledges, Compl. ¶ 43) Spotify's

own standalone audiobook subscription service, and comparably priced subscription audiobook services provided by other companies.

In this litigation, MLC takes the baffling position that Spotify should be forced to pay royalties to music publishers on the entire amount of subscription revenue it receives, notwithstanding the inclusion of an expansive audiobook streaming service within that subscription.  That position implausibly denigrates the literary works of authors and book publishers—not to mention the work of narrators, sound engineers, and others whose work goes into the creation of audiobooks—and represents an audacious attempt to renege on the settlement terms to which copyright owners agreed only two years ago.  Because MLC's claim is, on its face, at odds with the plain language of the governing regulations and demonstrably wrong as a matter of law, it should be dismissed with prejudice.

## A.    Spotify Premium is a "Bundle" within the meaning of the royalty regulations

The key regulatory provision at issue here is the definition of "Bundle."  As noted, the regulations define "Bundle" as "a combination of [1] a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads [2] and one or more other products or services [3] having more than token value, [4] purchased by End Users in a single transaction." 37 C.F.R. § 385.2.  It is undisputed that Spotify Premium satisfies the first and fourth requirements of this definition—it includes subscription, on-demand music streaming,[10] and users are charged for Spotify Premium in a single transaction every month.[11]  The only disputed questions here are (a) whether Spotify Premium includes "one or more other products or services" and (b) whether such other product or service has "more than token value."  The answers to both questions are

---

[10] *See* Compl. ¶ 51 (recognizing that "a music service" constitutes "a Subscription Offering providing Eligible Interactive Streams").
[11] *See, e.g.*, Compl. ¶¶ 37–38.

obviously yes, and MLC's complaint provides no factual basis for concluding otherwise.

      **1.**      **Spotify Premium combines music streaming "with one or more other products or services"—i.e., audiobook streaming**

             a.    <u>That audiobook streaming is its own product in the marketplace is sufficient to demonstrate that it is distinct from music streaming for purposes of the Bundle definition</u>

The inclusion of 15 hours monthly of audiobook streaming renders Spotify Premium a combination of "a music service, and 'one or more *other* products and services.'"  Compl. ¶ 51 (quoting 37 C.F.R. § 385.2 (emphasis added)).  The key word—"other"—means "different or distinct from the one mentioned or implied."  *Other, Collins Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/other.  It is beyond dispute that audiobook streaming is a product or service that is "different or distinct" from music streaming. Audiobooks are mainstream products offered by many companies, via downloads and subscription streaming, unconnected to music streaming.  Further, and significantly, books are created and licensed by *different rights holders*—book authors and publishers—who charge separate license fees (entirely outside of the Section 115 license).  Because audiobook streaming is different from a "music service," the audiobook-streaming component of Spotify Premium is inarguably an "other product or service."  Indeed, MLC acknowledges this point, alleging that Spotify Premium "consist[s] of unlimited music and access to ***other audio products***, including up to 15 hours of audiobook listening."  Compl. ¶ 6 (emphasis added).

This commonsense conclusion is reinforced by analogous case law from the antitrust context, where courts often are asked to assess the potential effects to competition when distinct products are "bundled" together.  In that context, courts must determine whether the alleged "bundle" in fact consists of distinct products.  *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) ("[B]undling . . . cannot exist unless two separate product markets

have been linked." (internal quotation marks and citation omitted)). In doing so, courts have applied a simple definition: "[b]undling is the practice of offering, for a single price, *two or more goods or services that **could be** sold separately*.'" *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (emphasis added); *cf. Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 462 (1992) (evidence that the two products "have been sold separately in the past and still are sold separately" is sufficient to conclude that the products are "distinct"). By the same token, it is an obvious and indisputable fact that audiobook subscriptions are a product or service that consumers can and do buy in the marketplace on a standalone basis, which is sufficient to show that audiobook streaming is a distinct product.

b.  The timing of Spotify's reporting of Premium as a "Bundle" is legally irrelevant

