UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MECHANICAL LICENSING COLLECTIVE,

                    Plaintiff,

          v.                                                    No. 1:24-cv-03809 (AT)

SPOTIFY USA INC.,

                    Defendant.


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**


PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000

*Attorneys for Plaintiff Mechanical Licensing
Collective*


Dated: September 17, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 5

    A.    The Section 115 Compulsory Blanket License and the MLC's Role in Administering That License .................................................................................. 6

    B.    The Definitions of "Bundle" and "Bundled Subscription Offering" under Section 115 ...................................................................................................................... 7

    C.    The Characterization of a Subscription Offering as a Bundle Has a Substantial Impact on the Calculation of Royalties under Section 115 ................ 8

    D.    Spotify Premium ............................................................................................. 9

    E.    The Audiobooks Access Plan—Spotify's Pretext for Characterizing Premium as a Bundle ........................................................................................ 11

    F.    Spotify's Premium Subscription Offering Is Not a Bundle ................................ 12

ARGUMENT ...................................................................................................................... 13

I. Accepting the MLC's Allegations as True, and Drawing All Reasonable Inferences in Plaintiff's Favor, the Complaint States a Plausible Claim for Relief .............................. 15

    A.    Premium Does Not Qualify as a Bundle Because It Is Not a Combination of a Music Service and One or More Other Products or Services ....................... 15

    B.    Premium Does Not Qualify as a Bundle Because the Ability to Listen to Up to 15 Hours of Audiobook Content Is of No More Than Token Value to Premium Subscribers ...................................................................................... 18

II. Spotify's Motion Improperly Attempts to Contradict the Detailed Factual Allegations in the Complaint by Relying on Additional Purported Facts from Outside the Four Corners of the Complaint ................................................................................................ 20

III. The Regulatory Language at Issue Involves Mixed Questions of Law and Fact That Are Not Appropriate for Resolution on a Motion to Dismiss ............................................ 24

CONCLUSION ................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, L.L.C.* v. *Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)...................................................................................15

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009).............................................................................................14

*Auriemma* v. *ExxonMobil Oil Corp.*,
  21-CV-5508 (RPK) (PK), 2023 WL 6389755 (E.D.N.Y. Sep. 30, 2023) ...............22

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007).............................................................................................14

*Christa McAuliffe Intermediate Sch. PTO, Inc.* v. *De Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019)...................................................................21

*Corley* v. *United States*,
  11 F.4th 79 (2d Cir. 2021) ..................................................................................14

*Del-Orden* v. *Bonobos, Inc.*,
  No. 17 CIV. 2744 (PAE), 2017 WL 6547902 (S.D.N.Y. Dec. 20, 2017) ...............24

*Epstein* v. *New York City Dist. Council of Carpenters Ben. Funds*,
  15-cv-2866 (PAC), 2016 WL 1718262 (S.D.N.Y. Apr. 28, 2016)..........................22

*Friedl* v. *City of New York*,
  210 F.3d 79 (2d Cir. 2000)...................................................................................14

*Gallardo Solis* v. *Wolf*,
  No. 19 CIV. 5383 (PAE), 2020 WL 5503651 (S.D.N.Y. Sept. 11, 2020).........................25, 26

*Goel* v. *Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016)...........................................................................20, 23

*Kane ex rel. United States* v. *Healthfirst, Inc.*,
  120 F. Supp. 3d 370 (S.D.N.Y. 2015)...................................................................24

*Lake* v. *Arnold*,
  112 F.3d 682 (3d Cir. 1997)................................................................................26

*Lynch* v. *City of New York*,
  952 F.3d 67 (2d Cir. 2020)..................................................................................14

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)...............................................................................25

*Nunes* v. *NBCUniversal Media, LLC*,
    643 F. Supp. 3d 403 (S.D.N.Y. 2022)...............................................................20

*OMG Accessories LLC* v. *Mystic Apparel LLC*,
    19 CV 11589, 2021 WL 1167528 (S.D.N.Y. Mar. 25, 2021)..............................26

*Palin* v. *N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019)...............................................................................15

*Powercap Partner LLC* v. *Fleischmann*,
    No. 20CV3428ARRRML, 2023 WL 6141276 (E.D.N.Y. Sept. 20, 2023) ............20

*Rowe* v. *Old Dominion Freight Lines, Inc.*,
    No. 21-cv-4021 (KMK), 2022 WL 2181619 (S.D.N.Y. June 16, 2022) .........24, 26

*Sacerdote* v. *New York Univ.*,
    9 F.4th 95 (2d Cir. 2021) ................................................................................4, 6, 14

*Sanchez* v. *Treesmiths, Inc.*,
    Civil No. 3:20-CV-858, 2021 WL 1015841 (M.D. Pa. Mar. 1, 2021) ...................26

*Won* v. *Amazon.com*,
    21-CV-2867 (NGG) (RER), 2022 WL 3576738 (E.D.N.Y. Aug. 19, 2022)...........25

*Wujin Nanxiashu Secant Factory* v. *Ti-Well Int'l Corp.*,
    No. 01CIV8871(JCF), 2002 WL 1144903 (S.D.N.Y. May 29, 2002)....................20

**Statutes**

17 U.S.C. § 106(1) ....................................................................................................6

17 U.S.C. § 106(3) ....................................................................................................6

17 U.S.C. § 115.................................................................................................. *passim*

17 U.S.C. § 115(e)(13).............................................................................................8

17 U.S.C. § 115(e)(16).............................................................................................8

Copyright Act............................................................................................................6

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264,
132 Stat. 3676 (2018)................................................................................................7

**Other Authorities**

37 C.F.R. § 385.2 ...............................................................................................2, 15

Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1356
(3d ed.) .................................................................................................................14

Fed. R. Civ. P. 12(b)(6).............................................................................. *passim*

Fed. R. Evid. 201(b).................................................................................................20

Plaintiff Mechanical Licensing Collective (the "MLC") submits this memorandum of law in opposition to the motion to dismiss filed by Defendant Spotify USA Inc. ("Spotify").

## PRELIMINARY STATEMENT

This case has been brought by the MLC because Spotify—one of the largest music streaming services in the United States—has failed to comply with the Copyright Act and its implementing regulations (collectively, "Section 115") and to pay the substantial mechanical royalties Spotify owes to the songwriters and music publishers who create, own and administer the musical works upon which Spotify's business is based. Spotify's motion to dismiss similarly fails to comply with the well-established legal standard governing a Rule 12(b)(6) motion by disregarding or mischaracterizing well-pleaded allegations in the MLC's complaint (the "Complaint"), relying on new purported facts outside of the Complaint in contravention of the case law applicable on a motion to dismiss, and making merits-based arguments concerning mixed questions of law and fact that are inappropriate for adjudication at this preliminary stage of this case. The proper application of the legal standard applicable on a motion to dismiss compels only one conclusion: Spotify's motion should be denied.

