**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MECHANICAL LICENSING COLLECTIVE,

        *Plaintiff*,

  v.

SPOTIFY USA INC.,

        *Defendant*.

Case No. 1:24-cv-03809-AT-KHP

**DEFENDANT SPOTIFY USA INC.'S REPLY IN SUPPORT OF
MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ....................................................................................................................... 3

    A.    The dispute here is amenable to resolution on a motion to dismiss because no further factual development is needed ................................................................. 3

        1.    The fact that this case involves a "mixed question of law and fact" and a recently-promulgated regulation does not preclude granting the motion to dismiss ................................................................................. 3

        2.    This dispute can be decided based on the factual allegations of the Complaint .................................................................................................... 5

    B.    Under a proper understanding of the legal standard and the relevant facts, Premium is a "Bundle" of audiobook streaming and music streaming ................... 8

        1.    Audiobook streaming is a "product[] or service[]" other than music streaming .................................................................................................... 8

        2.    Audiobook streaming has "more than token value" ................................. 11

            a.    Audiobooks have more than "token value" under the plain meaning of that term ........................................................................ 11

            b.    MLC's reliance on its allegation that audiobooks have no value to Spotify subscribers is mistaken ......................................... 12

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*,
    489 F. Supp. 3d 106 (E.D.N.Y. 2020) .................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................6, 7, 10, 11

*Basank v. Decker*,
    449 F. Supp. 3d 205 (S.D.N.Y. 2020) ..................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................6

*Ciox Health, LLC v. Azar*,
    435 F. Supp. 3d 30 (D.D.C. 2020) .......................................................................................4

*Epke v. City of New York*,
    No. 20-CV-9143 (AT), 2024 WL 1621207 (S.D.N.Y. Apr. 12, 2024) .................................6

*Fernandez v. Zoni Language Ctrs., Inc.*,
    858 F.3d 45 (2d Cir. 2017) ...................................................................................................4

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) .................................................................................................15

*Gallardo Solis v. Wolf*,
    No. 19-CV-5383, 2020 WL 5503651 (S.D.N.Y. Sept. 11, 2020) .........................................4

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ...............................................................................................12

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Secs. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ..................................................................................7

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) .................................................................................................3

*Lamie v. United States Tr.*,
    540 U.S. 526 (2004) .............................................................................................................7

*LCS Grp., LLC v. Shire LLC*,
    No. 18-CV-2688 (AT), 2019 WL 1234848 (S.D.N.Y. Mar. 8, 2019) ...................................7

*McCagg v. Marquis Jet Partners, Inc.*,
 No. 05-CV-10607, 2007 WL 2454192 (S.D.N.Y. Mar. 29, 2007) ............................................9

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
 No. 22-CV-10185, 2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ..........................................12

*Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*,
 544 F. Supp. 3d 405 (S.D.N.Y. 2021) .......................................................................................7

*OMG Accessories LLC v. Mystic Apparel LLC*,
 No. 19-CV-11589, 2021 WL 1167528 (S.D.N.Y. Mar. 25, 2021) ..........................................3

*Peabody & Co. LLC v. Wayne*,
 No. 22-CV-10316 (AT), 2024 WL 552495 (S.D.N.Y. Feb. 12, 2024) ....................................4

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
 602 F.3d 57 (2d Cir. 2010) ................................................................................................3, 4

*Pickett v. Migos Touring, Inc.*,
 420 F. Supp. 3d 197 (S.D.N.Y. 2019) (AT) ..............................................................................4

*Rolon v. Henneman*,
 517 F.3d 140 (2d Cir. 2008) (Sotomayor, J.) ............................................................................6

*Weinstein v. eBay, Inc.*,
 819 F. Supp. 2d 219 (S.D.N.Y. 2011) .......................................................................................6

*Won v. Amazon.com, Inc.*,
 No. 21-CV-2867, 2022 WL 3576738 (E.D.N.Y. Aug. 19, 2022) ............................................3

