PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
SAN FRANCISCO
TOKYO
TORONTO
WASHINGTON, DC
WILMINGTON

DIRECT DIAL: (212) 373-3163
EMAIL: JAYCOHEN@PAULWEISS.COM

October 16, 2024

**VIA ECF AND EMAIL**

The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl St., New York, NY 10007

*Mechanical Licensing Collective* v. *Spotify USA Inc.*, No. 1:24-cv-03809

Dear Judge Torres:

Pursuant to Your Honor's Individual Rules of Practice in Civil Cases § II(C), the parties in the above-referenced matter submit this joint letter to seek the Court's assistance in resolving a dispute regarding Defendant Spotify USA Inc.'s Responses & Objections to Plaintiff Mechanical Licensing Collective's First Set of Requests for Production of Documents (the "Responses"), which are attached hereto as Exhibit A.

The parties met and conferred in good faith via Zoom on September 18, 2024 for approximately two hours. The lawyers involved in the discussion were Darren Johnson of Paul, Weiss, Rifkind, Wharton & Garrison LLP on behalf of the Mechanical Licensing Collective (the "MLC"), and Allison Levine Stillman and Sy Damle of Latham & Watkins LLP on behalf of Spotify USA Inc. ("Spotify"). The parties' respective positions are set forth below.

*Plaintiff's Position*

Through this case, the MLC seeks to compel Spotify to comply with the Copyright Act and its implementing regulations (collectively, "Section 115") and to pay the substantial mechanical royalties it owes to the songwriters and music publishers who create, own and administer the musical works upon which Spotify's business is based. As set forth in the complaint, on March 1, 2024, Spotify unilaterally decided to substantially reduce the revenues it reports (and royalties it pays) to the MLC for its Premium subscription plan ("Premium") by claiming that Premium qualifies as a "Bundle" within the meaning of Section 115. To do so, Premium would have to be a "combination" of a music service and "one or more other products or services having more than token value." Spotify began reporting Premium as a Bundle of a music streaming service and an audiobook streaming service when it launched its Audiobooks Access plan, which allows subscribers to listen to up to 15 hours of audiobooks per month. But, as the complaint alleges, the launch of Audiobooks Access did not convert Premium into a Bundle because Premium subscribers *already* had access to the same 15 hours of audiobook listening made available to Audiobooks Access subscribers. This allegation is supported, *inter alia*, by Spotify's reporting and payment to the MLC in the months leading up to Audiobooks Access when Spotify reported

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

all revenue and made no claim of a Bundle even though its subscribers had the same access to the same audiobook content. Moreover, Spotify did not increase the subscription price when it added audiobook content to the Premium service because it recognized that Premium subscribers pay their monthly fees to get access to tens of millions of musical works on an on-demand ad-free basis, and that the ability also to listen to a limited number of hours of audiobooks has only token value to those subscribers. Nor did it make any efforts to promote Audiobooks Access as it would if it were a true standalone product.

These allegations, as set forth in greater detail in the complaint, provide the basis for the document requests the MLC served on Spotify. Yet Spotify has refused to produce any documents in response to many of the MLC's requests, and has sought to unreasonably narrow other requests, all in an effort to avoid producing the very documents the MLC requires to support its claim. For example, Spotify has refused to produce *any* documents concerning:

- Spotify's integration and launch of audiobooks as part of Premium (Req. No. 6);
- Spotify's launch of its Audiobooks Access and Basic (music-only) plans, including its decisions of whether and when to launch a separate audiobooks subscription plan and a music-only subscription plan, and the factors considered in reaching those decisions (Req. Nos. 7, 8, 32 and 37);
- Documents sufficient to show the design, user experience and technical architecture of Audiobooks Access (Req. No. 9);
- Testing, analysis or evaluation of different approaches related to the provision of Premium music content and audiobook content (Req. No. 10);
- Whether Spotify's offering of audiobooks content with Premium is treated as a Bundle under Spotify's other content license agreements (Req. No. 27);
- Spotify's decision as to whether and how to advertise and/or promote Audiobooks Access and Basic, how they did in fact advertise or promote Audiobooks Access and Basic, and their budget for doing so (Req. Nos. 33, 34, 36, 38, 39 and 41);
- Spotify's decision to offer Basic only to existing Premium subscribers (Req. No. 42);
- The extent to which adding audiobook content to Premium was anticipated to (and did in fact) impact the number of Premium subscribers and/or the revenues and profits generated by Premium (Req. Nos. 43-44);
- The extent to which the new Audiobooks Access and Basic plans were anticipated to (and did in fact) impact the number of Premium subscribers and/or the revenues and profits generated by Premium (Req. Nos. 43, 46-48);
- The number of anticipated and actual subscribers to Audiobooks Access (Req. No. 50);
- The revenues and profits generated by Audiobooks Access (Req. No. 55); and
- The amount consumers are (or may be) willing to pay for unlimited, ad-free access to music (Req. No. 59).

