UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MECHANICAL LICENSING COLLECTIVE,

                     Plaintiff,

            -against-

SPOTIFY USA INC.,

                     Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/29/2025__

24 Civ. 3809 (AT)

**OPINION AND ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Mechanical Licensing Collective ("MLC"), a government-appointed music license administrator, brings this action against Defendant, Spotify USA Inc. ("Spotify"), an audio streaming platform, alleging that Spotify failed to report and pay the royalties required by U.S. copyright law for the use of musical works. *See generally* Compl., ECF No. 1. Specifically, MLC claims that Spotify violated § 115 of the Copyright Act, 17 U.S.C. § 115(c)(2)(I), (d)(4)(A), and (d)(8)(B), and its implementing regulations, 37 C.F.R. Part 385 (including § 385.21(a), (d), and Appendix A) and § 210.27, by incorrectly reporting to MLC that its "Premium" subscription service, which includes both music and audiobook streaming, is a "Bundled Subscription Offering" under the implementing regulations. *See* Compl. ¶¶ 54–58. MLC seeks the royalties that Spotify would have paid if it had instead designated Premium as a standalone "Subscription Offering," as well as the late fees, attorneys' fees, costs, and interest authorized by statute and regulation. *Id.* ¶ 60(a)–(f).

Before the Court is Spotify's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 24; *see also* Def. Mem., ECF No. 25; Pl. Mem., ECF No. 28; Def. Reply, ECF No. 29. For the reasons stated below, the motion is GRANTED.

**BACKGROUND**

I.     <u>Factual Background</u>[1]

A.  MLC and § 115 Royalties

Under § 115 of the Copyright Act, qualifying digital music providers are granted a statutorily mandated (*i.e.*, "compulsory") blanket license to reproduce and distribute musical works for certain purposes, including streaming.  Compl. ¶ 19.  The statute and its implementing regulations require licensees to pay royalties for the use of those musical works.  *See generally* 17 U.S.C. § 115; *see also* Compl. ¶¶ 20, 25, 35.  MLC is the entity designated by the U.S. Register of Copyrights pursuant to § 115 to administer the compulsory blanket license, collect the royalties owed by licensees, and distribute those royalties to the songwriters and music publishers to which they are due.  17 U.S.C. § 115(d)(3); Compl. ¶¶ 20–21.  Section 115 authorizes MLC, as the administrator of the compulsory blanket license, to take "legal action" to "enforce rights or obligations" associated with the compulsory license.  17 U.S.C. § 115(d)(3)(G)(ii); Compl. ¶ 22.

The Copyright Act and its implementing regulations set forth a complicated formula for the calculation of compulsory license royalties.  As relevant here, the formula distinguishes between "Subscription Offerings" of music and "Bundled Subscription Offerings" of music. Compl. ¶¶ 25, 32; *see generally* 37 C.F.R. § 385.21.  A "Subscription Offering" is a covered activity under the compulsory license—for example, music streaming—that is offered to users for a fee "for defined subscription periods of 3 years or less (in contrast to, for example, a service where the basic charge to users is a payment per download or per play)."  *Id.* § 385.2.  A "Bundled Subscription Offering" is a Subscription Offering that is included in a "Bundle," which

---

[1] The following facts are taken from the complaint, which the Court must accept as true for the purposes of this motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

is "a combination of a Subscription Offering . . . and one or more other products or services having more than token value, purchased by [users] in a single transaction (*e.g.*, where [users] make a single payment without separate pricing for the Subscription Offering component)." *Id.*

One of the differences between Subscription Offerings and Bundled Subscription Offerings is the amount of revenue from licensed activity (*e.g.*, music streaming) that digital service providers must report for the purposes of calculating royalties due. For Subscription Offerings, providers are required to report "all revenue" they obtain from subscribers, subject to certain reductions. Compl. ¶¶ 26, 32. For Bundled Subscription Offerings, providers are required to report revenue based on the weight of the retail price of the individual component products or services of the Bundle if they were sold as standalone products or services, relative to the retail price of the Bundle. *See id.* ¶ 32. As an illustration, if a Subscription Offering is priced at $10.00 per month, the revenue the provider must report is $10.00 per month per subscriber, minus applicable reductions. *Id.* ¶ 33. By contrast, for a Bundled Subscription Offering consisting of the same Subscription Offering plus another product (*e.g.*, a video streaming service), both of which, standing alone, would be priced at $10.00 per month but are now offered as a Bundle for $18.00 per month, the revenue that the digital music provider would be required to report for § 115 purposes is only $9.00.[2] *See id.* Additional steps of the royalty formula further reduce the total royalties due for Bundled Subscription Offerings compared to standalone Subscription Offerings. *See id.* ¶ 34 (citing 37 C.F.R. § 385.2(d)(3)–(4)).

