UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, | |
| Plaintiff, | |
| v. | No. 1:24-cv-03809 (AT) |
| SPOTIFY USA INC., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**<u>MOTION FOR LEAVE TO AMEND THE COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

PROPOSED FIRST AMENDED COMPLAINT ............................................................... 6

      I.      Spotify Misreports and Underpays Royalties for Premium................................... 7

      II.     Spotify Misreports and Underpays Royalties for Audiobooks Access................. 11

ARGUMENT ..................................................................................................................... 13

      I.      The MLC's Proposed Amendments Are Not Futile .......................................... 144

      II.     Spotify Will Not Be Unduly Prejudiced By Granting the MLC Leave to Amend 17

      III.    The MLC's Motion is Not Unduly Delayed Nor Made in Bad Faith................. 211

CONCLUSION.................................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*A.V. by Versace, Inc.* v. *Gianni Versace S.p.A.*,
    87 F. Supp. 2d 281 (S.D.N.Y. 2000).................................................................................19

*Agerbrink* v. *Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016)..............................................................17, 18, 20, 21

*Anderson News, L.L.C.* v. *Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)...................................................................................14, 15

*Anderson* v. *Advance Publications, Inc.*,
    No. 22 CIV. 6826 (AT), 2023 WL 3976411 (S.D.N.Y. June 13, 2023)................................23

*Ballast* v. *Workforce7 Inc.*,
    No. 20-CV-3812 (ER), 2023 WL 3301839 (S.D.N.Y. May 8, 2023)..............................18, 20

*Blagman* v. *Apple, Inc.*,
    No. 12 CIV. 5453 ALC JCF, 2014 WL 2106489 (S.D.N.Y. May 19, 2014) .........................21

*Block* v. *First Blood Assocs.*,
    988 F.2d 344 (2d Cir. 1993).....................................................................................18, 21

*Bodum Holding AG* v. *Starbucks Corp.*,
    No. 19 CIV. 4280 (ER), 2020 WL 6135714 (S.D.N.Y. Oct. 16, 2020) ...............................20

*Carfora* v. *Tchrs. Ins. Annuity Ass'n of Am.*,
    No. 21 CIV. 8384 (KPF), 2023 WL 5352402 (S.D.N.Y. Aug. 21, 2023) .............................23

*Dalewitz* v. *Procter & Gamble*,
    No. 22-CV-07323 (NSR), 2025 WL 764023 (S.D.N.Y. Mar. 11, 2025)...............................23

*Delgado* v. *Donald J. Trump for President, Inc.*,
    No. 19 CIV. 11764 (AT), 2022 WL 767166 (S.D.N.Y. Mar. 14, 2022) .........................12, 15

*Dilworth* v. *Goldberg*,
    914 F. Supp. 2d 433 (S.D.N.Y. 2012)..................................................................................22

*Duling* v. *Gristede's Operating Corp.*,
    265 F.R.D. 91 (S.D.N.Y. 2010) ...............................................................................18, 21

*Falberg* v. *Goldman Sachs Grp.*,
    No. 19 CIV. 9910 (ER), 2020 WL 3893285 (S.D.N.Y. Jul. 9, 2020).....................................16

*Fin. Guar. Ins.* Co. v. *Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)..................................................................................................16

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Flood* v. *Carlson Restaurants Inc.*,
  No. 14CIV2740ATGWG, 2016 WL 3221146 (S.D.N.Y. June 7, 2016)..............14, 18, 19, 21

*Foman* v. *Davis*,
  371 U.S. 178 (1962)...........................................................................................................3, 13

*Francisco* v. *Abengoa, S.A.*,
  559 F. Supp. 3d 286 (S.D.N.Y. 2021).......................................................18, 19, 20, 21, 22, 23

*Kane* v. *Mount Pleasant Cent. Sch. Dist.*,
  80 F.4th 101 (2d Cir. 2023) ...................................................................................................14

*Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).................................................................................................2, 22

*United States ex rel. Mar. Admin.* v. *Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
  889 F.2d 1248 (2d Cir. 1989).................................................................................................19

*Monahan* v. *New York City Dep't of Corr.*,
  214 F.3d 275 (2d Cir. 2000)........................................................................................13, 18, 19

*Morrell* v. *WW Int'l, Inc.*,
  551 F. Supp. 3d 173 (S.D.N.Y. 2021).....................................................................................16

*P. Stolz Fam. P'ship L.P.* v. *Daum*,
  355 F.3d 92 (2d Cir. 2004).......................................................................................................2

*Pasternack* v. *Shrader*,
  863 F.3d 162 (2d Cir. 2017)...............................................................................................14, 21

*Rachman Bag Co.* v. *Liberty Mut. Ins. Co.*,
  46 F.3d 230 (2d Cir. 1995).....................................................................................................21

*State Tchrs. Ret. Bd.* v. *Fluor Corp.*,
  654 F.2d 843 (2d Cir. 1981)....................................................................................................21

*United States ex rel. Raffington* v. *Bon Secours Health Sys., Inc.*,
  285 F. Supp. 3d 759 (S.D.N.Y. 2018)....................................................................................14

*Reisner* v. *Gen. Motors Corp.*,
  511 F. Supp. 1167 (S.D.N.Y. 1981), *aff'd,* 671 F.2d 91 (2d Cir. 1982)...............................23

*White* v. *UMG Recordings, Inc.*,
  No. 20 CIV. 9971 (AT), 2022 WL 17744001 (S.D.N.Y. Aug. 16, 2022) ..............................14

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

**Statutes**

17 U.S.C. § 115................................................................................*passim*

17 U.S.C. § 115(c)(2)(I).........................................................................13

17 U.S.C. § 115(d)(4)(A).......................................................................13

17 U.S.C. § 115(d)(8)(B).......................................................................13

17 U.S.C. § 115(e)(13)...........................................................................12

**Regulations**

37 C.F.R. § 210.27.................................................................................13

37 C.F.R. § 385.2..............................................................................*passim*

37 C.F.R. § 385.21............................................................................*passim*

37 C.F.R. § 385.21(b)(1)..........................................................5, 6, 7, 11. 12, 17

37 C.F.R. § 385.21(b)(2)..........................................................................6

37 C.F.R. § 385.21(b)(3)........................................................................6, 7

37 C.F.R. § 385.21(b)(4)..........................................................................6

37 C.F.R. § 385.21(d)(6)......................................................................6, 13

**Other Authorities**

Fed. R. Civ. P 12(b)(6)......................................................................14,16

Fed. R. Civ. P. 15.......................................................................1, 2, 13, 22

*Audiobooks Access: A new plan for audiobook lovers*, Spotify,
    https://www.spotify.com/us/audiobooks/#plans.............................17

