# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, <br><br> Plaintiff <br><br> v. <br><br> SPOTIFY USA INC., <br><br> Defendant. | No. **1:**24 ~~CV~~ _____ **-cv-03809 (AT)** <br><br><br> **FIRST AMENDED COMPLAINT** |

Plaintiff Mechanical Licensing Collective (the "MLC"), for its complaint against Spotify USA Inc. ("Spotify"), upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, alleges as follows.

~~Nature of the Action~~

**NATURE OF THE ACTION**

1.      This case is brought to compel Spotify—one of the largest music streaming services in the United States—to comply with **Section 115 of** the Copyright Act and to pay the mechanical royalties it owes to songwriters, composers, lyricists**,** and music publishers (collectively, "Songwriters and Music Publishers") who create, own**,** and administer the musical works upon which Spotify's business is based.  ~~Under~~**Although Spotify has claimed in this Court that it is adhering to the letter of law with respect to its reporting and royalty obligations to the MLC, in reality the opposite is true, as Spotify is failing to report and pay royalties in violation of the plain language of** Section 115 ~~of the Copyright Act~~ and its implementing regulations ~~(collectively, "~~**.  Spotify is improperly reducing the royalties due to**

**Songwriters and Music Publishers with respect to its flagship Premium offering by overstating the value of the time-limited audiobooks listening available to Premium subscribers, tens of millions of whom began subscribing to Premium well before Spotify made audiobooks listening part of its music streaming service.  And with respect to Audiobooks Access—which also offers access to audiobooks and music—Spotify is failing to make any royalty payments at all on the subscription revenue generated from that Offering.  As a result, Spotify is depriving Songwriters and Music Publishers of the mechanical royalties they are owed in return for the blanket license that Spotify enjoys.**

2.    Under Section 115") of the Copyright Act, Spotify receives a compulsory blanket license that allows it to offer tens of millions of musical works on an on-demand basis. for listening by its End Users without otherwise having to license them directly from the Songwriters and Music Publishers that create and control the mechanical rights to those works.[1]  That blanket license is the foundation of a multibillion dollar business with tens of millions of subscribers paying monthly fees, typically $10.99, for access to Spotify's Premium music service Subscription Offerings[2] ("Premium").[1] In return, Basic

---

[1]  Throughout, capitalized terms have the meaning ascribed to them in Section 115 and its implementing regulations, including 37 C.F.R. § 385.2 (collectively, "Section 115").

[2]  Spotify offers Premium in a variety of tiers, including Premium Individual, Premium Duo, and Premium Family.  *See infra* ¶¶ 63-66.  References to "Premium," "Premium Bundle," or "Premium Bundled Subscription Offering" are inclusive of Premium Individual, Premium Duo, and Premium Family.

[1]  In addition to its "Individual" Premium plan (priced at $10.99 per month), Spotify also offers a "Duo" Premium plan for couples (priced at $14.99 per month) and a "Family" Premium plan for family members (priced at $16.99 per month).  *See* Spotify, https://www.spotify.com/us/premium/ (last accessed May 16, 2024).

Subscription Offerings[3] ("Basic"), and the Audiobooks Access Subscription Offering ("Audiobooks Access").[4]

3.    To be eligible for the blanket license, Spotify is obligated to ~~make~~comply with Section 115, including the monthly obligation to deliver certified usage reports and make prescribed mechanical royalty payments to the MLC, a non-profit ~~organization~~corporation that has been designated by the U.S. Copyright Office to ensure that Spotify and other music streaming services accurately and timely pay the ~~mechanical~~ royalties they owe to Songwriters and Music Publishers. ~~The amount of those royalty payments is dependent in part on the "Service Provider Revenue"[2] that Spotify earns from music-related "Subscription Offerings"[3] such as Premium.~~

~~2.    On March 1, 2024, without advance notice to the MLC, Spotify unilaterally and unlawfully decided to reduce the Service Provider Revenue reported to the MLC for Premium by almost *50 percent*, by improperly characterizing the service as a different type of~~

---

[3] Spotify offers Basic in a variety of tiers, including Basic Individual, Basic Duo, and Basic Family. *See infra* ¶¶ 66-67. References to "Basic" are inclusive of Basic Individual, Basic Duo, and Basic Family.

[4] A "Subscription Offering" is an "Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle." 37 C.F.R. § 385.2. Subscription Offering describes the type Offering but is not a reportable Offering type itself. For example, Standalone Portable Subscription Offerings and Bundled Subscription Offerings (the music component of a Bundle, like Premium) are all types of Subscription Offerings. References to a Subscription Offering are inclusive of all types of Subscription Offerings.

~~[2] "Service Provider Revenue" means "All revenue from End Users recognized by a Service Provider for the Offering"; "All revenue recognized by a Service Provider by way of sponsorship and commissions . . . *i.e.*, advertising"; and "All revenue recognized by a Service Provider . . . as a result of the placement of third party advertising . . ." 37 C.F.R. § 385.2.~~

~~[3] A "Subscription Offering" is an "Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle." 37 C.F.R. § 385.2.~~

~~Subscription Offering and underpaying royalties, even though there has been no change to the Premium plan and no corresponding reduction to the revenues that Spotify generates from its tens of millions of Premium subscribers.~~

~~3.    Neither the Copyright Act, nor its governing regulations, countenance Spotify's underreporting of Service Provider Revenue.~~  The financial consequences of Spotify's failure to meet its statutory obligations ~~are enormous for Songwriters and Music Publishers. If unchecked, the impact on~~ Songwriters and Music Publishers ~~of Spotify's unlawful underreporting could run into the hundreds of millions of dollars,  if estimates by industry publications are correct,[4]upending a central premise of Section 115 that Songwriters and Music Publishers should be paid in strict accordance with Section 115 and its regulations for the compulsory use of their works.~~

4.    Spotify's ~~rationale for reducing the amount of Service Provider Revenue is that, on March 1, 2024, Premium became a "Bundled Subscription Offering"[5]when Spotify launched Audiobooks Access ("Audiobooks Access"), a purportedly new product that allows Audiobooks Access subscribers to listen to up to 15 hours of audiobooks per month in return for a monthly $9.99 fee.  Section 115 instructs how Service Provider Revenue is to be reported when music offerings are sold or "bundled" together with non-music products or services in a single transaction.  Mechanical royalties for a Bundled Subscription Offering are only paid on the pro-rata portion of the music-related component of the Bundled~~ **obligation to report usage and royalties for each of its Subscription Offerings, including Premium and Audiobooks**

~~[4] *See Billboard*, "Spotify to Pay Songwriters About $150 Million Less Next Year with Premium, Duo, Family Plan Changes," https://www.billboard.com/business/streaming/spotify-songwriters-less-mechanical-royalties-audiobooks-bundle-1235673829/.~~
~~[5] A "Bundled Subscription Offering" is "a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads included within a Bundle." 37 C.F.R. § 385.2.~~

Access, is spelled out in 37 C.F.R. § 385.2 and 37 C.F.R. § 385.21.  Spotify is not complying with the plain language of those provisions.  With respect to Premium, which this Court has previously found to be a Bundle, Spotify is  underreporting revenue and underpaying royalties by overstating the value of Premium's audiobooks component.  With respect to Audiobooks Access, Spotify is also underreporting revenue and underpaying royalties for that service by failing to report it at all under the regulations applicable to Subscription Offerings, even though it clearly is a Subscription Offering.

5.    Turning first to Premium, 37 C.F.R. § 385.21 requires Spotify to pay mechanical royalties following a multi-step calculation process set out below.  *See infra* ¶¶ 37-45.  In broad outline, this formula begins with a requirement that Spotify determine the "all-in royalty" (or the pool of money subject to mechanical royalties) by determining the greater of either "the applicable percent of Service Provider Revenue"[5] or the "result of the TCC Prong Calculation"[6] (formerly known as Total Cost of Content).  37 C.F.R. § 385.21(b).  The calculation of mechanical royalties owed on Premium is also subject to certain minimum royalty floors.  *See* 37 C.F.R. § 385.21(d).

6.    If Premium is a Bundle of two products or services—music and audiobooks—Spotify must determine the value attributable to each component when it

---

[5]  "Service Provider Revenue" means "All revenue from End Users recognized by a Service Provider for the provision of the Offering"; "All revenue recognized by a Service Provider by way of sponsorship and commissions . . . i.e., advertising"; and "All revenue recognized by the Service Provider . . . as a result of the placement of third-party advertising."  37 C.F.R. § 385.2.

[6]  "TCC means the total amount expensed by a Service Provider or any of its Affiliates in accordance with GAAP for rights to make Eligible Interactive Streams or Eligible Limited Downloads of a musical work embodied in a sound recording through the Service Provider for the Accounting Period, which amount shall equal the Applicable Consideration for those rights at the time the Applicable Consideration is properly recognized as an expense under GAAP."  37 C.F.R. § 385.2.

calculates the Service Provider Revenue it reports to the MLC.  To do so, 37 C.F.R. § 385.2 requires that Spotify use the "standalone retail prices of each of the components of the Bundle."  If a Bundle component is not offered as a "standalone" product or service by Spotify, then Spotify must use the "average standalone published price . . . for the most closely comparable product or service" to the Bundle component, "or, if more than one comparable exists, the average of standalone prices for comparables."  *See id*.  Where "no reasonably comparable product or service exists in the U.S., then [Spotify] may use another good faith, reasonable measure of the market value of the component."  *Id.*

7.    After determining the applicable standalone value of each component, Spotify must then calculate the pro-rata portion of revenue attributable to the music component.  To do this, Spotify must divide the value of the music component by the sum of the values of the music and non-music components of the Bundle.  37 C.F.R. § 385.2. For example, if a Bundle consists of a music component with a standalone price of $10.00 and a non-music component with a standalone price of $10.00, the percentage of the revenue attributable to music under the Service Provider Revenue formula is the standalone price of the music component ($10.00) divided by the sum of the standalone prices of the music and non-music components ($10.00 + $10.00 = $20.00).  *Id.*  Thus, 50 percent of the revenue generated from the retail sale of that hypothetical Bundle would be attributable to the music component (*i.e.*, $10.00 ÷ $20.00 = .500 or 50%) and must be reported to the MLC as part of Service Provider Revenue.

5.    Spotify's assertion that Premium is now a Bundled Subscription Offering is directly at odds with the Section 115 regulations that the MLC has primary responsibility for interpreting and applying.  Premium is exactly the same service that Spotify offered to its

6

subscribers before the launch of Audiobooks Access. Nothing has been bundled with it. In the months before the purported transformation of Premium into a Bundled Subscription Offering, subscribers could listen to unlimited ad-free music and up to 15 hours of audiobooks each month in return for a $10.99 monthly payment, as well as other non-music audio content available on Spotify's platform, such as podcasts, comedy shows and spoken word performances. The launch of Audiobooks Access resulted in no change at all in Premium. And prior to March 1, Spotify paid mechanical royalties on the entirety of Premium revenues, subject to certain specific reductions identified in Section 115, despite the fact that Premium subscribers also had access to the same number of hours of audiobooks as Audiobooks Access subscribers now have. Nothing changed on the day Audiobooks Access launched: Premium subscribers continue to get the same single product, providing the same on-demand access to tens of millions of musical works (along with other audio content) at the same price. The only change is that Spotify, by erroneously recharacterizing its Premium service as a Bundled Subscription Offering, is violating Section 115 and its regulations with respect to its reporting of Service Provider Revenue and, as a result, underpaying mechanical royalties.

6.      In fact, the relevant Section 115 regulations, which are reviewed in detail below, specifically provide that, to qualify as a "Bundle," there must be a combination of *at least two* products: a "Subscription Offering," that is, a subscription music offering, plus "one or more other products or services having more than token value." 37 C.F.R. § 385.2. Premium did not become a Bundled Subscription Offering when Spotify launched Audiobooks Access because Premium already consisted of unlimited music and access to other audio products, including up to 15 hours of audiobook listening. To qualify as a Bundled Subscription Offering, an offering must include at least two distinct products or services. Premium does not.

