**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-03809-AT-KHP |
| SPOTIFY USA INC., | |
| *Defendant*. | |

**DEFENDANT SPOTIFY USA INC.'S OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR LEAVE TO AMEND THE COMPLAINT</u>**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY ................................................................ 1

II.  BACKGROUND .......................................................................................... 2

    A.  Legal Background ............................................................................... 2

    B.  Relevant Facts .................................................................................... 5

    C.  Procedural Background ....................................................................... 6

III.  LEGAL STANDARD ................................................................................. 10

IV.  ARGUMENT ............................................................................................. 12

    A.  MLC's Claim That Spotify Improperly Calculates The Bundle Royalties For Spotify Premium Is Futile ................................................................ 12

        1.  The $9.99 Retail Price of Audiobooks Access is the Appropriate Price to Use for the Audiobook Component of Spotify Premium ............ 12

            a.  Audiobooks Access establishes the "standalone retail price" of 15 monthly hours of audiobook listening. ................................ 13

            b.  Notwithstanding the inclusion of free music, Audiobooks Access is still the "most closely comparable product in the marketplace." .................................................................................. 13

        2.  The Retail Price of the Next Most Closely Comparable Product— Audible Standard—is Also $9.99 .............................................................. 14

            a.  Audible Standard is the next most closely comparable— and certainly a "reasonably comparable"—product to the audiobook component of Spotify Premium. ................................ 14

            b.  The audiobook services MLC relies on are far less comparable than either Audiobooks Access or Audible Standard. ................................................................................. 17

        3.  At the Very Least, $9.99 is a Reasonable Measure of the Market Value of the Audiobook Component of Spotify Premium ........................ 19

    B.  MLC's Claim That Spotify Underpaid Royalties For Audiobooks Access Exceeds The Scope of This Court's Order and Is Also Futile ............................ 22

        1.  MLC's Claim Should Be Rejected Because It Exceeds The Bounds

i

of the Leave Granted by This Court's Order .............................................22

2.      Audiobooks Access is not a Bundle, but Rather a Combination of a
        Subscription Audiobook Service and a "Free nonsubscription/ ad-
        supported" Music Offering .......................................................................23

C.      Granting Leave To Amend Would Prejudice Spotify...........................................26

V.   CONCLUSION .................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*,
  685 F.3d 174 (2d Cir. 2012)................................................................................5

*Am. Bd. of Internal Med. v. Salas Rushford*,
  114 F.4th 42 (1st Cir. 2024)..............................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................10

*Brown v. Prove Identity, Inc.*,
  No. 22-cv-9315-AT, 2024 WL 1195331 (S.D.N.Y. Mar. 20, 2024) ......................................10

*Colbert v. Rio Tinto PLC*,
  No. 17-cv-8169-AT, 2019 WL 10960490 (S.D.N.Y. July 29, 2019) .........................10, 11, 26

*Cortec Industries, Inc. v. Sum Holding, L.P.*,
  949 F.2d 42 (2d Cir. 1991)..........................................................................11, 17, 18

*Ekpe v. City of New York*,
  No. 20-cv-9143-AT, 2024 WL 1621207 (S.D.N.Y. Apr. 12, 2024).....................................10

*Farash v. Continental Airlines, Inc.*,
  337 F. App'x 7 (2d Cir. 2009) ............................................................................21

*Gas Natural, Inc. v. Iberdrola, S.A.*,
  33 F. Supp. 3d 373 (S.D.N.Y. 2014).....................................................................21

*Hadassah Acad. Coll. v. Hadassah Women's Zionist Org. of Am., Inc.*,
  No. 18-cv-02446-AT, 2019 WL 1897668 (S.D.N.Y. Apr. 29, 2019)....................................11

*Hawkins v. Coca-Cola Co.*,
  654 F. Supp. 3d 290 (S.D.N.Y. 2023).....................................................................22

*Himmelstein v. Comcast of the Dist., LLC*,
  908 F. Supp. 2d 49 (D.D.C. 2012) ........................................................................22

*Jang v. Trs. of St. Johnsbury Acad.*,
  771 F. App'x 86 (2d Cir. 2019) ...........................................................................11

*Jeanty v. UPS United Parcel Serv. Freight*,
No. 21-cv-8311, 2021 WL 5054439 (S.D.N.Y. Nov. 1, 2021)..................................................5

*Joyner v. Alston & Bird LLP*,
No. 20-cv-10093-AT, 2021 WL 4296433 (S.D.N.Y. Sept. 21, 2021)....................................11

*LeVy v. HU Prods. LLC*,
No. 23-cv-1381-AT, 2024 WL 897495 (S.D.N.Y. Mar. 1, 2024) ......................................5, 14

*Martin v. Am. Equity Ins. Co.*,
185 F. Supp. 2d. 162 (D. Conn. 2002).....................................................................................22

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016).....................................................................................................12

*Odgers v. USAA Cas. Ins. Co.*,
689 F. Supp. 3d 50 (E.D. Pa. 2023) .........................................................................................22

*Olson v. Major League Baseball*,
29 F.4th 59 (2d Cir. 2022) ......................................................................................................22

*Paleja v. KP NY Operations LLC*,
No. 20-cv-00475-AT, 2021 WL 148948 (S.D.N.Y. Jan. 15, 2021) ..................................10, 11

*Palm Beach Strategic Income, LP v. Salzman*,
457 F. App'x 40 (2d Cir. 2012) ...............................................................................................23

*Raji v. Societe Generale Americas Sec. LLC*,
No. 15-cv-01144-AT, 2016 WL 354033 (S.D.N.Y. Jan. 21, 2016) ........................................11

*Seidemann v. Pro. Staff Cong. Loc. 2334*,
432 F. Supp. 3d 367 (S.D.N.Y. 2020).....................................................................................22

*Shull v. TBTF Prods., Inc.*,
No. 20-3529, 2021 WL 3027181 (2d Cir. July 19, 2021).................................................10, 11

*Soler v. G. & U., Inc.*,
833 F.2d 1104 (2d Cir. 1987)...................................................................................................25

*Tulczynska v. Queens Hosp. Ctr.*,
No. 17-cv-1669, 2019 WL 6330473 (S.D.N.Y. Feb. 12, 2019) .................................11, 17, 18

*United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*,
484 U.S. 365 (1988)..................................................................................................................25

*Zaret v. Bonsey*,
No. 22-cv-07109-AT, 2023 WL 6317956 (S.D.N.Y. Sept. 28, 2023)....................................11

## STATUTES

17 U.S.C.
§ 115................................................................................................ *passim*
§ 115(e) ..........................................................................................24
§ 115(e)(7) ......................................................................................24

## RULES

Rule 12(b)(6)........................................................................................10

## REGULATIONS

37 C.F.R.
§ 385................................................................................................2
§ 385.2.............................................................................. *passim*
§ 385.21..........................................................................................3, 4
§ 385.21(b) ......................................................................................4, 5
§ 385.21(b)(1)(i) ..............................................................................3
§ 385.21(d) ......................................................................................4, 5

## OTHER AUTHORITIES

Audible, *Hear something amazing*, https://www.audible.com/mk/b/benefits ...............................18

Audible, *Learn about Audible Standard*, https://help.audible.com/s/article/learn-
about-standard-plan....................................................................................14

Audible, *Learn about Premium Plus*, https://help.audible.com/s/article/learn-
about-premium-plus....................................................................................14

