# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------
MECHANICAL LICENSING COLLECTIVE,
                                             Plaintiff,

                       -against-

SPOTIFY USA INC.,
                                             Defendant.
------------------------------------------------------------
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/25/2025

24 Civ. 3809 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Mechanical Licensing Collective ("MLC"), a government-appointed music license administrator, brings this action against Defendant, Spotify USA Inc. ("Spotify"), an audio streaming platform, alleging that Spotify has failed to properly report and pay the royalties required by U.S. copyright law for the use of musical works. *See generally* Proposed Am. Compl. ("PAC"), ECF No. 77-1; Compl., ECF No. 1. Specifically, MLC claims that Spotify violated § 115 of the Copyright Act, 17 U.S.C. § 115, and its implementing regulations, 37 C.F.R. Part 385 and § 210.27, by improperly reducing the royalties paid to songwriters and music publishers in connection with Spotify's "Premium" and "Audiobooks Access" subscription plans. *See generally* PAC. MLC seeks the unpaid royalties that Spotify would have paid if it had correctly calculated the royalties due, as well as the late fees, attorneys' fees, costs, and pre- and post-judgment interest authorized by statute and regulation. *Id.* ¶¶ 119–24.

Before the Court are MLC's motion to amend the complaint, ECF No. 75, and Spotify's motion for reconsideration of the Court's order allowing MLC to seek leave to amend, ECF No. 82. For the reasons stated below, Spotify's motion is GRANTED IN PART and DENIED IN PART, and MLC's motion is GRANTED.

# BACKGROUND[1]

## I.   Procedural History

MLC filed its original complaint on May 16, 2024, asserting a single cause of action against Spotify for violating § 115 of the Copyright Act by reporting its Premium subscription plans as "Bundled Subscription Offerings" instead of "standalone Subscription Offerings," thereby reducing the royalty payments made by Spotify to MLC. *See generally* Compl. By order dated January 29, 2025 (the "Dismissal Order"), the Court granted Spotify's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). *See generally* Dismissal Order, ECF No. 61; *Mech. Licensing Collective v. Spotify USA Inc.*, 763 F. Supp. 2d 608 (S.D.N.Y. 2025). The Court held that, accepting MLC's factual allegations as true, Spotify properly reported its Premium subscription plans as "Bundles" because the plans include both music streaming and another "product[] or service[]" that is of "more than token value"—specifically, 15 hours of audiobook listening per month—in a package that users pay for in a single monthly transaction. Dismissal Order at 10 (quoting 37 C.F.R. § 385.2). In light of the unambiguous regulatory language under the Copyright Act and its straightforward application to the facts as alleged by MLC, the Court found that there was no reasonable likelihood "that a valid claim [against Spotify] might be stated upon amendment of the complaint." *Id.* at 13–14 (citation omitted). Accordingly, the Court dismissed MLC's complaint with prejudice and without leave to amend, and the Clerk of Court entered judgment in favor of Spotify that same day. *See id.*; ECF No. 62 (judgment).

Fourteen days later, MLC moved for reconsideration of the Dismissal Order or, in the alternative, vacatur of the Court's judgment to allow MLC to seek leave to amend the complaint.

---

[1] The Court presumes familiarity with the facts of this case and recites only the facts relevant to the instant motions.

*See generally* ECF Nos. 70–71.  By order dated March 11 (the "Reconsideration Order"), the Court denied MLC's request for reconsideration but granted its alternative motion to vacate the judgment.  Reconsideration Order, ECF No. 74; *Mech. Licensing Collective v. Spotify USA Inc.*, No. 24 Civ. 3809, 2025 WL 786577 (S.D.N.Y. Mar. 11, 2025).

MLC had argued that reconsideration was warranted, among other reasons, because the Dismissal Order overlooked two claims that MLC supposedly made in its complaint.  Those claims were, first, that Spotify "failed to properly account for and pay royalties . . . in connection with [its] Audiobooks Access plan," and, second, that Spotify "improperly used the price of the Audiobooks Access plan as the standalone retail price of the non-music component of Premium when calculating the royalties due in connection with Premium."  Reconsideration Order at 2–3.  The Court did not agree that MLC raised these claims in its complaint.  Specifically, the Court found that the complaint's sole allegation related to the first claim was vague and conclusory, and that the complaint was devoid of any facts, conclusory or otherwise, related to the second claim.  *See id.* at 3–4.  Because the two claims were not properly before the Court, there was no error in declining to address them in the Dismissal Order.  *Id.* at 6.

The Court nevertheless vacated the judgment to allow MLC the opportunity to seek leave to amend the complaint to raise the two claims discussed above.  *Id.*  The Court noted that MLC's motion to vacate was brought under Federal Rule of Civil Procedure 59(e), which authorizes courts to entertain motions to alter or amend a judgment within 28 days after entry of judgment, and Rule 60(b), which authorizes courts in narrower circumstances to vacate a judgment "within a reasonable time" after judgment is entered.  *See* Fed. R. Civ. P. 59(e), 60(b)(6), 60(c)(1); Reconsideration Order at 1.  Citing both Rule 59(e) and Rule 60(b)(6) caselaw, the Court explained that, under either rule, the standard for vacating a judgment is

3

"strict," and "will generally be denied unless the moving party can point to controlling decisions or data that the Court overlooked" in its decision. Reconsideration Order at 1–2 (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (a Rule 59(e) case); *see id.* at 2 (citing *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 361 (2d Cir. 2023) (a Rule 60(b) case).