Despite acknowledging that "access to . . . audiobook listening" within Spotify Premium counts as an "other audio product[]" distinct from music streaming, Compl. ¶ 6, MLC bafflingly asserts that audiobook streaming is not an "other product or service" under the section 115 regulations, *id.* ¶ 5. MLC's strained theory rests on the fact that Spotify added audiobook streaming to its Premium subscription tier in November 2023, but did not begin reporting Premium as a "Bundle" until March 2024, when it launched Audiobooks Access. *See* Compl. ¶¶ 5, 38. But Spotify Premium met the criteria for Bundle treatment in November, too, and in each month after that; in other words, Spotify could have reported Spotify Premium as a "Bundle" during each of those months as well. But it was not *required* to do so, and MLC cannot point to any legal authority to suggest otherwise. Whether Spotify Premium was a Bundle in any month prior to March is irrelevant to the legal question, which is simply whether, as of March 2024, Spotify Premium contains a music service and some "other" product or service, period. Compl. ¶ 51. As noted, MLC admits that it does. *Id.* ¶ 6.

13

### 2. Audiobook streaming has "more than token value"

Fifteen hours of audiobook streaming per month carries "more than token value." Multiple dictionaries define "token" to mean "minimal," "perfunctory," or "symbolic." *See, e.g.*, *Token*, *American Heritage Dictionary of English Language*, https://www.ahdictionary.com/word/searc h.html?q=token; *Token*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/token; *Token*, *Collins Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/token; *see also T.S. v. Bd. of Educ. of Town of Ridgefield*, 10 F.3d 87, 89 (2d Cir. 1993) (observing that "[p]lain meaning is ordinarily our guide to the meaning of a statutory or regulatory term," and looking to dictionary for source of plain meaning).

These definitions find support in case law. Although no court has yet interpreted "token value" under the *Phonorecords IV* regulations, consistent with its plain meaning, courts—as well as the federal government—have interpreted "token value" to mean "inconsequential" or "insubstantial" value. *See, e.g.*, *Averyt v. Comm'r*, 104 T.C.M. (CCH) 65, 2012 WL 2891077, at *4 (T.C. 2012) (noting IRS guidelines equating items of "token value" with items of "inconsequential" or "insubstantial" value); *see also* Rev. Proc. 90-12, 1990-1 C.B. 471 § 2 (1990) (equating items with "token" value with items of "insubstantial" value); *State v. Gomez*, 673 P.2d 1160, 1162, 1164 (Kan. 1983) (holding that trial court did not err by treating fake $180 bill that had "no intrinsic value" as having "some small token value"); S. Rep. No. 100-515, at 6 (1988) (contrasting "token," or minimal, use with "substantial" use of a trademark); Modernization Updates to Standards of Ethical Conduct for Employees of the Executive Branch, 89 Fed. Reg. 43686, 43688 (May 17, 2024) (describing a "token" gift as one of little financial value).

a.    Common sense alone dictates that audiobook streaming has more
than token value

There can be no serious debate that 15 hours a month of access to a library of over 200,000 audiobooks by many of the world's leading writers has more than minimal, inconsequential, or insubstantial value, *i.e.*, "token value."  MLC's contrary claim strains credulity and is facially implausible.  A court deciding a motion to dismiss is "not require[d] . . . to ignore its common sense." *McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2454192, at *6 (S.D.N.Y. Mar. 29, 2007); *cf. Iqbal*, 556 U.S. at 679 (explaining that "[d]etermining whether a complaint" meets Rule 8's plausibility standard "requires the reviewing court to draw on its judicial experience and common sense").  It is common sense that providing Spotify Premium subscribers the ability to listen to a wide variety of audiobooks carries more than token value.  MLC's complaint even recognizes "television streaming," "news and fitness content," and "cloud storage," as valid non-music bundle components—none of which are materially different from audiobook streaming in having significant independent value.  *See* Compl. ¶ 24.[12]