As alleged in the Complaint, on March 1, 2024, Spotify, unilaterally and in contravention of Section 115, decided to reduce the revenues it reports, and as a result, the royalties it pays, to the MLC. As the Complaint states, the financial implications are enormous for the creators of the music Spotify has relied on to build its business—with the estimated impact to be about $150 million, just in the next year.

Spotify claims that its flagship Premium subscription plan ("Premium") became a "Bundle"[1] of a music streaming service and a distinct audiobook streaming service under the applicable definitions in Section 115 when it launched its Audiobooks Access plan, a purportedly new subscription plan allowing its subscribers to listen to up to 15 hours of audiobooks per month along with access to Spotify's catalog of music content and other non-music content. As a result, Spotify asserts that Section 115 allowed it to pay royalties on only a fraction of the revenues that it receives from its tens of millions of Premium subscribers. But as the Complaint sets forth in detail—and Spotify simply seeks to wish away in its motion—the launch of this new Audiobooks Access plan had no impact whatsoever on Spotify's obligation to pay royalties on *all* of the revenues Spotify earns from its Premium plan because Premium subscribers *already* had access at the same price to the same 15 hours of audiobook content made available to Audiobooks Access subscribers.

The Complaint alleges that because Premium subscribers continued to get access to exactly the same product before and after the launch of the Audiobooks Access plan, Spotify is not entitled to report Premium revenues and royalties as a Bundle. To qualify as a Bundle, Premium would have to be a "combination" of a music service and "one or more other products or services." Here there was no such combination, but rather a single product. And the Complaint goes further, alleging that Spotify's decision to pay royalties on *all* of Premium's revenues prior to the launch of the Audiobooks Access plan (despite providing the same access to audiobook

---

[1]    Under Section 115, a "Bundle means a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and one or more other products or services having more than token value, purchased by End Users in a single transaction (e.g., where End Users make a single payment without separate pricing for the Subscription Offering component)." 37 C.F.R. § 385.2.

content) is an admission that the addition of that audiobook content did not convert Premium into a Bundle.

The Complaint further alleges another, independent basis for the claim that Spotify is not in compliance with Section 115. As the Complaint explains, even if the audiobook content offered to Premium subscribers could be considered a separate product, it must have more than "token value" for the service to qualify as a Bundle. The Complaint pleads that Spotify's decision not to increase the subscription price when it added audiobook content to the Premium service demonstrates that audiobooks have no more than token value. The Complaint further alleges that Spotify did not raise the price because it recognized that Premium subscribers pay their monthly fees because they want access to tens of millions of musical works on an on-demand ad-free basis, and that the additional audiobook content has only token value to those subscribers.

And, as the Complaint also alleges, the manner in which Spotify launched the Audiobooks Access plan—making it difficult for potential subscribers even to sign up for a subscription to the plan—demonstrates that the plan has token value for Spotify. Indeed, the principal "value" of the Audiobooks Access plan was to provide a pretext for Spotify to claim that it could reduce its mechanical royalty payments under Section 115. Under Spotify's interpretation of a Bundle, it can reduce its songwriter royalty payments by $150 million per year even if no one ever signs up for the Audiobook Access plan and irrespective of whether Premium subscribers actually listen to or value audiobook content. That is wrong; to qualify as a Bundle, audiobook content must have more than token value. The Complaint alleges that it does not.

Spotify's motion invites this Court either to ignore these well-pleaded allegations of the Complaint, or to rely on additional purported facts to contradict those allegations. Neither is appropriate on a motion to dismiss under governing Second Circuit precedent, which requires

3

the Court to accept all of the MLC's factual allegations as true and draw all reasonable inferences in the MLC's favor. *See*, *e.g.*, *Sacerdote* v. *New York Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021). For example, Spotify asserts that its failure to report Premium as a Bundle prior to the launch of the Audiobooks Access plan is "irrelevant" because it "could have" earlier claimed Premium to be a Bundle once it added audiobook content. (Mot. 12–13.) But the allegations of the Complaint— which must be accepted as true—demonstrate the relevance, because the Complaint contends that Spotify's original reporting accurately reflected how Premium (which already included audiobook content) was a single product under Section 115, as opposed to the Bundle claimed by Spotify once it initiated its Audiobooks Access plan. (Compl. ¶¶ 50–51.) Spotify may ultimately try to persuade the Court to ignore its inconsistent reporting of the same Premium offering, but a motion to dismiss is not the appropriate vehicle for it to do so.

Similarly, Spotify argues that the Court can decide the question of "token value" as a matter of law even though, as Spotify concedes, the interpretation of the relevant regulatory language is a question of first impression. (Mot. 14, 16.) That is wrong. The question of token value is inherently a question of fact that turns on an assessment of the value of the audiobook content access at issue to Spotify's Premium subscribers and whether that value meets or exceeds the as yet legally undetermined threshold under Section 115. The fact that other courts in other contexts have defined "token value" is beside the point. And, in any event, insofar as Spotify contends that "token value" may be defined as "minimal value" (Mot. 14), that is precisely what the Complaint alleges—that audiobook content has minimal (if any) value to Premium subscribers.

The remainder of Spotify's "token value" argument demonstrates just how far it strays from the legal standards governing a motion to dismiss. Spotify contends that the Court should take judicial notice of the fact that subscribers pay billions of dollars to audiobook services

operated by companies *other* than Spotify.  (Mot. 16.)  But these extraneous facts are neither subject to judicial notice nor properly considered on a motion to dismiss.  The Complaint specifically alleges that Spotify did not charge for access to the audiobook content when it was added to Premium because it recognized that audiobooks have no more than "token value" to Premium subscribers who purchased the service to get on-demand access to tens of millions of musical works.  That subscribers to audiobook services operated by *other* companies, such as Audible, pay subscription fees to listen to audiobooks does not demonstrate that audiobooks have more than "token value" for Premium subscribers or, for that matter, for Spotify.  If anything, the extraneous facts that Spotify improperly seeks to inject into its motion underscore that there may be a separate group of consumers who more than minimally value audiobook content, but, as the Complaint states, those consumers are not the tens of millions of Premium subscribers.