**RULES**

Fed. R. Evid. 201(b) ................................................................................................................12

**REGULATIONS**

37 C.F.R. § 385.2 ...................................................................................................3, 5, 13, 14

**OTHER AUTHORITIES**

*Other, Collins Dictionary*,
 https://www.collinsdictionary.com/us/dictionary/english/other (last visited
 Aug. 1, 2024) ............................................................................................................................8

I.      INTRODUCTION

This case is ripe for resolution on the pleadings. Whether Spotify Premium is a Bundle turns on the straightforward and objective requirements of the federal regulations, and MLC's attempts to manufacture factual disputes fall well wide of the mark. As MLC itself concedes (as it must), whether Spotify Premium meets the requirements of a Bundle turns on only two legal questions: (1) Is audiobook streaming an "other product or service" distinct from music streaming?; and (2) Does audiobook streaming have "more than token value?" All the Court needs to know to answer both questions in the affirmative is in the pleadings.

On the first question, it is obvious that audiobooks and music are different products. Even MLC's complaint cannot help but describe "audiobook streaming" as an "*other* audio product" distinct from "unlimited music." Dkt. No. 1 ("Complaint" or "Compl.") ¶ 6 (emphasis added). On the second question, common sense compels the conclusion that, by any objective metric, 15 hours of audiobook streaming—enough time to finish an entire book per month and have time left over to start the next one—has more than "*token*" value, which is a decidedly low bar. Even MLC concedes that many consumers "pay subscription fees to listen to audiobooks." Dkt. No. 28 ("Pl. Br.") 5. Put simply, discovery is not necessary to establish that audiobook streaming—a commercial service that is provided in the market by Spotify's competitors (at material cost)—has more than "token value."

MLC's response fails to show otherwise. In the scant five pages that MLC devotes to addressing the two principal questions at issue, MLC points to no factual allegations in the Complaint that would allow the Court to plausibly conclude that audiobook streaming (1) is indistinct from music streaming or (2) is of no more than token value. Instead, MLC's arguments are red herrings, premised on unsupported speculation about Spotify's subjective reasons for

1

various pricing, product marketing, and reporting cadence decisions. For instance, MLC argues that Spotify's decision to delay reporting Premium as a "bundle" of music streaming and audiobook streaming products, and the manner in which Spotify launched and marketed its separate standalone audiobook streaming product, indicates that Spotify believed audiobooks were not a distinct product from music. Similarly, it argues that Spotify's decision to keep its prices constant for a time after the introduction of audiobook streaming as a component of a Premium subscription is evidence that Spotify believed that audiobooks lacked value.

But whether a product is distinct from music streaming and whether it carries more than token value are (and must be) *objective* inquiries; they do not turn on what Spotify subjectively *believes*. Indeed, the *Phonorecords IV* regulations foreclose inquiries into what a service thinks about the value of the components of a Bundle, for good reason. It would make no sense to have royalty obligations turn on such subjective beliefs, which might be ever-changing, impracticable to discern, and subject to manipulation. It is far more sensible and administrable to rely on the objective characteristics of the components of an asserted Bundle. Indeed, MLC's Complaint is able to identify other undisputed "Bundles" in the marketplace (*i.e.*, those that include "cloud storage," "news," and "fitness" content), without any assessment of whether or how the particular provider or its subscribers *subjectively* value all of the Bundle components. Compl. ¶ 24.

Once it is understood that the relevant inquiry is an objective one, it is clear that the various allegations MLC raises regarding Spotify's reporting timing, pricing, or marketing are irrelevant; none of those requirements is found in the definition of a Bundle, and they shed no light on the questions on which this case turns. Discovery is not necessary to confirm that books are different from music, or that audiobook streaming, a product that consumers pay for independently in the market, has more than token value. The Court should dismiss MLC's complaint with prejudice.