Spotify also has said it will produce only those documents it unilaterally deems to be "sufficient to show" the following:

- The expansion of Spotify's business model into audiobooks, including, for example, budget proposals and financial projections (Req. No. 5);
- The music content and functionality of Audiobooks Access, and any changes to that content or functionality since inception (Req. No. 12);
- Spotify's decisions to set the subscription prices for Audiobooks Access, Premium and Basic (Req. Nos. 15-17);
- The value of audiobook content, rather than (as the MLC requested) all documents concerning the respective values consumers place on music and non-music content offerings on Premium (Req. No. 58); and
- The amount consumers are (or may be) willing to pay for audiobook content, rather than (as the MLC requested) all documents concerning the amount consumers are (or may be) willing to pay for access to 15 hours of audiobook content (Req. No. 60).

And for certain requests where the MLC sought documents "sufficient to show" specific information, Spotify has sought to narrow the scope of those requests even further by agreeing to produce only:

- The number of actual subscribers to Premium and Basic, but not the anticipated number of subscribers (Req. Nos. 49 and 51);
- The number of unique Premium subscribers who listened to audiobooks, but not the number who listened to musical works and podcasts (Req. No. 52);
- The total hours of audiobook listening by Premium subscribers, but not the total hours Premium subscribers listened to musical works and podcasts (Req. No. 53); and
- The revenues generated by Premium, but not the profits (Req. No. 54).

Spotify is refusing to produce these documents, or substantially narrowing the scope of what it will produce, based on relevance, burden and "duplicative" grounds. But the documents the MLC seeks are plainly relevant to its claims and Spotify has failed to identify any undue burden in responding to the requests as drafted. It is well-settled in this Circuit that "relevance, for purposes of discovery, is an extremely broad concept," *John Wiley & Sons, Inc.* v. *Book Dog Books, LLC*, 298 F.R.D. 184, 185 (S.D.N.Y. 2014), and that documents should be produced so long as "there is 'any possibility' that the information sought to be obtained may be relevant to the subject matter of the action." *MacCartney* v. *O'Dell*, No. 14-CV-3925 (NSR), 2018 WL 5023947, at *2 (S.D.N.Y. Oct. 17, 2018). That liberal discovery standard is easily satisfied by the requests at issue here, all of which go to the very heart of the MLC's claim. For example, Request No. 27 seeks information related to Spotify's decision to characterize Premium as a Bundle, which is central to the MLC's claim. Request Nos. 5 and 6 seek information about the addition of audiobooks to Premium, including financial models, subscriber projections and marketing strategies, which is critically important to whether the addition of that content transformed Premium into a Bundle. Request Nos. 7, 8, 14, 17, 32-34, 36-39, 41, 42, 45-48, 50, 51 and 55 seek information concerning Spotify's launch, pricing and marketing strategy for its Audiobooks Access and Basic plans, including its failure to promote those plans, which is necessary to show that those plans were a pretext so that Spotify improperly could claim that Premium had become