The formula also accounts for the possibility that each component of a Bundle may not be sold as a standalone product or service. The regulations provide that, when calculating the

---

[2] The $9.00 in revenue is the price of the Subscription Offering ($10.00) divided by the sum of the prices of the items that comprise the Bundle if they were sold as standalone products ($20.00), which, here, would be 0.5, multiplied by the bundled price ($18.00). *See* Compl. ¶ 33; 37 C.F.R. § 385.21.

price of the various products or services within a Bundle, if "there is no standalone published price for a component of the Bundle, then the [digital service provider] shall use the average standalone published price for [users] for the most closely comparable product or service in the U.S."  37 C.F.R. § 385.2.

In sum, the royalties a digital service provider like Spotify must pay to MLC depend partly on the revenue received in connection with compulsory-licensed activity (*e.g.*, music streaming), and the formula accounts for the reduced portion of revenue derived from such activity when the relevant Subscription Offering is just one part of an overall Bundle that includes products or services other than compulsory-licensed activity.

B.  Spotify Premium and Audiobooks Access

Spotify is one of the largest music streaming services in the United States, offering its users access to an extensive online library of music for streaming and download, as well as other audio content.  *See* Compl. ¶¶ 6, 12, 19.  It operates with a blanket license under § 115.  *Id.* ¶ 1.

Spotify's most basic product offering is free access to a limited-functionality music streaming service supported by advertisements.  *Id.* ¶ 36 n.15.  For a monthly fee, Spotify users may subscribe to "Premium," which offers unlimited, on-demand access to Spotify's library of musical works, without advertisements.  *Id.* ¶ 36.  Premium has more than 44 million subscribers and annual revenues in excess of $5 billion.  *Id.*

In 2015, Spotify added short-form videos and podcasts to its Premium offering, making those products available to Premium subscribers at no extra cost.  *Id.* ¶ 38 n.17; *see id.* ¶ 39.  In July 2023, Spotify increased the monthly cost of Premium to $10.99.  *Id.* ¶ 37.  Four months later, Spotify began providing up to 15 hours of audiobook listening per month to Premium users as part of their Premium subscription.  *Id.* ¶ 38.  When Spotify initially added the 15 hours of

audiobooks listening to the Premium plan, it did not change or discount its revenue reporting to MLC, nor did it change the price of the Premium plan. *Id.* ¶ 39. Spotify continued to report to MLC that Premium is a standalone Subscription Offering. *Id.*

On March 1, 2024, Spotify launched a new subscription plan called "Audiobooks Access." *Id.* ¶ 43. According to Spotify, the Audiobooks Access plan includes 15 hours of audiobook listening, does not include any other Premium features, and costs $9.99 per month. *Id.* ¶ 48. In fact, Spotify provides Audiobooks Access subscribers with the same unlimited, on-demand, and ad-free music-streaming service that is included in the Premium plan. *Id.* The Audiobooks Access and Premium plans are, therefore, virtually identical, other than the name and price of the plans ($9.99 versus $10.99). *Id.*

Coinciding with the launch of Audiobooks Access, Spotify began reporting to MLC that Premium is a Bundled Subscription Offering that comprises both music streaming and audiobook streaming. *Id.* ¶ 40. It is estimated that Spotify's decision to categorize Premium as a Bundled Subscription Offering rather than a standalone Subscription Offering will cost the music industry $150 million in royalties in the first year alone. *See id.* ¶¶ 41–42.

## II.    Procedural History

MLC filed its complaint in May 2024, asserting a single cause of action against Spotify for violating § 115 of the Copyright Act by reporting Premium as a Bundled Subscription Offering rather than a standalone Subscription Offering. *See generally* Compl. Spotify moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 24.

## DISCUSSION

## I.    Legal Standard

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id.* On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

II. Application

MLC claims that by reporting Premium as a Bundled Subscription Offering that consists of both music streaming and audiobook streaming, Spotify has significantly reduced the royalties it pays to musicians and music publishers and violated § 115 of the Copyright Act. As stated, § 115's implementing regulations define a Bundle as "a combination of a Subscription Offering [*e.g.*, music streaming] . . . and one or more other products or services having more than token value, purchased by [users] in a single transaction (*e.g.*, where [users] make a single payment without separate pricing for the Subscription Offering component)." 37 C.F.R. § 385.2.