*Kobo Plus*, Kobo, https://www.kobo.com/us/en/plus?srsltid=AfmBOoqm5PBK
    vveSnsBrIu3aGxuLXY_evau31xSX4AXqIAlUT060BALj....................................9

*Revealed: The Top Artists, Songs, Albums, Podcasts, and Audiobooks of 2024*,
    Spotify, https://newsroom.spotify.com/2024-12-04/top-songs-artists-podcasts-
    audiobooks-albums-trends-2024/.........................................................10

**<u>TABLE OF AUTHORITIES</u>**
**(Continued)**

**Page(s)**

*Stand-alone*, Oxford English Dictionary, https://www.oed.com/dictionary/stand-
   alone_n?tab=meaning_and_use ........................................................................9, 15

*The Plus Catalog*, Audible, https://www.audible.com/ep/audible-plus-member-
   benefit ..................................................................................................................9

Pursuant to Federal Rule of Civil Procedure 15(a) and the Court's March 11, 2025 Order, Dkt. 74, plaintiff Mechanical Licensing Collective (the "MLC") respectfully submits this Memorandum of Law in Support of its Motion for Leave to Amend the Complaint.

## PRELIMINARY STATEMENT

The MLC brings this case to compel Spotify—one of the largest streaming services in the United States—to comply with the Copyright Act and its implementing regulations (collectively, "Section 115") and to pay the substantial mechanical royalties it owes to the songwriters and music publishers who create, own, and administer the musical works upon which Spotify's business is based. Under Section 115, Spotify receives a compulsory blanket license that allows it to offer tens of millions of musical works to its subscribing customers (referred to as End Users).[1] That blanket license is the foundation of a multibillion dollar business with tens of millions of subscribers paying monthly fees for access to Spotify's Subscription Offerings,[2] including, as relevant here, Spotify's Premium Offerings[3] ("Premium"), Basic Offerings[4] ("Basic"), and its Audiobooks Access Offering ("Audiobooks Access"). In return, Spotify is

---

[1]    Throughout, capitalized terms have the meaning ascribed to them in Section 115 and its implementing regulations, including 37 C.F.R. § 385.2.

[2]    A "Subscription Offering" is an "Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle." 37 C.F.R. § 385.2. Subscription Offering describes the type Offering but is not a reportable Offering type itself. For example, Standalone Portable Subscription Offerings and Bundled Subscription Offerings (the music component of a Bundle, like Premium) are all types of Subscription Offerings. References to a Subscription Offering are inclusive of all types of Subscription Offerings.

[3]    Spotify offers Premium in a variety of tiers, including Premium Individual, Premium Duo, and Premium Family. *See* PFAC ¶¶ 2, 64. References to "Premium" or "Premium Bundle" are inclusive of Premium Individual, Premium Duo, and Premium Family.

[4]    Spotify offers Basic in a variety of tiers, including Basic Individual, Basic Duo, and Basic Family. *See* PFAC ¶¶ 2, 66. References to "Basic" are inclusive of Basic Individual, Basic Duo, and Basic Family.

required to make monthly royalty payments to the MLC, a non-profit corporation that has been designated by the U.S. Copyright Office to ensure that streaming services like Spotify accurately and timely pay the mechanical royalties they owe to songwriters and music publishers.

The MLC filed its original Complaint on May 16, 2024, which alleged that Spotify failed to comply with Section 115 by improperly reporting Premium as a Bundle and underpaying royalties to the MLC as a result. *See* Dkt. 1. On January 29, 2025, this Court granted Spotify's motion to dismiss with prejudice, concluded that Premium is properly reported as a Bundle, and entered judgment.[5] *See* Dkt. 61; Dkt. 62. Fourteen days later, the MLC sought reconsideration of that decision and reinstatement of the MLC's claims in full, or, in the alternative, vacatur of the judgment so that the MLC could seek leave to amend its Complaint. *See* Dkt. 71. This Court denied the MLC's request for reconsideration, vacated the judgment, and granted the MLC permission to seek leave to file an amended complaint with respect to two claims: (1) "that Spotify has allegedly underpaid the royalties due on the Audiobooks Access plan" and (2) that Spotify "improperly calculated the royalties owed in connection with Premium by relying on Audiobooks Access as the standalone subscription price of the Bundle's non-music component." Dkt. 74, at 6. The MLC's proposed amendments as to those claims are reflected in the proposed First Amended Complaint (the "PFAC") attached as Exhibit 1 to the Declaration of Jay Cohen filed herewith.

Pursuant to the Court's March 11, 2025 Order, the MLC seeks leave to amend its original Complaint under Rule 15's "liberal" and "permissive standard," *Loreley Fin. (Jersey) No.*

---

[5]    The MLC does not concede that Premium is a Bundle and preserves its right to appeal the dismissal of its claim at the appropriate time. *See P. Stolz Fam. P'ship L.P.* v. *Daum*, 355 F.3d 92, 96 (2d Cir. 2004) (The Second Circuit does "not require a party, in an amended complaint, to replead a dismissed claim in order to preserve the right to appeal the dismissal when the court has not granted leave to amend" because "[s]uch a formalistic requirement serves no valid purpose.").

*3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), where leave "shall be freely given" in the absence of prejudice, undue delay, bad faith, or futility of amendment. *Foman* v. *Davis*, 371 U.S. 178, 182 (1962). The PFAC states plausible claims that Spotify misreported and underpaid royalties owed for both Premium and Audiobooks Access. Moreover, the proposed amendments are not futile, do not prejudice Spotify, and are not made after undue delay or in bad faith. *See id.*

Spotify's obligations to accurately report and pay royalties for each of its Offerings, including Premium and Audiobooks Access, are spelled out in 37 C.F.R. § 385.2 and 37 C.F.R. § 385.21. As the proposed pleading makes clear, Spotify is not complying with the plain language of those provisions with respect to Premium and Audiobooks Access.

*First*, with respect to Premium, Spotify is inflating the price of Premium's audiobooks component in order to decrease the portion of Premium's revenues subject to mechanical royalties. In November 2023, Spotify began providing Premium subscribers with up to 15 monthly hours of audiobooks listening. The inclusion of audiobooks listening did not change Spotify's reporting of Premium as a standalone Subscription Offering, meaning that 100 percent of revenue, less permitted deductions, remained subject to mechanical royalties. In March 2024, Spotify launched Audiobooks Access, a new service providing subscribers with the ability to listen to music and up to 15 monthly hours of audiobooks content in return for a $9.99 monthly subscription fee. At the same time, Spotify began reporting all tiers of Premium as Bundles consisting of two components: music and 15 hours of monthly audiobooks listening. Spotify used the $9.99 subscription price of its newly created Audiobooks Access service to value Premium's audiobooks component.