7.    ~~There are numerous other flaws in Spotify's position. Spotify informs potential Audiobooks Access subscribers that, unlike Premium subscribers, they will not have access to unlimited, ad-free, on-demand music. But in rolling out its Audiobooks Access plan, Spotify neglected to create a different product. It appears that new Audiobooks Access subscribers are being granted access~~ to 15 hours of audiobooks listening ~~and the *same* access to unlimited, ad-free, on-demand music that Premium subscribers are provided. The only difference is that subscribers to Audiobooks Access are paying $9.99 per month, rather than $10.99, to receive the same product.~~

8.    ~~But even if Audiobooks Access were a differentiated product, Premium still would not qualify as a Bundled Subscription Offering. That is because the audiobooks component of Premium does not have more than the "token value" required to qualify as a Bundled Subscription Offering under Section 115.[6]Spotify did not raise the $10.99 monthly price of Premium when it added audiobooks to its service in November 2023 and allowed Premium subscribers to listen to~~ **In November 2023, Spotify added audiobooks listening to Premium.[7]** **Spotify added 15 monthly hours of audiobooks listening each month, in addition to the unlimited access to music that Premium subscribers previously enjoyed. Spotify, which had long included a variety of non-music content in all of its Offerings (in addition to the music content that was the primary feature of each Offering), did not raise the prices of**

---

[6]  ~~As noted above, under Section 115 a "Bundle means a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and one or more other products or services *having more than token value*…." 37 C.F.R. § 385.2 (emphasis added).~~

[7]  **Spotify first announced the addition of audiobooks listening to Premium in a highly-publicized announcement on October 3, 2023, with comments from Spotify's senior executives, including founder and CEO Daniel Ek, Chief Business Officer Alex Norström, and Vice President of Business Affairs David Kaefer, among others. Spotify, *Audiobooks on Spotify*, YouTube, https://www.youtube.com/watch?v=gZL3teCFcP0 (October 3, 2023).**

**Premium to reflect the addition of** 15 **monthly** hours of audiobooks ~~with no additional charge. The fact that the price did not go up is powerful evidence of the "token value" of audiobooks to the Premium subscribers.~~ **listening.**

9.    ~~The manner in which Spotify has launched Audiobooks Access also demonstrates that it has no more than "token value" to Spotify. The Audiobooks Access subscription page does not appear to be directly accessible from Spotify's website. Nor is Audiobooks Access among the plans that Spotify advertises to potential subscribers at the foot of every single page of its website. Accordingly, there is little doubt that the number of subscribers who will sign up for Audiobooks Access is likely to be a fraction of the Premium subscribers. The principal value of Audiobooks Access to Spotify is to support Spotify's claim that Premium is now a Bundled Subscription Offering. That does not and cannot satisfy the "more than token value" requirement of Section 115.~~**Spotify also continued to report Premium to the MLC as a standalone Subscription Offering, just as it had done prior to this announcement, and certified the accuracy of those reports as required by 37 C.F.R. § 210.27. This meant that Spotify continued to report and pay royalties for Premium based on 100 percent of Premium's revenue (less permitted deductions).**

**10.    In March 2024, Spotify launched Audiobooks Access, a new Subscription Offering. Despite its name, Audiobooks Access actually provides its subscribers with up to 15 hours of audiobooks listening *and* unlimited hours of music listening in exchange for a monthly subscription fee—just like Premium. However, in stark contrast to the highly publicized announcement regarding the addition of audiobooks listening to Premium (which continued after the launch of Audiobooks Access), Spotify, a**

9

sophisticated marketer that had grown Premium into the largest music streaming service in the world, launched Audiobooks Access with effectively no marketing.

11.     Coincident with the launch of Audiobooks Access, Spotify began reporting all tiers of Premium to the MLC as Bundles consisting of two components: (1) unlimited music listening, and (2) up to 15 hours of audiobooks listening per month. Spotify then used the $9.99 price of Audiobooks Access as the price for Premium's audiobooks component in the Service Provider Revenue formula applicable to Bundled Subscription Offerings (which is the term that refers to the music components in the Premium Bundles).

12.     Upon information and belief, a principal purpose of the launch of Audiobooks Access was to create a $9.99 subscription price for Premium's audiobooks component, in order to reduce reportable Service Provider Revenue—and the payment of mechanical royalties—for Premium under the regulations governing Bundled Subscription Offerings.  To use Premium Individual as an example, Spotify reported that the "standalone" price for Premium Individual's music component was $10.99 and the "standalone" price for the audiobooks component was $9.99, which Spotify based on the $9.99 price of Audiobooks Access.  *See* 37 C.F.R. § 385.2.  By reporting Premium Individual as a Bundle and pricing Premium Individual's audiobooks component at $9.99, Spotify decreased the pro-rata portion of Premium Individual's revenue attributable to the music component, and thus the portion subject to mechanical royalties (*i.e.*, Service Provider Revenue), from 100 percent (less permitted deductions) to approximately 52.4 percent ($10.99 ÷ ($10.99 + $9.99) = .524 or 52.4%).  Spotify employed the same tactic to

slash the revenue attributable to music for Premium Duo by approximately 40 percent and the revenue attributable to music for Premium Family by approximately 37 percent.

13.    But neither 37 C.F.R. § 385.2 nor 37 C.F.R. § 385.21 permit Spotify to use the subscription price of Audiobooks Access as the "standalone published price" of the audiobooks component of the Premium Bundle for a very clear and simple reason: Audiobooks Access is not a "standalone" audiobooks service.  As Spotify's own description of the service confirms, Audiobooks Access provides its subscribers with access to audiobooks listening *and* music listening.[8]  Therefore, the $9.99 subscription price of Audiobooks Access cannot serve as the "standalone published price" for the audiobooks component of the Premium Bundle.  *See* 37 C.F.R. § 385.2.  The plain meaning of "standalone" in the applicable regulatory language supports no other conclusion.

14.    Because Spotify does not have a standalone audiobooks offering equivalent to Premium's audiobooks component (*i.e.*, a standalone service that offers *only* 15 hours of monthly audiobooks listening), the regulations specify that Spotify must use the "published price" of the "most closely" and "reasonably comparable product or service" available in the U.S., if such a service exists, to set the value of the audiobooks component of the Premium Bundle.  *See* 37 C.F.R. § 385.2.  Upon information and belief, there are *no* audiobooks services that are "reasonably comparable" to the audiobooks component of Premium.  Other audiobooks services provide more value to subscribers, by either permitting unlimited monthly listening during the subscription period or providing a

---

[8]    "Enjoy 15 hours of listening time from our audiobook subscriber catalog every month, with ad-supported access to music and podcasts, available in the US only."  *Audiobooks Access plan*, Spotify, https://support.spotify.com/us/article/audiobooks-access-plan (accessed Mar. 29, 2025).

monthly token or credit that subscribers may use to buy books of any length (which, in most instances, may be retained even after they cancel their subscription), or a combination of both.  By contrast, Premium subscribers are limited to 15 monthly hours of audiobooks listening during their subscriptions (unless they purchase additional listening hours for an additional fee), and they do not receive a token or credit each month that can be used to purchase an audiobook.  Additionally, Premium's app is not an audiobooks app. It is a music app with additional audiobooks listening that offers a different user experience from standalone audiobooks apps tailored to support and enhance the experience of listening to audiobooks.

15.    When a component of a Bundle is not offered on a standalone basis and there are no other "reasonably comparable" standalone products on the market, Spotify's only other option to calculate Service Provider Revenue under the applicable regulations is to use a "good faith, reasonable measure of the market value" of the audiobooks component of Premium.  37 C.F.R. § 385.2.  The $9.99 price of Audiobooks Access is not a "good faith, reasonable measure of the market value" for 15 monthly hours of audiobooks listening because other audiobooks products on the market offer *unlimited* hours of audiobooks listening per month for *less* than $9.99 per month.  *See id.*  Nor can the $9.99 price of Audiobooks Access meet the "good faith, reasonable" market value test for 15 monthly hours of audiobooks listening given that Spotify initially provided Premium subscribers with the identical amount of monthly audiobooks listening at no additional charge, and then, months later, only raised the price of the Premium Bundles by one dollar per month for Premium Individual, two dollars per month for Premium Duo, and three dollars per month for Premium Family.

16.    Because Spotify is basing Service Provider Revenue on the subscription price of Audiobooks Access rather than a "good faith" and "reasonable measure of the market value" of 15 monthly hours of audiobooks listening, Spotify is failing to accurately report revenue and pay royalties to the MLC as required by Section 115 and its implementing regulations.

17.    Spotify claims it is accounting for Audiobooks Access in the usage reports and royalty payments that it provides for a completely different, unrelated, non-subscription Offering: Spotify's free, ad-supported service ("Spotify Free").  Once again, such reporting contradicts the plain language of the governing regulations.  Audiobooks Access subscribers do not receive access to music for free; they pay a subscription fee of $9.99 to listen to both music *and* audiobooks "in one app experience."[9]  As a result, Audiobooks Access can only be properly characterized as a Subscription Offering, and Spotify must report the subscription revenues generated by Audiobooks Access and the royalties it owes for streams of music by Audiobooks Access subscribers in separate usage reports.  *See* 37 C.F.R. § 385.21(b) (providing that where a "Service Provider makes available different Offerings, royalties must be calculated separately with respect to each Offering").  Further, if Premium is properly characterized as a Bundle of music and audiobooks components, as the Court has previously concluded, then so too is Audiobooks Access, meaning that Spotify must report and pay royalties for Audiobooks Access as a Bundled Subscription Offering.

---

[9] *Spotify's New Audiobooks Access Tier Gives Booklovers More Listening Options*, Spotify, https://newsroom.spotify.com/2024-03-01/spotifys-new-audiobooks-access-tier-gives-booklovers-more-listening-options/ (Mar. 1, 2024).

10.    In sum, and as shown below, Spotify's attempt to reduce its **18.    There are significant financial consequences of Spotify's failure to meet its statutory obligations to properly report revenue and pay** mechanical royalties has resulted in a clear breach of its obligations under Section 115**to the MLC for Premium and Audiobooks Access. The precise amount of mechanical royalties owed in connection with Spotify's improper calculation of royalties for Premium under the Service Provider Revenue formula for Bundles will ultimately depend upon a determination at trial of the "good faith, reasonable measure of the market value" of Premium's audiobooks component. And the precise amount of mechanical royalties owed in connection with Spotify's failure to properly report royalties for Audiobooks Access will depend on a determination at trial of the appropriate level of royalties owed for the service under the regulations governing Subscription Offerings. *See* 37 C.F.R. §§ 385.2; 385.21. Because the reporting and payment obligations set out in Section 115 and its implementing regulations will remain in effect at least through the end of 2027 (when the current rates and terms expire[10]), the damages caused to Songwriters and Music Publishers by Spotify's improper reporting and payment of royalties will continue to compound**. As a result, the MLC, which is specifically authorized under the Copyright Act to bring actions to enforce the royalty obligations of compulsory blanket licensees such as Spotify, brings this suit to compel Spotify to adhere to the**its** clear and specific **royalty** reporting and payment obligations that Section 115 imposes.

---

[10]    **The current rates and terms were determined in *Phonorecords IV*, which is discussed below, *infra* ¶¶ 32-36.**

~~The Parties~~

**THE PARTIES AND PRIOR PROCEEDINGS**

~~11~~**19**.  Plaintiff the MLC is a non-profit corporation formed and existing under the laws of the State of Delaware with its headquarters at 333 11th Avenue South, Suite 200, Nashville, Tennessee 37203.  The MLC is the sole entity authorized to offer and administer compulsory blanket licenses under Section 115, and to collect the ensuing royalties due from blanket licensees.  *See* 37 C.F.R. § 210.23(a); 17 U.S.C. § 115(d)(3)(B)-(C).  The MLC is explicitly authorized by statute to engage in legal action to enforce the royalty obligations of licensees.  *See* 17 U.S.C. § 115(d)(3)(C)(i)(VIII).

~~12~~**20**.  Defendant Spotify is a corporation formed and existing under the laws of the State of Delaware with its headquarters at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007.  Spotify ~~is~~**operates** one of the largest music streaming services in the U.S. and undertakes substantial business activities throughout the country, including in this District.  Spotify obtained a compulsory blanket license, as of January 1, 2021, by operation of law because it was already operating under the previous statutory mechanical license, which was superseded by the compulsory blanket license.  *See* 17 U.S.C. § 115(d)(9)(A).  Spotify filed a Notice of License with the MLC confirming its operation under the compulsory blanket license on or about December 1, 2020.

**21.    The MLC filed its original Complaint on May 16, 2024.  In that Complaint, the MLC alleged that Spotify misreported and underpaid royalties on Audiobooks Access and Premium, inclusive of all tiers, and that Premium was not a Bundle.  *See* Dkt. 1.  The Court dismissed the entirety of the MLC's original Complaint with prejudice and entered judgment.  *See* Dkt. 61, 62.  The MLC moved for**

reconsideration and vacatur of the judgment.  *See* Dkt. 71.  The Court granted the MLC's motion for vacatur of the judgment and granted the MLC permission to seek leave to file this First Amended Complaint with respect to certain matters, including "that Spotify has allegedly underpaid the royalties due on the Audiobooks Access plan and improperly calculated the royalties owed in connection with Premium by relying on Audiobooks Access as the standalone subscription price of the Bundle's non-music component."[11]  *See* Dkt. 74, at 6.

~~Jurisdiction and Venue~~JURISDICTION AND VENUE

~~13~~22.    This Court has subject matter jurisdiction over this action, which arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq*., pursuant to 28 U.S.C. §§ 1331 and 1338(a).

~~14~~23.    This Court has personal jurisdiction over Spotify because its principal place of business is located within this District, and because it has conducted systematic and continuous business in this District.