Austin McCauley Publishers, *Ten Benefits of Listening to Audiobooks*,
https://www.austinmacauley.com/blog/ten-benefits-listening-audiobooks;............................15

*B&N Audiobooks*, Barnes & Noble, https://www.barnesandnoble.com/h/bn-
audiobooks ..............................................................................................17

https://tinyurl.com/audibledemoncopperhead.........................................................18

https://tinyurl.com/koboplusdemoncopperhead.........................................................19

*Learn about Premium Plus*, Audible, https://help.audible.com/s/article/learn-
about-premium-plus?language=en_US....................................................................17

Speechify, *Exploring the World of Audiobook Length*,
https://speechify.com/blog/average-length-of-an-audiobook/ .................................15

Spotify, *Audiobooks in Premium: Get lost in great stories*,
https://www.spotify.com/us/audiobooks/ ..........................................................5, 18

Spotify, *How to listen to Audiobooks on Spotify*,
   https://newsroom.spotify.com/2023-10-03/audiobooks-included-in-spotify-
   premium/ ..................................................................................................................................15

Spotify, *Most popular audiobooks*,
   https://open.spotify.com/genre/section0JQ5IMCbQBLuBnqz9hPPS8 ..................................15

Spotify Premium Account: Spotify, *The Fellowship of the Ring*,
   https://open.spotify.com/show/5thw29eqjomhIDMY1XKsLk; ............................................18

*Spotify Premium*, Spotify, https://www.spotify.com/us/premium/ ..................................................5

Spotify, *The Return of the King*,
   https://open.spotify.com/show/3bhx8DUeCnIRAvFFMIXd11 ............................................19

Spotify, *The Two Towers*,
   https://open.spotify.com/show/3X9r1SEIQiG60xaNNaRPhC; ............................................18

## I.    INTRODUCTION AND SUMMARY

MLC's obstinate pursuit of this baseless litigation must end.  Both claims that MLC attempts to add to this lawsuit are unfounded, and the motion can and should be denied as futile based on the proposed pleadings alone.

MLC's first claim is that Spotify's use of $9.99 as the standalone price of the audiobook component of Spotify Premium when calculating Bundle royalties is unreasonable and should be some unspecified lower amount.  But a straightforward application of the governing regulations supports Spotify's use of $9.99.  The regulations provide three methods for determining the audiobook component's price: (i) the "standalone retail price" of that component, (ii) absent such a price, the price of "the most closely comparable product or service," or (iii) if neither of the first two measures exists, "the Service Provider may use another good faith, reasonable measure of the market value."  37 C.F.R. § 385.2.  Under any of the three methods, Spotify's use of $9.99 is appropriate:  Spotify's $9.99 Audiobooks Access product offers the same 15 hours of audiobook listening as Spotify Premium, and users' access to an otherwise *free* music service has no impact on the $9.99 price.  Audible Standard, a service of the leading competitor in the audiobook market, offers closely similar audiobook access for the same $9.99 price—facts tactically excluded from MLC's proposed amended complaint in what can only be gamesmanship.  And even if MLC were correct that Spotify could not rely on the first two prongs of the regulations, it has made no plausible allegations that Spotify's use of $9.99 was unreasonable or in bad faith.  Spotify and Audible both price their similar products at $9.99, while the (only slightly) lower-priced products highlighted by MLC (Audible Plus and Kobo Plus Listen) offer much more limited catalogs of audiobooks, making them less valuable products.

MLC's second claim, that Audiobooks Access should be treated as a Bundle, is

procedurally improper as it exceeds the scope of this Court's prior Order. In moving for reconsideration and vacatur of the judgment, MLC asserted that Spotify's Audiobooks Access included the same music functionality as Spotify Premium. It has now abandoned that claim, conceding that Audiobooks Access comes only with Spotify's free music service. Instead, it now asserts that Audiobooks Access should be reported as a Bundle of audiobook listening and Spotify Free. But the Court did not grant MLC leave to add *that* claim. In any event, even setting aside MLC's perpetual theory-shifting, this new claim is contrary to the regulations and thus futile. A Bundle combines a "Subscription Offering" (*i.e.*, a subscription music streaming product) with other products. 37 C.F.R. § 385.2. A "Subscription Offering" is one where the user is "*required to pay a fee to have access to the Offering.*" *Id.* (emphasis added). As noted, the music offering provided to Audiobooks Access users is Spotify Free. It is thus not a "Subscription" offering because users are not "*required to pay a fee to have access to*" it. *Id.* Read as a whole, the regulations cannot support the conclusion that Spotify Free is a "Subscription Offering" or that Audiobooks Access is a Bundle.

This Court has already twice explained why MLC's original complaint failed to state a claim. MLC's proposed amended complaint fares no better. MLC should not be allowed to use the Court to needlessly harass Spotify through its shifting, meritless theories. The Court should finally put an end to this wasteful and protracted litigation.

## II.    BACKGROUND

### A.    Legal Background

Under Section 115 of the Copyright Act, 17 U.S.C. § 115, "qualifying digital music providers are granted a statutorily mandated (*i.e.*, 'compulsory') blanket license to reproduce and distribute musical works for certain purposes, including streaming. The statute and its implementing regulations"—37 C.F.R. pt. 385—"require licensees to pay royalties for the use of

those musical works." Dkt. No. 61 at 2. The governing regulations lay out a formula for calculating the royalties owed by a music streaming service. *See* 37 C.F.R. § 385.21. Those royalties are calculated, in the first instance, as a portion of revenue earned by the service for music streaming. *Id.* § 385.21(b)(1)(i). The regulations provide specific rules for determining the amount of revenue to be included in the revenue base, and they embody the commonsense principle that revenue derived from sources *other* than music streaming should be excluded. *See id.* § 385.2 (defining "Service Provider Revenue" and stating that "Service Provider Revenue shall exclude revenue derived by the Service Provider solely in connection with activities other than Offering(s) [of music streaming].")). This makes sense because digital music providers should have to pay music rights holders only for revenue generated from use of those music rights.

One way that the regulations protect music streaming services against paying royalties to music rights holders for use of other, non-music content is by establishing particular rules for calculating the revenue base where a company offers a music service bundled together with *other* products or services. The regulation sets forth a specific formula for calculating the "Service Provider Revenue" attributable to the music component of a "Bundle."[1] *See id.* In particular, a Bundle's royalty-eligible revenue base "shall be the aggregate of the retail price paid for the Bundle (*i.e.*, all components for one retail price) multiplied by a fraction where the numerator is the standalone retail price of the Subscription Offering [*i.e.*, subscription music streaming] component in the Bundle and the denominator is the sum of the standalone retail prices of each of the components in the Bundle." *Id.* To use this Court's example, if a Bundle priced at $18 per month consists of a music streaming service priced at $10 per month plus another product also

---

[1] As this Court knows well, a "Bundle means a combination of a Subscription Offering providing Eligible Interactive Streams . . . and one or more other products or services having more than token value, purchased by End Users in a single transaction." 37 C.F.R. § 385.2.

priced at $10 per month, then the digital music provider would report $9 in revenues for purposes of the Section 115 license. Dkt. No. 61 at 3. The "Service Provider Revenue" attributable to a Bundle is thus a function of three inputs: (1) the retail price of the Bundle; (2) the standalone retail price of the Bundle's music component; and (3) the standalone retail price of the Bundle's non-music component(s). *See, e.g.*, Dkt. No. 77-1, Proposed First Amended Complaint ("PFAC"), ¶¶ 52, 54–55.