Still, the Court explained that even the "strict finality of Rule 60" may give way to the "liberal spirit" of Rule 15, which provides for leave to amend, "when vacatur is sought in order to obtain leave to file a first amended complaint." *Id.* at 2 (cleaned up) (quoting *Mandala*, 88 F.4th at 361–62). Thus, under both Rule 59(e) and Rule 60(b)(6), the Court wrote, "the Second Circuit has generally ensured that plaintiffs seeking post-judgment leave to amend are given at least one opportunity to replead, so long as there is no undue delay, bad faith, or dilatory motive on the part of the movant or undue prejudice to the opposing party." *Id.* (cleaned up) (citation omitted). Applying those principles to MLC's motion, the Court held that MLC should be given at least one opportunity to amend the complaint with the benefit of the Court's reasoning in the Dismissal Order. The Court, therefore, "vacate[d] the judgment to allow MLC to seek leave to file an amended complaint addressing the first and second claims discussed above." *Id.* at 6. MLC's motion to amend the complaint is now fully briefed, *see* MLC Mem., ECF No. 76; Spotify Opp., ECF No. 79; MLC Reply, ECF No. 81, and the factual allegations of the proposed amended complaint ("PAC") are detailed below, *see* Section II *infra*.

About one month after the parties briefed MLC's motion to amend, the Supreme Court issued its decision in *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612 (2025). In *BLOM Bank*, the Court held that the Second Circuit's approach to Rule 60(b)(6) motions to vacate a judgment for the purpose of amending a pleading is contrary to the "text and structure of Rule 60," which

4

"make[s] clear that relief under Rule 60(b)(6) is available only in narrow circumstances." 145 S.

Ct. at 1619. As the Court explained it, the Second Circuit's approach to "balancing" the finality

of Rule 60(b)(6) with the liberal spirit of Rule 15 "conflates th[e] order of operations and dilutes

Rule 60(b)(6)'s well-established standard," which provides for vacatur only upon a showing of

"extraordinary circumstances." *Id.* at 1619–20 (citation omitted). Rather than "balance" Rule

60's and Rule 15's competing standards, district courts should treat a Rule 60(b)(6) motion to

vacate for the purpose of amendment as "calling for two distinct analyses, with the question of

vacatur under Rule 60(b)(6) preceding that of repleading under Rule 15(a)." *Id.* at 1621. The

initial Rule 60(b)(6) analysis must conform to that rule's "strict standard." *Id.* at 1622. Thus,

although district courts are free to "*consider*[] a movant's desire to amend his complaint" and

may "acknowledge amendment-related considerations" under Rule 60(b)(6), courts may not

depart from the rule's "stringent standard by balancing it with Rule 15(a)'s liberal pleading

principles." *Id.* (cleaned up) (emphasis in original) (citation omitted). Only if a movant

demonstrates "extraordinary circumstances" justifying relief under Rule 60(b)(6) may the court

then determine whether leave to amend is warranted under Rule 15's liberal standard. *Id.*

(citation omitted).

Importantly, the Court explained that its decision did not touch on Rule 59(e), which

permits parties to move "to alter or amend a judgment . . . no later than 28 days after the entry of

judgment." Fed. R. Civ. P. 59(e). That rule, the Court wrote, "differs from [Rule 60(b)(6)] in

just about every way that matters to the inquiry." *BLOM Bank*, 145 S. Ct. at 1622 (citation

omitted). Because Rule 59(e) motions must be filed within 28 days after the entry of judgment,

unlike Rule 60(b)(6) motions, which may be filed at any reasonable time after judgment, "Rule

59(e) does not threaten the finality of judgments to the same degree that Rule 60(b)(6) does," so

courts "do not require a movant to show the same extraordinary circumstances to receive relief." *Id.* (citation omitted).

About a week after the Court issued its decision in *BLOM Bank*, Spotify moved for reconsideration of the Reconsideration Order. *See* Spotify Mem., ECF No. 83. It argues that the Court should revisit its decision to reopen the case under the standard articulated in *BLOM Bank* and, applying that standard, find that MLC has not shown the extraordinary circumstances required to vacate a judgment under Rule 60(b)(6). *See generally id.*; *see also* MLC Opp., ECF No. 85; Spotify Reply, ECF No. 86.

II.    Factual Allegations[2]

The PAC alleges as follows: Spotify operates one of the largest music streaming platforms in the United States. PAC ¶ 20. Under § 115 of the Copyright Act, Spotify enjoys a compulsory blanket license that allows the platform to offer a library containing tens of millions of musical works to its users without having to individually license each work from the songwriters and music publishers who create and control the works' mechanical rights. *Id.* ¶ 20. To be eligible for the compulsory blanket license, Spotify is obligated to comply with § 115, including by making prescribed royalty payments to MLC, a non-profit corporation designated by the U.S. Copyright Office as the sole entity authorized to offer and administer compulsory blanket licenses under § 115 and collect royalty payments on behalf of songwriters and music publishers. *Id.* ¶¶ 3, 19.