Although common sense is sufficient on its own to rule in Spotify's favor, it is likewise amply supported by judicially noticeable facts.  "[A] court adjudicating" a Rule 12(b)(6) motion may consider "matters of which judicial notice may be taken."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).  The rough size of the audiobooks market and the services provided and prices charged by competitors are generally known, not subject to dispute, and appropriate for judicial notice.  *See* Fed. R. Evid. 201; *see also, e.g.*, *23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of the content of websites); *Jeanty v. UPS United Parcel Serv. Freight*, No. 21-cv-8311, 2021 WL 5054439, at

---

[12] This allegation is a reference to Apple's "Apple One" bundle, which combines iCloud storage, Apple TV+, Apple News+, Apple Fitness+, and Apple Arcade in a single subscription bundle.  *See Apple One*, Apple, https://www.apple.com/apple-one/.

*1 n.1 (S.D.N.Y. Nov. 1, 2021) ("Generally, courts may take judicial notice of publicly available information, including from a website.").

As noted above, Americans pay over $2 billion for audiobooks annually, and Amazon's Audible service generates more than $1 billion of U.S. revenue from its audiobook subscription plans (priced at $7.95 and $14.95 per month, respectively).[13]  Fifteen hours of streaming is typically sufficient to complete at least one book a month.  For example, the audiobook of *To Kill a Mockingbird* by Harper Lee (and narrated by Sissy Spacek), is 12 hours and 17 minutes in duration.[14]  Barnes & Noble sells that audiobook for $26.99.[15]  Spotify Premium subscribers can listen to this audiobook in its entirety in a single month, using their monthly audiobook streaming allotment, and still have time left over to start their next book.  Accordingly, 15 hours monthly of access to over 200,000 audiobooks through Spotify Premium, *see* Compl. ¶ 45, has obvious and significant value—and certainly more than mere "token" value.

     b.    <u>MLC's attempts to manufacture disputes about irrelevant facts are unavailing</u>

Recognizing that common sense eviscerates its claims, MLC's complaint instead concocts irrelevant allegations about Spotify's consumer pricing and business strategies: (1) that Spotify initially marketed Audiobooks Access in a way that was allegedly hard for potential customers to find on Spotify's website, *see id.* ¶¶ 9, 45, 52; and (2) that Spotify did not *immediately* raise the consumer subscription price of Spotify Premium upon initially adding audiobook streaming to that offering, *see id.* ¶¶ 8, 41, 52.

---

[13] *Member Benefits*, Audible, https://www.audible.com/ep/memberbenefits.
[14] *To Kill a Mockingbird*, Barnes & Noble, *https://www.barnesandnoble.com/w/to-kill-a-mockingbird-harper-lee/1100151011?ean=2940170266890.*
[15] *Id.*

These alleged facts are irrelevant to the legal question of whether 15 hours of audiobook streaming a month has more than token value.  MLC's giant leap from those allegations to the conclusion that audiobook streaming has no more than token value is baseless and unsupported as a matter of law.  *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) ("Under Rule 12(b)(6), the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." (internal quotation marks and citation omitted)).

First, MLC's allegations about marketing of Audiobooks Access have no connection to the legal requirements at issue.  The *Phonorecords IV* regulations do not even require Spotify to *offer* a standalone audiobook streaming product at all, let alone market it in a particular way.  Indeed, the regulations expressly contemplate that a "Bundle" can exist even where the "other product or service" (here, audiobook streaming) is not made available as a standalone product.  *See* 37 C.F.R. § 385.2 (providing method for calculating "Service Provider Revenue" "in the event that there is no standalone published price for a component of the Bundle").[16]

Second, Spotify's decision to maintain the price of Premium for a time after incorporating audiobook streaming has no legal bearing on whether audiobook streaming has only "token value." Businesses may choose to leverage the greater value of an improved product or service by raising prices; but they may also choose to keep prices constant to prioritize customer acquisition,