Finally, the motion to dismiss is premised on Spotify's erroneous argument that courts "routinely" determine questions of regulatory interpretation on a motion to dismiss.  But the standard for granting a motion to dismiss is no different in a case turning on a statute or regulation than in any other context.  Because the allegations of the Complaint must be accepted as true, there are, at a minimum, disputed issues of fact as to whether Spotify has underreported royalties to the MLC in violation of Section 115.  Those questions cannot be resolved at the 12(b)(6) stage.

## STATEMENT OF FACTS

Spotify claims, in a footnote, that "[f]or purposes of this motion, Spotify accepts the facts as alleged in the complaint."  (Mot. 7, n.3.)  Spotify never acknowledges, however, that it accepts those facts *as true*, as the law requires.  Indeed, the "Legal and Factual Background" section of Spotify's motion—which spans nearly 7 pages—cites to and relies on numerous purported facts from outside the four corners of the Complaint, including purported facts that

attempt to contradict the MLC's factual allegations.  For instance, Spotify introduces extraneous facts related to the size of the audiobooks industry, the purported value that book publishers receive from audiobook streaming on Spotify, and the settlement negotiations that led to the codified Section 115 regulations.  Spotify's citation to and reliance on such extraneous facts is entirely antithetical to what may properly be considered on a Rule 12(b)(6) motion.  The only relevant facts on this motion are those alleged in the Complaint, which must be accepted as true and construed liberally in favor of the MLC.  *See e.g.*, *Sacerdote*, 9 F.4th at 106–07.  Those facts, with accompanying citations to the Complaint, are summarized below.

A.     ***The Section 115 Compulsory Blanket License and the MLC's Role in Administering That License***

Section 106 of the Copyright Act grants the owner of a copyright in a musical work certain exclusive rights, including the exclusive rights to reproduce and distribute the work. (Compl. ¶ 16 (citing 17 U.S.C. § 106(1) and (3)).)  Since 1909, the Copyright Act has also made these exclusive rights subject to compulsory licensing in certain situations, provided that there is compliance with applicable statutory and regulatory requirements.  (*Id.* ¶ 17.)  In particular, Section 115 of the Copyright Act provides that the exclusive rights to reproduce and distribute musical works are subject to compulsory licensing in situations involving audio-only sound recordings, or "phonorecords," of "nondramatic musical works."  (*Id.* (citing 17 U.S.C. § 115(a)(1)).)  From 1909 until 2021, this compulsory mechanical license generally required that the licensee first send notice to the copyright owner of each musical work to be used under the compulsory license, and then account and pay monthly royalties directly to each copyright owner. (*Id.* ¶ 18.)

In 2018, as a consequence of the rise of digital music providers and their need for libraries of sound recordings embodying tens of millions of musical works, the Copyright Act was

amended by the Music Modernization Act (the "MMA"), which created a new compulsory blanket license for musical works.  (*Id.* ¶ 19 (citing 17 U.S.C. § 115(d)).)  The compulsory blanket license, which became available on January 1, 2021, allows digital music providers such as Spotify to reproduce and distribute musical works in certain covered activity that includes on-demand streaming, so long as they properly notice their intent to operate under the compulsory blanket license and then comply with its applicable laws and regulations.  (*Id.*)

The MLC is the non-profit organization that was designated by the Register of Copyrights, pursuant to the MMA, to administer the compulsory blanket license, collecting the royalties owed by licensees and distributing those royalties to the songwriters and music publishers to which the royalties are due.  (*Id.* ¶ 21.)

**B.**    ***The Definitions of "Bundle" and "Bundled Subscription Offering" under Section 115***

Section 115 recognizes that digital music providers may operate subscription services that "bundle" distinct products or services together and offer them to consumers at a single subscription price.  (*Id.* ¶ 24.)  For example, a digital music provider might offer a bundled subscription plan that includes cloud storage, television streaming and music streaming.  (*Id.*) Potential subscribers are encouraged to subscribe to a bundle of products or services at a discounted price relative to the aggregate price of subscribing to each of the bundled products or services individually.  (*Id.*)

Under Section 115, a "Subscription Offering" is defined as "an Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle."  (*Id.* ¶ 23 (citing 37 C.F.R. § 385.2).)  A Bundle is defined as "a combination of a Subscription Offering providing Eligible Interactive Streams and/or

Eligible Limited Downloads,"[2] *i.e.*, music, and "one or more other products or services having more than token value, purchased by End Users in a single transaction (*e.g.*, where End Users make a single payment without separate pricing for the Subscription Offering component)."  (*Id.*) And a "Bundled Subscription Offering" is defined as "a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads included within a Bundle."  (*Id.*)

**C.**   ***The Characterization of a Subscription Offering as a Bundle Has a Substantial Impact on the Calculation of Royalties under Section 115***

The revenue reporting and royalty calculation process in Section 115 distinguishes between standalone Subscription Offerings and Bundled Subscription Offerings.  (*Id.* ¶ 25.)  For Bundled Subscription Offerings, the revenue that a digital music provider must report is determined by using "the aggregate of the retail price paid for the Bundle (*i.e.*, all components for one retail price) multiplied by a fraction where the numerator is the standalone retail price of the Subscription Offering component in the Bundle and the denominator is the sum of the standalone retail prices of each of the components in the Bundle. . . ."  (*Id.* ¶ 32 (citing 37 C.F.R. § 385.2).)  Thus, for example, in a situation where a standalone Subscription Offering costs $10 per month, the Service Provider Revenue that the digital music provider must report is $10 less certain permissible reductions (advertising expenses, etc.).  (*Id.* ¶ 33.)  By contrast, in a situation where a standalone Subscription Offering costs $10 per month and a standalone video streaming subscription service costs $10 per month, and a Bundled Subscription Offering containing both services costs $18 per month (a discount of $2 per month), the Service Provider Revenue would be calculated by multiplying the $18 bundled price by a fraction where the numerator is the price

---

[2]   Section 115 defines an "Interactive Stream" as a "digital transmission of a sound recording of a musical work in the form of a stream . . ."  17 U.S.C. § 115(e)(13).  Similarly, Section 115 defines a "Limited Download" as a "digital transmission of a music works in the form of a download . . ."  17 U.S.C. § 115(e)(16).

of the standalone Subscription Offering ($10) and the denominator is the sum of the price for each of the standalone services in the bundle ($10 for the Subscription Offering plus $10 for the video streaming subscription service, or $20).  (*Id.*)  In other words: $18 x ($10 ÷ $20).  Thus, in this illustrative example, the monthly revenue per subscriber that a digital music provider must report to the MLC for purposes of calculating mechanical royalties for that Bundled Subscription Offering would be $9 out of the bundled $18 subscription price.  (*Id.*)

**D.    *Spotify Premium***

Spotify launched its Premium subscription offering in the United States in July 2011.  (*Id.* ¶ 36.)  A Premium subscription provides unlimited on-demand access to tens of millions of sound recordings of musical works.  (*Id.*)  For a number of years, Spotify has enhanced the Premium plan by offering Premium subscribers access to various other types of non-music audio content, including podcasts, comedy shows, and spoken word performances, at no additional charge.  (*Id.* ¶¶ 5, 38.)