II.     ARGUMENT

    A.   **The dispute here is amenable to resolution on a motion to dismiss because no further factual development is needed**

        1.   **The fact that this case involves a "mixed question of law and fact" and a recently-promulgated regulation does not preclude granting the motion to dismiss**

At the heart of MLC's opposition is the argument that because the question here is a "mixed question of law and fact," that is a sufficient basis to deny Spotify's motion to dismiss. Pl. Br. 1, 24–27. But the only real dispute is a legal one: whether, given the undisputed facts as described in MLC's Complaint, Premium is "a combination of [music streaming] and one or more other products or services having more than token value." 37 C.F.R. § 385.2. The only way to answer this question is to look at what is offered under Premium—which, as discussed *infra*, is not in dispute—and decide as a matter of law whether it meets this definition. No further factual development is needed, and so this is a matter perfectly suited for resolution on a Rule 12(b)(6) motion.[1] To draw an analogy to another area of copyright law, the Second Circuit has recognized that the question of whether two works are substantially similar for the purposes of copyright infringement can be resolved by a district court on a motion to dismiss. *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63–65 (2d Cir. 2010). Although "the issue

---

[1] The cases MLC cites in support of its argument either are mischaracterized or turn on disputed facts not resolvable on a motion to dismiss or on facts not in the record. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (holding that "the materiality element" of Sections 11 and 12 of the Securities Act is rarely dispositive on a motion to dismiss because dismissal is appropriate only where the alleged misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" (citation and quotation marks omitted)); *Won v. Amazon.com, Inc.*, No. 21-CV-2867, 2022 WL 3576738, *10–12 (E.D.N.Y. Aug. 19, 2022) (allowing the case to proceed to discovery where "[f]actual development remain[ed]" to determine whether the truth of various disputed factual allegations); *OMG Accessories LLC v. Mystic Apparel LLC*, No. 19-CV-11589, 2021 WL 1167528, *5–6 (S.D.N.Y. Mar. 25, 2021) (denying motion to dismiss because the defendant's copyright fair use defense turned on facts not yet in the record).

3

of substantial similarity is clearly a factual one," turning on the features of the two works, it is "entirely appropriate" for a district court to resolve that issue in connection with the motion to dismiss, because "the court has before it all that is necessary in order to make such an evaluation." *Id.* at 64 (citation and quotation marks omitted); *see also, e.g., Pickett v. Migos Touring, Inc.*, 420 F. Supp. 3d 197, 206–09 (S.D.N.Y. 2019) (AT) (granting motion to dismiss after "carefully listen[ing]" to the two songs in dispute); *Peabody & Co. LLC v. Wayne*, No. 22-CV-10316 (AT), 2024 WL 552495, at *2–4 (S.D.N.Y. Feb. 12, 2024) (same). Here, the Court can decide this case based solely on the undisputed facts before it. No further fact finding is necessary.

MLC's argument that this case cannot be decided on a motion to dismiss because "no court has yet interpreted the regulatory language at issue," Pl. Br. 26, makes no sense. MLC acknowledges that this case turns on the Court's interpretation of the regulatory language at issue. Settled law holds that questions of statutory and regulatory interpretation are "properly adjudicated in the context of a motion to dismiss." *Gallardo Solis v. Wolf*, No. 19-CV-5383, 2020 WL 5503651, at *2 (S.D.N.Y. Sept. 11, 2020) (citation and quotation marks omitted); *see also Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 48 (2d Cir. 2017) (affirming dismissal based on regulatory interpretation of "other educational institution"); *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 53 (D.D.C. 2020) (noting that "courts routinely deal with complex administrative statutes and regulations" and that there was "nothing uniquely difficult about interpreting [the regulation at issue] that would justify deferring a decision to develop more facts"). Without any support whatsoever, MLC seeks to impose an exception to this basic principle for recently enacted statutes and regulations, suggesting that a court interpreting the law is somehow unable to do so under Rule 12 simply because it is the first time a particular law is being interpreted. The law establishes no such exception. Where, as here, a review of a claim turns on interpretation of

4

regulatory language and application of that language to undisputed facts, the court is well within its authority to conduct that review and dismiss the claim.