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

a Bundle, even though nothing about Premium had changed. Further, information about Spotify's launch of the standalone services is directly relevant to the question of whether audiobooks add more than token value to Premium because that information sheds light on the relative value that Spotify and its customers place on the ability to stream audiobook content and music content. Request Nos. 9-12 seek information necessary to show that the content and functionality of Audiobooks Access is substantially similar—if not identical—to the content and functionality of Premium, which will demonstrate that Premium is not a "combination" of a music service and "one or more other products or services." Request Nos. 15 and 16 seek information about Spotify's pricing of Premium, which will further evidence that nothing about Premium had changed, and that the addition of audiobook listening does not have more than token value to Premium subscribers. Request Nos. 23, 43, 44, 49, 52, 53, 58, 59 and 60 concern the respective value that music, audiobooks and other non-music content has to Spotify and its Premium subscribers, which will further show that the addition of audiobook listening does not have more than token value. And Request No. 54 seeks documents sufficient to show the profits generated by Premium, which is necessary to rebut Spotify's assertion that the royalties it previously paid to songwriters and music publishers are now being paid to book authors and publishers. Nor is Spotify's claim that some of these requests are "duplicative" a good faith basis to withhold plainly relevant documents from production. The scope of each of the requests is clearly different, and the fact that "it is conceivable that responses to [one request] may include certain documents and communications already produced in response to [another]" does not alter Spotify's obligation to produce responsive documents. *Jessore Mgmt. SA* v. *Brit Syndicate 2987*, No. 20CV5849ATKNF, 2021 WL 4037849, at *14 (S.D.N.Y. Sept. 3, 2021). Finally, Spotify should not be permitted to narrow its production to documents "sufficient to show" when doing so would only allow Spotify to shield from the MLC the very documents that evidence Spotify's bad faith mischaracterization of Premium as a Bundle.

Spotify attempts to support its position below by blatantly misconstruing the NMPA's general objections to Spotify's subpoena. *See* Exhibit B at 3, NMPA's Responses and Objections to Defendant's Subpoena to Produce Documents. In fact, the NMPA objects on the ground that *Spotify has claimed* the only issue at hand is a pure matter of law, and that Spotify's attempt to force third-parties to engage in discovery is particularly unwarranted given *Spotify's* position on that issue. *Id.* In any event, the NMPA's third-party responses and objections do not bind the MLC.

For these reasons, the MLC respectfully requests that the Court order Spotify to produce responsive documents to the foregoing requests in full and as they originally were drafted.

***Defendant's Position***

This case centers on a single issue: whether, beginning in March 2024, Spotify correctly reported its Premium subscription offering as a Bundle as defined in the *Phonorecords IV* regulations. *See* 37 C.F.R. § 385.2 (defining a "Bundle" to be a combination of music streaming and "one or more other products or services having more than token value, purchased by End Users in a single transaction"). MLC does not allege that Spotify misreported Premium (or otherwise

violated Section 115) prior to March 2024; it does not allege that Spotify is misreporting any other subscription tier; and it does not allege that Spotify failed to obtain appropriate licenses for either audiobooks or music in any of its subscription tiers. Resolving MLC's claim is a straightforward matter of applying the regulatory language to the products and services offered in Premium and confirming whether monthly audiobook streaming is a "product[] or service[]" other than music streaming that has "more than token value." *See, e.g.*, Dkt. 25 ("Def. Br.") 10–18; Dkt. 29 ("Def. Reply Br.") 8–15.

Indeed, both Spotify and the National Association of Music Publishers ("NMPA")—which, *unlike MLC*, were parties to the *Phonorecords IV* proceedings and negotiated the very terms being interpreted in this case—agree that "extrinsic evidence and discovery" is "irrelevant[] and unnecessary to" the "pure questions of law" at the heart of this case. *See* Exhibit B at 3, NMPA's Responses and Objections to Defendant's Subpoena to Produce Documents. For this reason, as discussed further in a concurrently filed pre-motion letter Spotify respectfully requests that discovery be stayed until the Motion to Dismiss the Complaint has been resolved.[1]

MLC's approach to discovery here only highlights the need for resolution of this gating legal question in the first instance. Despite the narrow scope of its asserted cause of action and the limited universe of facts relevant to this case, MLC has propounded over sixty Requests for Production ("RFPs"), seeking extremely broad, invasive examination of a wide range of topics for a period of over three-and-a-half years, and which MLC refused to narrow following the parties' meet and confer.

Despite the significant overbreadth and irrelevance of virtually all of MLC's discovery requests, Spotify has agreed to produce documents responsive to *fifty-three* of the MLC's requests. In recognition of the limited number of issues in dispute, Spotify has sought to narrow the scope of many requests to address overbreadth and relevance, and has asked MLC to articulate any relevant scope of numerous requests that are duplicative. However, MLC has refused. Spotify has already agreed to take on a remarkable burden, collecting and reviewing tens of thousands of documents (if not more). The MLC's refusal to compromise on any of its requests is entirely unreasonable.