Spotify contends that, under the facts as alleged by MLC, Premium unequivocally qualifies as a Bundle, and the music it allows users to stream on Premium is, therefore, a Bundled Subscription Offering. Def. Mem. at 10. Neither party argues that Premium users do not purchase the products and services included within Premium "in a single transaction," *i.e.*, in "a single [monthly] payment without separate pricing for the Subscription Offering [*i.e.*, music streaming] component." 37 C.F.R. § 385.2. The only disputed issue is whether MLC's

allegations suffice to show that (1) Premium's 15 hours of monthly audiobook streaming is not a "product[] or service[]" "other" than music streaming, or that (2) the 15 hours of monthly audiobook listening included within Premium is of no "more than token value." *Id.*

The Court finds that § 115 and its implementing regulations are unambiguous, and that the only plausible application of the law supports Spotify's position. Under the facts as alleged, audiobook streaming is a product or service that is distinct from music streaming and has more than token value. Premium is, therefore, properly categorized as a Bundle, and the allegations of the complaint do not plausibly suggest otherwise.

### A. Whether Audiobook Streaming Is an Other Product or Service

In its complaint and opposition to Spotify's motion to dismiss, MLC argues that audiobook streaming is not some "other product[] or service[]" that is combined with music streaming in the Premium plan. Compl. ¶¶ 6–7; Pl. Mem. at 15–18.

Section 385.2 of the implementing regulations does not define the phrase "other products or services." The meaning of the phrase is plain, however, and no party contends that the meaning is ambiguous or that the Court should ascribe specialized meaning to the phrase or its terms.[3] *See Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms." (citation omitted)). Spotify contends that 15 hours of audiobook streaming is plainly a "product[] or service[]" "other" than music streaming, and that MLC's allegations do not plausibly suggest otherwise. Def. Mem. at 10.

---

[3] Although MLC suggests that it would be inappropriate for a court to dismiss a claim based upon application of an ambiguous statute, *see* Pl. Mem. at 24, 26, MLC does not advance any argument that the statute or its implementing regulations are ambiguous.

Indeed, MLC appears to recognize that "non-music audio content . . . such as podcasts, comedy shows[,] and spoken word performances" are included within Premium and are "other" products or services in the ordinary sense of the words.  Compl. ¶ 5; *see id.* ¶ 39.  It argues that Premium's offering of audiobook streaming is different, however, not because audiobook streaming and music streaming are the same product or service, which they plainly are not, but because Spotify already included 15 hours of audiobook streaming as part of Premium when it launched the Audiobooks Access plan.  *See* Pl. Mem. at 10, 13, 16; Compl. ¶ 5.  It necessarily follows, MLC contends, that Premium does not represent a "combination" of music streaming and some "other product[] or service[]."  37 C.F.R. § 385.2.  In other words, MLC argues that § 385.2's reference to "other products or services" means other *preexisting*, standalone products or services.  Because Premium already included 15 hours of audiobook streaming when Spotify launched Audiobooks Access, MLC argues, Premium is not a Bundle that combines the benefits of the Premium and Audiobooks Access plans.

The problem for MLC is that the regulations do not say "other preexisting, standalone products or services," and the Court finds no basis to read words into the law that are not there.  *See Minda v. United States*, 851 F.3d 231, 236 (2d Cir. 2017) (declining to "ignore[] the plain words of the statute and . . . read words into the statute that are not there").  The regulations expressly contemplate that a Bundle can include components that are not offered as standalone products or services.  *See* Compl. ¶ 32 ("Where 'there is no standalone published price for a component of the Bundle, then the [provider] shall use the average standalone published price for [users] for the most closely comparable product or products in the U.S." (quoting 37 C.F.R. § 385.2)).  The Court, therefore, agrees with Spotify that the launch of the Audiobooks Access

plan has no bearing on whether Premium combines music streaming and some other product or service within a single package.  *See* Def. Mem. at 13.

Once Spotify added 15 hours of monthly audiobook streaming to Premium in November 2023, it combined music streaming with another product or service in a single offering.  *Id.*  The launch of Audiobooks Access months later did not alter that reality.  *See* Compl. ¶ 5 ("The launch of Audiobooks Access resulted in no change at all in Premium.").  MLC suggests that Spotify's launch of Audiobooks Access was "a pretext for Spotify to claim that it could reduce its [] royalty payments under [§] 115," Pl. Mem. at 3, but even if Spotify's decision were pretextual, that would not change the fact that Audiobooks Access "resulted in no change at all in Premium," Compl. ¶ 5, and therefore had no impact on whether Premium constituted a Bundle.  That Spotify did not immediately report Premium as a Bundle to MLC in November 2023 although it could have, and thus likely paid more in royalties to MLC than it was otherwise required to pay, does not mean that Spotify's later decision to reclassify Premium as a Bundle is invalid.  MLC points to no provision of § 115 or its implementing regulations that suggests that a digital service provider like Spotify forfeits the opportunity to report an offering as a Bundle simply because it previously did not do so.  Nor does MLC provide support for its argument that launching a similar or even identical Bundle to one that already existed means that one or both of the packages no longer qualify as a Bundle.[4]