As the PFAC alleges, Spotify has run afoul of the requirements of 37 C.F.R. § 385.2

3

and 37 C.F.R. § 385.21 by using the subscription price of Audiobooks Access to overvalue the audiobooks component of the Premium Bundle, which, in turn, reduced Premium revenue subject to mechanical royalties (*i.e.*, Service Provider Revenue).   When determining Service Provider Revenue, the regulations require Spotify to divide the "standalone retail price" of the music component by "sum of the standalone retail prices of each of the components of the Bundle" to determine the pro-rata portion of Premium revenue subject to mechanical royalties.  37 C.F.R. § 385.2.  The "standalone retail price" of each "component[ ]" of Premium, for example, would be the standalone retail price of the music component and the standalone retail price of the audiobooks component.  *See id.*

Spotify cannot use the $9.99 Audiobooks Access price as the "standalone retail price" for the audiobooks component of the Premium Bundle because Audiobooks Access is not a "standalone" audiobooks service.  To the contrary, Audiobooks Access provides its subscribers with *both* audiobooks *and* music listening, while Premium's audiobooks component is comprised *solely* of audiobooks listening.  The regulations specify what Spotify must do when there is no "standalone" subscription price for the non-music component of a Bundle: Spotify must use either the "published price" of the "most closely" and "reasonably comparable product or service" available in the U.S., or, where there are no other "reasonably comparable" standalone products on the market, Spotify must use a "good faith, reasonable measure of the market value" for the audiobooks component of Premium.  *See id*.

As the PFAC alleges and as discussed below, the $9.99 price of Audiobooks Access meets neither the "reasonably comparable" nor "market value" tests, because not only do other audiobooks services on the market provide more value to subscribers—either by permitting *unlimited* monthly listening during the subscription period, or by providing a monthly token or

credit that subscribers may use to buy books of any length, or a combination of both—but they do so for *less* than $9.99 per month. *See* PFAC ¶¶ 14-15. As a result, Spotify has improperly reduced the pro-rata portion of Premium's revenue subject to mechanical royalties and therefore underpaid royalties on Premium.

      *Second*, as alleged in the PFAC, Spotify improperly reports Audiobooks Access as a service "free of any charge to the End User" and has therefore underpaid mechanical royalties owed for that Offering. *See* Table 2 to 37 C.F.R. § 385.21(b)(1) (setting forth permitted Offering types). Spotify combines its reporting and payment of royalties owed for Audiobooks Access as part of its free service ("Spotify Free"), which does not charge users a subscription fee, meaning Spotify does not report or pay royalties on *any* of the subscription revenue generated by Audiobooks Access. As alleged, Audiobooks Access is properly reported as one of the Subscription Offering types under the governing regulations—it is a service providing access to music offered under the compulsory blanket license for which a fee is charged. And, if Premium is a Bundle of music and audiobooks, Audiobooks Access is also properly reported as a Bundle, and the music within as a Bundled Subscription Offering. As a result of its improper characterization of Audiobooks Access as an Offering "free of any charge to the End User," Spotify has improperly reported and underpaid royalties on Audiobooks Access. *See* 37 C.F.R. §§ 385.2; 385.21.

      The PFAC easily satisfies the test for an amended pleading: it plausibly states claims that Spotify has underreported and underpaid mechanical royalties owed to the MLC for Premium and Audiobooks Access. Spotify cannot meet its burden to establish futility, prejudice, or bad faith, and the MLC has not unduly delayed seeking leave to amend. Accordingly, the MLC's motion for leave to file an amended complaint should be granted.

## PROPOSED FIRST AMENDED COMPLAINT

The PFAC plausibly states two claims for the misreporting and underpayment of mechanical royalties owed for Spotify's Premium and Audiobooks Access Subscription Offerings.

Under Section 115, Spotify is a Service Provider that must report and pay mechanical royalties to the MLC. *See* 37 C.F.R. § 385.2; PFAC ¶¶ 2-3. Royalties are calculated using a multistep process set out in 37 C.F.R. § 385.21. In broad outline, Step 1 requires the calculation of the "all-in royalty for the Offering," which requires determining the greater of "the applicable percent of Service Provider Revenue"[6] or the "result of the TCC Prong Calculation."[7] *See* 37 C.F.R. § 385.21(b)(1); PFAC ¶¶ 5, 37-41,. Step 2 requires subtracting applicable performance royalties from the "all-in royalty" determined in Step 1. *See* 37 C.F.R. § 385.21(b)(2); PFAC ¶ 42. At Step 3, the Service Provider must "[d]etermine the payable royalty pool" by calculating the greater of the result of the Step 2 calculation or certain applicable royalty floors (if any). *See* 37 C.F.R. § 385.21(b)(3); PFAC ¶ 43. Notably, Offerings "free of any charge to the End User," are not "subject to a royalty floor" in Step 3. 37 C.F.R. § 385.21(d)(6); PFAC ¶¶ 44, 62. Finally, in Step 4, the Service Provider must divide the royalty pool determined in Step 3 by the total number of plays of all musical works through the Offering and multiply that result by the number of plays of each musical work through the Offering. *See* 37 C.F.R. § 385.21(b)(4);

---

[6]  "Service Provider Revenue" means "All revenue from End Users recognized by a Service Provider for the Offering"; "All revenue recognized by a Service Provider by way of sponsorship and commissions . . . i.e., advertising"; and "All revenue recognized by a Service Provider . . . as a result of the placement of third-party advertising." 37 C.F.R. § 385.2.

[7]  "TCC means the total amount expensed by a Service Provider or any of its Affiliates in accordance with GAAP for rights to make Eligible Interactive Streams or Eligible Limited Downloads of a musical work embodied in a sound recording through the Service Provider for the Accounting Period, which amount shall equal the Applicable Consideration for those rights at the time the Applicable Consideration is properly recognized as an expense under GAAP." 37 C.F.R. § 385.2; *see also* PFAC ¶ 3.

PFAC ¶ 45.

As the proposed amendments demonstrate—and at the very least plausibly allege—Spotify underpaid mechanical royalties subject to this mandatory calculation procedure with respect to both Premium and Audiobooks Access.

## I.    Spotify Misreports and Underpays Royalties for Premium

The PFAC alleges that, if Premium is a Bundle, Spotify underpaid mechanical royalties by overstating the value of Premium's audiobooks component to reduce Service Provider Revenue.  PFAC ¶¶ 4, 6, 8-16, 78-103.  Section 115 sets forth the requirements for how a Service Provider must account for the value of the non-music components of Bundles.  By using the $9.99 monthly price of Audiobooks Access as the value of Premium's audiobooks component to calculate royalties owed for Premium, instead of a "good faith, reasonable measure of the market value of the component," Spotify underreported and underpaid mechanical royalties owed to the MLC.  *See* PFAC ¶¶ 16, 78-103; 37 C.F.R. §§ 385.2; 385.21(b)(1); 385.21(b)(3).