~~15~~24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(a) because Spotify has its principal place of business within this District and has committed, and continues to commit, the wrongful acts alleged herein within this District.

---

[11]    The MLC does not concede that Premium is a Bundle and preserves its right to appeal that holding at the appropriate time.  *See P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) (The Second Circuit does "not require a party, in an amended complaint, to replead a dismissed claim in order to preserve the right to appeal the dismissal when the court has not granted leave to amend" because "[s]uch a formalistic requirement serves no valid purpose.").  Instead, in this First Amended Complaint, the MLC alleges in the alternative that, if Premium is a Bundle, Spotify has nonetheless underpaid royalties owed for Premium.

## ~~The Facts~~THE FACTS

### *The Section 115 Compulsory Blanket License*

~~16~~**25**.  Section 106 of the Copyright Act grants the owner of a copyright in a musical work certain exclusive rights, including the exclusive rights to reproduce and distribute the work.  *See* 17 U.S.C. § 106(1) and (3).

~~17~~**26**.  Since 1909, the Copyright Act has also made these exclusive rights subject to compulsory licensing in certain situations, provided that there is compliance with applicable statutory and regulatory requirements.  In particular, the Copyright Act provides that the exclusive rights to reproduce and distribute musical works are subject to compulsory licensing in situations involving audio-only sound recordings, or "phonorecords," of "nondramatic musical works."  17 U.S.C. § 115(a)(1)**(A)**.

~~18~~**27**.  From 1909 until 2021, this compulsory mechanical license generally required that the licensee first send notice to the copyright owner of each musical work to be used under the compulsory license~~,~~ and then account and pay monthly royalties directly to each copyright owner.

~~19~~**28**.  With the advent of digital music providers and their need for libraries of sound recordings embodying tens of millions of musical works, many new problems developed around the system of individualized notice and payment.  In 2018, the Copyright Act was amended by the Music Modernization Act (the "MMA"), which created a new *compulsory* blanket license for certain uses of musical works.  *See* 17 U.S.C. § 115(d).  The compulsory blanket license became available on January 1, 2021.  Digital music providers who obtain a

**compulsory** blanket license are permitted to reproduce and distribute musical works[7]in [12] in connection with certain covered activity[8]that includes **Covered Activities,[13] including in** digital **interactive** streaming by services such as Spotify that provide on-demand access to music.

***The MLC and ItsHas* Standing *toTo* Bring Legal Claims *toTo* Enforce Rights**
***and And* Obligations *under aUnder The* Section 115 Compulsory Blanket License**

2029. The MMA directed the Register of Copyrights to appoint a single non-profit "mechanical licensing collective" to administer the compulsory blanket license, **including by** collecting the **mechanical** royalties owed by licensees and distributing those royalties to the Songwriters and Music Publishers to which the royalties are due. 17 U.S.C. § 115(d)(3).[9]

2130. Plaintiff the MLC is the non-profit organization**corporation** that was designated by the Register of Copyrights, pursuant to the MMA, to serve as the mechanical licensing collective under the MMA.[10] **[14]**

---

[7] The right to reproduce and distribute musical works that are eligible for statutory licensing under 17 U.S.C. § 115 is also known as the "mechanical" right.

**[12] The right to reproduce and distribute musical works that are eligible for statutory licensing under 17 U.S.C. § 115 is also known as the "mechanical" right.**

[8] "Covered Activity" is defined in the MMA to mean "the activity of making a digital phonorecord delivery of a musical work, including in the form of a permanent download, limited download, or interactive stream, where such activity qualifies for a compulsory license under this section." 17 U.S.C. § 115(e)(7).

**[13] "Covered Activity" is defined in the MMA to mean "the activity of making a digital phonorecord delivery of a musical work, including in the form of a permanent download, limited download, or interactive stream, where such activity qualifies for a compulsory license under this section." 17 U.S.C. § 115(e)(7).**

[9] The royalty rates and terms for the compulsory blanket license are set by the Copyright Royalty Board in quinquennial administrative proceedings and codified in the Code of Federal Regulations. *See* 17 U.S.C. Chapter 8; 37 C.F.R. Part 385.

[10] *See* 37 C.F.R. § 210.23(a); U.S. Copyright Office, Library of Congress, Designation of Music Licensing Collective and Digital Licensee Coordinator, 84 Fed. Reg. 32274 (July 8, 2019).

**[14] *See* 37 C.F.R. § 210.23(a); U.S. Copyright Office, Library of Congress, Designation of Music Licensing Collective and Digital Licensee Coordinator, 84 Fed. Reg. 32274 (July 8, 2019).**

2231.    The MMA gives the MLC standing to "[e]ngage in legal and other efforts to enforce rights and obligations under" the Copyright Act,[1115] and specifically contemplates that the MLC may "enforce rights or obligations under a blanket license, including through a bankruptcy proceeding or other legal action."[1216]

*The Definitions of "Bundle" and "Bundled Subscription Offering" under the Section 115 Regulations*

23.    Under the relevant regulatory provisions, "Bundle" is defined as "a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and one or more other products or services having more than token value, purchased by End Users in a single transaction (*e.g.,* where End Users make a single payment without separate pricing for the Subscription Offering component)."  37 C.F.R. § 385.2.  A "Bundled Subscription Offering" is defined as "a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads included within a Bundle."  *Id.*  And a "Subscription Offering" is defined as "an Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle."  *Id.*

24.    Other subscription services illustrate the type of Bundled Subscription Offering the Section 115 regulations are meant to cover.  For example, some subscription services make Bundled Subscription Offerings available in multiple pricing tiers that include different services.  One tier might include cloud storage, television streaming and music streaming; another might include those same products, plus additional ones such as news and

---

[1115] 17 U.S.C. § 115(d)(3)(C)(i)(VIII).
[1216] 17 U.S.C. § 115(d)(3)(G)(ii).

fitness content. Potential subscribers are encouraged to subscribe to a Bundled Subscription Offering at a discounted price relative to the aggregate price of subscribing to each of the bundled services individually.

***The History And Process For The Setting Of Royalty Rates And Terms Applicable To The Section 115 Compulsory Blanket License***

32.     The royalty rates and terms for the compulsory blanket license are set by the Copyright Royalty Board ("CRB") in quinquennial administrative proceedings and codified in the Code of Federal Regulations. *See* 17 U.S.C. ch. 8; 37 C.F.R. § 385.

33.     In 2009, the Copyright Royalty Board issued the first determination of royalty rates and terms for acts of interactive streaming under the Section 115 compulsory license, which is generally referred to as the *Phonorecords I* determination.[17] The *Phonorecords I* determination included a rate category for bundled subscription services, where the music Offering was provided "with one or more other products or services."[18]

34.     In 2013, the CRB issued the *Phonorecords II* determination, which maintained the bundled subscription service rate category from *Phonorecords I*.[19]

35.     In 2019, the CRB issued the *Phonorecords III* determination, which maintained the bundled subscription rate from *Phonorecords I* and *Phonorecords II* and categorized it as a "Bundled Subscription Offering," which was defined as a Subscription

---

[17] Copyright Royalty Board, Library of Congress, Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 4510 (Jan. 26, 2009).

[18] *Id.* at 4532.

[19] Copyright Royalty Board, Library of Congress, Adjustment of Determination of Compulsory License Rates for Mechanical and Digital Phonorecords, 78 Fed. Reg. 67943 (Nov. 13, 2013).

Offering where the music Offering was made available "with one or more other products or services . . . as part of a single transaction without pricing for the subscription service providing [the music content] separate from the product(s) or service(s) with which it is made available (e.g., a case in which a user can buy a portable device and one-year access to a subscription service providing Licensed Activity for a single price)."[20]

36.    The *Phonorecords IV* proceeding, which resulted in the promulgation of the current rates and terms embodied in Section 115, govern for the period of January 1, 2023 through December 31, 2027.[21]

**The ~~Calculation of~~Steps For Calculating Royalties ~~under~~Owed For The Use Of Musical Works Under Section 115's Compulsory Blanket License**

~~25~~37.    Section 115 ~~provides detailed steps governing the calculation of royalties payable to the MLC on a monthly basis.   *See generally*~~and its implementing regulations (which were promulgated pursuant to *Phonorecords IV*) impose specific reporting and royalty payment requirements for music services offering "Eligible Interactive Streams," which is defined as any "digital transmission of a sound recording of a musical work in the form of a stream" that is not subject to performance royalty exemptions (which are not relevant here).  17 U.S.C. § 115(e)(13); 37 C.F.R. § ~~385.21 *et seq*~~385.2.  The royalty calculation process set out in the applicable regulations involves four steps, ~~with certain important distinctions (as discussed below) between standalone Subscription Offerings and~~some of which have specific terms that only apply to Bundled Subscription Offerings.  There are also

---

[20]  Copyright Royalty Board, Library of Congress, Determination of Royalty Rates and Terms for Making and Distributing Phonorecords, 88 Fed. Reg. 54481 (Aug. 10, 2023).

[21]  Copyright Royalty Board, Library of Congress, Determination of Royalty Rates and Terms for Making and Distributing Phonorecords, 87 Fed. Reg. 80448 n.2 (December 30, 2022).

**differences in some of the steps that are only applicable to music services provided for a fee or those that are "free of any charge to the End User." *See* 37 C.F.R. § 385.21(b).**

~~26.~~ **38.** **Regardless of whether a service is provided for a fee or is offered free of charge,** Step 1 requires ~~that licensees "Calculate~~**Service Providers to "[c]alculate** the all-in royalty for the Offering" by determining the greater of "[t]he applicable percent of Service Provider Revenue" and "[t]he ~~Result~~**result** of the TCC[13] Prong Calculation for the respective type of Offering." 37 C.F.R. §~~§~~ 385.21(b)(1)(i)-(ii). ~~Where a "~~**The methodologies for calculating both the "applicable percent of** Service Provider ~~makes available different Offerings, royalties must be calculated separately with respect to each Offering . . . ."~~ **Revenue" and the "TCC Prong Calculation" are expressly set out in the governing regulations.** 37 C.F.R. §~~§~~ 385.21(b)**(1); 385.2**.

~~27~~**39**. The ~~methodologies for calculating both the "applicable percent~~**same definition** of Service Provider Revenue~~" and the "TCC Prong Calculation" are expressly set out in the governing regulations. *See id.*~~ For example, the ~~Percent~~ **applies to all Offering types, and includes: (i) "[a]ll revenue from End Users recognized by a Service Provider for the provision of the Offering [*i.e.*, subscription fees]"; (ii) "[a]ll revenue recognized by a Service Provider by way of sponsorship or commissions as a result of the inclusion of third-party 'in-stream' or 'in-download' advertising . . . i.e., advertising placed immediately at the start or end of, or during the actual delivery of, a musical work"; and (iii) "[a]ll revenue recognized by the Service Provider, including by way of sponsorship and commissions, as a result of the placement of third-party advertising on a Relevant Page of**

---

[13] ~~"TCC" is defined as "the total amount expensed by a Service Provider . . . in accordance with GAAP for rights to make Eligible Interactive Streams or Eligible Limited Downloads of a musical work embodied in a sound recording . . . ." 37 C.F.R. § 385.2.~~

the Service Provider [*i.e.*, advertisements on the home screen of an Offering from which an End User can stream musical works]."[22]  37 C.F.R. § 385.2.  The applicable percentage of Service Provider Revenue ~~set forth in the regulations~~for use in royalty calculations varies by royalty year, ~~from 15.1% in 2023 to 15.35% in 2027 (the final year encompassed by the existing the regulations)~~.  *See* Table 1 to 37 C.F.R. § 385.21(b)(1).  For 2024, the ~~provided amount is~~percentage was 15.2%, and for 2025, the percentage is 15.25%.  *Id.*

40.    The TCC Prong Calculation varies based on the type of Offering at issue, including, as relevant here, whether an Offering is provided "free of any charge to the End User" or charges a fee (*e.g.*, a Bundled Subscription Offering).  Table 2 to 37 C.F.R. § 385.21(b)(1).  As mentioned above, TCC refers to "the total amount expensed by a Service Provider . . . in accordance with GAAP for rights to make Eligible Interactive Streams or Eligible Limited Downloads of a musical work embodied in a sound recording."  37 C.F.R. § 385.2.  TCC thus represents the total cost borne by the Service Provider for the rights to use sound recordings.  *See id.*; *see also* 37 C.F.R. § 385.21(b)(1).