The regulations give digital music providers specific direction on how to determine standalone retail prices in the second and third inputs, using a three-tiered approach. *First*, where a "standalone retail price" exists for the component, that standalone retail price "shall be" used. 37 C.F.R. § 385.2. *Second*, "in the event that there is no standalone published price for a component of the Bundle, then the Service Provider shall use the average standalone published price for End Users of the most closely comparable product or service in the U.S. or, if more than one comparable exists, the average of standalone prices of comparables." *Id. Third*, if there is no "standalone retail price" for the component *and* "no reasonably comparable product or service exists in the U.S., then the Service Provider may use another good faith, reasonable measure of the market value of the component." *Id.*

The Service Provider Revenue for any Offering is just one factor in calculating the royalties ultimately due to MLC. 37 C.F.R. § 385.21(b), (d); PFAC ¶¶ 37–62. Other factors include subscriber figures and other licensing expenses. 37 C.F.R. § 385.21. The precise formula employed in any given scenario is dictated by the nature of the music service provided. Different formulas are used depending on whether the music offering is a standalone "Subscription Offering" (*i.e.*, an offering that requires payment of a fee to access), "Bundled Subscription Offering" (*i.e.*, a "Subscription Offering" within a Bundle), or a "Free nonsubscription/ad-

supported service[] free of any charge to the End User." *Id.* § 385.21(b), (d).

### B.    Relevant Facts

Spotify provides music streaming through three different products:  a free-to-the-user, ad-supported, limited-functionality music-streaming tier ("Spotify Free"), a Subscription Offering that includes ad-free music listening with enhanced functionality, without audiobooks ("Spotify Basic"), and a Subscription Offering that includes ad-free music listening with enhanced functionality, and 15 hours of audiobook listening ("Spotify Premium").[2]  PFAC ¶¶ 17, 63, 66, 76.

In addition, Spotify has a standalone audiobooks subscription product called "Audiobooks Access."  *Id.* ¶ 10.  Audiobooks Access provides subscribers with "15 hours of audiobook listening time from [Spotify's] audiobooks subscriber catalog each month."  Audiobooks Access users—like everyone else—are also able to use Spotify's limited-functionality, "free, ad-supported service"—*i.e.*, Spotify Free.  *Id.* ¶ 71 (depicting Spotify's website without alleging the statement is inaccurate); *see also id.* ¶¶ 13 n.8, 107 (acknowledging that Spotify Free and Audiobooks Access both "provide identical music functionality to users and are supported by advertising revenue").  Spotify Premium and Audiobooks Access include access to the same catalog of over 250,000 audiobooks, without any limit on the number of audiobooks a user can listen to at once.[3]  *Id.* ¶ 73.

---

[2] Spotify's website describes some of the functionality differences between Spotify Free and Spotify Premium in greater detail.  *See Spotify Premium*, Spotify, https://www.spotify.com/us/premium/.  MLC cites the Spotify website 30 times in the PFAC and relies on the information there to support its claims.  For that reason, the full information on that website can properly be considered in evaluating MLC's motion.  *See LeVy v. HU Prods. LLC,* No. 23-cv-1381-AT, 2024 WL 897495, at *2 (S.D.N.Y. Mar. 1, 2024) (deeming documents quoted and cited in a proposed amended complaint incorporated by reference).  In any event, these are indisputable, publicly available facts of which it would be proper for the Court to take judicial notice.  *See, e.g., 23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health,* 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of the content of websites); *Jeanty v. UPS United Parcel Serv. Freight,* No. 21-cv-8311, 2021 WL 5054439, at *1 n.1 (S.D.N.Y. Nov. 1, 2021) ("Generally, courts may take judicial notice of publicly available information, including from a website.").

[3]    *Audiobooks    in    Premium:    Get    lost    in    great    stories*,    Spotify,

The following table summarizes Spotify's relevant services:

| Service | Features | Monthly Individual Subscription Price |
|---|---|---|
| **Spotify Free** | • Free, ad-supported, limited-functionality music | N/A ($0.00) |
| **Audiobooks Access** | • Access to Spotify Free | N/A ($0.00) |
| | • 15 monthly hours of audiobook listening from a 250,000 audiobook catalog | $9.99 |
| **Spotify Basic** | • Ad-free music listening with enhanced functionality | $10.99 |
| **Spotify Premium** | • Ad-free music listening with enhanced functionality<br>• 15 monthly hours of audiobook listening from a 250,000 audiobook catalog | $11.99 |

Spotify reports Spotify Premium as a Bundle, and, in calculating the revenue base subject to royalties for that Bundle, uses $9.99—the retail price for Audiobooks Access—as the "standalone retail price" of the audiobook component, and $10.99—the retail price of Spotify Basic—as the "standalone retail price" of the Subscription Offering (*i.e.*, music) component. *Id.* ¶¶ 11, 68.

Spotify reports Spotify Free as a "[f]ree nonsubscription/ad-supported service[] free of any charge to the End User," which all agree is proper. *Id.* ¶¶ 41, 61, 104. Spotify's reporting of Spotify Free includes advertising revenue associated with Audiobooks Access subscribers' use of the included free, ad-supported music service (*i.e.*, Spotify Free). *Id.* ¶¶ 17, 104-05, 117.

**C.    Procedural Background**

MLC initiated this lawsuit on May 16, 2024. *See* Dkt. No. 1. In its original Complaint, MLC argued that Spotify underpaid royalties by improperly reporting Spotify Premium as a

---

https://www.spotify.com/us/audiobooks (cited at PFAC ¶¶ 70–72, 75). As of May 2024, Spotify Premium's library contained over 200,000 audiobooks, PFAC ¶ 70. That number has increased over time.

Bundle.  *See generally id.*  At the time, MLC agreed that the only issues in dispute were two straightforward questions: (1) whether audiobook streaming is a product or service distinct from music streaming; and (2) whether audiobook streaming has more than token value.  *See* Dkt. No. 28 at 15, 18, 25.  Despite the narrow scope of those two questions, MLC nonetheless served *sixty-one* requests for production of documents and *twenty* interrogatories on Spotify, extending well beyond anything reasonably necessary for its case and demonstrating its intent to improperly use discovery as a bludgeon to punish Spotify for exercising a clear regulatory entitlement.

Fortunately, this Court put an end (temporarily) to MLC's harassment.  On January 29, 2025, this Court held that *no* discovery was needed to conclude that "audiobook streaming is a product or service that is distinct from music streaming and has more than token value" and thus that Spotify Premium is a Bundle under the governing regulations.  Dkt. No. 61 at 7.  The Court accordingly dismissed MLC's Complaint with prejudice.  *Id.* at 14.

On February 12, 2025, MLC filed a motion for reconsideration or, in the alternative, a motion to vacate the judgment so that MLC could seek to amend its complaint.  *See* Dkt. No. 71.  This Court denied the motion in part and granted it in part.  Dkt. No. 74.  It affirmed its earlier holding that Spotify Premium is a Bundle as a matter of law and denied MLC's request to amend its Complaint to allege otherwise.  *Id.* at 4–6.  Instead, the Court permitted MLC to seek leave to amend solely with respect to two narrow, alternative claims: (1) "that Spotify has allegedly underpaid royalties due on the Audiobooks Access plan," which was based on MLC's false assertion that the Audiobooks Access plan offered Premium music; and (2) that Spotify "improperly calculated the royalties owed in connection with Premium by relying on Audiobooks Access as the standalone subscription price of the Bundle's non-music component."  *Id.* at 6.  As to the former, the Court determined that MLC had raised merely a "conclusory claim that it

inadvertently or strategically forfeited." *Id.* at 3. Nonetheless, as a matter of judicial grace and for purposes of procedural exhaustion, the Court stated it would "allow MLC to seek leave to plead the claim in an amended complaint." *Id.* (noting the Court's "'strong preference for resolving disputes on the merits' rather than on the technical ground of procedural default" (citation omitted)).