---

[2] The following facts are taken from the PAC, which the Court must accept as true for the purpose of MLC's motion to amend. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading."); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012) (explaining that courts adjudicating motions to dismiss a plaintiff's filed pleading under Rule 12(b)(6) must "accept as true the facts alleged in the [c]omplaint, drawing all reasonable inferences in favor of the plaintiff").

Section 115 and its implementing regulations require compulsory license holders to follow a complicated formula to calculate the royalties due to songwriters and music publishers. *See id.* ¶ 37. The formula comprises four "steps." *Id.* Some of the steps have specific terms that only apply to "Bundled Subscription Offerings." *Id.* In simplified terms, a "Subscription Offering" is music streaming "that is offered to users for a fee 'for defined subscription periods of 3 years or less (in contrast to, for example, a service where the basic charge to users is a payment per [song] download or per [song] play).'" Dismissal Order at 2 (quoting 37 C.F.R. § 385.2). "A 'Bundled Subscription Offering' is a Subscription Offering that is included in a 'Bundle,' which is 'a combination of a Subscription Offering and one or more other products or services having more than token value, purchased by users in a single transaction (*e.g.*, where users make a single [monthly subscription] payment [for the Bundle] without separate pricing for the Subscription Offering component).'" *Id.* at 2–3 (cleaned up) (quoting 37 C.F.R. § 385.2). As relevant here, the four steps of the royalty calculation formula also distinguish between "nonsubscription" streaming services that are "free of any charge" to users and subscription streaming services for which users pay a fee. PAC ¶¶ 37, 58 (quoting 37 C.F.R. § 385.21(b)).

A. Spotify's Free Streaming and Subscription-Based Plans

Spotify's most basic product offering is "Spotify Free," which gives users free access to a limited-functionality music streaming service that is supported by advertisements. *See* PAC ¶ 104; Dismissal Order at 4. For a monthly fee, users may subscribe to one of Spotify's "Premium" subscription plans, which offer unlimited, on-demand, and fully-functional access to Spotify's complete library without advertisements. *See* PAC ¶¶ 2 n.2, 64. In October 2023, Spotify announced that it would begin providing Premium subscribers up to 15 hours of audiobook listening per month at no additional charge to users' existing subscriptions. *Id.* ¶ 65.

7

Five months later, in March 2024, Spotify launched a new subscription plan, available only in the United States, called "Audiobooks Access."  *See id.* ¶¶ 68, 75.  Audiobooks Access provides subscribers with up to 15 hours of audiobook listening per month, as well as unlimited music streaming.[3]  *Id.* ¶ 68.  At the time, Spotify priced Audiobooks Access at $1.00 less than the "Premium Individual" plan.  *Id.*

Three months later, in June 2024, Spotify raised the prices of its Premium subscription plans, pricing the Premium Individual plan at $11.99 per month.  *Id.* ¶ 66.  At the same time, Spotify introduced a new tier of plans called "Spotify Basic," which it made available only to users who were already subscribed to a Premium plan when Basic was launched.  *Id.*  The Basic plans are identical to the Premium plans, except they do not include 15 hours of audiobook listening per month.  *Id.*  In other words, the Basic plans mirror what Premium used to be before November 2023.  As of the filing of the PAC, Spotify's Premium Individual plan is $11.99 per month; the Basic Individual plan is $10.99 per month; and the Audiobooks Access plan is $9.99 per month.  *See id.* ¶¶ 66–68.

When Spotify launched the Audiobooks Access plan five months after it added audiobook streaming to the Premium plans, it immediately began reporting the Premium plans as "Bundles."  *Id.* ¶ 68.  In the Dismissal Order, the Court held that Premium was properly characterized as a Bundle under the applicable regulations because the plan combines both a Subscription Offering (*i.e.*, music streaming) with another product or service (15 hours of

---

[3] For at least some period after activating a new subscription, Audiobooks Access subscribers receive unlimited, on-demand, fully-functional access to Spotify's music library without advertisements, just like Premium subscribers do.  PAC ¶ 77.  It may be the case that Spotify eventually reduces the functionality of Audiobooks Access subscribers' music streaming (by, for example, limiting the number of times users can "skip" a song) and requires them to listen to advertisements.  *See id.* ¶¶ 76–77; *see also id.* ¶ 13 n.8.  Nevertheless, Audiobooks Access subscribers are able to listen to the same catalog of audiobooks and music available on Premium, and their user interface is virtually indistinguishable from the Premium interface.  *See id.* ¶¶ 73–74, 77.

audiobook listening per month) for a single price that users purchase in a single, monthly transaction.  *See generally* Dismissal Order.  The Court did not address whether, assuming Premium is a Bundle, Spotify has properly calculated the royalties due to MLC.

      B.  MLC's New Theories of Liability

MLC now alleges that even if Premium is a Bundle, Spotify is still unlawfully using Audiobooks Access to lower its royalty payments to songwriters and music publishers.  PAC ¶ 4. MLC has at least two theories for how Spotify does this.