---

[16] MLC also alleges—in conclusory fashion—that "[i]t *appears*" Audiobooks Access subscribers are granted access to Spotify's ad-free, on-demand music service, rather than Spotify's ad-supported, limited-functionality music service.  Compl. ¶¶ 7, 48 (emphasis added).  But this allegation appears to have been the result of MLC's inadequate pre-suit investigation, and after Spotify informed MLC that the allegation is false, *see* ECF No. 18 at 2 n.2, it appears that MLC has not continued to press this claim in its pre-motion letters, *see* ECF No. 21.  These allegations should be ignored.  *See Iqbal*, 556 U.S. at 678 (holding that courts should disregard "naked assertions devoid of further factual enhancement" (internal quotation marks, citations, and alterations omitted)).

retention, and satisfaction.[17]  *See Eshelby*, 664 F. Supp. 3d at 422 ("Plausibility depends on . . . the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." (citation omitted)).  The regulations do not require services to set prices at a particular level in order to treat products as "Bundles."  *See* 37 C.F.R. 385.2.  Instead, they sensibly leave pricing decisions to the business judgment of the services.  That Spotify chose to keep prices constant for a time after November 2023 is therefore of no moment.  (In any event, even setting aside the legal irrelevance of Spotify's pricing decisions, MLC's allegations are highly misleading, as they fail to acknowledge that Spotify increased its Premium prices in August 2023, just before launching audiobook streaming within Premium.[18]  And it has since followed with further price increases to Premium as of July 2024.[19])  MLC's argument relies on Spotify's consumer pricing and business strategy because it cannot win on the relevant and distinct legal question of whether audiobook streaming has at least token value.

### B.    The complaint should be dismissed with prejudice

"[D]ismissal with prejudice is appropriate when the flaws in pleading are incurable." *Kling v. WHO*, 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) (internal quotation marks and citation omitted). Here, MLC's claim cannot be cured through pleading of additional or different factual allegations; the flaw is a substantive legal one.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming dismissal of complaint without leave to replead because "[t]he problem with [plaintiff's] causes of

---

[17]    *See* Spotify Technology S.A, 2023 SEC Form 20-F, *at* https://s29.q4cdn.com/175625835/files/doc_financials/2023/ar/26aaaf29-7cd9-4a5d-ab1f-b06277f5f2a5.pdf, at 7 (noting that Spotify's "subscription pricing, plans, or our pricing model . . . may not be well-received by consumers and could negatively impact our ability to attract and retain users or generate revenue").

[18]    *Adjusting Spotify Premium Prices in the US,* Spotify (June 3, 2024), https:// newsroom.spotify.com/2024-06-03/adjusting-spotify-premium-prices-in-the-us/.

[19]    *Adjusting Our Spotify Premium Prices*, Spotify (July 24, 2023), https:// newsroom.spotify.com/2023-07-24/adjusting-our-spotify-premium-prices/.

action is substantive; better pleading will not cure it").  For the reasons outlined above, there are no well-pleaded facts that MLC could point to that could ever demonstrate that audiobook streaming is not a distinct service with more than token value.  Dismissal with prejudice is particularly appropriate here because MLC does not pay its own legal fees, as its operating costs (including litigation expenses) are funded by the music streaming services, *including Spotify*.  17 U.S.C. § 115(d)(7)(A).  As a result, MLC is far less constrained by the usual cost/benefit analysis of pursuing legally unsupported claims through litigation.  Accordingly, the complaint should be dismissed with prejudice to curb the significant waste of party and judicial resources already incurred by MLC's misguided exploit.

Dated: August 27, 2024

Respectfully submitted,

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*

Allison L. Stillman
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
Facsimile: (212) 751-4864
Email: alli.stillman@lw.com

Sarang V. Damle
Michael E. Bern (*pro hac vice* pending)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (212) 906-1659
Facsimile: (202) 637-2201
Email: sy.damle@lw.com
          michael.bern@lw.com

*Attorneys for Spotify USA Inc.*