Since its launch, Premium has grown to become one of the largest on-demand subscription services in the United States, with more than 44 million subscribers and annual revenues in excess of $5 billion.  (*Id.* ¶ 36.)  On July 24, 2023, Spotify announced an increase to the monthly cost of a Premium subscription to $10.99.  (*Id.* ¶ 37.)  *Several months later*, on November 8, 2023, Spotify began to provide Premium subscribers with up to 15 hours of audiobook content per month as part of their Premium subscription.  (*Id.* ¶ 38.)  As with its prior additions of other types of non-music audio content (such as podcasts), Spotify provided all Premium subscribers with access to audiobook content at no additional charge.  Moreover, those subscribers were not given a choice as to whether or not they wanted access to audiobook content in addition to the unlimited, ad-free on-demand music catalog that continues to be the core of Premium; Spotify unilaterally added the audiobook content to Premium.  (*Id.*)

Spotify initially (and correctly) made no claim that the addition of audiobook content transformed Premium into a Bundled Subscription Offering, nor did it discount the Service Provider Revenue for purposes of calculating the mechanical royalties it owed to rightsholders. (*Id.* ¶ 39.)  In its usage report for March 2024, however, Spotify declared Premium to be a new Bundled Subscription Offering rather than a Subscription Offering.  (*Id.* ¶ 40.)  Spotify made this change without any advance warning to the MLC, and indeed the MLC only officially learned of Spotify's claim that Premium had become a Bundled Subscription Offering when Spotify submitted its March monthly usage report to the MLC on April 15, 2024, along with a cover email pointing out the change.  (*Id.*)

Although Spotify maintains that Premium has become a Bundled Subscription Offering, nothing about the Premium service actually has changed.  (*Id.* ¶ 41.)  The name of the service remains the same.  (*Id.*)  The functionality of the service remains the same.  (*Id.*)  The content available on the service—including unlimited on-demand access to tens of millions of musical works, along with up to 15 hours of audiobook content and many other features and enhancements—remains the same.  (*Id.*)  The subscription price of Premium also remained the same.  (*Id.*)  The only change was Spotify's decision to recharacterize Premium as a Bundled Subscription Offering, which it unilaterally asserted gave it the right to significantly reduce its reported Service Provider Revenue for Premium and, as a result, the amount of mechanical royalties it owed.  (*Id.*)

Spotify's recharacterization of Premium as a Bundled Subscription Offering threatens to cost songwriters and music publishers about $150 million in the next year.  (*Id.* ¶ 42.)  Each month that Spotify continues erroneously to report Premium as a Bundled Subscription

Offering only intensifies that devastating financial impact on the music creators who are the lifeblood of Spotify's multibillion-dollar business.  (*Id.*)

E.  ***The Audiobooks Access Plan—Spotify's Pretext for Characterizing Premium as a Bundle***

Spotify's claim that Premium is now a Bundled Subscription Offering coincided with the March 1, 2024 launch of the Audiobooks Access plan, a purported standalone audiobooks subscription service priced at $9.99 per month for an individual subscription.  (*Id.* ¶ 43.)  At the time the Complaint was filed, Spotify's homepage, which purports to list Spotify's available subscription plans, did not even mention Audiobooks Access as an available plan.  (*Id.* ¶ 44.)  Rather, it appeared that a potential subscriber could find the Audiobooks Access plan only by searching for words such as "Spotify" and "Audiobooks Access" on Google or a similar search engine.  (*Id.* ¶ 45.)  And even if a would-be subscriber did find the Audiobooks Access plan on Spotify's website, Spotify steered consumers to subscribe to Premium, not the Audiobooks Access plan.  (*Id.* ¶¶ 45–47.)

Spotify informs potential subscribers to the Audiobooks Access plan that "the music listening experience" in the Audiobooks Access subscription plan "will be on our free, ad supported service," and that, while subscribers will "[e]njoy 15 hours of listening time from our audiobook subscriber catalog every month," they will not receive "any other Premium features."  (*Id.* ¶ 48.)  It appears, however, that subscribers to the Audiobooks Access plan are granted full access to the same unlimited, on-demand, ad-free music service experience that Premium contains, rather than a more limited ad-supported service.  (*Id.*)  If, in fact, Audiobooks Access subscribers are provided access to Spotify's full catalog of music content (along with the rest of its non-music audio content) on an ad-free basis, then the two plans—Audiobooks Access and Premium—are identical, other than the name and the price.  (*Id.*)

**F.**    *Spotify's Premium Subscription Offering Is Not a Bundle*

Spotify's Premium subscription plan is not a Bundle within the meaning of the regulations implementing Section 115.  (*Id.* ¶ 49.)  As a result, Spotify is not permitted, under the same regulations, to report its Service Provider Revenue as a Bundled Subscription Offering.  (*Id.* (citing 37 C.F.R. § 385.2).)

*First*, to comprise a Bundle, Premium would have to be a "combination of a Subscription Offering providing Eligible Interactive Streams . . . and one or more other products or services. . . ."  (*Id.* ¶ 50 (quoting 37 C.F.R. § 385.2).)  Spotify's reporting and payments to the MLC for periods prior to March 1, 2024 made no claim that Premium qualified as a Bundle, despite the fact that the Premium subscription plan has long included other types of non-music audio content, such as podcasts, comedy recordings, and spoken word content.  (*Id.* ¶¶ 5, 38-39, 50.)  Nor did Spotify claim that Premium qualified as a Bundle for the purpose of reporting Service Provider Revenue or calculating mechanical royalties at the time it added up to 15 hours per month of audiobook content to its Premium service in November 2023.  (*Id.* ¶ 50.)