### 2. This dispute can be decided based on the factual allegations of the Complaint

The parties are in agreement that, under the terms of the *Phonorecords IV* regulations, whether Spotify Premium amounts to a Bundle turns on whether (a) audiobook streaming is a product or service other than music streaming, and (b) whether audiobook streaming has more than token value. Dkt. No. 25 ("Def. Br.") 10; Pl. Br. 15, 18. Applying the allegations of the Complaint to the regulatory text is sufficient to answer those questions in the affirmative.

Although MLC argues there exist "questions of fact" that preclude a ruling on the pleadings, *see* Pl. Br. 24–27, the answers to the two relevant questions of law turn on only a few *undisputed* facts set forth in the Complaint. Since 2011, Spotify has offered a Premium subscription tier, through which users pay a monthly fee in exchange for on-demand access to tens of millions of musical works. *See* Compl. ¶ 36. In March 2024, Spotify changed how it reported and paid monthly royalties for the Premium subscription tier to MLC, invoking the "bundling" provisions of the blanket license agreed to in settlement of the *Phonorecords IV* proceeding, codified at 37 C.F.R. § 385.2. *Id.* ¶¶ 2, 40. At the time of the change in reporting, a Spotify Premium subscription included 15 hours per month of on-demand audiobook streaming, which MLC admits is an "other audio product[]" in addition to "unlimited music" and other audio. *Id.* ¶ 6. The foregoing allegations are all that the Court needs to know to conclude that Spotify Premium is properly being reported as a "Bundle."

MLC devotes much of its opposition to trying to distract from that dispositive inquiry. It first accuses Spotify of attempting to "contradict" the factual allegations of the complaint. Pl. Br. 1, 3-4, 20-24. But MLC fails to identify a single bona fide, nonspeculative factual allegation

5

that Spotify is purportedly asking this Court to reject in order to grant its motion to dismiss. To the extent that MLC is referring to allegations stating an ultimate legal conclusion, this Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (Sotomayor, J.) (citation and quotation marks omitted); *see also, e.g.*, *Epke v. City of New York*, No. 20-CV-9143 (AT), 2024 WL 1621207, at *2 (S.D.N.Y. Apr. 12, 2024) (noting that plaintiffs "must assert 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do'" and dismissing complaint (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). For purposes of evaluating this Rule 12(b)(6) motion, the Court should ignore such allegations as "Spotify's Premium subscription offering is not a 'Bundle'" and "[A]udiobook content has no 'more than token value," Compl. ¶¶ 49, 52, both of which are legal conclusions. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (rejecting as "conclusory" allegations that the defendant was a "principal architect" of a discriminatory policy as nothing more than a "formulaic recitation of the elements of a constitutional discrimination claim" (citation and quotation marks omitted)).

After ignoring the allegations that merely embody speculation or legal conclusions, what remains are MLC's allegations about the timing of Spotify's price increases and its treatment of Spotify Premium as a Bundle. *See, e.g.*, Pl. Br. 16–17. But Spotify is not "contradicting" those allegations; rather, those allegations, even if true, are *legally irrelevant*. As Spotify has explained, nothing in the text of the *Phonorecords IV* regulations required Spotify to increase its product's price or immediately claim it as a Bundle. Def. Br. 13, 18; *see also, e.g.*, *Weinstein v. eBay, Inc.*, 819 F. Supp. 2d 219, 226 (S.D.N.Y. 2011) ("[T]he Court cannot rewrite a statute because Plaintiff attributes improper motives to Defendant's actions; the reasons for omitting the face value on reissued electronic tickets are simply irrelevant in light of clear statutory authority

6

to so do."); *Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004) (rejecting the petitioner's attempt to "read an absent word into the statute" and redefine "attorney" as "debtors' attorney"); *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*, 489 F. Supp. 3d 106, 132 (E.D.N.Y. 2020) ("Under the casus omissus pro omisso habendus est canon, a law should not be read to include matter it does not include." (citation and quotation marks omitted)). All that matters is whether, at the time Spotify invoked the Bundle regulations, Spotify Premium satisfied the requirements to be a "Bundle" as set forth in the text of the regulation. As explained previously and *infra*, it plainly did (and does).