Beyond the significant discovery Spotify has agreed to produce, the RFPs in dispute go well beyond what could possibly "be relevant to the subject matter of the action." *MacCartney v. O'Dell*, No. 14-cv-3925, 2018 WL 5023947, at *2 (S.D.N.Y. 2018).

*MLC Seeks Irrelevant Information Concerning Subscription Tiers Not In Dispute*

Over half of the RFPs in dispute seek a wide range of information concerning Spotify's Audiobook Access and Basic subscription tiers, which are not in dispute, and which MLC does

---

[1] Spotify's Motion to Dismiss the Complaint in its entirety is fully submitted, with the Reply having been filed on October 1, 2024. *See* Def. Reply Br.

not challenge.[2] The information MLC seeks—including "All Documents" about how Spotify has marketed Audiobooks Access or Basic and the decisions behind the pricing of those products—has nothing to do with the two questions that both parties agree dictate the resolution of this case: whether audiobook streaming is a product or service other than music streaming and whether it is of more than token value. *See* Dkt. 28 ("Pl. Br.") 25 (describing these as "the two primary questions"). Though MLC attempts to defend the relevance of its further requests for even more granular information about these subscription tiers, its position relies on a fundamental mischaracterization of both its own case and Spotify's arguments. In the opening paragraph of its position statement, MLC alleges that "the launch of Audiobooks Access did not convert Premium into a Bundle." Spotify has never claimed that Audiobooks Access "convert[ed]" Premium into a Bundle. Indeed, Spotify has repeatedly explained that Spotify Premium is a Bundle with the addition of audiobook streaming; the timing of the launch of Audiobooks Access was and is irrelevant to whether Premium is a Bundle. *See, e.g.*, Def. Br. at 17; Def. Reply Br. at 9–11. MLC cannot defend its overbroad discovery requests by imputing to Spotify arguments that MLC has invented and Spotify has squarely disclaimed. There is no sound legal basis for forcing Spotify to engage in a highly burdensome search for sensitive financial and business documents that have no role in this case. *See, e.g., Alcon Vision, LLC v. Lens.com, Inc.*, No. 18-cv-407, 2021 WL 200981, at *3 (E.D.N.Y. Jan. 20, 2021) (denying discovery into the plaintiff's treatment of products not at issue in the litigation, which the defendant argued would show that the plaintiff's stated motivations were "pretextual"); *Valdo v. CMFG Life Ins. Co.*, No. 23-cv-3234, 2023 WL 5561171, at *3 (S.D.N.Y. Aug. 29, 2023) (denying discovery into insurance policies "other than the policy at issue" as irrelevant). Nonetheless, Spotify has agreed to provide certain information related to these subscription tiers, including documents concerning user experience, pricing, advertising, and number of subscribers, in response to RFP Nos. 11, 12, 15, 17, 24, 25, 35, 40, 51, 56, and 61, which ought to be sufficient to give the MLC an understanding of the basic facts about these two tiers of service.

To the extent that Spotify has pressed MLC to limit the scope of certain RFPs, it has done so only where requests go beyond any possible relevance. For example, RFP No. 9 asks for "Documents sufficient to show the design, user experience (UX/UI), and technical architecture of Audiobooks Access, including primary documents related to design specifications, wireframes, prototypes, system architecture, software framework and underlying codebase." Even assuming requests related to Audiobooks Access have any role in this case, MLC has not articulated any justification for the degree of granular, technical, and commercially sensitive information it requests about either subscription tier. In none of the papers that the MLC has filed to date—a Complaint, a pre-motion letter, and an opposition to Spotify's motion to dismiss—have these technical details of Spotify's product even been *mentioned* as a relevant factor to assessing whether a product is a Bundle (because they are not). Spotify is hard-pressed to understand how documents related to wireframes or codebase have any bearing on whether audiobook streaming is a product

---

[2] Twelve disputed RFPs concern Spotify's Audiobooks Access subscription tier (including RFP Nos. 7, 9, 11, 12, 15, 33, 34, 36, 45, 46, 50, and 55). An additional ten disputed RFPs concern Spotify's Basic tier (RFP Nos. 8, 17, 37, 38, 39, 41, 42, 47, 48, and 51).

or service distinct from music streaming that has more than token value. To say nothing of the fact that the user interface, and "content and functionality" of Audiobooks Access and other Spotify products, are publicly available and readily accessible to MLC without any discovery whatsoever.