Section 385.2's definition of a Bundle is plain and unambiguous.  A provider must offer a combination of a qualifying Subscription Offering (*e.g.*, music streaming) and some other

---

[4] MLC's allegation that Audiobooks Access includes the same 15 hours of audiobook streaming and unlimited, ad-free music as Premium does but at a lower price is, therefore, irrelevant to whether Premium constitutes a Bundle.  *See* Compl. ¶ 7; Pl. Mem. at 11.  Even if Audiobooks Access looks very similar or is identical to Premium in all respects other than price, *see* Pl. Mem. at 12–13, that does nothing to change the fact that Premium, as alleged, includes compulsory-licensed music streaming "and one or more other products or services"—here, audiobook streaming.  37 C.F.R. § 385.2.

product or service, purchased together with a single payment in a single transaction. *See* 37 C.F.R. § 385.2. The definition does not require that the package combine two or more preexisting, standalone products or services. Applying the Bundle definition to the facts as alleged, the Court can draw only one conclusion: that Premium, which includes unlimited music streaming in addition to 15 hours of monthly audiobook streaming, is a "combination" of a Subscription Offering (*i.e.*, music streaming) and at least one "other product[] or service[]." *Id.*

B. Whether Audiobook Streaming Has More than Token Value

MLC contends, in the alternative, that Premium does not qualify as a Bundle because the 15 hours of monthly audiobook streaming it includes are of no more than token value to Spotify or its subscribers. Pl. Mem. at 18–20. This argument, too, fails.

Section 385.2 of the implementing regulations provides that the "other products or services" must "hav[e] more than token value" for the package to qualify as a Bundle. 37 C.F.R. § 385.2. Although the phrase "token value" is not defined in the regulations or statute, Spotify contends that the words mean exactly what they say. If the other products or services included within the offering have, as a general matter, "more than token value," then the offering is a Bundle. Def. Reply at 8, 11.

MLC disagrees. It argues that a product or service has more than token value for purposes of § 385.2 only if it contributes to a meaningful price increase when offered as a package with a Subscription Offering, such that the price of the package is greater than the price of any of its individual components. *See* Pl. Mem. at 13. Because Spotify added 15 hours of audiobook streaming to Premium without raising the price of the plan, MLC contends, audiobook streaming has no more than token value to Spotify or its Premium subscribers—even

if audiobooks do have intrinsic value in a philosophical sense or monetary value within a broader market. *See id.* at 5, 13; Compl. ¶ 8.

MLC's definition of "token value" has intuitive appeal. To most consumers, a "bundle" is the combination of multiple products or services sold together at a discount, such that the price of the bundle is greater than the individual price of any of its components but less than the sum of their prices if they were each purchased as standalone products. What Spotify is offering with Premium appears to be too good of a deal to be a bundle in the ordinary sense of the word. For the price of what consumers previously paid for music and other audio content, they now also get 15 hours of monthly audiobook listening at no extra cost. To an ordinary consumer, that's not a bundle—it's a two-for-one deal.[5]

The problem for MLC is that § 115's implementing regulations have not adopted the ordinary meaning of the word "bundle." The definition of Bundle at § 385.2 makes no mention of price, whether of the Bundle itself or any of its components. Its sweeping definition, which sounds very little like what an ordinary consumer might imagine to be a "bundle," conceivably encompasses "bundles" in the ordinary sense of the word as well as two-for-one deals, both of which involve a combination of distinct products or services of more than token value sold in a single transaction for a single price. *See* 37 C.F.R. § 385.2.