As described above, when calculating the mechanical royalties owed to the MLC, Spotify must first "[c]alculate the all-in royalty" for Premium, which is the "greater" of either "the applicable percent of Service Provider Revenue" or the "result of the TCC Prong Calculation."  37 C.F.R. § 385.21(b)(1).  With respect to Service Provider Revenue, the PFAC alleges that if Premium is a Bundle, it has two components: music and audiobooks listening.  *See* PFAC ¶¶ 6, 11, 17, 78; *see also* Dkt. 25, at 12.  Pursuant to 37 C.F.R. § 385.2, the Service Provider Revenue formula for a Bundle containing music and audiobooks components on a per subscription basis is as follows:

$$\frac{\text{Price of Music Component}}{\text{Price of Music Component} + \text{Price of Audiobooks Component}} \quad \text{x} \quad \text{Aggregate Retail Price} \quad = \quad \text{Service Provider Revenue}$$

In March 2024, Spotify began reporting Premium as a Bundle. PFAC ¶¶ 11, 68, 81. As the PFAC alleges, Spotify used the $9.99 monthly price of Audiobooks Access as the "standalone published price" of Premium's audiobooks component. PFAC ¶¶ 11, 81, 99. Spotify accounts for the music component as follows: $10.99 for Premium Individual, $14.99 for Premium Duo, and $16.99 for Premium Family. PFAC ¶¶ 12, 81, 100. Thus, for example, Spotify calculates the Service Provider Revenue on a per subscription basis for Premium Individual as follows:

$$\frac{\$10.99 \text{ (Music Component)}}{\$10.99 + \$9.99 \text{ (Music Component + Audiobooks Component)}} \quad \text{x} \quad \$11.99 \text{ (Retail Price)} \quad = \quad \$6.28 \text{ (Service Provider Revenue)}$$

In using Audiobooks Access as the "standalone" price of Premium's audiobooks component, Spotify slashed the pro-rata portion of Premium revenues attributable to music (Service Provider Revenue) by approximately 50 percent for Premium Individual, and approximately 40 percent for both Duo and Family. PFAC ¶¶ 12, 99-102. Spotify's use of the $9.99 price of Audiobooks Access in the Service Provider Revenue formula above is in clear violation of Section 115.

Section 115 requires that, when available, a Service Provider must use the "standalone retail price" of the non-music component in the Service Provider Revenue formula. 37 C.F.R. § 385.2; PFAC ¶¶ 6, 52, 80. Audiobooks Access is not a "standalone" service because it provides subscribers with 15 hours of monthly audiobooks listening *and* unlimited hours of music listening. PFAC ¶¶ 13, 82-85. The plain meaning of the term "standalone" is "[s]omething

8

that exists independently or in isolation from similar things" or "something that is free-standing or unconnected to another item." *See Stand-alone*, Oxford English Dictionary, https://www. oed.com/dictionary/stand-alone_n?tab=meaning_and_use (accessed Mar. 31, 2025). The audiobooks content on Audiobooks Access does not fit that definition, as it does not "exist independently or in isolation from" music content. *See id.* Thus, the price of Audiobooks Access cannot possibly be the "standalone retail price" for Premium's audiobooks component under the plain meaning of 37 C.F.R. § 385.2. PFAC ¶¶ 13, 82-85.

Where there is no "standalone retail price" for the non-music component, a Service Provider must use the "average standalone published price . . . for the most closely comparable product or service" to the Bundle component, "or, if more than one comparable exists, the average of standalone prices for comparables." 37 C.F.R. § 385.2. Whereas the audiobooks component of Premium is limited to 15 hours per month of audiobooks streaming, on information and belief, all other audiobooks subscription services available on the U.S. market offer unlimited streaming and/or credits that can be used to permanently download full audiobooks. PFAC ¶¶ 14, 86. These services are not "reasonably comparable" to Premium's audiobooks component. 37 C.F.R. § 385.2.

For example, Audible Plus[8] and Kobo Plus Listen,[9] which are priced at $7.95 and $7.99 respectively, offer unlimited streaming of their audiobooks catalogs. PFAC ¶ 87. A service offering a *limited* number of listening hours (such as Audiobooks Access) is not "reasonably comparable" to one offering *unlimited* hours at any price point. *See* 37 C.F.R. § 385.2; PFAC

---

[8]    *See The Plus Catalog*, Audible, https://www.audible.com/ep/audible-plus-member-benefit (accessed Mar. 31, 2025).

[9]    *See Kobo Plus*, Kobo, https://www.kobo.com/us/en/plus?srsltid=AfmBOoqm5PBKvveSnsBr Iu3aGxuLXY_evau31xSX4AXqIAlUT060BALj (accessed Mar. 31, 2025).

¶ 88.   That is especially so given that many popular audiobooks exceed 15 listening hours, including *Dune* by Frank Herbert (21 hours and 4 minutes), *Fourth Wing* by Rebecca Yarros (21 hours and 22 minutes), and *The Fellowship of the Ring* by J.R.R. Tolkien (22 hours and 38 minutes).  PFAC ¶ 89.   Indeed, seven of the ten audiobooks on Spotify's "Top Audiobooks in Premium Globally" list are longer than 15 hours.[10]  *Id.*  While a Premium subscriber cannot be able to finish a chosen audiobook from Spotify's own Top 10 list in one month, subscribers to Audible Plus and Kobo Plus Listen can listen to and finish as many audiobooks per month as they wish.  And services that offer permanent download credits, such as Audible Premium Plus, are even more valuable because, for a single monthly credit, users can finish an audiobook that is over 15 hours long and permanently keep the audiobook *even after cancelling their subscription*.  PFAC ¶ 93.  Finally, where Premium's app was designed primarily for music listeners with an interface focused on optimizing the user experience of listening to music, not audiobooks, an audiobooks "service with features and functionality tailored to audiobooks listening is not 'reasonably comparable' to one principally designed for music listening."  PFAC ¶94.