~~28.~~    ~~The~~41. For the purposes of Step 1 of the royalty rate calculation, the TCC Prong Calculation~~, meanwhile, varies based on the type of Offering at issue.  As an example,~~ for a "Standalone Portable Subscription Offering" ~~has a TCC Prong Calculation~~(like Spotify Basic) is "[t]he lesser of "~~(i)~~ ~~the lesser of~~ 26.2% of TCC for the Accounting Period or (ii) the aggregate amount of $1.10 per subscriber for the Accounting Period." ~~*See*~~ Table 2 to 37 C.F.R. § 385.21(b)(1).  ~~A~~By contrast, the TCC Prong Calculation for a "Bundled

---

[22] The regulations further provide that Service Provider Revenue includes the value of any barter or nonmonetary consideration, and may encompass revenue recognized by an associate, affiliate, agent, or representative of the Service Provider in lieu of its being recognized by the actual Service Provider.  *Id.*

Subscription Offering" ~~has a TCC Prong Calculation of~~ **(like the music component of the Premium Bundle) is calculated simply by taking "**24.5% of TCC for the Accounting Period ~~. See id.~~**," without applying a "lesser of" comparison. *Id.*  And the TCC Prong Calculation for "[f]ree nonsubscription/ad-supported services free of any charge to the End User" (like Spotify Free) is simply "26.2% of TCC for the Accounting Period," again without applying a "lesser of" comparison. *Id.***

~~29~~**42**.   Step 2 **of the royalty calculation process** requires the ~~Licensee~~**Service Provider** to subtract applicable "Performance Royalties," as defined in the regulations, from the amount determined in Step 1 for each Offering of the Service Provider.[14]   **37 C.F.R. § 385.21(b)(2).  This step is the same for all Offering types. *Id.*  Performance royalties are separate from the mechanical royalties at issue here and are paid by Service Providers either to performance rights organizations (on behalf of rightsholders) or directly to rightsholders. *See id.*  Under Step 2, the Service Provider is directed to subtract all Performance Royalties that it has expensed or will expense pursuant to its public performance licenses in connection with uses of musical works in the particular Offering from the "all-in royalty" calculated in Step 1. *Id.***

~~30~~**43**.   Step 3 **of the royalty calculation process** involves the determination of the payable royalty pool, which is **the amount payable for the reproduction and distribution of *all* musical works used by the Service Provider in connection with a given Offering, *i.e.*, mechanical royalties.  The pool is** calculated by determining the greater of "(i) ~~The~~**[t]he** result determined in step 2 **[the "all-in" royalty amount minus applicable Performance Royalties]** . . . ; and (ii) ~~The~~**[t]he** royalty floor (if any) resulting from the calculations" ~~specific to certain~~

---

[14]   ~~*See* 37 C.F.R. § 385.2; 37 C.F.R. Part 385, Appendix A at 385.2.~~

~~types of products (such as Bundled Subscription Offerings) identified in the applicable~~**set forth in the** regulations. 37 C.F.R. § 385.21(b)(3).

**44.    Significantly, not all Offerings are subject to a royalty floor.  For instance, Standalone Portable Subscription Offerings are subject to a royalty floor of 60 cents per subscriber, and Bundled Subscription Offerings are subject to a royalty floor of 33 cents per subscriber.  37 C.F.R. §§ 385.21(d)(3)-(4).  But a "free nonsubscription/ad-supported service free of any charge to the End User shall not be subject to a royalty floor" in Step 3.  37 C.F.R. § 385.21(d)(6).**

~~31~~**45**.    Step 4 requires the calculation of per-work royalty allocations~~.  See~~**, which determines the amount payable for the reproduction and distribution of** *each* **musical work used by the Service Provider through a particular Offering.** 37 ~~CFR~~**C.F.R.** § 385.21(b)(4). ~~Per-work~~**Like Step 2, this step is also the same for all Offering types.** *See id.* **This allocation is accomplished by dividing the royalty pool determined in Step 3 by the total number of plays of all musical works in the Offering to determine the amount of royalties owed for each individual play and then multiplying that per-play amount by the total number of plays reported for each musical work.** *Id.* **The initial per-play** allocations can vary for reasons including, among other things, the length of the specific work at issue. *See id.*; *see also, e.g.*, 37 C.F.R. § 385.21(c) (specifying "Overtime adjustment[s]" for use in calculating per-work royalty allocations for works beyond certain lengths of time, starting at 5 minutes).

**46.    Section 115 requires that licensees such as Spotify "report and pay royalties to the mechanical licensing collective . . . on a monthly basis" and specifies that "royalty payments shall be made on or before the twentieth day of each month and shall include all royalties for the month next preceding."    17 U.S.C. §§ 115(d)(4)(A)(i);**

25

115(c)(2)(I).  The content of the reports submitted to the MLC are governed by statute, and reports must include all of the information necessary for the MLC to calculate and distribute royalties to Songwriters and Music Publishers, including the Offering type and the "usage data for musical works used in covered activities" in each Offering.  17 U.S.C. § 115(d)(4)(A)(ii).

47.    Where a "Service Provider makes available different Offerings, royalties must be calculated separately with respect to each Offering taking into consideration Service Provider Revenue, TCC, subscribers, Plays, expenses, and Performance Royalties associated with each Offering."  37 C.F.R. § 385.21(b).

48.    The compulsory blanket license only allows musical works to be used in certain permitted activities (*i.e.*, Covered Activities), and the Service Provider's exercise of these rights is conditioned upon "complying with the provisions of [Section 115]."  17 U.S.C. § 115(a)(1)(A).  If a service does not fall within those permitted uses or the Service Provider fails to comply with the provisions of Section 115, then the Service Provider would have to negotiate a license for the music it wished to include in that service directly from each mechanical rightsholder.  *See id.*

49.    Failure to provide materially accurate and timely reports or royalty payments to the MLC can result in a default by the Service Provider, which can lead to the termination of its blanket license and other penalties.  *See* 17 U.S.C. §§ 115(d)(4)(E)(i)-(ii).

50.    In order to comply with the reporting requirements of Section 115, Service Providers are also required to certify that the monthly reports they submit to the MLC either (1) "accurately reflect, in all material respects the blanket licensee's usage of musical works, the statutory royalties applicable thereto . . . and any other data that is

necessary for the proper calculation of the statutory royalties in accordance with 17 U.S.C. [§] 115 and applicable regulations" or (2) contain statements of fact that "are true, complete, and correct to the best of [the provider's] knowledge, information, and belief, and are made in good faith."  37 C.F.R. §§ 210.27(i)(5)(i)-(ii).

51.     This certification requirement is important for a number of reasons.  First, it underscores the formality and accuracy with which Service Providers are supposed to treat their reporting obligations.  Second, the certifications provide rightsholders with the added assurance that they can rely on the information they receive from the MLC because Service Providers have certified that those usage reports are "true, complete, and correct."  *See* 37 C.F.R. §§ 210.27(i)(5)(i)-(ii).  As the Register of Copyrights and Director of the U.S. Copyright Office explained in response to a series of questions regarding Spotify's decision to classify Premium as a Bundle posed to her by Senator Marsha Blackburn and Representatives Ted W. Lieu and Adam B. Schiff, the certification requirement is supposed to guard against abuse of the blanket licensing system by Service Providers to the detriment of copyright owners.[23]

*The Royalty Calculation For Bundled Subscription Offerings*

~~32.     As noted above, there are significant differences between~~52.     There are certain steps in the royalty calculation process ~~for standalone Subscription Offerings and~~

---

[23]  "The Music Modernization Act . . . has several provisions to guard against abuse of the blanket license.  For example, digital music providers ('DMPs') are subject to detailed usage and royalty reporting and records retention requirements, including the requirement to file an annual report with the MLC that must be certified by a certified public accountant."  Letter from Shira Perlmutter, Register of Copyrights and Director of the U.S. Copyright Office, to Senator Marsha Blackburn and Representatives Ted W. Lieu and Adam B. Schiff, available at https://www.copyright.gov/laws/hearings/response-to-6-12-2024-letter.pdf (Aug. 21, 2024).

under Section 115 that only apply to Bundled Subscription Offerings. One critical distinction is [24] For example, the Service Provider Revenue figure that a digital service provider must report for use in Step 1 of the royalty calculation process. For standalone Subscription Offerings, the digital service provider must report "all revenue from End Users recognized by a Service Provider for the provision of the Offering," subject to certain enumerated reductions. For for Bundled Subscription Offerings, the digital service provider must report an amount determined by using is calculated by determining "the aggregate of the retail price paid for the Bundle (i.e., all components for one retail price) multiplied by a fraction where the numerator is the standalone retail price of each of the components the Subscription Offering component in the Bundle and the denominator is the sum of the standalone retail prices of each of the components in the Bundle. [. . . .]" 37 C.F.R. § 385.2. Where "there is no standalone published price for a component of the Bundle, then the The Service Provider shall use the average standalone published price for End Users for the most closely comparable product or products in the U.S. . . . ." Id. Revenue formula for Bundled Subscription Offerings is represented as:

| Standalone Price of Music Component Sum of Standalone Component Retail Prices | x | Aggregate Retail Price | = | Service Provider Revenue |
|---|---|---|---|---|

53.   Where "there is no standalone published price for a component of the Bundle, then the Service Provider shall use the average standalone published price for End Users for the most closely comparable product or service in the U.S. or, if more than one

---

[24] A "Bundle" is "a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads and one or more other products or services having more than token value, purchased by End Users in a single transaction (e.g., where End Users make a single payment without separate pricing for the Subscription Offering component)." 37 C.F.R. § 385.2. A "Bundled Subscription Offering" is "a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads included within a Bundle." Id.

**comparable exists, the average of standalone prices for comparables." 37 C.F.R. § 385.2.**
**If there is no "reasonably comparable product or service" in the U.S., "the Service**
**Provider may use another good faith, reasonable measure of the market value of the**
**component." *Id.***

33.    For example, in a situation where a standalone Subscription Offering costs
$10 per month, the Service Provider Revenue that the digital service provider must report is $10
less certain permissible reductions (advertising expenses, etc.). By contrast, in a situation**54.**
**Thus,** where a standalone music Subscription Offering costs $~~10~~**10.00** per month and a
standalone video streaming subscription costs $~~10~~**10.00** per month, and a ~~Bundled Subscription~~
~~Offering~~**Bundle** containing both **those standalone products** costs $~~18~~**18.00** per month ~~(a~~
~~discount of $2 per month)~~, the Service Provider Revenue **(on per subscription basis)** would be
calculated by multiplying the ~~$18 bundled~~**aggregate retail** price **of the Bundle** by a fraction
where the numerator is the price of the standalone music Subscription Offering ($~~10~~**10.00**) and
the denominator is the sum of the ~~price~~**retail prices** for each of the standalone services in the
~~bundle~~**Bundle** ($~~10~~**10.00** for music ~~and~~**+** $~~10~~**10.00** for video~~), *i.e.*, $20. In other words, $18 x~~
~~$10 ÷ $20. Thus, in this illustrative example, the monthly revenue per subscriber~~ **= $20.00).**
**Thus, on a per subscription basis, Service Provider Revenue (*i.e.*, the revenue** subject to
mechanical royalties ~~for that Bundled Subscription Offering)~~ would be ~~$9 out of the bundled $18~~
~~subscription price.~~**calculated as follows:**

$$\frac{\$10.00 \text{ (Music Component)}}{\$10.00 + \$10.00 \text{ (Music Component + Video Component)}} \quad x \quad \frac{\$18.00}{\text{(Retail Price)}} \quad = \quad \frac{\$9.00}{\text{(Service Provider Revenue)}}$$

55.    If, however, the video streaming component in the example above was not offered on a standalone basis, then its price would be determined by using the average price of the most closely comparable video streaming service or, if no video streaming service was reasonably comparable, another "good faith, reasonable measure" of fair "market value."  37 C.F.R. § 385.2.  If there was no comparable product on the market, and a good faith and reasonable measure of the market value of the video component was $8.00 per month, then the denominator would equal $18.00, and the Service Provider Revenue on a per subscription basis would be as follows:

$$\frac{\$10.00 \text{ (Music Component)}}{\$10.00 + \$8.00 \text{ (Music Component + Video Component)}} \quad x \quad \frac{\$18.00}{\text{(Retail Price)}} \quad = \quad \frac{\$10.00}{\text{(Service Provider Revenue)}}$$

3456.    Another important distinctionsignificant difference, as noted above, is that the percentage used in the TCC Prong Calculation differs between **Offering types.  For example, the TCC Prong Calculation for non-Bundled Subscription Offerings like Standalone Portable Subscription Offerings is "[t]he lesser of (i) 26.2% of TCC for the Accounting Period or (ii) the aggregate amount of $1.10 per subscriber for the Accounting Period," while the TCC Prong Calculation for** Bundled Subscription Offerings (24.5%) and standalone offerings (26.2%).  In additionis simply "24.5% of TCC for the Accounting Period," without the "lesser of" comparison.  Table 2 to 37 C.F.R. § 385.21(b)(1).