In an effort to avoid further wasting party and judicial resources, and after meeting and conferring, Spotify, through counsel, sent a letter to MLC's counsel on March 21, 2025, articulating reasons why any amended complaint would be futile. Ex. 1.[4] As particularly relevant, Spotify explained why $9.99 was the appropriate standalone retail price for the audiobook component in Spotify Premium. Among other things, Spotify informed MLC about a "closely comparable product"—Audible Standard, which "allows users to listen to one audiobook per month for a $9.99 monthly fee"—and provided links to relevant sites with information about that product and the following graphic from Audible's website:

---

[4] Exhibit 1 is attached to the declaration of Allison L. Stillman, filed concurrently herewith. MLC relied on this letter in formulating its proposed Amended Complaint but misrepresents what it says. *Compare* PFAC ¶ 77 *with* Ex. 1 at 3.

Ex. 1 at 4-5.

MLC did not respond to that correspondence.  MLC then filed a motion for leave to amend, Dkt. No. 76 ("Motion" or "Mot."), along with the PFAC, on April 1, 2025.  MLC alleges that Spotify underpays mechanical royalties for the Spotify Premium Bundle by using the $9.99 retail price of Audiobooks Access as the price of the Spotify Premium audiobook component.  *See* PFAC ¶¶ 78–103.  MLC also raises a brand-new theory: that Spotify underpays royalties on Audiobooks Access, not because Audiobooks Access secretly includes access to ad-free music listening with

enhanced functionality (as MLC wrongly argued in its initial complaint and when seeking reconsideration), but now, rather, because Audiobooks Access purportedly is a Bundle of audiobook listening and Spotify's *free* service. *See id.* ¶¶ 104–18. As discussed below, this last-gasp effort fails as well.

## III.    LEGAL STANDARD

A motion for leave to amend should be denied where the moving party "has unduly delayed or acted in bad faith, the opposing party would be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Colbert v. Rio Tinto PLC*, No. 17-cv-8169-AT, 2019 WL 10960490, at *5 (S.D.N.Y. July 29, 2019); *see also, e.g.*, *Shull v. TBTF Prods., Inc.*, No. 20-3529, 2021 WL 3027181, at *3 (2d Cir. July 19, 2021).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss" under Rule 12(b)(6). *Shull*, 2021 WL 3027181, at *3; *see also, e.g.*, *Paleja v. KP NY Operations LLC*, No. 20-cv-00475-AT, 2021 WL 148948, at *2 (S.D.N.Y. Jan. 15, 2021). Under that standard, "a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, 'state a claim to relief that is plausible on its face.'" *Ekpe v. City of New York*, No. 20-cv-9143-AT, 2024 WL 1621207, at *2 (S.D.N.Y. Apr. 12, 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Thus, "[a] complaint is properly dismissed where, as a matter of law, 'the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief.'" *Brown v. Prove Identity, Inc.*, No. 22-cv-9315-AT, 2024 WL 1195331, at *2 (S.D.N.Y. Mar. 20, 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Courts—including this one—routinely deny motions for leave to amend where the

amendments would be futile under the motion-to-dismiss standard. *See, e.g.*, *Paleja*, 2021 WL 148948, at *2; *Colbert*, 2019 WL 10960490, at *6; *Joyner v. Alston & Bird LLP*, No. 20-cv-10093-AT, 2021 WL 4296433, at *5 (S.D.N.Y. Sept. 21, 2021); *Raji v. Societe Generale Americas Sec. LLC*, No. 15-cv-01144-AT, 2016 WL 354033, at *3 (S.D.N.Y. Jan. 21, 2016); *Zaret v. Bonsey*, No. 22-cv-07109-AT, 2023 WL 6317956, at *5 (S.D.N.Y. Sept. 28, 2023). Further, even where a plaintiff has not previously amended a complaint, denial of leave to amend is proper where the proposed amendments would be futile. *See, e.g.*, *Shull*, 2021 WL 3027181, at *3; *Jang v. Trs. of St. Johnsbury Acad.*, 771 F. App'x 86, 88 (2d Cir. 2019) (summary order); *Hadassah Acad. Coll. v. Hadassah Women's Zionist Org. of Am., Inc.*, No. 18-cv-02446-AT, 2019 WL 1897668, at *5 (S.D.N.Y. Apr. 29, 2019).

For its part, MLC once again asserts that the issues relevant to its claim "are all questions of fact that cannot be decided at this stage," just as it did when wrongly arguing that Spotify Premium is not a Bundle. Mot. at 11; *see* Dkt. No. 28 at 25 ("At the very least, these allegations raise questions of fact that preclude a finding that Premium qualifies as a Bundle as a matter of law."). But MLC's apparent strategy to bluster its way into discovery should not be countenanced. All of the facts relevant to the dispute are contained in or fairly read into the PFAC. Based on those undisputed facts *from the very sources it relies on to make its claim*, MLC's claims necessarily fail.[5]

---

[5] In adjudicating whether a complaint adequately pleads a claim, a district court may consider any of the following: "the facts alleged in the complaint, which are accepted as true"; "any documents attached to the complaint as exhibits or incorporated by reference therein"; "matters of which judicial notice may be taken"; and "documents upon the terms and effect of which the complaint 'relies heavily' and which are, thus, rendered 'integral' to the complaint." *Tulczynska v. Queens Hosp. Ctr.*, No. 17-cv-1669, 2019 WL 6330473, at *3 (S.D.N.Y. Feb. 12, 2019). MLC's "failure to include matters of which as pleader[] [it] had notice and which were integral to [its] claim—and that [it] apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on [a 12(b)(6)] motion." *Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d

IV.    **ARGUMENT**

Both of MLC's new claims—that Spotify underpays royalties on the Spotify Premium Bundle by overpricing the audiobook component, and that it underpays royalties on Audiobooks Access by failing to treat it as a Bundle—fail as a matter of law, and this wasteful litigation should be put to an end once and for all.

**A.    MLC's Claim That Spotify Improperly Calculates The Bundle Royalties For Spotify Premium Is Futile**

Spotify properly reports and calculates royalties for Spotify Premium.  The revenue subject to royalties depends on three inputs: (1) Spotify Premium's retail price; (2) the "standalone retail price" of Spotify Premium's music component; and (3) the "standalone retail price" of Spotify Premium's audiobook component.  *See supra* at 3-4; PFAC ¶¶ 79, 100–02.  Only the third input is at issue here.  For that input, in the absence of a standalone retail price, Spotify is permitted to use the standalone published price for the most comparable audiobook product on the market, or any good faith, reasonable measure of market value of the audiobook component of Premium.  37 C.F.R. § 385.2.

MLC argues that Spotify's use of $9.99 is incorrect and results in reducing royalties paid to MLC.  PFAC ¶¶ 78–103.  This claim fails as a matter of law.  Under any reasonable interpretation of the regulations, $9.99 is the appropriate valuation for this third input.