      1.  Using Audiobooks Access as a Proxy for the Value of Premium's Audiobooks Offering

*First*, MLC alleges that Spotify has artificially inflated the price of Audiobooks Access to improperly use the plan as a proxy for the value of Premium's audiobook component, thereby reducing the royalties Spotify pays for Premium's music streaming component.  *See id.* ¶¶ 4, 12. When calculating the royalties due for the use of musical works in a Bundle, streaming services like Spotify are required to determine the independent, "standalone" value of each component of the Bundle, and then calculate the pro-rata portion of the Bundle's revenue that is attributable specifically to the music streaming component.  *See id.* ¶¶ 6–7.  For example, if a Bundle priced at $18 per month combines a music streaming subscription that is ordinarily valued at $10 per month with a television-streaming subscription ordinarily valued at $10 per month, the Bundle offeror would be required to report to MLC that 50% of the Bundle's total revenue is attributable specifically to music streaming.  *See id.* ¶ 7.

The regulations explain how streaming services must calculate the value of the various components of a Bundle for royalty purposes.  If the components of the Bundle are each separately available for sale on the market, the service should use each component's "standalone retail price" when conducting the calculation described above.  37 C.F.R. § 385.2 (subsections

9

(5)(i) and (5)(ii) under "*Service Provider Revenue*").  So, for example, if a streaming service offers a standalone music streaming service plan for $10 per month and a different, standalone television-streaming service plan for $10 per month, in addition to a Bundle that includes both plans for $18 per month, the service should use the standalone retail prices of the music- and television- streaming plans when calculating the royalties due to MLC on the music portion of the Bundle.  If one or all of the Bundle's components (for example, the television-streaming component) are *not* available on the market as individual products or services, the streaming service "shall use the average standalone published price . . . for the most closely comparable product or service in the [United States] or, if more than comparable exists, the average of standalone prices for comparables."  *Id.* (subsection (5)(iii)).  Finally, "[i]f no reasonably comparable product or service exists in the [United States], then the [s]ervice [p]rovider may use another good faith, reasonable measure of the market value of the component."  *Id.*

According to MLC, when Spotify launched the Audiobooks Access plan in March 2024, it did so as a pretext to lower the royalties owed in connection with its Premium tier plans.  PAC ¶ 12.  Although Spotify had already included 15 hours of monthly audiobook streaming in the Premium plans since the fall of 2023, it waited until the launch of Audiobooks Access in March 2024 to begin reporting Premium as a Bundle.  *See id.* ¶¶ 8–12.  It then used the $9.99 price of Audiobooks Access as the standalone retail price of Premium's audiobook component when calculating Premium's royalty payments.  *Id.* ¶ 12.  In doing so, Spotify decreased the pro-rata portion of Premium's revenue that is attributable to music streaming from 100 percent (prior to March 2024) to as little as 37 percent beginning in March 2024.  *See id.*

MLC alleges that Spotify created Audiobooks Access and artificially inflated its price for this purpose, never intending to seriously market Audiobooks Access as a "real" plan.  It details

certain facts in support of this claim. For one, Spotify launched Audiobooks Access only in the United States, and it did so with hardly any advertising—all in contrast to prior plan launches. *See id.* ¶¶ 69, 75. For months after Spotify launched Audiobooks Access, its website homepage did not even mention the plan. *Id.* The only way a potential user could find the plan would be by searching words like "Spotify" and "Audiobooks Access" on Google or another search engine, which might take users to a page within Spotify's website that those browsing the website would otherwise not be able to navigate to. *Id.* ¶ 70. Once a web surfer made it to the page, the page was designed in a manner that would channel potential customers to buy a Premium plan—not Audiobooks Access. *See id.* ¶¶ 70–73 (describing the organization and layout of the page, with pictures). For another, Spotify priced the plan, which includes 15 hours of audiobook streaming per month and unlimited access to Spotify's entire music library, just like Premium, at $9.99. *Id.* ¶ 68. Thus, even if Audiobooks Access provides only an ad-supported music streaming experience (or more limited music streaming functionality than Premium), as Spotify has contended, *see id.* ¶ 77, the minor price difference between Audiobooks Access and Spotify's Premium and Basic plans, both of which include unlimited, ad-free, fully-functional music streaming, suggests that Spotify values the better music streaming experience at only $2 per month, *see id.* ¶¶ 66–68. That valuation would seem to run contrary to the Basic Individual plan's $10.99 price tag. *See id.* ¶ 67. In addition, the $1 price difference between Basic Individual and Premium Individual—plans that differ only in their access to 15 hours of audiobook streaming per month—suggests that Spotify values the 15 hours of audiobook streaming per month included within Premium at just about $1, which would seem to be contrary to Audiobooks Access' $9.99 price tag. *See id.* ¶¶ 67, 97.

11

MLC alleges that Spotify cannot use the $9.99 price tag for Audiobooks Access to represent the "standalone retail price" of the audiobooks component of Spotify's Premium plans because Audiobooks Access is not a standalone audiobooks product. *Id.* ¶ 81. Rather, Audiobooks Access includes 15 hours of monthly audiobook listening *and* unlimited music listening, just like Spotify's Premium plans. *Id.* ¶¶ 10, 82.