Spotify's reports to the MLC for periods prior to March 1, 2024 accurately reflected that Premium is a Subscription Offering and not a Bundled Subscription Offering.  (*Id.* ¶ 51.)  Again, Section 115 makes clear that a Bundle must be a "combination" of "a Subscription Offering providing Eligible Interactive Streams" (*i.e.*, a music service) and "one or more other products or services."  (*Id.* (quoting 37 C.F.R. § 385.2).)  Spotify did not combine Premium with any other product or service when it launched Audiobooks Access; it merely added another type of non-music content to its existing service.  (*Id.*)  The Premium service offered to subscribers since March 1, 2024 has precisely the same music and non-music content that it offered to subscribers before that date.  (*Id.*)  As a result, the launch of the Audiobooks Access plan did not result in a "combination" of Premium with any "other products or services" that were not already available

to Premium subscribers. (*Id.*) Moreover, it appears that the two plans—Audiobooks Access and Premium—are substantially identical, which further underscores that the Audiobooks Access plan does not constitute "one or more other products or services" for purposes of the definition of a Bundle under Section 115. (*Id.*, n. 22.)

*Second*, Premium is not a Bundled Subscription Offering under Section 115 because the audiobook content has no "more than token value." (*Id.* ¶¶ 8, 9, 52.) Spotify did not increase the price of Premium when it added audiobook content in November 2023, evidencing Spotify's recognition that audiobook content has no more than token value to the tens of millions of Premium subscribers who purchase the service to get access to tens of millions of sound recordings of musical works on an on-demand, ad-free basis. (*Id.* ¶ 52.) Similarly, Spotify's launch of the Audiobooks Access plan, including but not limited to making it difficult for potential subscribers even to figure out how to find or sign up for the plan, demonstrates that the Audiobooks Access plan has no more than token value to Spotify, particularly in comparison to the billions of dollars it generates each year from Premium.[3] (*Id.*)

For those reasons, among others, Premium is not a Bundled Subscription Offering. (*Id.* ¶ 53.)

## **ARGUMENT**

Spotify's motion pays mere lip service to the relevant legal standard, ignoring or disputing the well-pleaded facts in the Complaint, improperly relying on purported facts from

---

[3]    Specifically, the Complaint alleges that at the time the Complaint was filed, the Audiobooks Access plan sign-up page did not appear to be directly accessible from Spotify's website and that the Audiobooks Access plan was not among the plans that Spotify advertised to potential subscribers at the foot of every single page of its website. (*Id.* ¶ 9, 44-47.) Accordingly, the number of subscribers who sign up for the Audiobooks Access plan is likely to be only a fraction of the number of subscribers to the Premium plan, which further demonstrates that the Audiobooks Access plan has only token value to Spotify. (*Id.* ¶ 9.)

outside the Complaint, and asking that the Court disregard certain critical factual allegations—which are inconsistent with Spotify's preferred reading of Section 115—as "irrelevant."

A motion to dismiss "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1356 (3d ed.); *see also Lynch* v. *City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (on a motion to dismiss, "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence"). Instead, the only question at this preliminary stage is whether the Complaint sets forth a "short and plain statement of the claim showing that the pleader is entitled to relief." *Corley* v. *United States*, 11 F.4th 79, 89 (2d Cir. 2021) (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating this question, "a court must accept as true all of the allegations," and the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). And in doing so, the Court must construe the Complaint "liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote*, 9 F.4th at 106–07.

Dismissal is appropriate only if, even after considering the Complaint's allegations in this most generous light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Friedl* v. *City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (internal citations omitted). Critically, the plausibility standard "does not impose a probability requirement" and instead "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [liability]." *Twombly* at 556. "[I]t is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory. The test is whether the complaint is plausible, not whether it is less plausible

than an alternative explanation." *Palin* v. *N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019). "The choice between or among plausible inferences or scenarios is one for the factfinder." *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).

## I.

### ACCEPTING THE MLC'S ALLEGATIONS AS TRUE, AND DRAWING ALL REASONABLE INFERENCES IN PLAINTIFF'S FAVOR, THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR RELIEF

The only question at this preliminary stage, under this well-established Second Circuit law, is whether the Complaint states a claim for relief that is plausible, liberally construing and accepting all of its factual allegations as true, and drawing all reasonable inferences in the MLC's favor. The Complaint plainly satisfies this test. It sets forth detailed factual allegations as to why Spotify's Premium subscription plan is not a Bundle within the meaning of Section 115, allegations that Spotify's motion simply ignores or disputes in contravention of the governing legal standard.

### A.    Premium Does Not Qualify as a Bundle Because It Is Not a Combination of a Music Service and One or More Other Products or Services

The Complaint alleges that Spotify's Premium subscription plan does not qualify as a Bundle because it is not a "combination" of "a Subscription Offering providing Eligible Interactive Streams," *i.e.*, a music service, and "one or more other products or services." 37 C.F.R. § 385.2. Among other things, the Complaint specifically alleges that:

> Premium is exactly the same service that Spotify offered to its subscribers before the launch of Audiobooks Access. Nothing has been bundled with it. In the months before the purported transformation of Premium into a Bundled Subscription Offering, subscribers could listen to unlimited ad-free music and up to 15 hours of audiobooks each month in return for a $10.99 monthly payment, as well as other non-music audio content available on Spotify's platform, such as podcasts, comedy shows and spoken word performances. The launch of Audiobooks Access resulted in no change at all in Premium. And prior to March 1, Spotify paid

15

mechanical royalties on the entirety of Premium revenues, subject
to certain specific reductions identified in Section 115, despite the
fact that Premium subscribers also had access to the same number
of hours of audiobooks as Audiobooks Access subscribers now
have.  Nothing changed on the day Audiobooks Access launched:
Premium subscribers continue to get the same single product,
providing the same on-demand access to tens of millions of musical
works (along with other audio content) at the same price.  The only
change is that Spotify, by erroneously recharacterizing its Premium
service as a Bundled Subscription Offering, is violating Section 115
and its regulations with respect to its reporting of Service Provider
Revenue and, as a result, underpaying mechanical royalties.

(Compl. ¶ 5.)