MLC also criticizes Spotify for introducing extraneous "facts from outside the four corners of the Complaint." Pl. Br. 20. But the facts to which MLC points, *see id.* 21–22, are not necessary to grant Spotify's motion to dismiss, and largely provide background and context. At the same time, courts need not bury their heads in the sand and set aside both common sense and common knowledge. MLC does not dispute that "[d]etermining whether a complaint states a plausible claim is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 413 (S.D.N.Y. 2021) (quoting *Iqbal*, 556 U.S. at 679); *LCS Grp., LLC v. Shire LLC,* No. 18-CV-2688 (AT), 2019 WL 1234848, at *13 (S.D.N.Y. Mar. 8, 2019) (same). Accordingly, this Court need not ignore indisputable facts—including the existence and rough size of the audiobooks market, and the services provided and prices charged by other audiobook providers—especially considering MLC's own acknowledgement of the existence of that market, *see* Pl. Br. 5 (acknowledging "subscribers to audiobook services operated by *other* companies, such as Audible, pay subscription fees to listen to audiobooks"); *see also, e.g.*, *In re Merrill Lynch & Co., Inc. Rsch. Reps. Secs. Litig.*, 289 F. Supp. 2d 416, 419, 421 n.6 (S.D.N.Y. 2003)

7

(granting Rule 12(b)(6) motion after taking notice of "the burst of the notorious internet bubble which directly intervened during plaintiffs' ownership of the securities and caused the virtual destruction of their stock holdings, before the accrual of their claims"); *Basank v. Decker*, 449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) (AT) (taking judicial notice of the effects of COVID-19 on people of advanced age and with underlying health problems).

      **B.**      **Under a proper understanding of the legal standard and the relevant facts, Premium is a "Bundle" of audiobook streaming and music streaming**

As MLC concedes, resolution of whether Spotify Premium is a Bundle turns on two straightforward questions: whether the audiobook streaming included in Premium subscriptions is "one or more other products or services" besides music streaming, and whether audiobook streaming has "more than token value." Pl. Br. 25 (describing these as "the two primary questions"); Def. Br. 10 (same). There is no need for discovery to answer those questions. They can be answered as a matter of law by interpreting the regulatory language according to its plain meaning, and applying common sense to the factual allegations in MLC's Complaint. Taking this approach, there can be no dispute that Premium qualifies as a Bundle and that MLC fails to state a plausible claim.

      **1.**      **Audiobook streaming is a "product[] or service[]" other than music streaming**

The first question is whether Premium combines music streaming with "one or more other products or services." More specifically, the question is whether 15 hours of on-demand audiobook streaming is a "product[] or service[]" other than music streaming.

The answer is yes. As Spotify explained, "other" means "different or distinct from the one mentioned or implied." Def. Br. 12 (citing *Other, Collins Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/other (last visited Aug. 1, 2024)). Audiobooks are "different or distinct" from music streaming. Put simply, one product is recorded

8

books and the other is music. Audiobooks come from the book publishing industry, not the music industry; they are licensed by different rightsholders; they derive from the work of different authors and creators; and they serve different purposes for consumers. This Court need not ignore what is common sense. *Cf. McCagg v. Marquis Jet Partners, Inc.*, No. 05-CV-10607, 2007 WL 2454192, at *6 (S.D.N.Y. Mar. 29, 2007) (finding that the plaintiff's construction of the relevant product market in an antitrust case was implausible and noting, in ordering dismissal on the pleadings, that "Rule [12(b)(6)] does not require the Court to ignore its common sense"). Moreover, case law from the antitrust context confirms the conclusion that music streaming and audiobooks are different, explaining that products within a "bundle" that have been or could be sold separately are considered distinct. *See* Def. Br. 12–13.