*MLC Seeks Irrelevant and Duplicative Information Concerning Premium*

In an additional thirteen disputed RFPs (RFP Nos. 6, 10, 14, 16, 23, 27, 43, 44, 49, 52, 53, 54, 58), MLC seeks a wide range of irrelevant information about Premium, including why Spotify decided to include audiobook streaming in Premium (RFP No. 6), the pricing of Premium (RFP Nos. 14, 16), the potential impacts to the number of Premium subscribers (RFP Nos. 43, 44, 49), and the "A/B testing, multivariate testing, user testing, or other comparative analyses" of different versions of the Premium platform (RFP No. 10). MLC argues that these requests are "important to whether the addition of [audiobook content] transformed Premium into a Bundle." Yet as Spotify explained in the Motion to Dismiss briefing, none of these topics goes to the question of whether Premium is properly characterized as a Bundle, and discovery into them is therefore unrelated to the sole claim in this case. *See, e.g.*, Def. Reply Br. at 9–14. Nowhere does the regulatory definition of Bundle make any reference to a subscription's price, the reasons why the provider included the different components of that subscription, or whether those components attract subscribers. Moreover, nowhere in this litigation has MLC ever articulated how these considerations fit into the regulatory definition, such that they would apply to all service providers and not just Spotify. *See id.* at 13–14. And even assuming these considerations were relevant, MLC ignores that Spotify has *already agreed to produce* documents regarding the basis for Spotify's pricing decisions, the number of subscribers to Premium, and how many subscribers listen to audiobooks, and the value of audiobooks to Premium subscribers. *See* RFP Nos. 1, 3, 11, 14, 16, 19, 23, 26, 49, 52, 53, 54, 57, and 58. MLC is not entitled to conduct a fishing expedition in search of documents to support an unarticulated, unsupported, and invented legal standard.

The remaining RFPs identified by MLC (RFP Nos. 5, 32, 59, and 60) all suffer similar issues of irrelevance, unnecessary burden, and/or repetitiveness. RFPs 59 and 60 seek "All Documents" concerning the amount consumers are willing to pay for unlimited ad-free music and fifteen monthly hours of audiobook listening, respectively. Yet MLC has promulgated numerous other RFPs that seek this exact same information about the value consumers place or may place on the different components of Premium, including RFP Nos. 5, 6, 15, 32, and 57. Spotify has already agreed to produce documents sufficient to show the value of audiobook content in response to RFP No. 59, and need not agree to requests that are both unnecessarily burdensome and duplicative. RFP Nos. 5 and 32, which seek "All Documents concerning the expansion of [Spotify's] business model into audiobooks content" and "All Documents concerning Your decision as to whether, and if so when, to launch a separate audiobooks subscription plan," respectively, suffer similar issues. In response to RFP No. 5, Spotify agreed to produce documents "sufficient to show the reasons it expanded its business into audiobooks content," which will give MLC insight into why Spotify decided to offer audiobooks (though Spotify maintains that its reasons for offering audiobooks are irrelevant to the litigation). Here, too, anything beyond the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

8

"documents sufficient to show" this information that Spotify has agreed to produce would be cumulative and unnecessarily burdensome.

While Spotify has made good faith efforts to resolve the disputes it can, it cannot agree to requests that are overly broad, unduly burdensome, and, *by all authoritative accounts*, substantively irrelevant. Spotify requests that the Court deny MLC's request.

\*    \*    \*

Respectfully submitted,

| **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** | **LATHAM & WATKINS LLP** |
|---|---|
| */s/ Jay Cohen*<br>Jay Cohen<br>Darren W. Johnson<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Telephone: (212) 373-3000<br>jaycohen@paulweiss.com<br>djohnson@paulweiss.com<br><br>*Attorneys for Plaintiff Mechanical Licensing Collective* | */s/ Allison Levine Stillman*<br>Allison Levine Stillman<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Telephone: 212-906-1200<br>alli.stillman@lw.com<br><br>Sy Damle<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DC 20004<br>Telephone: 202-637 2200<br>sy.damle@lw.com<br><br>*Attorneys for Defendant Spotify USA, Inc.* |