When an unambiguous term or phrase in a statute or regulation is undefined, courts generally give the term or phrase its ordinary and natural meaning. *Taniguchi v. Kan. Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). MLC does not argue that Bundle or "token value" are

---

[5] To Spotify, it's just good business. As Spotify explains, the offering of an additional product at no extra cost may be used by companies to attract new customers for whom the company will later raise prices. *See* Def. Mem. at 17–18 (explaining that Spotify's decision not to raise the price of Premium upon initially adding the 15 hours of audiobook streaming may have been motivated by "customer acquisition," and that it has since raised the price of Premium).

ambiguous terms or phrases.  It nonetheless asks the Court to adopt a unique definition of "token value," such that a product will have more than token value for purposes of § 385.2 only if its combination with a Subscription Offering causes a price increase relative to both products or services' standalone prices.  *See* Pl. Mem. at 18 (citing Compl. ¶ 52).  In effect, MLC asks the Court to interpret the undefined phrase "token value" in a manner that will force Bundle, a defined term, to reflect *that* term's ordinary and natural meaning.  This the Court cannot do.  *See Burgo v. Gen. Dynamics Corp.*, 122 F.3d 140, 143 (2d Cir. 1997) ("*Unless otherwise defined*, [terms] are assumed to carry their ordinary, contemporary, common meaning." (emphasis added) (citation omitted)).  Although the Court agrees with the premise of MLC's argument that the regulations define Bundle in a manner that encompasses more than what an ordinary consumer might consider a "bundle" to be, the Court cannot disturb the words of the regulation as they are defined.

The Court, therefore, agrees with Spotify that the ordinary meaning of "token value" applies.  Spotify contends, and MLC does not dispute, that token value ordinarily means something of "minimal," "perfunctory," "symbolic," "inconsequential," or "insubstantial" value.  Def. Mem. at 14 (collecting definitions from dictionaries and caselaw).  MLC argues that audiobook streaming has no more than token value to Spotify or its Premium subscribers because "[t]he Audiobooks Access subscription page does not appear to be directly accessible from Spotify's website;" "the number of subscribers who will sign up for [the] Audiobooks Access plan is likely to be a fraction of the Premium subscribers;" Spotify launched Audiobooks Access as a "pretext" to pay fewer royalties; and Spotify did not raise the price of Premium when it first included 15 hours of monthly audiobook streaming within the plan.  Pl. Mem. at 18–19; Compl. ¶¶ 8–10.  The Court is not persuaded.  Whether an item has token value in the ordinary sense of

12

the phrase need not depend on the price or motive for which it is offered.  After all, an item

offered for free or at a heavy discount to attract new customers, *see supra* note 5, may have

substantial value to those customers.  Moreover, MLC cannot plausibly claim that having access

to audiobooks is not something of intrinsic and monetary value to many, even if only a fraction

of Spotify's millions of Premium subscribers may take advantage of it.[6]  Applying the ordinary

meaning of "token value" to the facts as alleged, the Court can draw only one conclusion: that 15

hours of monthly audiobook streaming is a product or service that "ha[s] more than token value."

37 C.F.R. § 385.2.

Because MLC's allegations do not plausibly establish that Spotify violated § 115 by

reporting Premium as a Bundled Subscription Offering, the Court agrees with Spotify that

dismissal is appropriate.  *See* Def. Mem. at 18–19; *Friedl v. City of New York*, 210 F.3d 79, 83

(2d Cir. 2000) (explaining that dismissal is appropriate when there are "no set of facts" in the

complaint "which would entitle [the plaintiff] to relief" (citation omitted)); *see also Tocker v.

Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006) ("[L]eave to amend a complaint may be

denied when amendment would be futile.").  Whether or not "Premium is one product or two

products" and whether "access to audiobook content is of more than token value" are not

"inherently factual inquiries," as MLC claims.  Pl. Mem. at 25 (quotation omitted).  Answering

these questions requires applying unambiguous statutory language to the facts as alleged.  Taking

those facts as true, the Court finds that MLC is not plausibly entitled to relief and there is no

---

[6] MLC contends that the Court may not take judicial notice of the fact that there is a wide market for audiobooks in the United States, or that audiobooks generally are products of value.  *See* Pl. Mem. at 21–22.  The Court disagrees. These facts are "generally known" and "so obvious [that] they require no independent verification."  Pl. Mem. at 22 (quoting *Auriemma v. ExxonMobil Oil Corp.*, No. 21 Civ. 5508, 2023 WL 6389755, at *4 (E.D.N.Y. Sept. 30, 2023)).  Any other facts outside the four corners of the complaint, *see* Pl. Mem. at 21–22, are unnecessary to the Court's decision and are not relied upon.

reasonable likelihood that discovery would "reveal evidence of [liability]," *Twombly*, 550 U.S. at

556, or that "a valid claim might be stated" upon amendment of the complaint, *Chavis v.*

*Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation omitted).

## CONCLUSION

For the reasons stated above, Spotify's motion is GRANTED and MLC's claim under

Section 115 of the Copyright Act is DISMISSED with prejudice.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 24 and

close the case.

SO ORDERED.

Dated: January 28, 2025
      New York, New York

                                          ANALISA TORRES
                                  United States District Judge

14