Where there is no "reasonably comparable product or service," 37 C.F.R. § 385.2 requires Spotify to use a "good faith, reasonable measure of the market value of the [audiobooks] component."   37 C.F.R. § 385.2; PFAC ¶¶ 6, 15, 53, 80, 85, 95.   The PFAC alleges that Audiobooks Access is not a "good faith, reasonable measure" of the value of Premium's audiobooks component because Audiobooks Access provides its users access to music under the compulsory blanket license and the audiobooks component of Premium does not.  PFAC ¶¶ 15, 96-103.  Nor can the $9.99 price be justified when other audiobooks products offer *unlimited*

---

[10]   *See Revealed: The Top Artists, Songs, Albums, Podcasts, and Audiobooks of 2024*, Spotify, https://newsroom.spotify.com/2024-12-04/top-songs-artists-podcasts-audiobooks-albums-trends-2024/ (Dec. 4, 2024).

listening time for *less* than $9.99 per month.  *Id.*

Therefore, as set out in the PFAC, under 37 C.F.R. § 385.2, the price of Audiobooks Access cannot be used to account for the price of Premium's audiobooks component in the Service Provider Revenue formula.  PFAC ¶¶ 16, 99.  Moreover, whether Audiobooks Access provides a "standalone" price for Premium's audiobooks component, whether other services offering unlimited listening or permanent downloads of audiobooks (or both) are "reasonably comparable" to Premium's time-limited audiobooks component, and whether $9.99 is a "good faith, reasonable" price for Premium's audiobooks component are all questions of fact that cannot be decided at this stage.  The PFAC plausibly states a claim that Spotify's use of the $9.99 price of Audiobooks Access as the price of the audiobooks component in Premium violates the regulations governing the reporting of revenue and the payment of royalties set forth in Section 115.

## II.    Spotify Misreports and Underpays Royalties for Audiobooks Access

Spotify has also misreported and underpaid mechanical royalties owed to the MLC for Audiobooks Access by reporting it in combination with Spotify Free, which Spotify reports as a "free nonsubscription/ad-supported service[ ] free of any charge to the End User."[11]  *See* Table 2 to 37 C.F.R. § 385.21(b)(1).  As alleged, Audiobooks Access charges subscription fees for access to its audiobooks and music content.  PFAC ¶¶ 10, 17, 109.  As a result, Audiobooks Access must be reported as one of the Subscription Offering types[12] for the purposes of Section 115 because its subscribers (1) "pay a fee" for a "defined subscription period[ ]" to access (2) music delivered via

---

[11]  Spotify has never reported Audiobooks Access as a separate Offering as required by Section 115.  *See* 37 C.F.R. § 385.21(b).

[12]  The types of Subscription Offering delineated in the regulations include, amongst others, Standalone Portable Subscription Offerings, Bundled Subscription Offerings (the music component of a Bundle), and Standalone Limited Offerings.  *See* Table 2 to 37 C.F.R. § 385.21 (setting forth Offering types); 37 C.F.R. § 385.2 (defining Offering types).

a "digital transmission of a sound recording of a musical work in the form of a stream." PFAC ¶¶ 111-12 (citing 17 U.S.C. § 115(e)(13); 37 C.F.R. § 385.2). Moreover, if Premium is properly reported as a Bundle of music and audiobooks components, then Audiobooks Access is also properly reported as a Bundle of music and audiobooks components, meaning Audiobooks Access necessarily contains a Bundled *Subscription Offering*. *See* 37 C.F.R. § 385.2; PFAC ¶¶ 17, 104, 116, 118. Regardless, a plain reading of the regulations compels Spotify to report and pay royalties on Audiobooks Access as a Subscription Offering and not combined with Spotify Free as an Offering "free of any charge to the End User." *See* Table 2 to 37 C.F.R. § 385.21(b)(1). Where a "Service Provider makes available different Offerings, royalties must be calculated separately with respect to each Offering taking into consideration Service Provider Revenue, TCC, subscribers, Plays, expenses, and Performance Royalties associated with each Offering." 37 C.F.R. § 385.21(b); PFAC ¶ 47.

Although Spotify will no doubt assert that the music on Audiobooks Access is Spotify's free service ("Spotify Free"), that is irrelevant for the purposes of whether it is a Subscription Offering or whether Spotify is permitted to report and pay royalties on Audiobooks Access as "free of any charge to the End User," when it is clearly not. PFAC ¶ 107. All Offering types, whether paid or "free of any charge to the End User," must report Service Provider Revenue to the MLC. 37 C.F.R. §§ 385.2, 385.21; PFAC ¶¶ 108, 110. Service Provider Revenue is inclusive of advertising and subscription revenue. 37 C.F.R. § 385.2; PFAC ¶¶ 60, 107-09. Therefore, if Spotify suddenly began charging Spotify Free users a subscription fee, Spotify would need to report any advertising revenue *and* subscription revenue generated by Spotify Free as part of Service Provider Revenue. 37 C.F.R. § 385.2; PFAC ¶ 109. "The same is true for Audiobooks Access. All subscription revenue must be reported. The regulations make no exceptions." *Id.*

Spotify's misreporting of Audiobooks Access as a "service free of charge to the End User" means that in addition to miscalculating Service Provider Revenue, which is a violation of Section 115 on its own, Spotify is improperly avoiding the royalty floors applicable at Step 3 of the royalty calculation process described above. 37 C.F.R. § 385.21(d)(6). Subscription Offerings are subject to royalty floors, while Offerings "free of any charge to the End User," like Spotify Free, are not. *See* 37 C.F.R. § 385.21(d). By claiming to report Audiobooks Access as an Offering "free of any charge to the End User," Spotify has sidestepped the royalty floor calculation requirement at Step 3 of the royalty calculation process. "Indeed, the MLC cannot even know if the TCC Prong Calculation or applicable royalty floors would provide a basis for the royalty pool determined at Step 3 because Spotify does not report Audiobooks Access separately from Spotify Free." PFAC ¶ 117.

In sum, the PFAC plausibly alleges that Spotify has violated the reporting and royalty payment requirements set forth in Section 115, including 17 U.S.C. §§ 115(c)(2)(I), (d)(4)(A), and (d)(8)(B), and 37 C.F.R. §§ 385.2, 385.21, and 210.27, by improperly using the price of Audiobooks Access to value Premium's audiobooks component and by failing to report and account for the subscription revenues generated by Audiobooks Access.

## ARGUMENT

Rule 15 provides that a court "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Thus, absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed." *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) (citing *Foman*, 371 U.S. at 182); *see also Delgado* v. *Donald J. Trump for President, Inc.*, No. 19 CIV. 11764 (AT), 2022 WL 767166, at *2 (S.D.N.Y. Mar. 14, 2022) (Torres, J.) (same). "The rule in this Circuit has been to allow a party to amend its pleadings in

13

the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack* v. *Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quoting *AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)).  Spotify "bears the burden of showing prejudice, bad faith, and futility of the amendment." *See United States ex rel. Raffington* v. *Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 766 (S.D.N.Y. 2018).  For the reasons below, Spotify cannot meet that burden, and the Court should grant the MLC leave to file the PFAC.