.57.    Similarly, the royalty floors in Step 3 of the royalty calculation process requires identification of so-called royalty floors for certain types of offerings.  With respect to a Bundled Subscription Offering, the applicable regulations provide for a royalty floor in **are also different depending on the Offering type.  The royalty floor for non-Bundled Subscription Offerings like Standalone Portable Subscription Offerings is "the aggregate amount of 60 cents per subscriber per Accounting Period."  37 C.F.R. § 385.21(d)(3).  But the royalty floor for Bundled Subscription Offerings is less: the** "the aggregate amount of 33 cents per Accounting Period for each Active Subscriber." as compared to 60 cents per subscriber for Standalone Portable Subscription Offerings. 37 § CFR**C.F.R** § 385.21(d)(3) (4).

35.    Section 115 requires that licensees such as Spotify "report and pay royalties on a monthly basis," and further specifies that "royalty payments shall be made on or before the twentieth day of each month and shall include all royalties for the month next preceding."  17 U.S.C. § 115(c)(2)(I).  The content of the reports submitted to the MLC are governed by statute, and such reports must include all of the information necessary for the MLC to calculate and distribute royalties to Songwriters and Music Publishers, including "usage data for musical works used in covered activities."  17 U.S.C. § 115(d)(4)(A)(ii).  Failure to provide materially accurate and timely reports or royalty payments to the MLC can result in default by the licensee and, ultimately, termination of its blanket license and other penalties.  *See* 17 U.S.C. § 115(d)(4)(E)(i)-(ii).

*Royalties For Paid Offerings And "Nonsubscription" Offerings*
*Provided "Free Of Any Charge To The End User" Are Calculated Differently*

58.    Under the regulations, some aspects of Step 1 and Step 3 of the royalty calculation process described above and set forth in 37 C.F.R. § 385.21 are

different for paid Offerings and "nonsubscription" Offerings provided "free of any charge to the End User."

59.    For all Offerings, including "[f]ree nonsubscription/ad-supported services free of any charge to the End User," Step 1 requires determining the greater of either the "the applicable percent of Service Provider Revenue" and the "result of the TCC Prong Calculation."  37 C.F.R. § 385.21(b)(1).

60.    The calculation of Service Provider Revenue in Step 1 is the same regardless of whether the Offering is paid for by End Users or is a "nonsubscription" Offering "provided free of any charge," because Service Provider Revenue includes both subscription revenue and advertising revenue.  37 C.F.R. § 385.2; *see supra* ¶¶ 37-39.  And the applicable percentage of Service Provider Revenue is the same for both free and paid Offerings, varying only by the applicable royalty year.   *See* Table 1 to 37 C.F.R. § 385.21(b)(1).

61.    However, the TCC Prong Calculation in Step 1 is different depending on the Offering type.  *See* Table 2 to 37 C.F.R. §§ 385.21(b)(1); 385.2 (defining Offering types).  The TCC Prong Calculation for a "Bundled Subscription Offering" (like the music component of the Premium Bundle) is calculated simply by taking "24.5% of TCC for the Accounting Period."  Table 2 to 37 C.F.R. § 385.21(b)(1).  And the TCC Prong Calculation for "[f]ree nonsubscription/ad-supported services free of any charge to the End User" (like Spotify Free) is simply "26.2% of TCC for the Accounting Period."  *Id.*

62.    Step 3 of the royalty calculation process is also different for paid Offerings and Offerings "free of any charge to the End User."  *See* 37 C.F.R. § 385.21(b).  For example, while Service Providers reporting Bundled Subscription Offerings must take

32

the "greater of" (i) the result determined after Step 2 and (ii) the royalty floor described in paragraph (d) of the regulations, Offerings that are "free of any charge to the End User" are not subject to any such royalty floor.  37 C.F.R. §§ 385.21(b)(3); 385.21(d)(6). Consequently, in Step 3, the payable mechanical royalty pool for Offerings that are "free of any charge to the End User" is determined only by subtracting the Performance Royalties calculated in Step 2 from the "all-in" royalty result determined in Step 1.  *See* 37 C.F.R. § 385.21(d)(6).

*The Spotify**Spotify's* **Premium** *OfferingAnd Basic Subscription Offerings*

~~36~~**63**.    Spotify launched ~~its~~ Premium ~~subscription offering~~ in the United States in July 2011.[15]~~A~~ **At launch, a** Premium subscription ~~provides unlimited on-demand~~**provided one user** access to tens of millions of musical works **under the blanket compulsory license**.  Since its launch, Premium has grown to become one of the largest on-demand music subscription services in the United States, with more than 44 million subscribers and annual revenues in excess of $5 billion.**[25]**

~~37.    In July 2023, Spotify increased the monthly cost of a Premium subscription to $10.99.[16]~~

**64.    Premium now includes multiple tiers.  On October 20, 2014, Spotify launched the Premium Family tier, initially permitting up to five users per subscription,**

---

[15]  ~~In addition to Premium, Spotify also offers a free, ad-supported music service with more limited functionality.~~

**[25]  Murray Stassen,** *Spotify Had 44.4m US Subscribers in February, Apple Music had 32.6m, According to New Data,* **Music Business Worldwide, https://www.musicbusinessworldwide.com/spotify-had-44-4m-us-subscribers-in-february-apple-music-had-32-6m/ (July 3, 2023); Spotify Tech. S.A., Annual Report (Form 20-F) (Feb. 5, 2025).**

[16]  ~~The monthly subscription costs cited herein are for an individual Premium subscription.  As noted above in footnote 1, Spotify also offers a discounted Premium subscription rate for qualifying students, and higher monthly Premium subscription rates for couples (or "duos") and families.~~

**which Spotify later increased to six users.  On July 1, 2020, Spotify launched Premium Duo, which allows two users per subscription.[26]**

38**65**.  In ~~November~~**October** 2023, Spotify ~~began to provide~~**publicly announced that it would begin providing** Premium subscribers with up to 15 hours of ~~audiobook~~**audiobooks** listening per month as part of their ~~Premium subscription.~~ **existing subscriptions, which occurred the following month.[27]**  As with its prior additions of features and enhancements to Premium,~~17~~**28** Spotify provided *all* **Premium** subscribers with ~~access to~~**up to 15 monthly hours of** audiobooks **listening** at no additional charge **within their existing subscription**, giving those subscribers no choice as to whether or not they wanted access to audiobooks **listening** in addition to the unlimited, ad-free**,** on-demand music that is the core of Premium.~~18~~**29**

**66.    On June 3, 2024, Spotify raised its prices for each tier of Premium, pricing Premium Individual at $11.99, Premium Duo at $16.99, and Premium Family at**

---

[26]  **Spotify also offers a discounted student plan, but that plan does not include monthly audiobooks listening and is not relevant to this litigation.**

[27]  *Spotify Premium Will Include Instant Access to 150,000+ Audiobooks*, **Spotify, https://newsroom.spotify.com/2023-10-03/audiobooks-included-in-spotify-premium/ (Oct. 3, 2023).**

~~17~~[28] In 2015, for example, Spotify added short-form videos and podcasts to its Premium ~~offering~~**Offering**. *See* Sam Thielman, *Spotify moves into video and podcasts with major media partnerships*, The Guardian, https://www.theguardian.com/technology/2015/may/20/spotify-video-podcasts-media-partnerships (May 20, 2015).

~~18~~[29] *See* *Paid Subscription Terms and Conditions*, **Spotify, https://www.spotify.com/us/legal/paid-subscription-terms/ (accessed May 16, 2024).** Spotify's own Paid Subscription Terms, which state that Spotify can **change,** "at its discretion**,**" ~~change~~ the number of ~~audiobook listener~~**audiobooks listening** hours offered to subscribers, further suggest that access to audiobooks is a feature or enhancement that can be modified or even revoked at any time. ~~See Spotify Paid Subscription Terms and Conditions, available at https://www.spotify.com/us/legal/paid-subscription-terms/ (accessed May 16, 2024)~~***Id***.

**$19.99.  At the same time, Spotify introduced a new tier of plans called Basic, which included Basic Individual, Basic Duo, and Basic Family.  These Basic plans are identical to Premium, except that they do *not* include 15 monthly hours of audiobooks listening.  However, only pre-existing Premium users can subscribe to Basic.  New subscribers, including new Premium subscribers, cannot subscribe to Basic.[30]**

39.    ~~As a result, and as has been the case with other added features and enhancements to Premium, Spotify made no claim that the addition of audiobooks transformed Premium into a Bundled Subscription Offering.  Nor did Spotify discount the Service Provider Revenue subject to mechanical royalties.~~

40.    ~~In its revenue and royalty report for March 2024, however, Spotify declared, for the first time, that Premium comprised a new Bundled Subscription Offering.  Spotify made this change without any advance warning to the MLC, and indeed the MLC only learned of Spotify's claim that Premium had become a Bundled Subscription Offering when Spotify submitted its March monthly usage report to the MLC on April 15, 2024, along with a cover email pointing out the change.~~

41.    ~~Although Spotify maintains that Premium has become a Bundled Subscription Offering, nothing about the Premium service has actually changed.  The name of the service remains the same.  The functionality of the service remains the same.  The content available on the service—including unlimited on-demand access to tens of millions of musical works, along with up to 15 hours of audiobook listening and many other features and enhancements—remains the same.  The subscription price of Premium remains the same.  The~~

---

[30]  *Basic plans*, Spotify, https://support.spotify.com/us/article/spotify-basic/ (accessed Mar. 31, 2025).

only change is Spotify's decision to reduce its reported Service Provider Revenue and accordingly its payment of mechanical royalties. **67.    At $10.99 per month, Basic Individual plans cost only one dollar less per month than Premium Individual. Basic Duo costs $14.99, which is only two dollars less per month than Premium Duo. Basic Family costs $16.99, which is only three dollars less per month than Premium Family. The prices of the Basic tiers are identical to the prices of the corresponding Premium plans prior to Spotify's June 3, 2024 price hike and immediately prior to Spotify's addition of audiobooks listening to Premium plans in November 2023.**

42.    The financial impact of Spotify's recharacterization of Premium as a Bundled Subscription Offering is enormously consequential for the MLC and to the Songwriters and Music Publishers to whom the MLC accounts and distributes mechanical royalties. Although the MLC is precluded by Section 115 from disclosing to the Court the amount of potential mechanical royalty underpayments by Spotify until an appropriate protective order is put in place,[19] a leading industry publication estimates the impact at about $150 million, just in the next year.[20] That impact will be compounded if Spotify continues to erroneously report Premium as a Bundled Subscription Offering.

*Audiobooks Access*

*Spotify's Launch Of The Audiobooks Access Subscription Offering*

43**68**.    Spotify's ~~claim that~~**decision to recharacterize all of its** Premium ~~is a~~**tiers as Bundles and start reporting the music components of those Bundles as** Bundled

---

[19]    *See* 17 U.S.C. § 115(d)(12)(C); 37 CFR § 210.34.

[20]    *See Billboard*, "Spotify to Pay Songwriters About $150 Million Less Next Year with Premium, Duo, Family Plan Changes," https://www.billboard.com/business/streaming/spotify-songwriters-less-mechanical-royalties-audiobooks-bundle-1235673829/.

Subscription ~~Offering~~**Offerings** coincided with ~~the March 1, 2024~~**Spotify's** launch of Audiobooks Access~~, a purported standalone audiobooks subscription service,~~ **on March 1, 2024. Spotify** priced **Audiobooks Access** at $9.99 per month~~—~~**, which was at the time only $1.00 less than Premium Individual and only $1.00 less than the Basic Individual plan it launched three months later. Audiobooks Access provides subscribers with up to 15 monthly hours of audiobooks listening and unlimited hours of music listening, just like Premium.[31]**

~~44.    Although Spotify launched Audiobooks Access more than two months ago, Spotify's homepage, which lists Spotify's available subscription plans, does not even mention it:~~

**69.    Spotify made little effort to market or promote Audiobooks Access when it launched. Upon information and belief, the principal marketing for Audiobooks Access at launch consisted of a single 150-word press release that Spotify issued on March 1, 2024.[32] For a number of months thereafter, Spotify's homepage, which lists Spotify's available subscription plans, did not even mention Audiobooks Access:**

---

[31] *Audiobooks Access plan*, Spotify, https://support.spotify.com/us/article/audiobooks-access-plan/ (accessed Mar. 28, 2025).

[32] *See Spotify's New Audiobooks Access Tier Gives Booklovers More Listening Options*, Spotify, https://newsroom.spotify.com/2024-03-01/spotifys-new-audiobooks-access-tier-gives-booklovers-more-listening-options/ (Mar. 1, 2024).



*Source*: Spotify**, open.spotify**.com ~~Home Page, (~~accessed May 16, 2024**)** (red rectangle added for emphasis).