**1.    The $9.99 Retail Price of Audiobooks Access is the Appropriate Price to Use for the Audiobook Component of Spotify Premium**

Spotify properly uses $9.99 as the price of the audiobook component when calculating Spotify Premium's royalties: (a) the $9.99 price of Audiobooks Access is the proper "standalone

---

42, 44 (2d Cir. 1991); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (cleaned up)).

retail price" for Spotify Premium's audiobook component; and (b) alternatively, Audiobooks Access constitutes the standalone price of the "most closely comparable product."  37 C.F.R. § 385.2.

a. <u>Audiobooks Access establishes the "standalone retail price" of 15 monthly hours of audiobook listening.</u>

Audiobooks Access establishes the "standalone retail price" of Spotify Premium's audiobook component.  Where a consumer pays a single retail price for a product, and the company throws in a product that it otherwise offers for free, it does not make sense to treat any portion of that retail price as attributable to the free product.  The $9.99 Audiobooks Access product gives users access to 15 hours of audiobook listening, which is identical to Spotify Premium.  Those users can also access Spotify Free—which is available for free to anyone.  PFAC ¶ 71; *see also id.* ¶¶ 13 n.8, 107. Thus, the total retail price of the product is necessarily attributable to the audiobook listening component.

MLC's argument that Audiobooks Access cannot provide the "standalone retail price" of Spotify Premium's audiobook component because Audiobooks Access users are also given free music streaming is thus meritless.  PFAC ¶¶ 82–85.

b. <u>Notwithstanding the inclusion of free music, Audiobooks Access is still the "most closely comparable product in the marketplace."</u>

Even assuming, arguendo, Audiobooks Access could not directly provide the "standalone retail price" of the audiobook component of Spotify Premium, use of Audiobooks Access's $9.99 retail price is still correct as a matter of law. Audiobooks Access would undeniably be the "most closely comparable product in the marketplace," even if it is different from the audiobook component of Premium because it also comes with Spotify Free.  37 C.F.R. § 385.2.  Audiobooks Access consists of the *exact same* audiobook experience as Spotify Premium, as well as a music product that is available to consumers for zero dollars, making it the right benchmark for

establishing the price of the audiobook component of Spotify Premium.

Thus, whether it is considered the "standalone retail price" or the "most closely comparable product," Audiobooks Access's $9.99 price is the correct, obvious, and logical standalone price for the audiobook component of Spotify Premium. This renders MLC's claim futile, and its amendment request must be denied for this reason alone.

      **2.**      **The Retail Price of the Next Most Closely Comparable Product— Audible Standard—is Also $9.99**

            a.      Audible Standard is the next most closely comparable—and certainly a "reasonably comparable"—product to the audiobook component of Spotify Premium.

The next most closely comparable product to Spotify Premium's audiobook component in the marketplace today—Audible Standard—is *also* priced at $9.99.[6] Tellingly, MLC's Motion and PFAC entirely ignore the existence of Audible Standard, even though it is a direct third-party comparable. For example, neither Spotify Premium nor Audible Standard gives access to unlimited streaming of any category of audiobooks.[7] Audible Standard subscribers are able to

---

[6] Audible, *Learn about Premium Plus*, https://help.audible.com/s/article/learn-about-premium-plus (discussing Audible Standard plan). This webpage is cited and heavily relied upon in the PFAC, and is thus incorporated by reference. PFAC ¶ 93; *see LeVy*, 2024 WL 897495, at *2. Moreover, this webpage links to a different Audible webpage with further information about Audible Standard. *See* Audible, *Learn about Audible Standard*, https://help.audible.com/s/article/learn-about-standard-plan. The Court may properly take judicial notice of the content of this site. *See supra* n.2. Audible Standard is currently available only to existing Audible subscribers, though this limitation does not render it an unreasonable comparator. Although it appears Audible Standard launched after Spotify Premium began to be reported as a Bundle, it at a minimum serves as independent confirmation that the $9.99 price was a reasonable "standalone retail price" for the audiobook component of Spotify Premium even during the months before Audible Standard launched.

[7] Audible, *Learn about Premium Plus*, https://help.audible.com/s/article/learn-about-premium-plus (cited at PFAC ¶ 93) (noting that "[a]ccess to unlimited streaming and listening from the Audible Plus Catalog" is available only through the Audible Plus and Audible Premium Plus products).

select one audiobook per month, compared to the 15 monthly hours of audiobook listening provided to Spotify Premium subscribers, from an equivalent catalog of audiobooks. MLC points to one potential advantage of the one-book-a-month entitlement compared with Spotify Premium—a user can theoretically listen to an entire book that is longer than 15 hours in a single month. PFAC ¶ 89. At the same time, MLC ignores the disadvantages. For audiobooks that are *less* than 15 hours in length, as many are, Spotify Premium allows users to listen to *more* than one book per month.[8] Furthermore, once an Audible Standard subscriber has selected a book, it cannot switch to a different book mid-month.[9] A Spotify Premium subscriber, however, can allocate their 15 hours across audiobooks in Spotify's catalog as they see fit.[10] Given these facts, there is no doubt that the audiobook listening entitlements in these products are sufficiently comparable. And there are yet other similarities. Like Spotify Premium, unused monthly selections on Audible Standard do not roll over to the next month,[11] and subscribers can no longer listen to selected

---

[8] For instance, *Say You'll Remember Me* by Abby Jimenez, *Abundance* by Ezra Klein and Derek Thompson, *The Crash* by Freida McFadden, *Everything is Tuberculosis* by John Green, *Code Name: Pale Horse* by John Green, *The Boyfriend* by Freida McFadden, and *The Mountain is You* by Brianna Wiest—all of which are on Spotify's "Most popular audiobooks" list (Spotify, *Most popular audiobooks*, https://open.spotify.com/genre/section0JQ5IMCbQBLuBnqz9hPPS8, cited at PFAC ¶ 89)—total exactly 54 hours. In only a four-month span, then, a Spotify Premium subscriber could listen to all seven of those audiobooks and still have enough time left over to get through over half of *First Time Caller* by B.K. Borison, another audiobook on that list. In fact, many sources indicate that the average length of an audiobook is substantially less than 15 hours. *See, e.g.*, Austin McCauley Publishers, *Ten Benefits of Listening to Audiobooks*, https://www.austinmacauley.com/blog/ten-benefits-listening-audiobooks; Speechify, *Exploring the World of Audiobook Length,* https://speechify.com/blog/average-length-of-an-audiobook/.

[9] *See Learn about Audible Standard*, *supra* ("Monthly audiobook selections aren't eligible for return or exchange.").

[10] Spotify, *How to listen to Audiobooks on Spotify*, https://newsroom.spotify.com/2023-10-03/audiobooks-included-in-spotify-premium/ ("Fifteen monthly hours means that you can listen the way you want. Will you explore multiple titles from the evolving regularly refreshed selection or stick with one and listen from start to finish?").

[11] *Compare* PFAC ¶ 90 (noting that, for Spotify Premium, "any unused audiobooks listening time from the previous month can no longer be used"), *with Learn about Premium Plus*, *supra* (for

audiobooks after they cancel their subscription.[12]

To be sure, Audible Standard is not *identical* to the audiobook component of Spotify Premium. But that is not the standard. Rather, the regulation only requires reference to "*the most closely* comparable product or service." 37 C.F.R. § 385.2 (emphasis added). A product can be used as the source of the standalone retail price so long as it is "*reasonably* comparable." *Id.* (emphasis added). By that measure, Audible Standard is, as a matter of law, sufficiently comparable to the audiobook component of Spotify Premium. And because both retail for $9.99, it is immaterial whether Spotify's Audiobooks Access or Audible's Standard is used as the "most closely comparable" product. *See also* 37 C.F.R. § 385.2 (providing that "if more than one comparable exists" a digital music provider shall use "the average of standalone prices for comparables").