MLC also alleges that no products in the U.S. market "closely" resemble or are "reasonably comparable" to Premium's 15 hours of audiobook listening per month. *Id.* ¶ 86. Audible Plus and Kobo Plus Listen, for example, both offer unlimited audiobook listening for less than $8 per month. *Id.* ¶ 87. The difference between 15 hours and unlimited listening is significant, MLC claims, because "many popular audiobooks exceed 15 hours in length." *Id.* ¶ 89 (listing examples). Other services like B&N Audiobooks are also not reasonably comparable to Premium's audiobooks component, MLC claims, because they provide a monthly token or credit that allows users to purchase an audiobook permanently, so that the user can listen to the audiobook at any time, including after their subscription to the service ends. *Id.* ¶ 90; *see also id.* ¶ 93.

MLC further alleges that Spotify's use of $9.99 is not a "good faith, reasonable measure of the market value" of the audiobook component of Premium under the copyright regulations. 37 C.F.R. § 385.2 (subsection (5)(iii) under "*Service Provider Revenue*"); *see* PAC ¶ 96. MLC points to the way Spotify has priced its various subscription plans, which suggests that it values 15 hours of audiobook listening at significantly less than $9.99 per month. *See* PAC ¶ 98. And MLC further points to the fact that other audiobook streaming companies charge less than $8 per month for offerings that include much more than 15 hours of audiobook streaming per month. *Id.* ¶ 97. If Spotify used a "good faith, reasonable measure of the market value" of Premium's

12

audiobooks component, according to MLC, it would have shown that Premium's unlimited, on-demand, ad-free, fully-functional music streaming is worth a higher pro-rata portion of the Bundle's revenue than its audiobook component, resulting in "significantly more royalties owed." *Id.* ¶ 103.

### 2. Failing to Report and Pay Royalties for Audiobooks Access as a Bundled Subscription Offering

*Second*, MLC alleges that Spotify has not reported Audiobooks Access as required and has failed to pay the royalties due in connection with the unlimited music streaming that is part of the Audiobooks Access plan. *See* PAC ¶¶ 17, 104 & n.54, 106. Under the relevant regulations, "royalties must be calculated separately with respect to each Offering" by a service provider like Spotify, and they must be reported monthly to MLC. 37 C.F.R. § 385.21(b); *see* 17 U.S.C. § 115(d)(4)(A)(i). An "Offering" is a "[s]ervice [p]rovider's engagement in Licensed Activity," which includes providing music streaming under a compulsory license. 37 C.F.R. § 385.2; *see* PAC ¶¶ 37, 111. According to MLC, although Audiobooks Access includes unlimited music streaming under a compulsory license and is, therefore, an Offering, Spotify has never separately reported Audiobooks Access' revenue, other figures, or royalties to MLC. PAC ¶¶ 104 & n.54, 106. Instead, Spotify has informed MLC that it combines the reporting and payment of royalties due in connection with Audiobooks Access with the reporting and payment of royalties due in connection with Spotify Free—Spotify's free, ad-supported music streaming option. *Id.* ¶ 105. This, according to MLC, "contravenes the plain language of the applicable regulations" because Spotify Free and Audiobooks Access are distinct Offerings that must be reported "separately." *Id.* ¶ 106; *see also id.* ¶¶ 107–09.

In addition, MLC alleges that Spotify has refused to calculate Audiobook Access's royalties under the rules that apply to Bundles. *See id.* ¶ 116. The royalty calculation provisions

distinguish between "[f]ree nonsubscription/ad-supported services [that are] free of any charge to [users]," and "Bundled Subscription Offering[s]," which are the music streaming components of Bundles.  *See, e.g.*, 37 C.F.R. § 385.21 (Table 2 to § 385.21(b)(1)); *see also* 37 C.F.R. § 385.2 (defining "Bundled Subscription Offering").  As just one example, Bundled Subscription Offerings are subject to minimum royalty payments, whereas "[f]ree nonsubscription" Offerings or "ad-supported" Offerings that are made "free of any charge to [users]" are not.  37 C.F.R. § 385.21(d).  According to MLC, Spotify's Audiobooks Access plan is properly characterized as a Bundle because it combines unlimited, on-demand music streaming with 15 hours of audiobook listening per month in one plan that users pay for in a single, monthly transaction. *See* PAC ¶ 116; *see also* Dismissal Order at 6 (explaining what constitutes a Bundle).  Because Audiobooks Access is a Bundle, the music streaming component of the Bundle must be reported as a Bundled Subscription Offering, and Spotify must pay certain royalties based on its designation as such.  Instead, by reporting Spotify Free and Audiobooks Access as though they were a "free nonsubscription/ad-supported [Offering] free of any charge to [users]," Spotify has "sidestepped" important royalty-calculation provisions under the Copyright Act and decreased the royalty payments it makes to songwriters and music publishers in violation of the law.  PAC ¶ 117 (citation omitted).

## DISCUSSION

I.    Legal Standards

A.  Reconsideration

"Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly."  *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 701 (S.D.N.Y. 2011) (citation omitted).  It may be granted when, among other circumstances, the movant "identifies 'an intervening change of controlling law.'"  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL*

*Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

### B. Motion for Leave to Amend

Under Federal Rule of Civil Procedure 15, courts should "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). Under this liberal standard, courts will generally grant a party leave to amend their pleading "absent evidence of undue delay, bad faith or [a] dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000).