In other words, prior to the launch of the Audiobooks Access plan, Spotify offered

Premium subscribers the *same* access to audiobook content that it offers today, without any claim

that Premium qualified as a Bundle, and without any reduction in reporting of revenues and

royalties.  Following the launch of the Audiobooks Access plan, Premium subscribers continued

to receive access to the same single subscription plan, providing the same on-demand access to

tens of millions of sound recordings of musical works (along with a variety of other non-music

audio content) at the same price.  Based on these facts, the Complaint alleges that the Audiobooks

Access plan did not result in a "combination" of Premium with any "other products or services"

that were not already available to Premium subscribers.  (Compl. ¶ 51.)  At a minimum, these

allegations—which must be accepted as true for the purposes of a motion to dismiss—give rise to

a plausible inference that Spotify did not initially change its reporting because it recognized that

the addition of audiobook content to Premium neither altered the fundamental character of

Premium as a Subscription Offering nor transformed Premium into a Bundle.

Rather than accept these factual allegations as true, as it is required to do on this

motion, Spotify instead argues that Premium is a Bundle because "[i]t is beyond dispute that

audiobook streaming is a product or service that is 'different or distinct' from music streaming."

16

(Mot. 12.)  But if the addition of audiobook content indisputably transformed Premium into a Bundle, as Spotify now claims, then Spotify would have characterized Premium as a Bundle as soon as it added audiobook content to Premium many months ago, since doing so would have substantially reduced the royalty payments it was required to make to the MLC.  That it did not do so shows that Spotify itself recognized that the mere addition of some non-music audio content does not automatically convert Premium into a Bundle under Section 115.

Spotify also asserts that it is "irrelevant" that it did not characterize Premium as a Bundle until March 2024.  (*Id.* 12–13.)  But the MLC's allegations about Spotify's prior course of conduct are highly relevant to the dispute because they demonstrate that Spotify knew how correctly to report and pay royalties prior to the launch of Audiobooks Access, and that nothing about those obligations changed as a result of Spotify's decision to add audiobook content to its existing Premium subscription plan.  As the Complaint alleges, a trier of fact can infer from Spotify's course of conduct that the addition of audiobook content to Premium did not transform Premium into a Bundle.

Spotify also attempts to disregard the Complaint's allegations that Premium and Audiobooks Access are essentially the same service, claiming that "[t]hese allegations should be ignored." (Mot. 17, n.16.)  But the mere fact that Spotify disagrees with those allegations does not render them irrelevant for purposes of this motion.  As the Complaint alleges, "Spotify informs potential Audiobooks Access subscribers that, unlike Premium subscribers, they will not have access to unlimited, ad-free, on-demand music," but in fact "new Audiobooks Access subscribers are being granted access to 15 hours of audiobooks content and the *same* access to unlimited, ad-free, on-demand music that Premium subscribers are provided," with "[t]he only difference [being] that subscribers to Audiobooks Access are paying $9.99 per month, rather than $10.99, to receive

the same product."  (Compl. ¶ 7.)  Those allegations, as set forth in more detail in paragraph 48 of

the Complaint, are far from the "naked assertions devoid of further factual development" that

Spotify's motion suggests.  (Mot. 17, n.16.)  To the contrary, these allegations are more than

sufficient, at this stage of the litigation, to support the MLC's allegation that the launch of the

Audiobooks Access plan did not transform Premium into a Bundle.

**B.    Premium Does Not Qualify as a Bundle Because the Ability to Listen to Up to 15 Hours of Audiobook Content Is of No More Than Token Value to Premium Subscribers**

As separate and independent support for its claim, the Complaint alleges that

Premium also does not satisfy the definition of a Bundle because the ability to listen to up to 15

hours of audiobook content is of no "more than token value" to Premium subscribers, who

purchased and continue to pay for the Premium service to get access to tens of millions of sound

recordings of musical works on an on-demand, ad-free basis.  Among other things, the complaint

specifically alleges that:

> Spotify did not increase the price of Premium when it added audiobook listening in November 2023, evidencing Spotify's recognition that audiobook content has no more than token value to the tens of millions of Premium subscribers who purchase the service to get access to tens of millions of musical works on an on-demand, ad-free basis.  Similarly, Spotify's launch of Audiobooks Access, including but not limited to how it is accessed and marketed on its website demonstrates that Audiobooks Access has no more than token value to Spotify, particularly in comparison to the billions of dollars it generates each year from Premium.

(*Id.* ¶ 52.)

The Complaint alleges that Premium subscribers buy the Premium service because

they value the vast catalog of music they can access ad-free and on demand, and that those

subscribers do not place more than token value on the additional audiobook content that they

received even prior to the launch of Audiobooks Access.  The bulk of Premium subscribers bought

the service before Spotify added 15 hours of audiobook content per month to their Premium subscription in November 2023.  (*See id.* ¶ 38.)  And Spotify's decision not to increase the price of Premium when it added the 15 hours per month of audiobook content to the Premium subscription demonstrates Spotify's own recognition that audiobook content has no more than token value to Premium subscribers.  These allegations—that Spotify subscribers do not place more than minimal value on audiobook content and that Spotify would have charged subscribers more for audiobooks if they had more than "token value"—are more than sufficient to state a plausible claim for relief that the addition of monthly audiobook content did not transform Premium into a Bundle.  At a minimum, these allegations create a plausible inference that audiobook content has no more than minimal value to Premium subscribers who paid the same price for the service without any access to such content.

Furthermore, as the Complaint also alleges, the manner in which Spotify launched the Audiobooks Access plan demonstrates that the principal "value" of the Audiobooks Access plan to Spotify was to provide a pretext to claim reduced royalty payments under Section 115.  (*Id.* ¶¶ 8, 9, 52.)  The Audiobooks Access plan sign-up page did not appear to be directly accessible from Spotify's own website at the time the Complaint was filed.  (*Id.* ¶¶ 9, 44–47.)  Nor was the Audiobooks Access plan among the plans that Spotify advertised to potential subscribers at the foot of every single page of its website.  (*Id.* ¶ 9)  Accordingly, the number of subscribers who will sign up for the Audiobooks Access plan is likely to be a fraction of the number of subscribers to the Premium plan.  (*Id.*)  Yet under Spotify's interpretation of a Bundle, it can reduce its payments by $150 million even if no one *ever* subscribes to the Audiobook Access plan and irrespective of whether Premium subscribers actually value audiobook content.  This plainly does not satisfy the

requirement that audiobooks must have more than token value to Premium subscribers in order to qualify as a Bundle.