MLC largely concedes the point. It acknowledges that services like "cloud storage," "television streaming," and "news and fitness content" are "other products" that would qualify a subscription tier for Bundle treatment. Compl. ¶ 24; Pl. Br. 7–8. Just as "television streaming" (and the rest) are "other products," so too is "audiobook streaming." This conclusion is so obvious that even MLC could not avoid admitting it when drafting its own Complaint—describing Spotify Premium as "consist[ing] of unlimited music and access to *other audio products, including up to 15 hours of audiobook listening*." *Id*. ¶ 6 (emphasis added).

In its opposition, MLC does not challenge the definition of "other product[] or service[]" that Spotify proposed, nor does it provide a competing definition. MLC also does not contest the various differences between audiobooks and music streaming that Spotify pointed to in its opening brief. *See* Def. Br. 12–13. MLC makes no mention of the analogous antitrust cases concerning bundling. *Id.* at 13. Nor does it even attempt to explain away its own description of "up to 15 hours of audiobook listening" as an "other audio product" distinct from "unlimited music."

9

Compl. ¶ 6.  Indeed, MLC makes no effort at all to interpret or apply the meaning of the key regulatory phrase: "one or more other products or services."  *See* Pl. Br. 15–18.

Instead, MLC focuses attention on allegations that bear no relation to the regulation's plain text.  Rather than attempting to draw on objective criteria showing that audiobook streaming is not an "other" product beyond music streaming (because it cannot do so), MLC instead tries to draw inferences from Spotify's "course of conduct" between November 2023 and March 2024 to suggest "that the addition of audiobook content to Premium did not transform Premium into a Bundle."  *Id.* at 17.  That alleged course of conduct includes Spotify's decision to not immediately increase the price of Premium when it began including audiobook streaming in November 2023; Spotify's decision not to report Premium as a bundle until March 2024, after it launched its Audiobooks Access subscription tier; and the alleged availability of ad-free music within Spotify's Audiobooks Access product.  *Id.* at 16-17.

These allegations do not advance MLC's position for two reasons.  First, the regulations do not tie the determination of whether a product like audiobook streaming is distinct from music streaming to an individual platform's decisions regarding the timing of price increases or royalty reporting changes, nor to its decisions on how to design products other than the asserted Bundle.  Second, Spotify's course of conduct does not plausibly shed light on whether audiobook streaming is or is not an "other product or service."  MLC has no insight into the various business and logistical considerations that may have informed Spotify's decisions related to such tangential issues.  There is thus no basis for the Court to credit MLC's rank speculation about why Spotify made those decisions, nor MLC's further speculation that such decisions related to Spotify's views about whether audiobooks and music are different products.  *Cf. Iqbal*, 556 U.S. at 681 (declining to credit allegations of discrimination "given more likely explanations").  Nor can one plausibly

10

infer anything about whether audiobook streaming is a "product or service" "other" than music streaming based on the MLC's implausible and nonsensical claim that, contrary to its public marketing, Spotify somehow surreptitiously provides Audiobooks Access subscribers with Premium-tier music, *see* Compl. ¶ 46; Pl. Br. 17–18, particularly considering there is no need under the regulations to have provided a standalone audiobook product *at all*.

Instead, the relevant, and straightforward, legal question—whether audiobook streaming is an "other product or service" distinct from music streaming—simply requires addressing this question: are audiobooks different from music? Obviously they are, and no non-speculative factual allegations support the contrary conclusion. Because, under any reasonable interpretation of the term, audiobook streaming is a "product[] or service[]" "other" than music streaming, the first issue is easily resolved as a matter of law in Spotify's favor.