I.    **The MLC's Proposed Amendments Are Not Futile**

Spotify cannot meet its burden of showing that the MLC's proposed amendments are futile, because the PFAC would "survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)."  *See White* v. *UMG Recordings, Inc.*, No. 20 CIV. 9971 (AT), 2022 WL 17744001, at *2 (S.D.N.Y. Aug. 16, 2022) (Torres, J.); *see also Kane* v. *Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 107 (2d Cir. 2023).  "The adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading."  *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  "This means that the proposed allegations must state a 'claim of relief that is plausible on its face.'" *Flood* v. *Carlson Restaurants Inc.*, No. 14CIV2740ATGWG, 2016 WL 3221146, at *4 (S.D.N.Y. June 7, 2016) (Torres, J.) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  Accordingly, the Court must accept the proposed allegations as true and draw all reasonable inferences in the MLC's favor.  *See Anderson News*, 680 F.3d at 185.  And "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court" at this stage. *Id.*  "Given that the plausibility requirement '*does not* impose a *probability* requirement at the pleading stage,' the *Twombly* Court noted that 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is

very remote and unlikely.'" *See id.* (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007)). In sum, when determining whether the MLC's proposed amendments are futile, the Court "must only 'satisfy itself that [the claim or defense] is colorable and not frivolous." *Delgado*, 2022 WL 767166, at *2 (citation omitted).

The PFAC plausibly states two claims for relief and is thus not futile. It first alleges that, if Premium is a Bundle, Spotify is misreporting and underpaying owed royalties for Premium by overvaluing Premium's audiobooks component when calculating Service Provider Revenue. PFAC ¶¶ 4, 6, 8-16, 78-103. This claim follows from the Court's prior determination that Premium constitutes a Bundle, *see* Dkt. 61, at 12-13, and is premised on the plain language of the governing regulations, which do not permit Spotify to use a service that offers both music *and* audiobooks listening as the "standalone retail price" of the non-music component of the Bundle. 37 C.F.R. § 385.2.

As alleged, Spotify cannot use the price of Audiobooks Access in the Service Provider Revenue formula. Because it includes music, Audiobooks Access is neither identical to Premium's audiobooks component, nor is it a "standalone" audiobooks service under the plain meaning of the term "standalone." *See Stand-alone*, Oxford English Dictionary, https://www.oed.com/dictionary/stand-alone_n?tab=meaning_and_use (accessed Mar. 31, 2025). ("[s]omething that exists independently or in isolation from similar things" or "something that is free-standing or unconnected to another item"). Audiobooks Access is not a "standalone" audiobooks service because its 15 monthly hours of audiobooks listening does not "exist[ ] independently or in isolation" from its music content. *See id.*

The PFAC also alleges that there are "no reasonably comparable" products to Premium's audiobooks component on the market because other audiobooks services offer

unlimited listening or download credits (or both).  PFAC ¶¶ 14-15, 86-95; 37 C.F.R. § 385.2.

Services providing unlimited listening and/or permanent downloads of audiobooks are not

comparable to Premium's time-limited audiobooks component.  PFAC ¶¶ 86-95.  As such, Spotify

must use a "good faith, reasonable" price for the audiobooks component of Premium in the Service

Provider Revenue calculation.  37 C.F.R. § 385.2.

At minimum, the PFAC raises substantial questions of fact concerning the "good

faith, reasonable" price of the audiobooks component of Premium, which cannot be decided under

the motion to dismiss standard.  *See id.*; *Fin. Guar. Ins.* Co. v. *Putnam Advisory Co., LLC*, 783

F.3d 395, 405 (2d Cir. 2015) (denying a motion to dismiss where plaintiff's "argument raise[d] a

factual dispute that is inappropriate for resolution on a motion to dismiss.").  Questions of "good

faith" and "reasonableness" are fundamentally questions of fact.  *See*, *e.g.*, *Morrell* v. *WW Int'l*,

*Inc.*, 551 F. Supp. 3d 173, 186 (S.D.N.Y. 2021) ("However, on a motion to dismiss pursuant to

Rule 12(b)(6), the Court cannot determine the defendant's alleged good faith on the pleadings");

*Falberg* v. *Goldman Sachs Grp.*, No. 19 CIV. 9910 (ER), 2020 WL 3893285, at *9 (S.D.N.Y. Jul.

9, 2020) (holding that a determination of reasonableness is a "question of fact not determinable on

a motion to dismiss").

The PFAC also plausibly alleges that Spotify misreported revenue from (and

therefore underpaid royalties owed for) Audiobooks Access.  *See Putnam Advisory Co.,* 783 F.3d

at 405.  As alleged, Spotify combines its reporting of Audiobooks Access with Spotify Free, and

thereby fails to account Audiobooks Access's subscription fees when calculating Service Provider

Revenue.  PFAC ¶¶ 17, 104-18; 37 C.F.R. § 385.2.  In and of itself, this is a violation of the clear

terms of 37 C.F.R. § 385.21(b), which require that where a "Service Provider makes available

different Offerings, royalties must be calculated separately with respect to each Offering."

Moreover, Spotify cannot report Audiobooks Access as a "free nonsubscription/ad-supported service[ ] free of any charge to the End User" like Spotify Free. Table 2 to 37 C.F.R. § 385.21(b)(1). Audiobooks Access is properly reported as one of the Subscription Offering types under the plain language of the governing regulations because it is a service provided for a fee that offers users access to streamed music. *See* 37 C.F.R. § 385.2; PFAC ¶¶ 17, 111-15. And because Audiobooks Access is a Subscription Offering, the subscription revenue it generates must be reported as part of the Service Provider Revenue. 37 C.F.R. § 385.2; PFAC ¶¶ 17, 107-10. Indeed, Spotify states on its own website that Audiobooks Access requires subscribers to pay a fee of $9.99 to access music streaming and audiobooks content.[13] Because the definition of Service Provider Revenue includes *both* advertising revenue and subscription revenue, Spotify has no basis for not reporting Audiobooks Access subscription revenues. *See* 37 C.F.R. § 385.2. As alleged, Spotify's total failure to account for subscription revenues for Audiobooks Access is in direct contravention of the clear reporting requirements of Section 115.[14] PFAC ¶¶ 104-18.

## II. Spotify Will Not Be Unduly Prejudiced By Granting the MLC Leave to Amend

Spotify bears the burden "of demonstrating that substantial prejudice would result" were the MLC granted leave to file its PFAC. *Agerbrink* v. *Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016). "Denying leave to amend a complaint requires not just prejudice but

---

[13]  *Audiobooks Access: A new plan for audiobook lovers*, Spotify, https://www.spotify.com/us/audiobooks/#plans (accessed Mar. 31, 2025); *see also*, Dkt. 18, at 2 n.2; Dkt. 72, at 10 (admitting that Audiobooks Access provides access to music).