~~45.     Rather, it appears that~~**70.       Upon information and belief, for a period of time following the launch,** a potential subscriber ~~can~~**could** find Audiobooks Access only by searching for words such as "Spotify" and "Audiobooks Access" on Google or a similar search engine.  ~~And~~**During that period, Audiobooks Access was only mentioned on a webpage titled "Audiobooks in Premium."  However,** even if a would-be subscriber ~~can~~**did** reach ~~the Audiobooks Access webpage~~**that page** on Spotify's website **through a search engine**, the primary ~~message~~**purpose** of that page ~~is~~**was** to steer subscribers to Premium, not Audiobooks Access.[33]    A potential subscriber accessing ~~the Audiobooks Access~~**that** webpage ~~is~~**was** immediately presented with multiple promotions for Premium, not the Audiobooks Access ~~standalone~~ plan:

---

[33]   **That appears to still be the case today.  *Audiobooks in Premium: Get lost in great stories*, Spotify, spotify.com/us/audiobooks (accessed Mar. 31, 2025).**



*Source*: ***Audiobooks in Premium: Get lost in great stories,*** Spotify**, spotify**.com/us/audiobooks~~,~~ **(**accessed May 16, 2024**)** (red oval graphics added for emphasis).

~~46~~**71**.  Spotify ~~does~~**did** not reference the Audiobooks Access plan until two-thirds of the way down the same webpage:



*Source*: ***Audiobooks in Premium: Get lost in great stories,*** Spotify**, spotify**.com/us/audiobooks, **(**accessed May 16, 2024**)**.

4772.   And then, immediately after this brief reference to Audiobooks Access, visitors ~~are~~**were** encouraged yet again to "Explore Premium":



*Source*: ***Audiobooks in Premium: Get lost in great stories,*** Spotify**, spotify**.com/us/audiobooks, **(**accessed May 16, 2024**)** (red oval graphics added for emphasis).

73.    Spotify says on its website that Audiobooks Access is "new plan for audiobooks lovers," but Audiobooks Access does not appear to contain any features or functionality specifically aimed at audiobooks listeners.[34]   Upon information and belief, Audiobooks Access subscribers are able to listen to the very same catalog of audiobooks that is available on Premium.  Audiobooks Access also appears to have a user interface that is visually indistinguishable from the user interface on Premium, as the screenshots below reflect.  Nor do there appear to be any audiobooks-specific features in Audiobooks Access that are not also available on Premium.

---

[34] *Audiobooks in Premium: Get lost in great stories*, Spotify, spotify.com/us/audiobooks (accessed Mar. 31, 2025).



**Premium Individual (mobile)**



**Spotify Audiobooks Access (mobile)**

*__Source__*: **Screenshots from Spotify mobile app using Premium and Audiobooks Access subscriptions (accessed Mar. 27, 2025).**

74.    **Upon information and belief, Audiobooks Access subscribers are also able to listen to the very same catalog of music that is available on Premium.**

75.    **Spotify launched Audiobooks Access only in the United States.[35] Spotify provides audiobooks listening in nine other countries,[36] but only to Premium**

---

[35] *Audiobooks Access plan,* Spotify, **https://support.spotify.com/us/article/audiobooks-access-plan/ (accessed Mar. 28, 2025).**

[36] *Spotify Launches Audiobooks in France, Belgium, the Netherlands, and Luxembourg—and Premium Listeners Get Instant Access,* Spotify, **https://newsroom.spotify.com/2024-10-14/audiobooks-launch-france-belgium-netherlands-luxembourg/ (Oct. 14, 2024).**

**subscribers.  In those countries, Spotify has not launched the Audiobooks Access offering aimed at "audiobook lovers."[37]**

48.    ~~Spotify discloses to potential Audiobooks Access subscribers that "the music listening experience" of Audiobooks Access subscribers "will be on our free, ad supported service," and that, while they will "[e]njoy  15 hours of listening time from our audiobook subscriber catalog every month," they will not receive "any other Premium features."[21]  It appears, however, that  Audiobooks Access subscribers are  granted full access to the Premium unlimited, on-demand, ad-free music service, rather than an ad supported service.  If in fact~~ **76. In preparation for the filing of the original Complaint, the MLC investigated the music available to new Audiobook Access subscribers and found that music was being provided on an ad-free basis just as it was in Premium.  It also appeared, at that time, that subscribers to Audiobooks Access could choose which songs to play and could skip as many songs as they liked, just as is the case in Premium.  That investigation led to the allegation that, to the extent "**Audiobooks Access subscribers are accessing ad-free music, the two offerings—Audiobooks Access and Premium—are identical, other than the name and the price ($9.99 versus $10.99).**"  Dkt. 1, ¶ 48.**

~~*Spotify's Premium Subscription Offering Is Not a Bundle*~~

**77.    Spotify has disputed that allegation, although it has acknowledged that, at least for some period of time after activating a new subscription, Audiobooks**

---

[37] ***Audiobooks in Premium: Get lost in great stories*, Spotify, spotify.com/us/audiobooks (accessed Mar. 31, 2025).**

~~[21]  *See* https://support.spotify.com/us/article/audiobooks access plan/.  Spotify's "free, ad supported" music service is distinguishable from Premium in that it limits users' ability to listen to music after 14 days of traveling abroad, does not allow users to play musical works in their chosen order, does not allow users to download music to their devices for offline listening, and does not allow users to listen to music at the highest sound quality that Premium provides.  *See* Spotify, "Premium Plans," available at https://support.spotify.com/us/article/premium plans/ (accessed May 16, 2024).~~

43

Access subscribers receive access to on-demand music with no advertisements, just like Premium subscribers. In any event, even if the music on Audiobooks Access contains advertisements, or affords subscribers with less functionality than Premium, those differences do not change the fact that Spotify is misreporting revenue and underpaying royalties for Audiobooks Access. *See infra* ¶¶ 104-18.

*Spotify Underpaid Mechanical Royalties For Premium By Using The Price of Audiobooks Access As The Value Of Premium's Audiobooks Component*

78.     If Premium is a Bundle, then Spotify must report the music components of all three Premium plans (Premium Individual, Premium Duo, and Premium Family) as Bundled Subscription Offerings. Spotify must also comply with the royalty calculation process applicable to Bundled Subscription Offerings described above and set forth in 37 C.F.R. § 385.2 and 37 C.F.R. § 385.21. Under that royalty calculation process, Spotify has improperly used the price of Audiobooks Access as the value of the audiobooks component when calculating Service Provider Revenue for Spotify's Premium tiers, which artificially inflated the value of the audiobooks component and, in turn, improperly reduced the amount of royalties paid for the music component of Premium. *See* 37 C.F.R. § 385.2.

79.     As set out *supra* ¶¶ 52-55, the Service Provider Revenue formula for a Bundle that contains a music component and an audiobooks component, such as Premium, is as follows:

$$\frac{\text{Price of Music Component}}{\text{Price of Music Component} \ + \ \text{Price of Audiobooks Component}} \quad x \quad \frac{\text{Aggregate Retail Price}}{} \quad = \quad \frac{\text{Service Provider Revenue}}{}$$

80.    The price of the audiobooks component in this formula must be determined by using one of the following three values set forth in the regulations: (1) the standalone retail price of the component (if any); (2) the retail price of market comparables (if any); or (3) a good faith, reasonable measure of the market value of the component.  *See* 37 C.F.R. § 385.2.

81.    Beginning in March 2024, when Spotify began reporting all Premium tiers as Bundles, Spotify valued the music component of Premium Individual at $10.99, the music component of Premium Duo at $14.99, and the music component of Premium Family at $16.99.  For all tiers, Spotify valued the audiobooks component at $9.99, which is the price of Audiobooks Access.  Spotify cannot use the price of Audiobooks Access as the "standalone retail price" of the audiobooks component because Audiobooks Access is not a "standalone" audiobooks product.  *See* 37 C.F.R. § 385.2.

(1) Audiobooks Access Cannot Provide The Standalone Retail Price Of Premium's Audiobooks Component In The Service Provider Revenue Formula

82.    Spotify cannot use the price of Audiobooks Access as the "standalone retail price" of Premium's audiobooks component because Audiobooks Access is not a "standalone" audiobooks product.  *See* 37 C.F.R. § 385.2.  Audiobooks Access is not "standalone" because it provides users with 15 monthly hours of audiobooks listening *and* unlimited music listening.  *See id.*

45

83.     "Standalone" is defined as: "[s]omething that exists independently or in isolation from similar things" or "something that is free-standing or unconnected to another item." *Stand-alone*, Oxford English Dictionary, https://www.oed.com/dictionary/stand-alone_n?tab=meaning_and_use (accessed Mar. 31, 2025).  Under the plain meaning of "standalone," Audiobooks Access is not a "standalone" audiobooks service because its 15 monthly hours of audiobooks listening does not "exist[ ] independently or in isolation" from its music content. *See id.*  Simply put, the audiobooks listening in Audiobooks Access is not "unconnected to another item." *See id.*

84.     There can be no dispute that Audiobooks Access is not a "standalone" audiobooks offering.  Spotify has repeatedly acknowledged throughout this litigation that Audiobooks Access provides its subscribers with music.  *See, e.g.*, Dkt. 18, at 2; Dkt. 72, at 10.  Indeed, Spotify's own website states that Audiobooks Access provides "access to music."[38]

85.     Because Spotify does not offer a "standalone" audiobooks product that provides *only* 15 monthly hours of audiobooks listening, Spotify must use the "average standalone published price for End Users for the most closely comparable product[s]," or, if there are no "reasonably comparable product[s]," a "good faith, reasonable measure of the market value" for Premium's audiobooks component.  *See* 37 C.F.R. § 385.2.

(2) There Are No Services On The Market That Are Closely Or
Reasonably Comparable To Premium's Audiobooks Component

86.     Upon information and belief, there are no standalone products available in the U.S. market that are "closely" or "reasonably comparable" to Premium's

---

[38] *Audiobooks Access Plan*, Spotify, https://support.spotify.com/us/article/audiobooks-access-plan/ (accessed Mar. 24, 2025).

audiobooks component.  The principal audiobooks streaming products in the U.S. market offer either *unlimited* audiobooks streaming or a token or credit that can be used to purchase an entire audiobook for repeated, lifetime listening, or a combination of both.  None of those products can be compared to Premium's audiobooks component, which limits audiobooks listening time to 15 hours per month.

87.    For example, Audible Plus[39] and Kobo Plus Listen,[40] which are priced at $7.95 and $7.99 respectively, offer *unlimited* audiobooks listening.  Those products are not "reasonably comparable" to Premium's audiobooks component because subscribers are not limited to a set number of listening hours.  *See* 37 C.F.R. § 385.2.

88.    The difference between unlimited listening and 15 hours of audiobooks listening is significant no matter how the offering are priced—a product offering unlimited listening hours is not "reasonably comparable" to one with an hourly limit on listening.  *See* 37 C.F.R. § 385.2.  A service of any kind providing unlimited use to subscribers is a far more valuable service and not comparable to one that limits a subscriber's use of that service to a set period of time.[41]   Take, for example, a cell phone plan.  A cell phone plan with limited calling hours per month is not "closely" or "reasonably comparable" to a plan that has unlimited hours of calling per month.  *See id.*

89.    The 15-hour limit is particularly significant because, upon information and belief, many popular audiobooks exceed 15 hours in length.  Many

---

[39] *See         The        Plus        Catalog*, Audible, https://www.audible.com/ep/audible-plus-member-benefit (accessed Feb. 12, 2025).
[40] *See         Kobo        Plus*, Kobo, https://www.kobo.com/us/en/plus?srsltid=AfmBOoqm5PBKvveSnsBrIu3aGxuLXY_ev au31xSX4AXqIAlUT060BALj (accessed Feb. 12, 2025).
[41] Indeed, Spotify charges an additional fee for a limited number of additional hours.

audiobooks on Spotify's "Most popular audiobooks" list, which Premium users may listen to with their subscription, cannot be finished within 15 hours.  For example: *The Nightingale: A Novel* by Kristin Hannah is 17 hours and 37 minutes long; *Demon Copperhead: A Novel,* by Barbara Kingsolver is 21 hours and 3 minutes long; *Dune* by Frank Herbert is 21 hours and 4 minutes long; *Fourth Wing* by Rebecca Yarros is 21 hours and 22 minutes long; *The Fellowship of the Ring* by J.R.R. Tolkien is 22 hours and 38 minutes long; *The 48 Laws of Power* by Robert Green is 23 hours and 6 minutes long; and *A Court of Mist and Fury* by Sarah J. Maas is 23 hours and 16 minutes long.[42]  *The Way of Kings* by Brandon Sanderson, which reached #7 on the New York Times Best Seller list and is also on Spotify's "Most popular audiobooks" list, is 45 hours and 30 minutes long,[43] which means that it would take a Premium subscriber more than three months to finish *The Way of Kings*.  Indeed, six of the ten audiobooks on Spotify's "Top Audiobooks in Premium Globally" for 2024 are longer than 15 hours.[44]  And of the 100 audiobooks listed

---

[42] *See* Kristin Hannah, *The Nightingale: A Novel*, Spotify, https://open.spotify.com/show/4BHprSavRJoDw00Rr91Bbh (Feb. 2, 2015) (17 hours, 37 minutes); Barbara Kingsolver, *Demon Copperhead: A Novel*, Spotify, https://open.spotify.com/show/0t2b5P0rMJxysawG0R4wNN (Oct. 17, 2022) (21 hours, 3 minutes); Frank Herbert, *Dune*, Spotify, https://open.spotify.com/show/7iHfbu1YPACw6oZPAFJtqe?si=972e46cd29c94 1c0 (May 28, 2007) (21 hours, 4 minutes); Rebecca Yarros, *Fourth Wing*, Spotify, https://open.spotify.com/show/4ez5NQopq7PCIFjdtCtLPu?si=c50a2290f4e74d24 (May 1, 2023) (21 hours, 22 minutes); J.R.R. Tolkien, *The Fellowship of the Ring*, Spotify, https://open.spotify.com/show/1NDH0k2YgnVmC3M2zkomuV?si=2023e6c3f63f4ce5 (Sept. 15, 2021) (22 hours, 38 minutes); Robert Greene, *The 48 Laws of Power*, Spotify, https://open.spotify.com/show/1NDH0k2YgnVmC3M2zkomuV?si=97552e0feed34059 (Apr. 4, 2007) (23 hours, 6 minutes); Sarah J. Maas, *A Court of Mist and Fury*, Spotify, https://open.spotify.com/show/0drWNw7Mb37dALe105qjIg (May 2, 2016) (23 hours, 16 minutes).