Remarkably, despite the obvious similarities between Spotify Premium and Audible Standard, MLC does not even *mention* Audible Standard in its Motion or the PFAC. MLC's silence is inexcusable, given that counsel for Spotify brought Audible Standard to MLC's attention in written correspondence on March 21, 2025, long before MLC filed its PFAC. Ex. 1 at 4–6. What's more, the features of Audible Standard are discussed in a source that *MLC itself cites in the PFAC*.[13] MLC nonetheless chose to hide from the Court an audiobook service that is plainly far more objectively comparable to Spotify Premium than the four audiobook services MLC does point to, as discussed in greater detail below. The reason is obvious—Audible Standard is

---

Audible Standard: "Unused monthly selections don't roll over to the next month").

[12] *Compare* PFAC ¶ 90 ("Premium subscribers are not provided with a monthly credit or token allowing them to permanently download an audiobook for listening in later months (or after they unsubscribe)."), *with Learn about Premium Plus*, *supra* (for Audible Standard: "Listen to your selected audiobooks until you cancel").

[13] *See Learn about Premium Plus*, *supra* (cited at PFAC ¶ 93).

unquestionably at least a "reasonably" comparable product to the audiobook component of Spotify Premium, and discussing that product in its PFAC would have been fatal to MLC's claim. Fortunately, "where the language of a complaint is contradicted by a written document that plaintiff artfully conceals from a court, the court may consider such a document on a motion to dismiss." *Tulczynska*, 2019 WL 6330473, at \*5; *see also Cortec*, 949 F.2d at 46-48 (holding that documents that plaintiffs "had notice" of and were "integral" to the plaintiffs' claim could fairly be considered on a motion to dismiss even though they were not attached to nor incorporated by reference). Accordingly, this Court should squarely reject MLC's effort to hide the ball and pursue this meritless litigation through deceptive pleading.

> b. <u>The audiobook services MLC relies on are far less comparable than either Audiobooks Access or Audible Standard.</u>

Instead of taking on Audiobooks Access and Audible Standard, MLC strains to focus the PFAC on four other, less comparable audiobook products that it asserts are more valuable than the audiobook component of Spotify Premium. As to two, B&N Audiobooks and Audible Plus Premium, *see* PFAC ¶¶ 90–93, MLC neglects to mention that they are priced at *much more than $9.99*—$14.99 and $14.95, respectively.[14] Even crediting, arguendo, MLC's claim that those two services are more valuable, Spotify is pricing the audiobook component of Premium at 2/3 the price of those services. If anything, these benchmarks support Spotify's position rather than MLC's.

As to the other two services, Audible Plus (at $7.95 per month) and Kobo Plus Listen (at $7.99 a month), *see* PFAC ¶ 87, Spotify agrees that these, too, are not comparable to the audiobook

---

[14] *B&N Audiobooks*, Barnes & Noble, https://www.barnesandnoble.com/h/bn-audiobooks (cited at PFAC ¶ 90); *Learn about Premium Plus*, Audible, https://help.audible.com/s/article/learn-about-premium-plus?language=en_US (cited at PFAC ¶ 93).

component of Spotify Premium, but for a diametrically opposite reason: while they provide unlimited listening, their audiobook catalogs are far inferior to Spotify Premium's—another fact knowable from the materials referenced in MLC's complaint, *see infra* nn. 17, 19, but that MLC has hidden from the Court. Again, MLC's omission should not prevent this Court from deciding this issue as a matter of law at this stage. *Cortec*, 949 F.2d at 44; *Tulczynska*, 2019 WL 6330473, at *5.

Spotify Premium subscribers have access to over 250,000 audiobooks.[15] All of the "popular audiobooks" highlighted in Paragraph 89 of the PFAC are available on Spotify Premium. The Audible Plus catalog, however, contains merely "thousands" of audiobooks and generally does not include "bestseller[s] or new release[s]."[16] Indeed, *only one* of the eight "popular audiobooks" cherrypicked by MLC in the PFAC is available to Audible Plus subscribers.[17] And the one that is, J.R.R. Tolkien's *The Fellowship of the Ring,* is merely the first book of a trilogy for which the Audible Plus catalog lacks the remaining two books. The listener dying to know what happens to Frodo and Sam after the breaking of the fellowship will need to listen elsewhere—perhaps on Spotify Premium, which has the entire trilogy.[18]

---

[15] Spotify, *Audiobooks in Premium: Get lost in great stories*, https://www.spotify.com/us/audiobooks/ (cited at PFAC ¶¶ 70–72, 75).

[16] Audible, *Hear something amazing*, https://www.audible.com/mk/b/benefits.

[17] The Audible Plus catalog is publicly available to be searched, including directly from the URLs cited at PFAC ¶¶ 87 n.39, 89 n.45. It is possible to search for just works included in the "Plus Catalog." For example, when a search is run for *Demon Copperhead* (one of the audiobooks hand-selected at PFAC ¶ 89), it does not appear in the Audible Plus Catalog. *See* https://tinyurl.com/audibledemoncopperhead. The Court may properly consider the search results on the Audible website. *See supra* n. 2. This brief's discussion of the various services' catalogs reflects how they existed as of April 21, 2025.

[18] The note "Included with Premium" can be seen at these links when logged into a Spotify Premium Account: Spotify, *The Fellowship of the Ring*, https://open.spotify.com/show/5thw29eqjomhIDMY1XKsLk; Spotify, *The Two Towers*,

Kobo Plus Listen fares even worse. *Not a single one* of the "popular audiobooks" hand-selected in MLC's PFAC is available to Kobo Plus Listen subscribers.[19] Such a subscriber thus cannot hear about even the magic of Gandalf's fireworks at Bilbo Baggins's eleventy-first birthday party. Thus, the (slightly) lower prices of Kobo Plus Listen and Audible Plus reflect their highly limited catalogs; they are not comparable products to Audiobooks Access, Audible Standard, or the audiobook component of Spotify Premium. To borrow MLC's analogy, *see* PFAC ¶ 88, the vast majority of people would prefer a cell phone plan with limited hours but no restrictions on who can be called, over one with unlimited calls that can be made only to their in-laws.

### 3.    At the Very Least, $9.99 is a Reasonable Measure of the Market Value of the Audiobook Component of Spotify Premium

Finally, based on all of the facts available and incorporated into the PFAC, this Court should find as a matter of law that $9.99 is a "good faith" and "reasonable" measure of the market value of Spotify Premium's audiobook component (if the Court even reaches that question, which it need not for all the reasons expressed above). *See* 37 C.F.R. § 385.2 ("If no reasonably comparable product or service exists in the U.S., then the Service Provider may use another good faith, reasonable measure of the market value of the component."). As explained above, (a) there are multiple real-world audiobook products that are similar to the audiobook component of Spotify Premium that are priced at *exactly* $9.99; (b) $9.99 is substantially less than the retail price of

---

https://open.spotify.com/show/3X9r1SEIQiG60xaNNaRPhC; Spotify, *The Return of the King*, https://open.spotify.com/show/3bhx8DUeCnIRAvFFMIXd11.