The Court may deny leave to amend on futility grounds if the movant's proposed claims "could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citation

omitted).  Ultimately, the "[f]actual allegations," accepted as true, "must be enough to raise a

right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

II.    Application

A.  Reconsideration

Spotify argues that the Court should revisit the Reconsideration Order in light of the

Supreme Court's decision in *BLOM Bank* and set aside the portion of that order that vacated the

judgment and allowed MLC to seek leave to amend the complaint.[4]  Spotify Mem. at 4–5.

Spotify correctly points out that *BLOM Bank* changed the controlling law in this Circuit for

motions to vacate a judgment under Rule 60(b)(6), and an "intervening change of controlling

law" is one of the "major grounds" that may "justify[] reconsideration" of a prior decision.  *Id.* at

3–4 (quoting *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 377 (2d Cir. 2024)).

Revisiting the Reconsideration Order with *BLOM Bank* in mind, however, does not alter

the outcome of that Order.  The *BLOM Bank* Court made clear that its decision was limited to

analyzing Rule 60(b)(6)'s standard and its relationship to Rule 15.  *See BLOM Bank*, 145 S. Ct.

at 1622.  It did not consider and therefore did not change the standard that applies when a party

moves to amend or vacate a judgment under Rule 59(e), which does not call for the

"extraordinary circumstances" that Rule 60(b)(6) requires.  *Id.*

As this Court wrote in its Reconsideration Order, MLC's motion to vacate the judgment

for the purpose of seeking leave to amend the complaint was filed pursuant to *both* Rules 59(e)

---

[4] Local Civil Rule 6.3 requires motions for reconsideration to be filed within 14 days of the "order being challenged."  Here, Spotify's motion was filed about three months after the Reconsideration Order, but within 14 days of the Supreme Court's decision in *BLOM Bank*.  *See* Spotify Mem.  MLC does not argue that the motion is untimely, *see generally* MLC Opp., and as Spotify points out in its brief, courts in this District have exercised their discretion to hear motions for reconsideration filed under similar circumstances, *see* Spotify Mem at 3 n.3 (collecting cases).  Ultimately, the Court does not reach the issue of timeliness because Spotify's motion fails on the merits for the reasons discussed herein.

and 60(b)(6).  Reconsideration Order at 1.  Although "federal courts generally have used Rule 59(e) only to reconsider matters properly encompassed in a decision on the merits," such as "to rectify [their] own mistakes in the period immediately following [their] decisions," and they ordinarily "will not address new arguments or evidence that the moving party could have raised before the decision issued," *Banister v. Davis*, 590 U.S. 504, 508 (2020) (cleaned up) (citation omitted), courts have also held that judgments should be vacated pursuant to Rule 59(e) when necessary to avoid a "manifest injustice," *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142, 144 (2d Cir. 2020) (citation omitted).  The Supreme Court has stated that denying a request to vacate a judgment under Rule 59(e) for the purpose of seeking leave to amend is a manifest injustice if there is no evidence of undue delay, bad faith, dilatory tactics, or undue prejudice to the opposing party, amendment would not be futile, and the movant has not previously failed to cure deficiencies by amendments previously allowed.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Metzler*, 970 F.3d at 144; *Williams v. Citigroup Inc.*, 659 F.3d 208, 213–14 (2d Cir. 2011).

The Court applied that standard in the Reconsideration Order and found that vacatur was warranted under both Rules 59(e) and 60(b)(6).  *See* Reconsideration Order at 1–4.  Revisiting that decision in light of *BLOM Bank*, the Court finds that, even if MLC has not demonstrated "extraordinary circumstances" under Rule 60(b)(6), *BLOM Bank*, 145 S. Ct. at 1622, it nevertheless has satisfied the relaxed requirements of Rule 59(e) articulated in *Foman*.  Spotify argues that MLC had opportunities to amend the complaint before judgment, and that is true. Spotify Reply at 5; *see* Fed. R. Civ. P. 15(a)(1)–(2); Individual Practices in Civil Cases ("Individual Practices") ¶ III.B.  But the Court did not find in the Dismissal Order that MLC "waive[d] [its] right to use the amendment process to cure any defects that [were] made apparent

17

by the briefing" on Spotify's motion to dismiss.  Individual Practices ¶ III.B.iv.  MLC has not

"repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed," and there is no

evidence that MLC has acted in "bad faith or [with a] dilatory motive" in prosecuting this action.

*Williams*, 659 F.3d at 213–14 (quoting *Foman*, 371 U.S. at 182).  To the extent Spotify will

suffer prejudice caused by reopening the judgment at this early stage of litigation, in which

discovery has hardly progressed beyond initial exchanges, that prejudice does not outweigh the

heavy cost MLC would bear if it were denied the opportunity to make its first request for leave to

amend with the benefit of the Court's reasoning in the Dismissal Order.  *See Loreley Financing*

*(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the

benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to

weigh the practicality and possible means of curing specific deficiencies."); *see also Flood v.*

*Carlson Rests. Inc.*, No. 14 Civ. 2740, 2016 WL 3221146, at *2 (S.D.N.Y. June 7, 2016)

(collecting cases explaining that, "allegations of prejudice because of time, effort, or money

expended in a case" are "insufficient to defeat a motion to amend," especially when "the case is

in the early stage of litigation" (citations omitted)).  Additionally, for the reasons stated in the

Reconsideration Order and discussed below, MLC's amendments to the complaint are not

"demonstrably futile."  Reconsideration Order at 3.