## II.

### SPOTIFY'S MOTION IMPROPERLY ATTEMPTS TO CONTRADICT THE DETAILED FACTUAL ALLEGATIONS IN THE COMPLAINT BY RELYING ON ADDITIONAL PURPORTED FACTS FROM OUTSIDE THE FOUR CORNERS OF THE COMPLAINT

In addition to improperly disregarding the detailed factual allegations in the Complaint, Spotify also improperly relies on additional purported facts from outside the four corners of the Complaint. Those extraneous facts do not—and cannot—provide any basis for dismissing the Complaint. *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (holding that the district court erred in relying on materials outside the complaint and noting that "[b]ecause a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials"); *Nunes* v. *NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 411 (S.D.N.Y. 2022) ("Generally, courts do not look beyond facts stated on the face of the complaint, documents incorporated in the complaint, matters of which judicial notice may be taken and documents that are 'integral' to the complaint."); *see also Powercap Partner LLC* v. *Fleischmann*, No. 20CV3428ARRRML, 2023 WL 6141276, at *3 (E.D.N.Y. Sept. 20, 2023) (denying motion to dismiss where movant relied on facts outside of the complaint); *Wujin Nanxiashu Secant Factory* v. *Ti-Well Int'l Corp.*, No. 01CIV8871(JCF), 2002 WL 1144903, at *2–3 (S.D.N.Y. May 29, 2002) (same).

Spotify attempts to avoid this well-settled law by claiming that the extraneous sources to which it cites are subject to judicial notice. (Mot. 15–16.) That is not correct. Matters of which judicial notice may be taken are controlled by Rule 201(b) of the Federal Rules of

Evidence.  *See Christa McAuliffe Intermediate Sch. PTO, Inc.* v. *De Blasio*, 364 F. Supp. 3d 253,

262 (S.D.N.Y. 2019).  "Under Federal Rule of Evidence 201(b), '[t]he court may judicially notice

a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial

court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned.'"  *Id.* at 261–62 (quoting Fed. R. Evid. 201(b)).

These circumstances do not apply to the additional purported facts Spotify seeks to

introduce on this motion.  For example:

- Spotify asserts that it "has invested heavily in creating and acquiring other [non-music] forms of content" (Mot. 1);

- Spotify asserts that such non-music content "provide(s) greater value to customers" (*id.*);

- Spotify asserts that such non-music content "attract[s] and retain[s] [customers] on the Spotify platform" (*id.*);

- Spotify asserts that the MLC's position "profoundly devalues the contributions of the tens of thousands of book authors whose works are available with a Premium subscription—from literary luminaries, to mainstays on best sellers lists, to up-and-coming writers who are finding their audience"[4] (*id.* 1–2);

- Spotify asserts that songwriters and music publishers agreed to "favorable language on bundles" "in exchange for" the "highest royalty rate in the history of streaming anywhere" (*id.* 7);

---

[4]    If this were true, then Spotify itself also profoundly devalued the contributions of those authors for the many months that it offered access to their audiobooks on Premium without characterizing the service as a Bundle.

- Spotify asserts numerous purported facts about the size, price points and annual revenues of the audiobooks industry (*id.* 7, 10–11);

- Spotify asserts purported facts concerning its acquisition of an audiobook platform called Findaway, and its offering of audiobooks for *a la carte* download starting in September 2022 (*id.* 7–8); and

- Spotify asserts that its "foray into audiobook streaming has been a success for Spotify and book publishers," and that book publishers have "confirmed that the initial returns [from Spotify's audiobook streaming service] have been solid, in terms of both revenue and reaching new consumers" (*id.* 8).

These are "not the sort of generally known facts that are amenable to judicial notice," which are "typically so obvious they require no independent verification." *Auriemma* v. *ExxonMobil Oil Corp.*, 21-CV-5508 (RPK) (PK), 2023 WL 6389755, at *4 (E.D.N.Y. Sep. 30, 2023) (collecting cases). And even if some of the purported facts Spotify cites were subject to judicial notice, "the court may take judicial notice only 'to determine *what* statements [the public records] contained;'" it "may not take judicial notice '*for the truth of the matters asserted*.'" *Epstein* v. *New York City Dist. Council of Carpenters Ben. Funds*, No. 15 CIV. 2866 (PAC), 2016 WL 1718262, *2 (S.D.N.Y. Apr. 28, 2016) (emphasis in original) (quoting *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). "At bottom, 'a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact.'" *Id.*

Yet that is precisely what Spotify asks the Court to do here. For example, Spotify is not merely asking the Court to take notice of statements set forth in articles or on webpages, it is asking the Court to take notice of the *truth* of these statements. Such an approach is impermissible under the law and risks "permit[ting] the improper transformation of the Rule

12(b)(6) inquiry into a summary-judgment proceeding—one featuring a bespoke factual record, tailor-made to suit the needs of defendants." *Goel* at 560.

That concern applies with particular force here, where Spotify's motion is entirely one-sided in choosing which new facts to include and which to omit. For example, when attempting to argue that "15 hours of audiobook streaming a month carries more than token value" (Mot. 10), Spotify recites purported facts as to the subscription prices and revenues generated by *different* providers who offer consumers access to audiobook content without access to any music content, and based on these extraneous facts, Spotify asserts in a wholly conclusory fashion that audiobook access has "significant independent value." (Mot. 15.) But these purported facts (even if they were properly considered on a motion to dismiss, which they are not) provide no evidence as to whether *Spotify Premium subscribers*—tens of millions of whom subscribed to Premium before the subscription service included any audiobook content at all—consider the addition of audiobook content to have "more than token value" in the context of the tens of millions of songs they already are receiving on-demand and ad-free. That subscribers to audiobook services like Audible pay to listen to audiobooks (Mot. 16) says nothing about whether audiobook content has more than "token value" for Premium subscribers or for Spotify; if anything, it merely underscores that there is a separate group of subscribers who in fact value subscribing to a service that only offers access to audiobooks. Those subscribers, and that offering, have no relevance to assessing the value of audiobook content to Premium subscribers.

Moreover, as the Complaint alleges, the fact that Spotify did not increase the price of Premium when it added audiobook content in November 2023 evidences Spotify's own recognition that audiobook content has no more than token value to Premium subscribers. (Compl. ¶ 8.) And, as the Complaint further alleges, the manner in which Spotify has launched the

Audiobooks Access plan, which impedes and discourages potential subscribers from actually signing up for the plan, reinforces that the addition of access to audiobook content has no more than "token value." (*Id.* ¶ 9.)