### 2. Audiobook streaming has "more than token value"

The second issue is whether 15 hours of audiobook streaming has "more than token value." Here, too, the answer is yes.

### a. Audiobooks have more than "token value" under the plain meaning of that term

As confirmed by both dictionary definitions and case law, "token value" means "minimal," "perfunctory," or "insubstantial" value. *See* Def. Br. 14–15. It is common sense that a product that allows subscribers to stream 15 hours of audiobooks per month plainly has more than insubstantial or perfunctory value.

This conclusion is only confirmed by the existence of a robust market for audiobooks and audiobook subscription and rental services, including through companies like Audible (Amazon) and Barnes & Noble. *See id.* at 15–16. To ask the Court to ignore the existence of a market for audiobooks is to ask it to set aside "judicial experience and common sense." *Iqbal*, 556 U.S. at

11

679. Indeed, contrary to MLC's assertion, *see* Pl. Br. 23, the basic fact that a market exists for audiobooks, *i.e.*, multiple companies sell audiobooks or audiobook subscriptions at various prices that are publicized on their websites, is "not subject to reasonable dispute." *See* Fed. R. Evid. 201(b). Even MLC cannot bring itself to question that fact, *acknowledging* that "subscribers to audiobook services operated by other companies, such as Audible, pay subscription fees to listen to audiobooks." Pl. Br. 5. Courts regularly take "judicial notice of readily ascertainable and understandable price data." *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, No. 22-CV-10185, 2023 WL 9102400, at *12 (S.D.N.Y. Dec. 29, 2023) (emphasis omitted) (collecting cases); *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."). Undisputed, publicly available information about the price of audiobooks and audiobook subscriptions, a plain reading of the regulatory text, and the application of basic common sense thus leave no doubt that the availability of 15 hours of audiobook streaming per month is of "more than token value."

        b.    <u>MLC's reliance on its allegation that audiobooks have no value to Spotify subscribers is mistaken</u>

Tellingly, MLC concedes that objectively, a product that, standing alone, provides 15 hours of audiobook streaming would be of more than token value to consumers. *See* Pl. Br. 23 (asserting that services like Audible show that there is a "group of subscribers who in fact value subscribing to a service that only offers access to audiobooks"). Grasping for some way to manufacture a claim, MLC implausibly speculates that *Spotify Premium subscribers* are different—and consider audiobooks worthless. *See id.* at 18 (arguing that "Premium does not qualify as a Bundle because [audiobook streaming] is of no more than token value to Premium subscribers").

Even setting aside whether MLC has set forth any well-pleaded factual allegations that

12

support their claim (which they have not, as discussed *infra*), MLC's reliance on that allegation in support of its argument suffers from a more fundamental flaw. As a legal matter, assessing the value of a Bundle's components does not—and practically speaking, *cannot*—require a service or MLC to delve into the psyches of individual subscribers to assess what they subjectively think of the non-music components of a bundled product. This is so for three reasons.

*First,* the *Phonorecords IV* regulations foreclose use of a subjective inquiry. They specifically require parties to measure the value of Bundle components based on an objective assessment of public facts, not the individualized preferences of any given set of subscribers. The definition of "Service Provider Revenue" in 37 C.F.R. § 385.2 provides the rules for determining what revenues should be used to calculate royalties owed to MLC. In the section addressing Bundles, the definition provides a mechanism for assessing relative value of non-music streaming products "in the event that there is no standalone published price for a component of the Bundle"— that is, if the non-music component of the Bundle is not sold individually. Specifically, the regulations first provide that the platform "shall use the average standalone published price for End Users for the most closely comparable product or service in the U.S.," and then provide that, "[i]f no reasonably comparable product or service exists in the U.S., then the Service Provider may use another good faith, reasonable measure of the market value of the component." *Id*. Because the regulations look to the objective value assigned to a product by the broader market when calculating the amount of royalties due in relation to a Bundle, it would make no sense to ignore that broader market value when evaluating whether a product carries more than "token" value for purposes of determining whether the product is a Bundle to begin with.