[14]  Again, whether Audiobooks Access has the same music functionality as Spotify Free—which Spotify has repeatedly claimed, *see* Dkt. 18, at 2 n.2; Dkt. 25, at 17 n.16; Dkt. 29, at 14-15— is irrelevant to determining whether the music on Audiobooks Access is properly reported as a service "free of any charge to the End User" or a Subscription Offering. Indeed, pursuant to this Court's January 29, 2025 Order that Premium is a Bundle, *see* Dkt. 61, to the extent that Audiobooks Access was "virtually identical" to Premium, *id.* at 5, Audiobooks Access was also a Bundle, which necessarily contained a Bundled *Subscription Offering*. *See* 37 C.F.R. § 385.2; PFAC ¶¶ 17, 104, 116, 118.

*undue* prejudice." *Francisco* v. *Abengoa, S.A.*, 559 F. Supp. 3d 286, 314 (S.D.N.Y. 2021).  A

defendant is unduly prejudiced where, among other things, "the assertion of a new claim would:

(i) require the opponent to expend significant additional resources to conduct discovery and

prepare for trial" or "(ii) significantly delay the resolution of the dispute." *Block* v. *First Blood

Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).  Because neither of these factors are implicated by the

MLC's motion, Spotify cannot meet its burden of demonstrating undue prejudice.

       *First*, the MLC's proposed amendments would not require Spotify to "expend

significant additional resources to conduct discovery and prepare for trial." *See Agerbrink*, 155 F.

Supp. 3d at 454 (quoting *Monahan*, 214 F.3d at 284).  The PFAC will "not substantially alter the

scope of discovery" since "the operative facts underlying" the dismissed Premium claim, the

proposed alternative Premium claim, and the proposed Audiobooks Access claim are closely

related.  *See Ballast* v. *Workforce7 Inc.*, No. 20-CV-3812 (ER), 2023 WL 3301839, at *7

(S.D.N.Y. May 8, 2023) ("[W]here proposed amendments 'arise[ ] from the same set of operative

facts as the original claims, or from events closely related to those originally pleaded,' no undue

prejudice will result even where the deadline for discovery has passed." (citation omitted)); *see

also Flood*, 2016 WL 3221146, at *2.  For example, the MLC previously served Spotify with a

number of discovery requests for information that would be relevant to the PFAC's Audiobooks

Access claim, including at least twelve requests for production, *see* Dkt. 30-1, at 12, 15, 17, 20,

36, 37, 38, 39, 46, 47, 59, four interrogatories, and one Rule 30(b)(6) deposition topic.

       To be sure, the PFAC does make allegations that would expand the scope of

discovery.  But, "the need for new discovery is not sufficient to constitute undue prejudice on its

own."  *See Duling* v. *Gristede's Operating Corp.*, 265 F.R.D. 91, 100–01 (S.D.N.Y. 2010)

(collecting cases); *see also Agerbrink*, 155 F. Supp. 3d at 455 (finding no undue prejudice where

the proposed amendment would "expand[ ] the scope of discovery"). Indeed, this Court has held that "[n]o significant additional burden is imposed on [a defendant] should they be required to tailor, around the edges, depositions, interrogatories, or other discovery to account for whatever unique facts may be pertinent" to a new claim. *Flood*, 2016 WL 3221146, at *2. Ultimately, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States ex rel. Mar. Admin.* v. *Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989); *see also Monahan*, 214 F.3d at 284 (holding that "the fact that one party has spent time and money preparing for trial will usually not be deemed prejudice sufficient to warrant a deviation from the rule broadly allowing amendment to pleadings").

      *Second*, the MLC's proposed amendments would not delay the resolution of the dispute. "[C]ourts consider the procedural posture of the case in determining whether an amendment is prejudicial." *See Francisco*, 559 F. Supp. 3d at 314; *see also A.V. by Versace, Inc.* v. *Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (finding no undue prejudice where no trial date was set and discovery had not yet been completed). Prior to dismissal of the MLC's original Complaint, this "case [was] in an early stage of litigation" and so permitting the MLC to file its PFAC would not "significantly delay" resolution the case. *See Flood*, 2016 WL 3221146, at *2 (quoting *Amusement Indus., Inc.* v. *Stern*, No. 07 Civ. 11586, 2014 WL 4460393, at *14 (S.D.N.Y. Sept. 11, 2014) (collecting cases)).

      Spotify had only produced a curated set of 173 documents, many of which were non-substantive mass marketing or news emails. *See* Dkt. 65, at 8:18-24; *see also* Dkt. 58, at 1. That more discovery had not occurred is entirely due to Spotify's own conduct. Spotify went so far as to file a motion to stay discovery that was rejected by the Magistrate Judge. Dkt. 50, at

36:19-37:3; *see also* Dkt. 58, at 1 (arguing that "Spotify's failure to proceed with timely document discovery is impeding the MLC's ability to proceed to depositions, some of which have been noticed, but cannot take place without substantial production of the relevant documents").  Despite the Magistrate Judge's conclusion that discovery should proceed, Spotify continued to delay productions, which led the Magistrate Judge to later conclude, just days before the Court dismissed the MLC's original Complaint, that Spotify had not "produc[ed] very much in two months" and had not provided "information for [what] the holdup [was] in producing documents."  Dkt. 65, at 47:9-13, 27:3-7.

In sum, given that no trial date had been set, Spotify had only produced 173 documents, and no depositions were conducted, any additional discovery required by the PFAC would "not significantly prolong the resolution of the action."  *See Agerbrink*, 155 F. Supp. 3d at 455 (concluding that even where "amendment may warrant additional discovery," it would not significantly delay resolution of the dispute); *see also Bodum Holding AG* v. *Starbucks Corp.*, No. 19 CIV. 4280 (ER), 2020 WL 6135714, at *10 (S.D.N.Y. Oct. 16, 2020) (finding no undue prejudice caused by a delay in the resolution of the case where the request for leave to amend came "well before the close of discovery" and "the majority of the depositions [were] still outstanding"). While Spotify may "experience some hardship from the passage of time and the increased expenses related to discovery, those factors are not sufficient to constitute *undue* prejudice—especially where . . . discovery has not even commenced" in any meaningful way.  *See Francisco*, 559 F. Supp. 3d at 314; *see also Ballast*, 2023 WL 3301839, at *7 ("Amendments are not unduly prejudicial even where they may warrant some additional discovery and concomitant extensions of scheduling deadlines. . . . This is particularly true where significant amounts of discovery remain outstanding.").