[43] *See* Brandon Sanderson, *The Way of Kings: Book One of the Stormlight Archive*, Spotify, https://open.spotify.com/show/3YGUwfwOiB2eXH258hRCEq?si=53ab8ce1973e4ee2 (Aug. 30, 2010) (45 hours, 30 minutes).

[44] *Revealed: The Top Artists, Songs, Albums, Podcasts, and Audiobooks of 2024*, Spotify, https://newsroom.spotify.com/2024-12-04/top-songs-artists-podcasts-audiobooks-album

on Audible's "Bestselling Audiobooks" chart, 36 of those audiobooks exceeded 15 hours in length.[45]

90.    Services providing a monthly token or credit for the permanent purchase of an audiobook, such as B&N Audiobooks, are also not "reasonably comparable" to Premium's audiobooks component.[46]  *See* 37 C.F.R. § 385.2.  Subscribers to services providing credits or tokens can generally keep their downloaded audiobooks even after cancelling their subscription, which provides significant value, because that subscriber can continue to listen to *unlimited* monthly hours of audiobooks from their purchased library *even after they stop subscribing to the audiobooks service*.  By contrast, Premium subscribers are not provided with a monthly credit or token allowing them to permanently download an audiobook for listening in later months (or after they unsubscribe).  In Premium, "[a]ny unused audiobooks listening time from the previous month can no longer be used."[47]

91.    For example, if a B&N Audiobooks subscriber used their monthly credit to purchase *Fourth Wing*, which reached #1 on the New York Times Best Seller list (and has remained on the list for 87 weeks),[48] that subscriber could listen to the entirety of

---

https://newsroom.spotify.com/2024-12-04/top-songs-artists-podcasts-audiobooks-albums-trends-2024/ (December 4, 2024).

[45] *Bestselling Audiobooks*, Audible, https://www.audible.com/charts/best (accessed Mar. 28, 2025).

[46] *B&N Audiobooks*, Barnes & Noble, https://www.barnesandnoble.com/h/bn-audiobooks (accessed Mar. 31, 2025).

[47] *Audiobooks in Premium plans*, Spotify, https://support.spotify.com/us/article/audiobooks-premium-plans/ (accessed Mar. 25, 2025).

[48] *The New York Times Best Sellers*, The New York Times, https://www.nytimes.com/books/best-sellers/ (accessed Mar. 28, 2025).

the audiobook (21 hours and 22 minutes) in a single month while a Premium subscriber could not. Moreover, if a B&N Audiobooks subscriber wanted to listen to part of an audiobook again (perhaps because they inadvertently left the audiobook playing, fell asleep while listening, or wanted to play a particular chapter for a friend), they could do so as many times in a month and for as long as they wanted (even after unsubscribing). But if Premium subscribers want to "relisten to a book, or part of the book," their "allocated audiobook listening time [would] continue to reduce as normal."[49]

92.    Nor can Premium subscribers stretch their monthly listening times by playing audiobooks at faster speeds.[50] As Spotify explains on its website: "For example, if you listen to a 5-hour audiobook at 2x speed, even if you finish the audiobook in 2.5 hours, your audiobooks listening time is reduced by 5 hours since that's the length of the book at normal speed. If you relisten to the whole book, your audiobooks listening time is reduced by another 5 hours."[51] Thus, depending on the length of the audiobook purchased using a credit or token, in one month a B&N Audiobooks subscriber could easily far exceed the 15 listening hours permitted to Premium subscribers.

93.    Moreover, subscription services like Audible Premium Plus, which provides subscribers unlimited audiobooks listening during the term of the subscription _and_ an additional monthly token or credit for the permanent download of an audiobook, are even less comparable to the audiobooks component of Premium.[52] Services like

---

[49] _Audiobooks in Premium plans_, Spotify, https://support.spotify.com/us/article/audiobooks-premium-plans/ (accessed Mar. 25, 2025).

[50] _Id._

[51] _Id._

[52] _Learn about Premium Plus_, Audible, https://help.audible.com/s/article/learn-about-premium-plus?language=en_US (accessed Mar. 26, 2025).

Audible Premium Plus offer more value to customers (unlimited listening and permanent download of an audiobook) than Premium (15 monthly hours of audiobooks listening).

94.    Upon information and belief, the services on the market for audiobooks have apps that were designed to optimize the user experience of audiobooks listening.  By contrast, Premium's app was designed primarily for music listeners and appears to focus on optimizing the user experience of listening to music, not audiobooks.  An audiobooks service with features and functionality tailored to audiobooks listening is not "reasonably comparable" to one principally designed for music listening.  *See* 37 C.F.R. § 385.2.

95.    Since there is no "standalone" price for Premium's audiobooks component and there are no similarly time-bound audiobooks services available in the United States that are "reasonably comparable" to Premium's audiobooks component, Spotify must use a "good faith, reasonable measure of the market value" of Premium's audiobooks component when calculating the fractional portion of the Service Provider Revenue formula.  *See* 37 C.F.R. § 385.2.

(3) The $9.99 Price Of Audiobooks Access Is Not A Good Faith, Reasonable Measure Of The Market Value of Premium's Audiobooks Component

96.    There is market evidence that a "good faith, reasonable measure of the market value" of Premium's audiobooks component is well below the $9.99 price employed by Spotify in its reporting to the MLC.  Several facts support that allegation.

97.     First, as discussed *supra* ¶ 87, at least two audiobooks services charge approximately $2.00 less per subscriber per month for unlimited monthly audiobooks listening.

98.    Second, Spotify offers pre-existing Premium subscribers (Premium Individual, Premium Duo, and Premium Family) the ability to switch to Basic plans (Basic Individual, Basic Duo, and Basic Family), which are identical to Premium but without 15 hours of monthly audiobooks listening.  The fact that the price for Basic Individual is only $1.00 per month less than Premium Individual, the price for Basic Duo is only $2.00 per month less than Premium Duo, and the price for Basic Family is only $3.00 per month less than Premium Family, suggests that Spotify values the audiobooks components in its Premium plans between $1.00 and $3.00—the difference in price between the two sets of Offerings.

99.    The improper use of the $9.99 Audiobooks Access subscription price results in different reductions in Service Provider Revenue for different tiers of Premium. By reporting Premium as a Bundle and using the $9.99 price of Audiobooks Access as the price of all tiers of Premium's audiobooks component, Spotify reduced the revenue subject to mechanical royalties (or Service Provider Revenue) from 100 percent of revenue, less permitted deductions, to approximately 52 percent of revenue for Premium Individual, approximately 60 percent of revenue for Premium Duo, and approximately 70 percent of revenue for Premium Family.[53]  At the time of the filing of this First Amended Complaint, Spotify reported the Service Provider Revenue formula for each Premium tier on a per subscription basis as set forth below.

100.    For Premium Individual, the pro-rata portion of revenue subject to mechanical royalties is approximately 52 percent ($10.99 ÷ ($10.99 + $9.99) = .524 or

---

[53]  The fractional portion of the Service Provider Revenue formula represents the percentage of Bundle revenue subject to mechanical royalties.

52.4%). Thus, the Service Provider Revenue on a per subscription basis for Premium Individual is as follows:

$$\frac{\$10.99 \text{ (Music Component)}}{\$10.99 + \$9.99 \text{ (Music Component + Audiobooks Component)}} \quad x \quad \frac{\$11.99}{\text{(Retail Price)}} \quad = \quad \frac{\$6.28}{\text{(Service Provider Revenue)}}$$

101. For Premium Duo, the pro-rata portion of revenue subject to mechanical royalties is approximately 60 percent ($14.99 ÷ ($14.99 + $9.99) = .600 or 60.0%). Thus, the Service Provider Revenue on a per subscription basis for Premium Duo is as follows:

$$\frac{\$14.99 \text{ (Music Component)}}{\$14.99 + \$9.99 \text{ (Music Component + Audiobooks Component)}} \quad x \quad \frac{\$16.99}{\text{(Retail Price)}} \quad = \quad \frac{\$10.20}{\text{(Service Provider Revenue)}}$$

102. For Premium Family, the pro-rata portion of revenue subject to mechanical royalties is approximately 63 percent ($16.99 ÷ ($16.99 + $9.99) = .630 or 63.0%). Thus, the Service Provider Revenue on a per subscription basis for Premium Family is as follows:

$$\frac{\$16.99 \text{ (Music Component)}}{\$16.99 + \$9.99 \text{ (Music Component + Audiobooks Component)}} \quad x \quad \frac{\$19.99}{\text{(Retail Price)}} \quad = \quad \frac{\$12.59}{\text{(Service Provider Revenue)}}$$

103. Incorporating a "good faith, reasonable measure of the market value" of Premium's audiobooks component in the fractional portion of the Service Provider Revenue formula described above would result in Spotify reporting a higher Service Provider Revenue figure for each of the tiers of Premium, which in turn would result in

53

higher mechanical royalties payable to the MLC than what Spotify has paid since March 2024, when it began reporting the Premium tiers as Bundles.  And although Spotify has claimed that a "good faith" and "reasonable" price for the audiobooks component would not change the mechanical royalties payable to the MLC because royalties would be paid on the basis of the TCC Prong Calculation or the applicable royalty floors, rather than the applicable percent of Service Provider Revenue, the MLC's analysis is different, showing that valuing the audiobooks component of Premium at even $1.00 less than the value Spotify is currently using would result in significantly more royalties owed.

*Spotify Improperly Reported Audiobooks Access As A Free, Nonsubscription Service, Thereby Underpaying Owed Royalties*

104.    Spotify has also misreported and underpaid mechanical royalties owed to the MLC for Audiobooks Access by reporting it in combination with Spotify Free, which Spotify reports as a "free nonsubscription/ad-supported service[ ] free of any charge to the End User."[54]  *See* Table 2 to 37 C.F.R. § 385.21(b)(1).  Audiobooks Access is only properly reported as a Bundled Subscription Offering under a plain reading of 37 C.F.R. § 385.2.  Therefore, Spotify must pay royalties according to the royalty calculation process applicable to Bundled Subscription Offerings, as described above and set forth in 37 C.F.R. § 385.21.

105.    Spotify has informed the MLC that it combines its reporting and payment of royalties due for Audiobooks Access with its reporting and payment of royalties due for Spotify Free.

---

[54]  Spotify has never reported Audiobooks Access as a separate Offering as required by Section 115.  *See* 37 C.F.R. § 385.21(b).