[19] The Kobo Plus catalog is publicly available to be searched, including directly from the URL cited at PFAC ¶¶ 87 n.40. It is possible to search for just works included in the "Kobo Plus" catalog. For example, when a search is run for *Demon Copperhead*, the book by Barbara Kingsolver (the one included in Paragraph 89 of the PFAC) does not appear in the Kobo Plus catalog. *See* https://tinyurl.com/koboplusdemoncopperhead. The Court may properly consider the search results on the Kobo Plus website. *See supra* n. 2.

multiple audiobook products identified by MLC; and (c) $9.99 is only slightly greater than the subscription price of materially inferior audiobook products.

If anything, the alleged facts and other material that the Court may properly consider at this stage indicate that $9.99 is a conservatively low price. The average price of the four audiobook services discussed in the PFAC (including the two with inferior catalogs) is $11.47, *$1.48 greater* than the $9.99 price Spotify uses. *Cf.* 37 C.F.R. § 385.2 (providing that, "if more than one comparable exists" in the marketplace, digital music providers should use "the average of standalone prices for comparables"). Because $9.99 is eminently reasonable, MLC's claim is futile and amendment should not be permitted.

MLC's contrary assertion is based on merely two allegations, neither of which adequately supports any inference that Spotify's decision to price the audiobook component at $9.99 was not in "good faith" or unreasonable. First, MLC points again to the lower-priced Audible Plus and Kobo Plus Listen products. PFAC ¶ 97. But that allegation does not support a finding of bad faith or unreasonableness, especially given the material differences in those services. Second, MLC asserts that "[t]he fact that the price for Basic Individual is only $1.00 per month less than Premium Individual, the price for Basic Duo is only $2.00 per month less than Premium Duo, and the price for Basic Family is only $3.00 per month less than Premium Family, suggests that Spotify values the audiobooks components in its Premium plans between $1.00 and $3.00." PFAC ¶ 98. Again that allegation does not support a finding of bad faith or unreasonableness. To the contrary, MLC's flawed logic would then also suggest that the value of the *music* component of Premium should be only *$2*—the difference between Audiobooks Access ($9.99) and Spotify Premium ($11.99). That is not the rule. Indeed, the regulations clearly reject this "price-difference" approach, instead allowing the digital music provider to make a straightforward, reasonable assessment of what the

"market value" of the component would be if sold on a standalone basis. That the regulations expressly empower the Service Provider to select a "good faith," "reasonable" price reinforces that the standard is intended to be deferential to a reasonable choice—a standard easily and demonstrably met for all the reasons explained above.

By contrast, the notion that access to 15 hours of listening per month to a catalog of over 250,000 audiobooks, including all the "popular" audiobooks that MLC identified in its complaint, would have a reasonable market value of $1 is factually and legally implausible, given the prices of the other products in the marketplace. MLC offers no other factual allegations that even purport to demonstrate why Spotify's choice of $9.99 would not, at a minimum, be a good faith, reasonable measure of the market value of the audiobook component of Spotify Premium.

Finally, MLC wrongly states that questions of good faith and reasonableness "cannot be decided under the motion to dismiss standard." Mot. at 16. If that were true, there would be no check against vexatious litigation. And indeed, it is not true; courts in this Circuit and beyond frequently decide such issues as a matter of law at the motion-to-dismiss stage and dismiss complaints that, like the PFAC, fail to plausibly allege bad faith or unreasonableness. In *Farash v. Continental Airlines, Inc.*, 337 F. App'x 7 (2d Cir. 2009), for instance, the plaintiff alleged negligence arising out of alleged mistreatment on a flight. *Id.* at 8. While "recogniz[ing] that the question of whether given conduct was 'reasonable' under the circumstances is often reserved for the trier of fact," the court held that the plaintiff's particular claim was properly dismissed because he failed to plausibly allege that the airline's conduct was unreasonable. *Id.* at 9-10. And in *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373 (S.D.N.Y. 2014), the court found that plaintiff had failed to plausibly allege a violation of a contractual obligation to negotiate in good faith. *Id.*

at 375, 384-85.  Other examples abound.[20]  And dismissal is especially proper here, given that "all the information the Court needs to make its finding [on good faith and reasonableness] appears on the face of the Amended Complaint," or in other material that is fairly considered together with that complaint.  *Seidemann v. Pro. Staff Cong. Loc. 2334*, 432 F. Supp. 3d 367, 386 (S.D.N.Y. 2020).

**B.   MLC's Claim That Spotify Underpaid Royalties For Audiobooks Access Exceeds The Scope of This Court's Order and Is Also Futile**

MLC separately claims that Spotify underpaid royalties for Audiobooks Access by failing to report Audiobooks Access as a Bundle.  PFAC ¶¶ 104–18.  This is yet another brand-new theory that MLC has never raised (even though it easily could have before).  *See supra* at 9.  MLC was right not to raise it the first time; it has no basis and fails as a matter of law.

**1.   MLC's Claim Should Be Rejected Because It Exceeds The Bounds of the Leave Granted by This Court's Order**

As an initial matter, MLC has exceeded the proper bounds of this Court's reconsideration order by attempting to insert a new claim not mentioned in its reconsideration motion.  In that motion, MLC argued that the Court had overlooked the claim that, "to the extent Audiobooks Access provides subscribers *with the same access to unlimited on-demand ad-free music as Premium*, Spotify has failed to properly account for and pay royalties owed to the MLC for Audiobooks Access under Section 115."  Dkt. No. 71 at 3 (emphasis added) (citation omitted). This Court narrowly granted leave to allow MLC to seek to amend its complaint to add *that* claim. Dkt. No. 74 at 2-3.  But, now MLC concedes—after being called out for its failure to conduct a

---

[20] *Hawkins v. Coca-Cola Co.*, 654 F. Supp. 3d 290, 306-07 (S.D.N.Y. 2023); *Martin v. Am. Equity Ins. Co.*, 185 F. Supp. 2d. 162, 165 (D. Conn. 2002); *Am. Bd. of Internal Med. v. Salas Rushford*, 114 F.4th 42, 61 (1st Cir. 2024) (affirming dismissal); *Odgers v. USAA Cas. Ins. Co.*, 689 F. Supp. 3d 50, 54-55 (E.D. Pa. 2023); *Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 54-55 (D.D.C. 2012); *cf. Olson v. Major League Baseball*, 29 F.4th 59, 77-80 (2d Cir. 2022) (affirming dismissal where plaintiffs failed to plausibly allege reasonable reliance).

reasonable pre-suit investigation, *see* Ex. 1—that Audiobooks Access users get access *only to Spotify Free*.  Rather than leaving well enough alone, however, MLC now claims that Spotify underpays royalties on Audiobooks Access *because that product is a Bundle of audiobook listening and Spotify Free*.  PFAC ¶¶ 104-118.  That is not a claim that this Court granted MLC leave to seek to add, and for that reason alone the Court should deny MLC's Motion.  *Cf. Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted." (collecting cases)).

### 2.    Audiobooks Access is not a Bundle, but Rather a Combination of a Subscription Audiobook Service and a "Free nonsubscription / ad-supported" Music Offering

Should the Court consider the merits, this claim is also futile.  As explained, Audiobooks Access merely comes with access to Spotify's free, ad-supported music service (*i.e.*, Spotify Free).  Spotify properly pays royalties for the music within Audiobooks Access in the same manner that it always (properly) pays royalties for the music within Spotify Free—it pays royalties on the ad revenue generated from music listening (or, alternatively, on the "TCC Prong").  PFAC ¶¶ 17, 38, 107-09.