The Court agrees with Spotify that revisiting the Reconsideration Order is warranted in

light of *BLOM Bank*.  But, having reconsidered the Order and applied *BLOM Bank* to the record,

the Court reaches the same outcome:  The judgment is vacated for the purpose of allowing MLC

to seek leave to amend its complaint.  Assuming without deciding that the judgment could not be

vacated under Rule 60(b)(6) because MLC has not shown the "extraordinary circumstances"

necessary to do so, the judgment nevertheless must be vacated under Rule 59(e).  Spotify's

18

motion for reconsideration is, therefore, GRANTED IN PART and DENIED IN PART, and the Court proceeds to MLC's motion to amend the complaint.

### B.   Leave to Amend

The Court has already determined that MLC's motion to amend the complaint is not delayed, dilatory, made in bad faith, or unduly prejudicial.  *See supra*; *see also Monahan*, 214 F.3d at 283.  The inquiry turns, then, to whether it would be futile for MLC to amend the complaint because the proposed pleading fails to state a valid claim to relief.  *See Monahan*, 214 F.3d at 283.  Reviewing the proposed pleading under the standard applicable to a Rule 12(b)(6) motion, the Court finds that it would not be futile to pursue the complaint because the PAC states multiple plausible claims.  *See Lucente*, 310 F.3d at 258.

### 1.   Audiobooks Access as a Proxy for Premium's Audiobooks Offering

Spotify advances multiple arguments claiming that the $9.99 price of the Audiobooks Access plan is the proper value to assign the audiobooks component of Premium when calculating royalties due on the Premium-tier plans.  No argument has merit.  First, Spotify argues that the $9.99 price point for Audiobooks Access properly represents the "standalone retail price" of Premium's audiobook component because the other component that makes up Audiobooks Access—unlimited, on-demand, ad-supported music streaming—is already offered for free to users in the form of Spotify Free.  *See* Spotify Opp. at 13.  In other words, Spotify claims that Audiobooks Access's $9.99 price point reflects the value of listening to 15 hours of audiobooks per month and nothing more.  The unlimited music streaming that is also included within Audiobooks Access is, according to Spotify, merely a "free product" thrown in for free by the retailer.  *Id.*

This argument ignores the plain language and structure of the regulations, which require service providers to measure the value of a Bundle's components based on their "standalone retail price" and distinguish between "standalone" products and Bundles.[5] 37 C.F.R. § 385.2 (subsections (5)(i)–(ii) to the "Service Provider Revenue" definition); *see also, e.g.*, *id.* (distinguishing "payment . . . on a standalone basis" from payment "as part of a Bundle"). MLC has plausibly alleged that Audiobooks Access is a Bundle because it combines compulsory licensed music streaming with a quantity of audiobook streaming that is of more than token value, which users pay for in a single monthly transaction, just like Premium. *See* PAC ¶ 116; *see generally* Dismissal Order (concluding that Premium is a Bundle based on nearly identical factual allegations). If MLC is correct that Audiobooks Access is a Bundle, then it is also plausible that Audiobooks Access cannot serve as a proxy for the "standalone retail price" of Premium's audiobooks component because a Bundle is not the same as the standalone *component* of a Bundle.

MLC has also plausibly alleged that there is no product or service in the United States that is "closely" or "reasonably comparable" to Premium's 15 hours of audiobook listening per month. 37 C.F.R. § 385.2; *see* PAC ¶¶ 86–95. Spotify argues that Audiobooks Access or, in the alternative, Audible Standard, which is also priced at $9.99, are the most reasonably comparable products to Premium's audiobook component. *See* Spotify Opp. at 13–14. Assuming the Court can consider Spotify's claims about Audible's "Standard" plan, which is not discussed within the

---

[5] The argument also ignores the value of convenience. A user who creates one Spotify profile and subscribes to the Audiobooks Access plan to listen to both audiobooks and music will, in all likelihood, have a better and more convenient user experience than a Spotify Free user who must maintain at least two separate accounts on two separate platforms in order to access both audiobook and music streaming. It, therefore, makes little sense to argue that Audiobooks Access is nothing more than 15 hours of audiobook streaming with only token access to music. The $9.99 price tag of Audiobooks Access presumably encompasses not only the sum of the value of the plan's components, but the value of having all of its components organized in one place, on one account, on the same platform. *See* PAC ¶ 73 (suggesting that the Audiobooks Access interface is a music-forward interface equivalent to Premium).

four corners of the complaint, both Audiobooks Access and Audible Standard have features that distinguish them from Premium's 15 hours of audiobook listening. Audiobooks Access includes 15 hours of audiobook listening per month like Premium's audiobook component, but it *also* includes access to unlimited, on-demand music streaming, all in one platform. Audible Standard, meanwhile, allows users to pick only one audiobook to listen to per month, which may be far more or far less than 15 hours long depending on the book, and which differs significantly from Audiobooks Access users' ability to listen to multiple audiobooks at once in the same month. *See id.* at 14–15; PAC ¶¶ 86–92. Taken as true, MLC's allegations suffice to raise at least a colorable claim that no other product or service in the United States is reasonably or closely comparable to Premium's audiobook component.