**III.**

**THE REGULATORY LANGUAGE AT ISSUE INVOLVES
MIXED QUESTIONS OF LAW AND FACT THAT ARE NOT
APPROPRIATE FOR RESOLUTION ON A MOTION TO DISMISS**

Spotify claims that courts "routinely grant motions to dismiss where the plaintiff's case turns on an erroneous interpretation of unambiguous statutory or regulatory language." (Mot. 10.) If Spotify is arguing that there is a different standard applicable to a motion to dismiss when a question of statutory or regulatory language is involved, that is wrong; the same standard for dismissal applies. *See*, *e.g.*, *Kane ex rel. United States* v. *Healthfirst, Inc.*, 120 F. Supp. 3d 370, 382 (S.D.N.Y. 2015) (using the *Twombly* and *Iqbal* plausibility standards when analyzing a motion to dismiss based on a statutory claim); *Del-Orden* v. *Bonobos, Inc.*, No. 17 CIV. 2744 (PAE), 2017 WL 6547902, at *4 (S.D.N.Y. Dec. 20, 2017) (same).

Not surprisingly, the authorities Spotify cites as support for its proposition that courts "routinely grant motions to dismiss" in circumstances such as these are entirely inapposite. *Rowe* v. *Old Dominion Freight Lines, Inc.* involved a wage misconduct claim where the relevant facts were not in dispute: the parties agreed on the plaintiffs' FLSA-exempt employment status, agreed they had worked overtime, and agreed they had already been paid a particular overtime rate. Instead, the narrow issue before the court was whether plaintiffs could plausibly argue for greater compensation by attempting to fuse two sections of a statute together by adding words not found in the text of the law. *See* No. 21-cv-4021 (KMK), 2022 WL 2181619, at *1, 4 (S.D.N.Y. June 16, 2022) (cited at Mot. 10). And *Gallardo Solis* v. *Wolf* involved another situation where the court specifically found that none of the relevant facts were in dispute—instead, the issue was

24

solely that the plaintiff had attempted to apply an exception provided for in one section of an immigration statute to an entirely different section of the same statute. *See* No. 19 CIV. 5383 (PAE), 2020 WL 5503651, at *1, 4 (S.D.N.Y. Sept. 11, 2020) (cited at Mot. 10). Neither situation is comparable to the MLC's claim in this case. Indeed, in seeking to disregard key factual allegations in the Complaint and instead rely on purported facts from outside the Complaint, Spotify's motion only further demonstrates that there are heavily disputed questions of law and fact at issue here, including what the Section 115 definition of Bundle means in the specific context of Spotify's Premium subscription service.

A Rule 12(b)(6) motion is not the vehicle to resolve such disputes. Instead, for purposes of this motion, the Complaint's detailed factual allegations—including the fact that Spotify did not claim Premium had become a Bundle when it first added audiobook content, and that when it did so months later nothing about the subscription service had changed in terms of content or cost—must be accepted as true, and all reasonable inferences must be construed in plaintiff's favor. At the very least, these allegations raise questions of fact that preclude a finding that Premium qualifies as a Bundle as a matter of law.

That is especially true with respect to the two primary questions that ultimately will be decided here. The question of whether Premium is one product or two products, as well as the question of whether access to audiobook content is of "more than token value" are inherently factual inquiries. As a result, Spotify's references to numerous different product examples and various definitions and interpretations of the term "token value" only confirms the factual nature of the issue. *See*, *e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (finding that mixed questions of law and fact "will rarely be dispositive in a motion to dismiss"); *Won* v. *Amazon.com*, 21-CV-2867 (NGG) (RER), 2022 WL 3576738, *10–12

(E.D.N.Y. Aug. 19, 2022) (denying motion to dismiss where statutory elements involved resolving questions of fact); *OMG Accessories LLC* v. *Mystic Apparel LLC*, 19 CV 11589 (ALC) (RWL), 2021 WL 1167528, *5–6 (S.D.N.Y. Mar. 25, 2021) (denying motion to dismiss until a full record is developed to assist with the statutory analysis).

Spotify has not even come close to demonstrating that the question of what constitutes "more than token value" to Premium subscribers could be decided as a matter of law on this motion, especially considering the Complaint's allegations that tens of millions of people subscribed to Premium before they were granted access to audiobook content, and that Spotify did not change the price of the Premium subscription service when it granted Premium subscribers access to 15 hours per month of audiobook content. There will be a time to address this question, and the other questions of fact raised by the MLC's claim, but only on a full record and after the parties have conducted the discovery that Spotify's ill-conceived motion to dismiss seems designed to avoid.

Resolution of these questions at this stage also is inappropriate because, as Spotify concedes (Mot. 14), no court has yet interpreted the regulatory language at issue. *See Sanchez* v. *Treesmiths, Inc.*, Civil No. 3:20-CV-858, 2021 WL 1015841, *6 (M.D. Pa. Mar. 1, 2021) (denying motion to dismiss where lawsuit presented a "novel question" concerning a recently enacted statute and would benefit from further fact-finding); *see also Lake* v. *Arnold*, 112 F.3d 682, 689 (3d Cir. 1997) (reversing trial court's grant of a motion to dismiss because the case involved a complex question of first impression that could not be decided "on the basis of a comparably incomplete factual record"). No such novel question existed in the cases upon which Spotify relies. Indeed, the finding of "unambiguous" language in those cases was bolstered by the existence of judicial precedent that already had interpreted the regulations at issue. *See Rowe* at *4–5; *Wolf* at *6.

There is no such support to be found here, as no court has yet interpreted the regulatory language at the heart of the MLC's claim.

Spotify's motion provides no basis whatsoever to resolve these novel and fact-specific questions at this preliminary stage. Instead, all reasonable inferences as to the proper construction of the regulation, and the facts supporting that construction, must be construed in the MLC's favor. Applying that well-settled legal standard, which Spotify's motion ignores, the Complaint's detailed factual allegations plainly state a claim for relief.

## CONCLUSION

For these reasons, the MLC respectfully requests that the Court deny Spotify's motion to dismiss in its entirety and with prejudice.

Dated: September 17, 2024
      New York, New York

                                      PAUL, WEISS, RIFKIND,
                                      WHARTON & GARRISON LLP

                                      */s/ Jay Cohen*
                                      Jay Cohen
                                      Darren W. Johnson
                                      1285 Avenue of the Americas
                                      New York, NY 10019-6064
                                      Telephone: (212) 373-3000
                                      jaycohen@paulweiss.com
                                      djohnson@paulweiss.com

                                      *Attorneys for Plaintiff*
                                      *Mechanical Licensing Collective*