*Second*, the subjective test of token value that MLC proposes would be unworkable as a practical matter. MLC frames the question as whether audiobook streaming has more than token

13

value to "Premium subscribers," but it offers no guidance on how that invented-for-litigation standard should be satisfied. For instance, does each and every Bundle subscriber of any blanket licensee have to "value" the non-music streaming component of a Bundle to meet MLC's definition? Or is the relevant threshold a majority of subscribers, or even just a few? And what would it even mean for a subscriber to a Bundle to "value" the non-music streaming product of that Bundle? None of these questions is relevant to the legal standard, because none of them is even referenced in passing in the regulations.

Indeed, the *Phonorecords IV* regulations, which were the product of an industry-wide settlement, apply to *all* music streaming platforms, which need to understand whether their subscription offerings are entitled to Bundle treatment. Under MLC's subjective definition of "token value," any platform that wants to characterize a subscription as a Bundle would have to collect undefined but potentially exhaustive information on the habits and practices of its subscribers to investigate the value of constituent aspects of the Bundle to them. For good reason, 37 C.F.R. § 385.2 does not require or contemplate this amorphous endeavor.

*Third*, MLC's Complaint itself undercuts its position that the "token value" inquiry depends on the subjective value subscribers place on a subscription's individual components. As an example of "the type[s] of [Bundles] [the *Phonorecords IV*] regulations are meant to cover," the Complaint describes a subscription tier that includes "cloud storage, television streaming and music streaming" and another that "might include those same products, plus additional ones such as news and fitness content." Compl. ¶ 24. Notably, however, MLC is able to classify such services as Bundles without providing any data on whether those particular providers' subscribers *personally value* cloud storage, news, or fitness content, and to what individual extent. In so doing, MLC makes clear that services are Bundles based on *what* they include, and whether those

14

products and services objectively carry value in the broader market—not some subjective inquiry into the minds of particular subscribers. Under MLC's implausible interpretation, by contrast, a subscription offering *identical* services might count as a Bundle for one provider, but not another; and for one subscriber, but not another. MLC points to nothing in the text of, nor history leading to, the *Phonorecords IV* regulations that supports that unworkable construction.

Even setting aside the fundamental legal flaw underlying MLC's invocation of the subjective views of Spotify subscribers, MLC has also failed to plead facts sufficient to support its rank speculation that audiobook streaming in fact "has minimal (if any) value to Premium subscribers." Pl. Br. 4. MLC points to two allegations to support that conclusion: (a) that Spotify's decision not to increase the price of Premium in November 2023 (when audiobook streaming was introduced) "evidenc[es] Spotify's recognition that audiobook content has no more than token value" to Premium subscribers, and (b) that the manner of "Spotify's launch of Audiobooks Access . . . demonstrates that Audiobooks Access has no more than token value to Spotify." Compl. ¶ 52; *see also id.* ¶¶ 8–9. But there is no inherent connection between the timing of Spotify's price increases—which occurred in 2023 and 2024, though not at the moment audiobook streaming was introduced—and Spotify's beliefs about the value of audiobooks to its subscribers, much less about what the subscribers themselves might believe. Similarly, there is no logical link between Spotify's launch and marketing of Spotify's Audiobooks Access product and the value that subscribers to Spotify's *separate* Premium product place on the audiobook listening component of that product. These "unwarranted deductions," *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (citation omitted), should be ignored.

Because no plausible facts could support MLC's claim, this case should be dismissed with prejudice.

15

Dated: October 1, 2024

Respectfully submitted,

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*

Allison L. Stillman
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
Facsimile: (212) 751-4864
Email: alli.stillman@lw.com

Sarang V. Damle
Michael E. Bern (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: sy.damle@lw.com
         michael.bern@lw.com

*Attorneys for Spotify USA Inc.*