### III.    The MLC's Motion is Not Unduly Delayed Nor Made in Bad Faith

The Second Circuit has made clear that "[m]ere delay" in seeking amendment, "absent a showing of bad faith or undue prejudice," is not a sufficient basis to deny leave to amend. *Flood*, 2016 WL 3221146, at *2 (quoting *Block*, 988 F.3d at 350); *see also Pasternack*, 863 F.3d at 174 (finding abuse of discretion where the district court denied leave to amend "based solely on delay and litigation expense."). "[T]he party seeking to amend its pleading must explain its delay," *Francisco*, 559 F. Supp. 3d at 312, but absent prejudice or bad faith, "even vague or 'thin' reasons are sufficient." *Duling*, 265 F.R.D. at 98. Importantly, "the party opposing the amendment carries the burden of showing . . . bad faith." *Francisco*, 559 F. Supp. 3d at 312.

The MLC has not unduly delayed seeking leave to amend and does not make this motion in bad faith. Less than a year has passed since the MLC filed its initial complaint, *see* Dkt. 1, and the Second Circuit has affirmed a district court's grant of leave to amend in cases where leave was sought "more than four years after the complaint was filed" and even where the "reasons for the delay [we]re not entirely clear." *Rachman Bag Co.* v. *Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995); *see also Blagman* v. *Apple, Inc.*, No. 12 CIV. 5453 ALC JCF, 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (collecting cases where leave to amend was granted after delays of up to seven years); *State Tchrs. Ret. Bd.* v. *Fluor*, 654 F.2d 843, 845–46 (2d Cir. 1981) (granting amendment after three years); *Flood*, 2016 WL 3221146, at *2 (granting plaintiff's motion for leave to amend even though the case was nearly two years old).

Moreover, this is the MLC's first request for leave to amend. *See Pasternack*, 863 F.3d at 174 (reversing the district court's denial of leave on the basis of untimeliness where "essentially no discovery ha[d] been undertaken" and plaintiff's "proposed amended complaint would be the first complaint to be considered after the district court decided a motion to dismiss"). Spotify's musings on whether the MLC "could have moved to amend earlier," *Agerbrink*, 155 F.

21

Supp. 3d at 452, or is "alleging facts that were previously within [its] knowledge," *Dilworth* v. *Goldberg*, 914 F. Supp. 2d 433, 460 (S.D.N.Y. 2012), are "immaterial," because "[c]ourts in this Circuit routinely reject either basis for a finding of bad faith, even when several years have passed since the complaint was originally filed." *Francisco*, 559 F. Supp. 3d at 312–13.

That the MLC did not seek leave to amend prior to the Court's dismissal of the original Complaint is not determinative. The MLC's decision not to seek leave to amend before the Court issued its Order granting Spotify's motion to dismiss the complaint, *see* Dkt. 61, was based on the MLC's position, as the sole entity authorized to offer and administer the Section 115 license, that Premium does not constitute a Bundle. *See* Dkt. 1, at 11; PFAC ¶ 19. The Court has concluded otherwise, dismissing that claim, and the MLC's request to amend the Complaint to plead the consequences of that decision is consistent with Second Circuit precedent holding that the proper time to seek leave to amend is after the district court rules on a motion to dismiss. *See Loreley*, 797 F.3d at 190 (finding the district court's treatment of the plaintiff's decision "to stand by the complaint after a preview of [d]efendants' arguments—in the critical absence of a definitive ruling—as a forfeiture of the protections afforded by Rule 15" to be "premature and inconsistent with the course of litigation as prescribed by the Federal Rules").

The MLC was entitled to "the benefit of a ruling" on Spotify's motion to dismiss to "see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Id.*; *see also Francisco*, 559 F. Supp. 3d at 313 ("[A]s the Second Circuit has emphasized, '[i]t is the District Court's ruling, not the defendant's arguments in support of a motion to dismiss, that puts a plaintiff on notice of the complaint's deficiencies.'" (quoting *Cresci* v. *Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017))). Indeed, it is common practice for courts to "grant a plaintiff 'leave to amend at least once after having the benefit of a

court's reasoning in dismissing the complaint.'" *Francisco*, 559 F. Supp. 3d at 313 (citation omitted); *see also Anderson* v. *Advance Publications, Inc.*, No. 22 CIV. 6826 (AT), 2023 WL 3976411, at *5 (S.D.N.Y. June 13, 2023) (Torres, J.) (granting leave to amend despite the fact that plaintiff had already amended his complaint once because "the deficiencies described in [the court's] order might be cured by amendment").

Finally, Spotify cannot carry its burden of showing that any alleged delay in seeking amendment was made in bad faith. Courts have found a party acted in bad faith where the opposing party can show that the decision to delay seeking amendment was done "solely to gain a tactical advantage," *Dalewitz* v. *Procter & Gamble*, No. 22-CV-07323 (NSR), 2025 WL 764023, at *3 (S.D.N.Y. Mar. 11, 2025), or where the opposing party can show dilatory motive, *Reisner* v. *Gen. Motors Corp.*, 511 F. Supp. 1167, 1172 (S.D.N.Y. 1981), *aff'd,* 671 F.2d 91 (2d Cir. 1982). None of those factors are present here. Spotify simply cannot show that the MLC acted in bad faith because this "case remains in its infancy" and the MLC "moved quickly to amend following the Court's dismissal of the Complaint." *See Carfora* v. *Tchrs. Ins. Annuity Ass'n of Am.*, No. 21 CIV. 8384 (KPF), 2023 WL 5352402, at *12 (S.D.N.Y. Aug. 21, 2023).

## <u>CONCLUSION</u>

For the foregoing reasons, the MLC respectfully requests that its motion for leave to amend the complaint be granted so that the MLC may file its proposed First Amended Complaint.

Dated:  April 1, 2025
        New York, New York

                                        PAUL, WEISS, RIFKIND,
                                        WHARTON & GARRISON LLP

                                        */s/ Jay Cohen*
                                        Jay Cohen
                                        Darren W. Johnson
                                        Dylan O. Smith
                                        1285 Avenue of the Americas
                                        New York, NY  10019-6064
                                        Telephone: (212) 373-3000
                                        jaycohen@paulweiss.com
                                        djohnson@paulweiss.com
                                        dosmith@paulweiss.com

                                        *Attorneys for Plaintiff*
                                        *Mechanical Licensing Collective*

24

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word.  The total number of words in this brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 7,566.  In preparing this certificate, I relied on the word count program in Microsoft Word.

Dated: April 1, 2025
      New York, New York

                               PAUL, WEISS, RIFKIND,
                               WHARTON & GARRISON LLP

                               */s/ Jay Cohen*
                               Jay Cohen
                               Darren W. Johnson
                               Dylan O. Smith
                               1285 Avenue of the Americas
                               New York, NY 10019-6064
                               Telephone: (212) 373-3000
                               jaycohen@paulweiss.com
                               djohnson@paulweiss.com
                               dosmith@paulweiss.com

                               *Attorneys for Plaintiff*
                               *Mechanical Licensing Collective*