54

49106. Spotify's ~~Premium subscription offering is not a "Bundle" within the meaning of the regulations implementing Section 115. As a result, Spotify is not permitted, under the same regulations, to report its Service Provider Revenue as a Bundled Subscription Offering. *See*~~ **combined reporting of Audiobooks Access and Spotify Free contravenes the plain language of the applicable regulations.** 37 C.F.R. § ~~385.2.~~**385.21(b) requires that where a "Service Provider makes available different Offerings, royalties must be calculated separately with respect to each Offering taking into consideration Service Provider Revenue, TCC, subscribers, Plays, expenses, and Performance Royalties associated with each Offering." That Spotify does not report Audiobooks Access separately is itself a violation of Section 115 and its implementing regulations.**

~~50. *First*, to comprise a Bundle, Premium would have to be a "combination of a Subscription Offering providing Eligible Interactive Streams . . . and one or more other products or services having more than token value." 37 C.F.R. § 385.2. Spotify's reporting and payments to the MLC for periods prior to March 1, 2024 made no claim that Premium qualified as a Bundle, despite the fact that Premium has long included other non-music audio content, such as podcasts. Nor did Spotify claim that Premium qualified as a Bundle for the purpose of reporting Service Provider Revenue or calculating mechanical royalties at the time it added up to 15 hours per month of audiobook listening to its Premium service in November 2023.~~

~~51. Spotify's reports to the MLC for periods prior to March 1, 2024 accurately reflected that Premium is not a Bundled Subscription Offering. Again, the Section 115 regulations make clear that a Bundle must be a "combination" of "a Subscription Offering providing Eligible Interactive Streams," *i.e.,* a music service, and "one or more other products or services." 37 C.F.R. § 385.2. Spotify did not combine Premium with any other product or~~

service when it launched Audiobooks Access.  The Premium service offered to subscribers since March 1, 2024 has precisely the same music and other audio content that it offered to subscribers before.  As a result, the launch of Audiobooks Access did not result in a  "combination" of Premium with any "other products or services" that were not already available to Premium subscribers.[22]

52.    *Second*, Premium is not a Bundled Subscription Offering under Section 115 because the audiobook content has no "more than token value."  Spotify did not increase the price of Premium when it added audiobook listening in November 2023, evidencing Spotify's recognition that audiobook content has no more than token value to the tens of millions of Premium subscribers who purchase the service to get access to tens of millions of musical works on an on-demand, ad-free basis.  Similarly, Spotify's launch of Audiobooks Access, including but not limited to how it is accessed and marketed on its website demonstrates that Audiobooks Access has no more than token value to Spotify, particularly in comparison to the billions of dollars it generates each year from Premium.

53.    For those reasons, among others, Premium is not a Bundled Subscription Offering.

**107.    Spotify appears to claim that it is permitted to report Audiobooks Access and Spotify Free as one Offering "free of any charge to the End User" because both services provide identical music functionality to users and are supported by advertising revenue.  *See* Table 2 to 37 C.F.R. § 385.21(b)(1).  Spotify's position implies that it does not need to attribute any Audiobooks Access subscription revenue to the music in Audiobooks**

[22]  Moreover, as discussed *supra* (¶48), the two offerings—Audiobooks Access and Premium—are substantially identical, which further underscores that Audiobooks Access does not constitute "one or more other products or services" for purposes of the definition of a "Bundle" under Section 115.

Access because the music is supported by advertisements.  But Section 115 does not permit Spotify to avoid reporting subscription revenue for Audiobooks Access just because that Offering generates advertising revenue.

108.    The regulations expressly require the reporting of advertising *and* subscription revenue for *all* Offering types.   37 C.F.R. § 385.2.   That is because all advertising and subscription revenue is accounted for in the Service Provider Revenue calculation required at Step 1 of the royalty calculation process described above, *see supra* ¶ 39, which Spotify must calculate separately for each Offering.   37 C.F.R. §§ 385.2; 385.21(b).  Thus, Spotify must report both advertising revenue and subscription revenue generated from each Offering provided under the compulsory blanket license.[55]  37 C.F.R. § 385.2.  Accordingly, that both Spotify Free and Audiobooks Access generate advertising revenue is irrelevant in determining whether the subscription revenue from Audiobooks Access must also be reported.

109.    The definition of Service Provider Revenue also does not exempt the reporting of subscription revenue based on the music functionality of an Offering.  *See* 37 C.F.R. § 385.2.   When calculating Service Provider Revenue, Spotify must report subscription revenue regardless of whether its Offering generates additional advertising revenue, restricts on-demand listening, limits the number of skips per hour, or is provided at lower audio quality.  *See id.*  Indeed, that Spotify Free also generates advertising revenue would not relieve Spotify from reporting subscription revenue if it suddenly decided to

---

[55]  Indeed, upon information and belief, Spotify reports advertising and subscription revenue as part of Service Provider Revenue when calculating the royalties owed for Premium.

charge Spotify Free users a subscription fee.  The same is true for Audiobooks Access.  All subscription revenue must be reported.  The regulations make no exceptions.

110.    The regulations require reporting of all subscription revenue because, as described above, *see supra* ¶¶ 58-62, there are different reporting and royalty calculation requirements for Subscription Offerings and Offerings "free of any charge to the End User."  Table 2 to 37 C.F.R. § 385.21(b)(1).  Audiobooks Access is properly reported as one of the Subscription Offering types, and Spotify must report and pay royalties as such.

111.    The regulations define Subscription Offering as "an Offering for which End Users are required to pay a fee to have access to the Offering for defined subscription periods of 3 years or less . . . whether the End User makes payment for access to the Offering on a standalone basis or as part of a Bundle."  37 C.F.R. § 385.2.  "Offering means a Service Provider's engagement in Licensed Activity," which includes the sale of music services providing "Eligible Interactive Streams," which are defined as any "digital transmission of a sound recording of a musical work in the form of a stream" that are not subject to performance royalty exemptions (which are not relevant here).  *Id.*; 17 U.S.C. § 115(e)(13).

112.    Therefore, under a plain reading of the regulations, a service is properly reported as one of the Subscription Offering types where its subscribers must (1) "pay a fee" for a "defined subscription period[]" to access (2) music delivered via a "digital transmission of a sound recording of a musical work in the form of a stream."  17 U.S.C. § 115(e)(13); 37 C.F.R. § 385.2.  Audiobooks Access clearly satisfies these two criteria.

113.    First, Spotify requires its Audiobooks Access subscribers to pay a $9.99 fee for the defined period of one month.

114.    Second, in exchange for that monthly subscription fee, Spotify's own website admits that Audiobooks Access provides subscribers with "access to music."[56]

115.    As a result, there can be no dispute that Audiobooks Access is properly characterized and must be reported as one of the Subscription Offering types.  As discussed above, Spotify has repeatedly acknowledged throughout this litigation that Audiobooks Access is a subscription service that charges a fee and provides its subscribers with access to streamed music.  *See, e.g.*, Dkt. 18, at 2; Dkt. 72, at 10.

116.    If, as the Court has previously concluded,  Premium is properly characterized and reported as a Bundle of music and audiobooks components, *see* Dkt. 61, at 12-13, then Audiobooks Access must also be reported as a Bundle.  For the purposes of reporting and calculating mechanical royalties, Premium and Audiobooks Access are essentially identical.  Both offer access to music and audiobooks listening, and both charge a subscription fee.  That Audiobooks Access may have more limited music functionality than Premium is irrelevant for the purposes of determining whether Audiobooks Access is properly reported as a Bundled Subscription Offering.  *See supra* ¶¶ 104-109.  As a result of improperly reporting Audiobooks Access combined with Spotify Free, Spotify has not reported *any* of the subscription revenue generated from Audiobooks Access to the MLC as required by the applicable regulations.

---

[56] *Audiobooks Access Plan*, Spotify, https://support.spotify.com/us/article/audiobooks-access-plan/ (accessed Mar. 24, 2025).

117.    It is also essential that Spotify report Audiobooks Access as one of the Subscription Offering types as required by Section 115, because Subscription Offerings are subject to royalty floors, while Offerings "free of any charge to the End User," like Spotify Free, are not.  *See* 37 C.F.R. § 385.21(d).  In failing to report Audiobooks Access as one of the Subscription Offering types, Spotify has sidestepped the applicable royalty floors and reporting requirements set forth in Section 115.  Indeed, the MLC cannot even know if the TCC Prong Calculation or applicable royalty floors would provide a basis for the royalty pool determined at Step 3 because Spotify does not report Audiobooks Access separately from Spotify Free.

118.    In summary, Spotify charges a fee to End Users for Audiobooks Access, and Audiobooks Access contains music.  Therefore, Spotify must report and pay royalties on Audiobooks Access separately from Spotify Free and in accordance with the regulations applicable to Bundled Subscription Offerings as required by Section 115 and its implementing regulations.

## ~~CLAIM~~CLAIMS FOR RELIEF

**Recovery of Unpaid Statutory License Royalties and Late Fees Due to Spotify's Violations of 17 U.S.C. § 115 (including §§ 115(c)(2)(I), (d)(4)(A) and (d)(8)(B)); 37 C.F.R. Part 385 (including §§ 385.2, 385.21~~(a), (d)~~, Appendix A); and 37 C.F.R. § 210.27**

~~54~~119. Plaintiff re-alleges and reincorporates by reference the allegations in the paragraphs above, as if fully set forth herein.

~~55~~120. Section 115 establishes a compulsory blanket license for the use of musical works by on-demand streaming services such as ~~Spotify~~Premium and Audiobooks Access.

~~56~~**121**.  As a licensee, Spotify is required to report and pay royalties in accordance with the rates and terms set forth in Section 115 and the regulations promulgated in connection therewith.  *See* 17 U.S.C. § 115(c)(2)(I), (d)(4)(A); 37 C.F.R. Part 385; 37 C.F.R. § 210.27.

**122.    Spotify has misreported and underpaid mechanical royalties owed to the MLC for its Premium and Audiobooks Access Offerings.**

~~57.    By improperly reporting Premium as a Bundled Subscription Offering, Spotify has substantially underreported—and is continuing to substantially underreport to the MLC—the revenues generated by Premium, resulting in substantial underpayment of~~ ~~mechanical royalties payable to the MLC under Section 115.~~

~~58.    In addition, to the extent Audiobooks Access provides subscribers with the same access to unlimited on-demand ad-free music as Premium, Spotify has failed to properly account for and pay royalties owed to the MLC for Audiobooks Access under Section 115.~~

~~59~~**123**.  Spotify also will owe late fees in connection with its failure to timely pay all royalties due under the compulsory blanket license.   Section 115  ~~provide~~**provides** that royalties not paid to the MLC within 45 days after the end of the respective month in which they are due incur late fees of 1.5% per month, or the highest lawful rate, whichever is lower.[~~23~~57]  Because Spotify has underpaid the amount of mechanical royalties due for March 2024 **and all following reporting periods**, it also owes late fees for that month and each monthly reporting

---

[~~23~~57] *See* 17 U.S.C. § 115(d)(8)(B); 37 C.F.R. § 385.3; 37 C.F.R. Part 385, Appendix A at § 385.3; **U.S. Copyright Office, Library of Congress,** Fees for Late Royalty Payments Under the Music Modernization Act, 88 Fed. Reg. 60587 (September 5, 2023) ("the plain and natural meaning of the statute is that 'all royalties' for a given monthly reporting period are 'due' no later than 45 days after the end of the monthly reporting period. Thus, any royalties received by the MLC for such reporting period after this 'due date for payment' are late.  They are 'past due royalty payments' that are subject to such 'late fees' as the CRJs may adopt.").

period in which it underpays royalties, at the regulatory rate and accruing from the statutory due date.

60124. Further, because Spotify has failed to satisfy its obligations under the compulsory blanket license under Title 17 of the Copyright Act, the MLC also is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

**125.** WHEREFORE, the MLC prays for judgment against Spotify and for the following relief:

a**126.** For an order declaring that ~~Spotify's characterization of Premium as a Bundled~~**Spotify must report and pay royalties for Audiobooks Access as a** Subscription Offering, and its resulting underpayment of royalties,~~,~~ is in violation of the rates and terms set forth in Section 115 ~~and the regulations promulgated in connection therewith~~;

**127.** **For an order declaring that Spotify cannot use the price of Audiobooks Access as the price of the audiobooks component of Premium when calculating Service Provider Revenue, and its resulting underpayment of royalties is in violation of the rates and terms set forth in Section 115;**

b**128.** For compensatory damages, in such amounts to be determined at trial, arising from Spotify's underpayment of royalties, plus late fees, as required by statute and regulation;

c**129.** For the MLC's costs and attorneys' fees pursuant to 17 U.S.C. § 505;

d**130.** For pre-judgment and post-judgment interest according to law, as applicable;

**131.** **For permanent injunctive relief prohibiting Spotify from using the price of Audiobooks Access as the price of Premium's audiobooks component when**

**calculating Service Provider Revenue and from underpaying royalties to the MLC as a result of that improper calculation; and**

~~e~~**132**.   For ~~preliminary and~~ permanent injunctive relief prohibiting Spotify from improperly characterizing ~~its Premium subscription offering as a Bundled~~**Audiobooks Access as anything but a** Subscription Offering and from underpaying royalties to the MLC as a result of that mischaracterization; and

~~f~~**133**.   Such other and further relief as the Court deems just and proper.

Dated: New York, New York

　　　　　　　　　　　　　
~~May 16, 2024~~

~~PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP~~

~~By:  /s/ Jay Cohen~~
~~Jay Cohen~~
~~Darren W. Johnson~~
~~1285 Avenue of the Americas~~
~~New York, New York 10019-6064~~
~~Phone:  (212) 373-3000~~
~~Fax:  (212) 757-3990~~
~~jaycohen@paulweiss.com~~
~~djohnson@paulweiss.com~~

*~~Attorneys for Plaintiff~~*

63

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

_____

Jay Cohen
Darren W. Johnson
Dylan O. Smith
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
jaycohen@paulweiss.com
djohnson@paulweiss.com
dosmith@paulweiss.com

*Attorneys for Plaintiff*
*Mechanical Licensing Collective*