MLC argues, however, that Audiobooks Access is a Bundle and that Spotify underpays royalties by not reporting it as such.  That is simply wrong.  As this Court knows well, a Bundle requires, among other things, "a combination of [1] a **Subscription Offering** providing Eligible Interactive Streams and/or Eligible Limited Downloads and [2] one or more other products or services."  37 C.F.R. § 385.2 (emphasis added).  Under both the facts as alleged and the statutory and regulatory definitions, Audiobooks Access does not satisfy the first requirement as a matter of law and is thus not a Bundle—or any other "Subscription Offering" encompassed by the

regulations.

Under the regulations, an "Offering" is "a Service Provider's engagement in Licensed Activity[.]"  *Id.*  "Licensed Activity," in turn, "means Covered Activity, under voluntary or statutory license."  *Id.*  Finally, "Covered Activity" is defined in the Copyright Act and means "the activity of making *a digital phonorecord delivery of a musical work*, including in the form of a permanent download, limited download, or interactive stream, where such activity qualifies for a compulsory license under this section."  17 U.S.C. § 115(e)(7) (emphasis added).[21]  Putting it all together, an "Offering" refers to Spotify's provision of *music* to its users under the compulsory license.  And as the final step, a "Subscription Offering" is an "Offering"—*i.e.*, the provision of music—"for which End Users are ***required to pay a fee to have access*** to the Offering."  37 C.F.R. § 385.2.

Because audiobook streaming is not compulsory-licensed activity covered by the Section 115 license (which covers only *music* activity), the *audiobook* component of Audiobooks Access cannot constitute an "Offering" within the meaning of the regulations.  MLC implicitly concedes as much, asserting that it is the "*music* component of the Premium Bundle," specifically, that constitutes the Subscription Offering with the Spotify Premium Bundle.  PFAC ¶¶ 41, 61 (stating that the "*music* component of the Premium Bundle" is a "Bundled Subscription Offering" (emphasis added)).

The question, then, is whether the *music* service that comes with Audiobooks Access is "a Subscription Offering"—one of the requirements of a Bundle—within the meaning of the regulations.  The answer is plainly no, as a matter of law.  Audiobooks Access users are not

---

[21] "Covered Activity" is not defined in the regulations and thus has "the same meaning given to [it] in 17 U.S.C. [§] 115(e)."  37 C.F.R. § 385.2.

"*required to pay a fee to have access to*" the music-streaming service that comes with Audiobooks Access. Instead, as alleged in the PFAC, any person in the United States can access that same service—Spotify Free—*without paying a fee*. *See* PFAC ¶¶ 71 (allegation depicting Spotify's website stating that Audiobooks Access provides access to Spotify's "free, ad-supported [music] service"), 107 (acknowledging that Spotify Free and Audiobooks Access both "provide identical music functionality to users and are supported by advertising revenue"); *see also id.* ¶ 13 n.8.

The unambiguity of the "Subscription Offering" definition is reinforced by other aspects of the regulations. *See United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."); *Soler v. G. & U., Inc*., 833 F.2d 1104, 1109 (2d Cir. 1987) (applying this principle to interpretation of federal regulations). Assuming Spotify were to treat Audiobooks Access as a Bundle, contrary to the regulations, it would have to determine the "standalone retail price" of the music component of that package, as per the regulatory formula:

$$\frac{\text{Price of Music Component}}{\text{Price of Music Component} + \text{Price of Audiobooks Component}} \quad \text{x} \quad \text{Aggregate Retail Price} \quad = \quad \text{Service Provider Revenue}$$

PFAC ¶ 79. The "standalone retail price" of the music component of Audiobooks Access is *zero*— MLC quotes from Spotify's own marketing that the same music experience is available to users at no cost through Spotify Free, *see id.* ¶ 71, and does not allege that statement is inaccurate. And zero divided by any (nonzero) number is also zero. And zero multiplied by any number is, again, also zero. So MLC's position, if adopted, would mean that *no subscription revenue* would be

reported to MLC from Audiobooks Access.  Yet MLC's position would somehow still be that the music component of Audiobooks Access is a "Subscription Offering."  The regulations cannot be read to support that nonsensical result.  For instance, MLC's position would mean (hypothetically) that if a company sold a television and it came with a free Spotify account, the television must be treated as part of a Bundle.[22]

Because Audiobooks Access does not include a Subscription Offering, the subscription revenues—which are entirely the fee the consumer pays for access to *audiobooks*—are not subject to Section 115 royalties.  Rather, Spotify must pay—*and does pay*—mechanical royalties for Audiobooks Access on the same terms as Spotify Free.  MLC's claim thus fails as a matter of law, and the Court should deny leave to amend to add this second claim as well.

### C.    Granting Leave To Amend Would Prejudice Spotify

This Court should further deny the Motion because granting leave would unfairly prejudice Spotify.  *See* Colbert, 2019 WL 10960490, at *5.  MLC suggests that granting leave to amend will not substantially alter the scope of discovery because it can rely on past discovery conducted while Spotify's motion to dismiss MLC's initial complaint was pending.  *See* Mot. at 18.  Not so.  MLC agreed that the only disputed issues under its initial complaint were: (1) whether audiobook streaming is a product or service distinct from music streaming; and (2) whether audiobook streaming has more than token value.  *See* Dkt. No. 28 at 15, 18, 25.  Discovery relevant to those questions is completely distinct from discovery relevant to MLC's proposed new claims regarding: (1) whether $9.99 is an appropriate price of the audiobook component of Spotify Premium; and (2) whether, in light of the fact that Spotify Premium is a Bundle, Audiobooks Access is also a

---

[22] The regulations provide specific accounting rules when the Bundle is made available to end users by third parties. 37 C.F.R. § 385.2 (paragraph (5)(ii) of Service Provider Revenue definition).

Bundle—both of which are questions that, again, should be resolved as a matter of law without any discovery at all.

Yet because MLC unilaterally chose to bring only some of its baseless claims at the outset, Spotify is now being forced to expend significant resources litigating the merits of *another* baseless complaint. MLC's delay tactics—and the resulting prejudice—are especially insidious here, given that, by law, Spotify (along with other unrelated third-party music streaming services) is forced to foot the bill for MLC's lawsuit, in addition to paying its own litigation costs. *See* Dkt. No. 25 at 3-4. And the damage to Spotify will only be exacerbated if MLC is permitted to prolong this harassing fishing expedition fostered by claims that are patently meritless as a matter of law. This Court should deny leave to amend.

## V.    CONCLUSION

For all the reasons articulated above, this Court should deny the Motion.

Dated: April 22, 2025                         Respectfully submitted,

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*
Allison L. Stillman
Grace McLaughlin
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
alli.stillman@lw.com
grace.mclaughlin@lw.com

Sy Damle
Michael E. Bern (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (212) 637-2200
sy.damle@lw.com
michael.bern@lw.com

*Attorneys for Spotify USA Inc.*

## <u>CERTIFICATION OF COMPLIANCE</u>

I certify pursuant to Local Civil Rule 7.1(c) and Rule III.D. of Judge Analisa Torres's Individual Practices that the foregoing Opposition to Plaintiff's Motion for Leave to Amend the Complaint was prepared on a computer using Microsoft Word. The total number of words in this brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 8,542. In preparing this certification, I relied on the word count program in Microsoft Word.

Dated: April 22, 2025

*/s/ Allison L. Stillman*
Allison L. Stillman