MLC has also plausibly alleged that $9.99 is not a "reasonable measure of the market value of the component," whether measured in relation to Spotify's other plans or the market more broadly. 37 C.F.R. § 385.2; *see* PAC ¶¶ 96–103. It alleges, for example, that Spotify's own plan structures and pricing suggest that the company values Premium's audiobook component at far less than $9.99. PAC ¶ 98. It also alleges that other products offer more audiobook streaming for less. *Id.* ¶ 97. To the extent Spotify argues that the Court should decide whether other products on the market are reasonably comparable or whether the $9.99 price is a reasonable measure of Premium's audiobook component, *see* Spotify Opp. at 13–22, its arguments are premature, *see Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (explaining that courts do not "weigh the evidence" at the motion to dismiss stage). MLC has pleaded enough facts and sufficiently connected those facts to the applicable statutory and regulatory language to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

2.   Spotify's Alleged Failure to Report and Pay Royalties for Audiobooks Access

As stated, MLC has pleaded sufficient facts to raise a plausible claim that Audiobooks

Access should be characterized as a Bundle because it includes both audiobook and music

streaming in one package, for one fee that users pay for in a single transaction.[6]  As the Court

has also explained, applicable regulations require services like Spotify to "separately" calculate

and report the royalties owed in connection with each of a service provider's Offerings,

including the music streaming components of its Bundles.  37 C.F.R. § 385.21(b); *see id.* § 385.2

(defining "Bundle," "Bundled Subscription Offering," "Subscription Offering," and "Offering").

MLC's allegations that Spotify has failed to separately calculate and report the royalties due in

connection with Audiobooks Access are, therefore, sufficient to state a claim under § 115 of the

Copyright Act for failure to report royalties, failure to separately calculate royalties, and failure

to treat Audiobooks Access as a Bundle for the purpose of the royalty calculations.  *See* PAC

¶¶ 4, 105, 108–09, 116.

Spotify contends that MLC should not be permitted to raise this claim in its amended

complaint because the claim exceeds the scope of the Court's Reconsideration Order.  Spotify

Opp. at 22–23.  Not so.  In the Reconsideration Order, the Court authorized MLC to seek leave

to amend the complaint to plead that "Spotify has allegedly underpaid the royalties due on the

Audiobooks Access plan."  Reconsideration Order at 6; *see also id.* at 2–3 (finding that MLC's

---

[6] Spotify advances the legal fiction that Audiobooks Access is not a Bundle but a "combination of a subscription audiobook service and a free nonsubscription/ad-supported music offering."  Spotify Opp. at 23 (capitalization altered).  In effect, Spotify asks the Court to ignore the allegations of MLC's PAC—that Audiobooks Access offers users the benefit of two services on one platform, with one account, for a single price, purchased in a single transaction.  As the regulations make clear, that is precisely what a Bundle is:  an offering that combines music streaming with two or more other products of more than token value under a single umbrella, purchased in a single transaction.  *See* 37 C.F.R. § 385.2; *see also* Dismissal Order at 2–3.  To treat the Audiobooks Access subscription plan as if it were actually two completely separate services, only one of which *really* counts as Spotify suggests, would ignore the well-pleaded allegations of the complaint and flout the plain meaning of the statutes and the considered structure of the regulatory scheme.

22

claim that "Spotify has failed to properly account for and pay royalties to MLC in connection with Spotify's Audiobooks Access plan" is "not demonstrably futile"). Spotify makes much of the fact that MLC has qualified the allegation it made in its original complaint that Audiobooks Access includes the same music streaming functionality as Premium. *See* Spotify Opp. at 22. But whether the plan's streaming functionality is identical to or less than the functionality offered by Premium has no bearing on MLC's broader contention that Audiobooks Access is properly characterized as a Bundle because it includes qualifying music streaming *generally*, in combination with access to audiobooks. Accordingly, although the finer details of MLC's complaint may have shifted over time, the legal claims it raises against Spotify fall neatly within the authorization provided by the Court in the Reconsideration Order.

In sum, the claims MLC proposes to include in its amended pleading against Spotify are neither futile, delayed, dilatory, made in bad faith, nor unduly prejudicial. Its motion for leave to amend the complaint under Rule 15(a)(2) is, therefore, GRANTED.

## CONCLUSION

For the reasons stated above, Spotify's motion for reconsideration, ECF No. 82, is GRANTED IN PART and DENIED IN PART. MLC's motion for leave to file an amended complaint, ECF No. 75, is GRANTED. By **October 2, 2025**, MLC shall file its amended complaint.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 82 and 75.

SO ORDERED.

Dated: September 25, 2025
New York, New York

_____
ANALISA TORRES
United States District Judge