**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-03809-AT-KHP |
| SPOTIFY USA INC., | |
| *Defendant*. | |

**<u>DEFENDANT SPOTIFY USA INC.'S OPPOSITION TO PLAINTIFF'S
MOTION TO CERTIFY THE COURT'S DISMISSAL ORDER FOR INTERLOCUTORY
APPEAL OR, IN THE ALTERNATIVE, TO ENTER PARTIAL FINAL JUDGMENT AS
TO CLAIM DISMISSED IN THE ORDER</u>**

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.      INTRODUCTION ............................................................................................1

II.     BACKGROUND ...............................................................................................3

        A.      Facts ........................................................................................................3

        B.      Procedural History .................................................................................4

III.    LEGAL STANDARDS .....................................................................................7

IV.     ARGUMENT ....................................................................................................8

        A.      MLC has not identified a controlling question of law as to which there is a
                substantial ground for difference of opinion ........................................8

                1.      There is no substantial ground for difference of opinion as to
                        whether audiobook streaming is a product "other" than music
                        streaming ....................................................................................10

                2.      There is no substantial ground for disagreement as to whether
                        audiobook streaming has more than "token value" ..................12

                3.      Interlocutory appeal is not warranted just because an issue is one
                        of first impression ......................................................................14

        B.      Immediate appeal would not "materially advance the termination of the
                litigation" ............................................................................................16

        C.      Permitting MLC to take an interlocutory appeal at this stage in the
                litigation is prejudicial and unwarranted..............................................20

        D.      Rule 54(b) certification is inappropriate ...............................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adrian v. Town of Yorktown*,
 210 F. App'x 131 (2d Cir. 2006) ............................................................25

*Alix v. McKinsey & Co.*,
 470 F. Supp. 3d 310 (S.D.N.Y. 2020)..............................................3, 7, 8

*Burrell v. State Farm and Cas. Ins. Co.*,
 226 F. Supp. 2d 427 (S.D.N.Y. 2002)................................................22, 23

*Capitol Records, LLC v. Vimeo, LLC*,
 972 F. Supp. 2d 537 (S.D.N.Y. 2013)........................................................9

*Carpenter v. City of New York*,
 984 F. Supp. 2d 255 (S.D.N.Y. 2013)......................................................24

*Century Pac., Inc. v. Hilton Hotels Corp.*,
 574 F. Supp. 2d 369 (S.D.N.Y. 2008)......................................................20

*Consub Delaware LLC v. Schahin Engenharia Limitada*,
 476 F. Supp. 2d 305 (S.D.N.Y. 2007)......................................................18

*Cornwell v. Credit Suisse Grp.*,
 270 F.R.D. 145 (S.D.N.Y. 2010) ..............................................................25

*Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*,
 232 F.R.D. 173 (S.D.N.Y. 2005) ..............................................................22

*Curtiss-Wright Corp. v. Gen. Elec. Co.*,
 446 U.S. 1 (1980).......................................................................................24

*FAT Brands Inc. v. PPMT Cap. Advisors, Ltd.*,
 No. 19-CV-10497, 2021 WL 1392849 (S.D.N.Y. Apr. 13, 2021) .........25

*Ferring B.V. v. Allergan, Inc.*,
 343 F. Supp. 3d 284 (S.D.N.Y. 2018).......................................................18

*Ginett v. Computer Task Group, Inc.*,
 962 F.2d 1085 (2d Cir. 1992)....................................................................23

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
 425 F.3d 158 (2d Cir. 2005)......................................................................24

*Hart v. Rick's Cabaret Int'l, Inc.*,
   73 F. Supp. 3d 382 (S.D.N.Y. 2014)..............................................................9, 12, 14

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*,
   23 F. Supp. 3d 173 (S.D.N.Y. 2014)..............................................................24

*Herbert v. Lando*,
   No. 74-CV-434, 1985 WL 463 (S.D.N.Y. Mar. 26, 1985) ...........................18

*Hermès Int'l v. Rothschild*,
   590 F. Supp. 3d 647 (S.D.N.Y. 2022)............................................................8

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   No. 10-CV-275, 2012 WL 1308993 (S.D.N.Y. Apr. 16, 2012) ...................21

*In re Buspirone Pat. Litig.*,
   210 F.R.D. 43 (S.D.N.Y. 2002) ....................................................................21

*In re Dynex Cap., Inc. Sec. Litig.*,
   No. 05-CV-1897, 2006 WL 1517580 (S.D.N.Y. June 2, 2006) ...................18

*In re Enron Creditors Recovery Corp.*,
   No. 01-16034 (AJG), 2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009).............9

*In re Flor*,
   79 F.3d 281 (2d Cir. 1996).........................................................................9, 14

*In re Lehman Bros. Holdings Inc.*,
   No. 08-13555, 2010 WL 10078354 (S.D.N.Y. Sept. 23, 2010) ...................14

*In re Vivendi Universal, S.A., Sec. Litig.*,
   No. 02-CV-5571, 2012 WL 362028 (S.D.N.Y. Feb. 6, 2012).......................25

*Klinghoffer v. S.N.C. Achille Lauro*,
   921 F.2d 21 (2d Cir. 1990)............................................................................15

*Koehler v. Bank of Bermuda Ltd.*,
   101 F.3d 863 (2d Cir. 1996)..........................................................................22

*Kogut v. Cnty. of Nassau*,
   No. 06-CV-6720, 2010 WL 844745 (E.D.N.Y. March 8, 2010)..................20

*L-7 Designs, Inc. v. Old Navy, LLC*,
   964 F. Supp. 2d 299 (S.D.N.Y. 2013)...........................................................25

iii

*Lankler Siffert & Wohl, LLP v. Rossi*,
   No. 02-CV-10055, 2004 WL 541842 (S.D.N.Y. Mar. 19, 2004), *aff'd*, 125 F.
   App'x 371 (2d Cir. 2005) ...................................................................................24

*Lee v. Bankers Tr. Co.*,
   166 F.3d 540 (2d Cir. 1999)...............................................................................11

*LoCurto v. AT&T Mobility Servs. LLC*,
   No. 13-CV-4303, 2019 WL 2491248 (S.D.N.Y. June 13, 2019) ...........................20

*Mandala v. NTT Data, Inc.*,
   88 F.4th 353 (2d Cir. 2023) ...............................................................................6

*Martens v. Smith Barney, Inc.*,
   238 F. Supp. 2d 596 (S.D.N.Y. 2002)................................................................21

*Mills v. Everest Reinsurance Co.*,
   771 F. Supp. 2d 270 (S.D.N.Y. 2009)....................................................2, 8, 9, 17

*Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.*,
   No. CV-11-6521, 2013 WL 12306438 (C.D. Cal. July 11, 2013).........................21

*Netrebko v. Metro. Opera Ass'n, Inc.*,
   No. 23-CV-6857 (AT), 2025 WL 2161448 (S.D.N.Y. July 29, 2025) .......14, 17, 20

*Nippon Yusen Kaisha v. FIL Lines USA Inc.*,
   977 F. Supp. 2d 343 (S.D.N.Y. 2013)................................................................24

*Novick v. AXA Network, LLC*,
   642 F.3d 304 (2d Cir. 2011)........................................................................ *passim*

*Raffles Tree Apparel Pte. Ltd. v. A Base IX Co. LLC*,
   No. 18-CV-05791, 2019 WL 2117643 (S.D.N.Y. Apr. 29, 2019) .........................24

*Riverkeeper, Inc. v. EPA*,
   514 F. Supp. 2d 565 (S.D.N.Y. 2007)..........................................................15, 18

*Rothstein v. GMAC Mortg., LLC*,
   No. 12-CV-3412, 2014 WL 1329132 (S.D.N.Y. Apr. 3, 2014) ...........................21

*Salinas v. U.S. Xpress Enters., Inc.*,
   No. 1:13-CV-245, 2016 WL 11745101 (E.D. Tenn. Dec. 13, 2016) ....................21

*Samtani v. Cherukuri*,
   No. 11-CV-2159, 2013 WL 2181037 (E.D.N.Y. May 20, 2013) .........................25

*SEC v. Coinbase, Inc.*,
   761 F. Supp. 3d 702 (S.D.N.Y. 2025)..................................................................9

*SEC v. Rio Tinto PLC*,
    17-CV-7994, 2021 WL 1893165 (S.D.N.Y. May 11, 2021) ...........................................18, 19

*SEC v. Ripple Labs, Inc.*,
    697 F. Supp. 3d 126 (S.D.N.Y. 2023)............................................................................ *passim*

*Stevens v. HMSHost Corp.*,
    No. 10-CV-3571, 2015 WL 926007 (E.D.N.Y. Mar. 4, 2015)................................................21

*Tantaros v. Fox News Network, LLC*,
    465 F. Supp. 3d 385 (S.D.N.Y. 2020)........................................................................7, 18, 20

*Transp. Workers Union of Am., Loc. 100, AFL-CIO v. New York City Transit*
    *Auth.*,
    358 F. Supp. 2d 347 (S.D.N.Y. 2005)..................................................................................9, 18

*Transp. Workers Union of Am., Loc. 100, AFL-CO v. New York City Transit*
    *Auth.*,
    505 F.3d 226 (2d Cir. 2007)..............................................................................................9, 18

*U.S. Fid. & Guar. Co. v. Frosty Bites, Inc.*,
    350 F. Supp. 2d 508 (S.D.N.Y. 2004).....................................................................................24

*Uni-Rty Corp. v. Guangdong Bldg., Inc.*,
    249 F.R.D. 149 (S.D.N.Y. 2008) ...........................................................................................25

*United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*,
    521 F. Supp. 3d 265 (E.D.N.Y. 2021) ...................................................................................21

*Xue v. Koenig*,
    No. 19-CV-07630, 2025 WL 897046 (S.D.N.Y. Mar. 24, 2025)..........................................20

*Youngers v. Virtus. Inv. Partners Inc.*,
    228 F. Supp. 3d 295 (S.D.N.Y. 2017)....................................................................................10

## STATUTES

17 U.S.C.
    § 115.............................................................................................................................. *passim*
    § 115(c)(1)(E)................................................................................................................3
    § 115(c)(1)(F)................................................................................................................3
    § 801(b)(1) ....................................................................................................................3

28 U.S.C.
    § 1291.............................................................................................................................5
    § 1292(b) ................................................................................................................. *passim*

# RULES

Fed. R. Civ. P.
    12(b)(6) .................................................................................................................13
    54(b) ............................................................................................................... *passim*

# REGULATIONS

37 C.F.R.
    § 210.23 .................................................................................................................3
    § 385.2 ............................................................................................... *passim*
    § 385.21 .................................................................................................................4

# OTHER AUTHORITIES

Adam Parness, *Guest Column*, Billboard (May 22, 2024),
    https://www.billboard.com/business/streaming/spotify-pay-songwriters-fair-
    share-guest-column-1235689545/ ........................................................................16

## I.    INTRODUCTION

Almost a year ago, this Court rejected the sole claim brought by Plaintiff Mechanical Licensing Collective ("MLC") in its original complaint—alleging that Spotify had underpaid royalties by treating its Premium service as a "Bundle" under the Copyright Act and its implementing regulations.  *See generally* Dkt. 61 (Order Dismissing Compl.).  MLC could have immediately appealed that decision as a matter of right.  It did not.  Instead, MLC strategically chose to seek reconsideration of the order and, in the alternative, asked this Court for leave to amend its complaint to plead additional facts and pursue a new "theory that it did not raise directly in its complaint or opposition papers."  Dkt. 74 (Order Grant. And Deny. Mot. For Recon. In Part) at 3.  The Court denied the reconsideration motion, but permitted MLC to seek leave to amend, which MLC then sought and the Court granted.  MLC filed an amended complaint and Spotify answered.  Now, MLC wants another do-over after nearly a year of resource-intensive motions practice and discovery:  it has asked this Court to let it appeal the January 2025 Order after all, via the extraordinary relief of certifying an interlocutory appeal or entering a partial final judgment.  This Court should reject those exceptional requests, which do not meet the heightened standards for interlocutory review under 28 U.S.C. § 1292(b) and Federal Rule of Civil Procedure 54(b).

As this Court has explained—more than once—the governing regulations are "unambiguous" and "the only plausible application of the law supports Spotify's position."  Dkt. 61 at 7.  MLC concedes that a plan satisfies the definition of a Bundle so long as it amounts to a "combination of a Subscription Offering [*i.e.*, a paid music streaming service] . . . and one or more other products or services," and the other product(s) or service(s) have "more than token value."  Dkt. 105 (MLC Mem. for Interlocutory Appeal) at 8-9 (citing Dkt. 61 at 3).  Far from showing that there is *substantial* ground for difference of opinion on those questions, MLC simply regurgitates arguments that this Court has rejected twice over as inconsistent with both the "plain and

unambiguous" "definition of a Bundle," and the "obvious" conclusion that audiobook streaming access carries more than token value.  Dkt. 61 at 9-10, 13 n.6.

MLC also wholly fails to show that an interlocutory appeal would materially advance the ultimate termination of litigation.  MLC suggests that an interlocutory appeal is necessary to avoid "trial on its amended claims" prior to an appeal from this Court's January 2025 Order.  Dkt. 105 at 3.  But that so-called problem is one entirely of MLC's making—resulting from its own choice to forgo an immediate appeal in January 2025.  In any event, MLC's attempt to restore *additional* issues to this case would do nothing to help the parties "avoid protracted and expensive litigation." *Mills v. Everest Reinsurance Co.*, 771 F. Supp. 2d 270, 273 (S.D.N.Y. 2009) (citation omitted). To the contrary, it would unnecessarily multiply the proceedings by forcing the parties to simultaneously litigate an interlocutory appeal in the Second Circuit, while continuing to pursue discovery and motions practice in this Court on MLC's newly added claims it is simultaneously trying to render moot.  And should the Second Circuit affirm this Court's decision, it would result in exactly the kind of piecemeal litigation that the final judgment rule is intended to avoid— culminating in two separate appeals to two separate panels involving closely related facts.

Finally, MLC's strategic delay in pursuing an appeal from this Court's dismissal order independently warrants denial of MLC's request.  When a party's own choices and resultant delay create the purported need for an interlocutory appeal, certification is not appropriate.  It is no wonder that MLC cannot identify a single case in which a court has certified an interlocutory appeal of an order that a party declined to appeal as of right one year earlier—particularly where, as here, the party affirmatively chose to pursue other claims in the interim.

MLC's request that this Court enter a partial final judgment is equally flawed. "Certification under Rule 54(b) must be granted 'sparingly' in light of the 'policy against

piecemeal appeals.'" *Alix v. McKinsey & Co.*, 470 F. Supp. 3d 310, 318 (S.D.N.Y. 2020) (quoting *Novick v. AXA Network, LLC*, 642 F.3d 304, 310 (2d Cir. 2011)). Notably, the Second Circuit has cautioned that district courts "generally should not grant a Rule 54(b) certification if the same or closely related issues remain to be litigated." *Novick*, 642 F.3d at 311 (internal citation omitted). MLC fought to add and pursue these new claims to its case. MLC fails to rebut Spotify's previous showing, in its pre-motion letter response, that MLC's original and alternative theories are sufficiently related to make Rule 54(b) certification inappropriate.

For all these reasons, MLC's request for extraordinary relief should be denied.

## II.    BACKGROUND

### A.    Facts

The relevant facts are, by now, well known to this Court. Section 115 of the Copyright Act, 17 U.S.C. § 115, provides Spotify and other companies that engage in music streaming a compulsory "blanket" license covering mechanical rights in musical works which are embodied in sound recordings streamed to users. The rates and terms of the Section 115 compulsory license are determined through rate-setting proceedings held every five years. 17 U.S.C. §§ 115(c)(1)(E), 115(c)(1)(F), 801(b)(1). Section 115 requires companies that stream music to report musical work usage and pay royalties to a central licensing administrator designated by the Copyright Office: the MLC. 37 C.F.R. § 210.23.

During the most recent rate-setting proceedings governing the royalty rate for 2023-2027, all the major music services and music publishers negotiated a settlement of the proceeding, and jointly agreed to regulations which provide specific rules for determining the amount of revenue

to be used in royalty calculations. *See* 37 C.F.R. § 385.2.[1]  Among other things, the regulations set forth the royalty rate due to be paid with respect to "Subscription Offerings" (such as paid standalone music streaming services) and "Bundled Subscription Offerings," (*i.e.*, the music streaming component of a "Bundle," defined as "a combination of a Subscription Offering providing Eligible Interactive Streams and/or Eligible Limited Downloads" and "one or more other products or services having more than token value.").  37 C.F.R. § 385.2; *see id.* § 385.21.   In other words, the regulations include rules addressing how to account for revenue attributable to products or services for which no music publishing license is even implicated (such as, for example, audiobooks—created and licensed by *entirely different rightsholders*).

In November 2023, Spotify added 15 hours per month of audiobook streaming to Spotify Premium—its premier, paid streaming subscription product that already included music streaming. Dkt. 1 at ¶ 38.  In March 2024, Spotify also launched a new, standalone audiobooks subscription called "Audiobooks Access," which is a paid audiobook streaming subscription product that gives subscribers access to 15 hours per month of audiobook streaming, along with non-subscription access to free, ad-supported music streaming that comes with any Spotify user account.  *Id.* ¶¶ 43, 46, 48.  Spotify began reporting Spotify Premium as a "Bundle" under the regulations in its March 2024 royalty report, which it submitted to MLC on April 14, 2024.  *See id.* ¶ 40.

### B.    Procedural History

In May 2024, a few weeks after Spotify began reporting Premium as a Bundle, MLC filed suit.  *See* Dkt. 1.  MLC's complaint raised a single claim implicating a single legal issue:  whether Spotify underpaid royalties by improperly reporting Spotify Premium as a Bundle.  *Id.* ¶¶ 54-59.

---

[1] The "lawmakers" MLC refers to in its memorandum had no role whatsoever in drafting or implementing the Bundle regulations at issue.  *See* Dkt. 105 at 3 n.1.

Specifically, MLC's complaint asserted that Spotify Premium did not meet the regulatory definition of a "Bundle" because it did not amount to a combination of a Subscription Offering and one or more other products or services, and that access to 15 hours of audiobook streaming lacked more than "token value." *Id.* ¶¶ 6-8.

This Court granted Spotify's motion to dismiss with prejudice, agreeing with Spotify that "§ 115 and its implementing regulations are unambiguous, and . . . the only plausible application of the law supports Spotify's position." Dkt. 61 at 7. "Applying the Bundle definition to the facts as alleged, the Court [could] draw only one conclusion: that Premium, which includes unlimited music streaming in addition to 15 hours of monthly audiobook streaming, is a 'combination' of a Subscription Offering (i.e., music streaming) and at least one "other product[] or service[]." *Id.* at 10. Similarly, "[a]pplying the ordinary meaning of 'token value' to the facts as alleged, the Court [could] draw only one conclusion: that 15 hours of monthly audiobook streaming is a product or service that 'ha[s] more than token value.'" *Id.* at 13 (quoting 37 C.F.R. § 385.2). Because Spotify Premium satisfied both requirements of a Bundle under the unambiguous regulatory framework at issue, this Court dismissed MLC's original complaint in full.

MLC could have immediately appealed that decision as a matter of right. *See* 28 U.S.C. § 1291. But it chose not to. Instead, MLC moved for reconsideration of the Court's decision, and in the alternative, insisted that it should be permitted to plead new facts and pursue a different theory that Spotify improperly calculated the royalties due to MLC from its Audiobooks Access and Premium plans, even assuming the latter is properly treated as a Bundle. *See* Dkt. 71 (Mot. For Recon.). This Court declined to reconsider its holding that Premium is properly treated as a Bundle under the Copyright Act and its implementing regulations. Dkt. 74 (Order) at 6. The Court reiterated the conclusion it had previously reached, rejecting MLC's arguments to the contrary as

"irrelevant and insufficient to establish that Premium is a standalone subscription offering." *Id.* at 4. The Court further explained that because MLC "ha[d] not identified any controlling law or evidence that the Court overlooked in reaching its conclusion," there was no reason to grant reconsideration. *Id.* at 5. Nevertheless, owing to the Court's "'strong preference for resolving disputes on the merits' rather than on the technical ground of procedural default," it allowed MLC to seek leave to amend to press the new claims. *Id.* at 3 (quoting *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 362 (2d Cir. 2023)).

After the Court granted MLC's subsequent motion for leave to file an amended complaint, and granted, in part, Spotify's motion for reconsideration, (Dkt. 87), MLC filed its Amended Complaint on October 1, 2025, Dkt. 88. In contrast to its original claim, MLC's new claims rely on allegations that audiobook services do have more than token value, just some (unspecified) different value from what Spotify, and other third parties, charge consumers at retail. *Compare, e.g.*, Dkt. 1 ¶ 8 ("[T]he audiobooks component of Premium does not have more than the 'token value' required to qualify as a Bundled Subscription Offering under Section 115.") *with* Dkt. 88 ¶4 ("Spotify is underreporting revenue and underpaying royalties by overstating the value of Premium's audiobooks component."); *id.* at ¶ 1 ("Spotify is improperly … overstating the value of the time-limited audiobooks listening available to Premium subscribers[.]"). Indeed, MLC relies on the Court's January 2025 Order to prop up its new claims. *See, e.g.,* Dkt. 71 at 3 ("The Court's holding that Premium qualifies as a Bundle *does not resolve, but rather confirms*, the sufficiency of the MLC's Audiobooks Access claim.") (emphasis added). The parties proceeded with discovery and Spotify filed its Answer on October 24, 2025.

On November 17, 2025—ten months after this Court dismissed its original complaint—MLC first asked this Court to certify that order for interlocutory appeal, or, in the alternative, to

enter a partial final judgment under Federal Rule of Civil Procedure 54(b). *See* Dkt. 99 (Letter). According to MLC, the original Bundle claim was the primary reason it brought "this litigation in the first instance," and it revealed for the first time that it intends to pursue that claim "regardless of the outcome of the [new] claims presented in its First Amended Complaint." *Id*.

## III.    LEGAL STANDARDS

Section 1292(b) certification is appropriate only where "(1) the order involves a controlling question of law, (2) as to which there is a substantial ground for difference of opinion, and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation." *SEC v. Ripple Labs, Inc.*, 697 F. Supp. 3d 126, 132 (S.D.N.Y. 2023) (Torres, J.) (internal citations and alterations omitted). It is the movant's burden to establish that all three prongs of the test are met. *Id.* "Section 1292(b) is a rare exception to the final judgment rule that generally prohibits piecemeal appeals," and is justified only in "*exceptional* circumstances" "[b]ecause interlocutory appeals are strongly disfavored." *Id.* (internal citations omitted and emphasis added). "[E]ven when all three prongs of the § 1292(b) test are met, it is *still* within the discretion of the Court to deny a request to certify a question for interlocutory appeal." *Tantaros v. Fox News Network, LLC*, 465 F. Supp. 3d 385, 389 n.3 (S.D.N.Y. 2020) (emphasis added).

Under Federal Rule of Civil Procedure 54(b), "[w]hen an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." To demonstrate there is "no just reason for delay," the Court must determine "certification is in the interest of sound judicial administration . . . . or, in the infrequent harsh case, where there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Alix*, 470 F. Supp. 3d at 317-18 (internal citations omitted). "It does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require

two (or more) three-judge panels to familiarize themselves with a given case in successive appeals from successive decisions on interrelated issues." *Novick*, 642 F.3d at 311 (internal citation omitted).  As with § 1292(b) certification, Rule 54(b) certification "must be granted 'sparingly' in light of the 'policy against piecemeal appeals.'" *Alix*, 470 F. Supp. 3d at 318 (citation omitted).

## IV.    ARGUMENT

### A.    MLC has not identified a controlling question of law as to which there is a substantial ground for difference of opinion

MLC asserts that whether Premium constitutes a Bundle under the regulations presents a controlling question of law for which there is a substantial ground for difference of opinion.  Dkt. 105 at 6-11.  MLC notes this issue "turn[s] on two fundamental questions:  (1) whether Premium is 'a combination of a Subscription Offering . . . and one or more products or services,' and (2) 'whether that product or service has more than token value.'" *Id.* at 8-9 (quoting Dkt. 61 at 3). Even assuming MLC has identified controlling questions of *law* that it seeks to appeal, *but see infra* at 13, MLC comes nowhere close to identifying a "substantial ground for difference of opinion" as to whether Spotify Premium meets the two requirements of a Bundle under the Copyright Act and its implementing regulations.

To warrant a § 1292(b) certification, a party must show a "*substantial* ground for difference of opinion." *Ripple Labs, Inc.*, 697 F. Supp. 3d at 135 (emphasis added).[2]  This requires "more than a claim that the court's ruling was wrong." *Mills*, 771 F. Supp. 2d at 273.  Instead, a party must show one of the following two prongs:  "(1) there is conflicting authority on an issue" or (2)

---

[2] Courts within this district have explained that the standard for satisfying § 1292(b) "should be viewed in light of the extraordinary nature of an interlocutory appeal to require more than just moderate disagreement among courts." *Hermès Int'l v. Rothschild*, 590 F. Supp. 3d 647, 656 (S.D.N.Y. 2022).  "Interlocutory appeals are designed to be rare and reserved for exceptional circumstances, lest they disrupt the orderly disposition of lawsuits in their due course." *Id.* at 651.

"*the case is particularly difficult*" in addition to being a matter "of first impression within this Circuit." *Id.* at 274 (emphasis added). MLC identifies no conflicting authority concerning whether Spotify Premium constitutes a Bundle, so the first prong is out. *See generally* Dkt. 105.[3]

As for the second prong, a "question of first impression, standing alone" does not warrant certification. *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996)). Instead, "the district court must analyze the strength of the arguments in opposition to the challenged ruling" and "decid[e] whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *SEC v. Coinbase, Inc.*, 761 F. Supp. 3d 702, 718 (S.D.N.Y. 2025) (internal citations omitted). This requires far more than "[m]ere conjecture that courts would disagree on the issue," *Ripple Labs*, 697 F. Supp. 3d at 135 (internal citation omitted), or as MLC puts it, understating the standard, "room for reasonable disagreement," Dkt. 105 at 9, 11. And where, as here, a statute's "text, purpose, and regulations all point to the same outcome" and a party "fail[s] to . . . undermine" the Court's analysis, an issue is not "particularly difficult" and therefore inappropriate for interlocutory review. *Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 393, 396 (S.D.N.Y. 2014).

Sure enough, this Court has already concluded that "§ 115 and its implementing regulations are *unambiguous*, and that the only plausible application of the law supports Spotify's position."

---

[3] That sharply distinguishes this case from several cases on which MLC heavily relies. *See, e.g.*, *In re Enron Creditors Recovery Corp.*, No. 01-16034 (AJG), 2009 WL 3349471, at *7 (S.D.N.Y. Oct. 16, 2009) (conflicting authority consisted of contrary holdings from five other courts of appeal). MLC also relies on *Transp. Workers Union of Am., Loc. 100, AFL-CIO v. New York City Transit Auth.*, 358 F. Supp. 2d 347 (S.D.N.Y. 2005). But in that case, the district court found that a recent Second Circuit case left "substantial questions" that it believed warranted clarification from that court. *Id.* at 351. Even so, the Second Circuit *denied* certification and "dismissed the interlocutory appeal because the parties had not demonstrated exceptional circumstances justify[ing] [interlocutory appeal]." *Transp. Workers Union of Am., Loc. 100, AFL-CO v. New York City Transit Auth.*, 505 F.3d 226, 229 (2d Cir. 2007) (internal citation omitted).

Dkt. 61 at 7 (emphasis added); *see also* Dkt. 74.  Because MLC fails to identify any contrary authority or establish substantial ground for difference of opinion regarding the regulations' meaning, it cannot show the "exceptional" relief of § 1292(b) certification is warranted.  *Youngers v. Virtus. Inv. Partners Inc.*, 228 F. Supp. 3d 295, 298 (S.D.N.Y. 2017) (citation omitted).

### 1.  There is no substantial ground for difference of opinion as to whether audiobook streaming is a product "other" than music streaming

The first question MLC argues provides a substantial ground for difference of opinion is whether Premium combines music streaming with "one or more other products or services," or more specifically, whether 15 hours of audiobook streaming is a "product[] or service[]" "other than" music streaming.  37 C.F.R. § 385.2.  Specifically, MLC asserts that there is substantial ground for difference of opinion as to whether the "other products or services" must be "preexisting, standalone products or services."  Dkt. 105 at 9 (quoting Dkt. 61 at 10).

But this argument simply reprises one that this Court has already twice rejected as incompatible with the regulations' unambiguous language, and therefore—once again—fails.  *See* Dkt. 61 at 8-9 (rejecting MLC's bid to read additional language concerning "preexisting, standalone products" into the regulations).  Merely repeating this argument for a third time fails to establish a "*substantial* ground for difference of opinion."  *Ripple Labs*, 697 F. Supp. 3d at 135 (emphasis added).[4]

As this Court explained, although the regulations do not define the phrase "other products or services," "[t]he meaning of the phrase is plain . . . and no party contends that the meaning is ambiguous or that the Court should ascribe specialized meaning to the phrase or its terms."  Dkt.

---

[4] As Spotify pointed out in its opposition to MLC's pre-motion letter, Dkt. 100, MLC's letter made no serious effort to establish that there is a substantial ground for difference of opinion as to whether Spotify Premium meets the regulatory definition of a "Bundle" under 37 C.F.R. § 385.2.  Attempting to overcome that failure, MLC now advances a series of supposedly "new" arguments found nowhere in its pre-motion letter.  *See* Dkt. 105 at 8-9.

61 at 7 (citing *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999)).[5]  Even today, MLC does not appear to dispute that audiobooks would qualify as an "other" product for purposes of the regulation had Spotify launched a standalone audiobook service before adding it to Premium. Instead, MLC's (renewed) argument boils down to the suggestion that whether Premium is a Bundle turns on whether Spotify launched a standalone audiobooks offering before combining that service with its Premium music streaming service.  *See* Dkt. 28 (Opp. to Mot. to Dismiss) at 17 (arguing only that Spotify's "course of conduct" between November 2023 and March 2024 suggests the addition of audiobooks to Premium does not constitute a Bundle); Dkt. 105 at 9 (arguing that because "the audiobooks content on Premium had never existed as a separate product from Premium," it cannot be a "combination" because that word "necessarily implies the existence of at least two separate products that can be combined").

This Court has already explained, however, that the governing regulations do not limit Bundles to "other preexisting, standalone products or services."  Dkt. 61 at 8.  Rather, "[t]he regulations expressly contemplate that a Bundle can include components that are not offered as standalone products or services."  *Id.* at 9; *see* 37 C.F.R. § 385.2 ("[I]n the event that there is no standalone published price for a component of the Bundle, then the Service Provider shall use the average standalone published price of End Users for the most closely comparable product or service in the U.S.").

---

[5] MLC also acknowledged in its initial complaint that Spotify Premium "consist[s] of unlimited music *and* access to *other* audio products, *including* up to 15 hours of audiobook listening."  Dkt. 1 ¶ 6 (emphases added); *see also* Dkt. 61 at 8 ("MLC appears to recognize that 'non-music audio content . . . such as podcasts, comedy shows[,] and spoken word performances' are included within Premium and are 'other' products or services in the ordinary sense of the words.") (quoting Dkt. 1 ¶ 5).

Similarly, this Court already explained that the timing of when Spotify launched its separate Audiobooks Access plan "has no bearing on whether Premium combines music streaming and some other product or service within a single package"—the only relevant question under the regulations. Dkt. 61 at 8-9. Therefore, the launch of Spotify's separate Audiobooks Access service did not "alter th[e] reality" that "[o]nce Spotify added 15 hours of monthly audiobook streaming to Premium in November 2023, it combined music streaming with another product or service in a single offering." *Id.* at 9. That Spotify waited to report Premium as a Bundle did not undermine this conclusion where "MLC point[ed] to no provision of § 115 or its implementing regulations that suggests that a digital service provider like Spotify forfeits the opportunity to report an offering as a Bundle simply because it previously did not do so." *Id.*

In short, because audiobooks consist of recorded books while music streaming is music, under a common sense reading of the regulations, Premium undoubtedly combines music streaming "with one or more other products or services." 37 C.F.R. § 385.2. MLC's renewed attempt to read language into this "unambiguous" interpretation of the regulations "fail[s] to . . . undermine" this Court's analysis, and therefore cannot establish that this is the rare, "particularly difficult" question that satisfies § 1292(b)'s robust standard. *Hart*, 73 F. Supp. 3d at 393, 396.

## 2. There is no substantial ground for disagreement as to whether audiobook streaming has more than "token value"

MLC next argues that there are "grounds for reasonable disagreement concerning the Order's interpretation of the phrase 'token value.'" Dkt. 105 at 10. But this argument is a non-starter for multiple reasons. To begin with, MLC points to no real disagreement with any controlling question of law about the meaning of "token value." Thus, MLC advances no argument that the Court was wrong to interpret the regulations to afford "token value" its ordinary meaning—*i.e.*, "something of 'minimal,' 'perfunctory,' 'symbolic,' 'inconsequential,' or

'insubstantial,' value." Dkt. 61 at 12.  Nor does MLC take issue with this Court's conclusion that 15 hours of audiobook streaming is "something of intrinsic and monetary value to many."  *Id.* at 13.  Instead, MLC primarily faults this Court (again)[6] for purportedly "credit[ing]" a "factual argument outside the Complaint" about the reason why Spotify might have initially chosen not to raise the price of Spotify Premium when adding audiobook streaming.  MLC argues that, under Federal Rule of Civil Procedure 12(b)(6), there is "at least reasonable ground for disagreement as to whether the Court should have credited that factual argument from Spotify."  Dkt. 105 at 10.

This kind of disagreement falls well outside the reach of § 1292(b).  For one thing, the question on which there exists a "substantial ground for difference of opinion" must involve a pure legal question; "a litigant's argument that the court misapplied the law is not a pure question of law" appropriate for § 1292(b) certification.  *Ripple Labs*, 697 F. Supp. 3d at 132 (internal citation omitted).  In any event, this argument fails on its own terms.  The Court did not "credit" a factual argument from Spotify, it merely noted Spotify's explanation as to why it did not raise the price while explaining why an "other" service could have more than token value even if a company did not increase the price when bundling it with a music streaming service.  *See* Dkt. 61 at 13.  Notably, this is a premise that MLC itself now largely admits is correct.  *See* Dkt. 105 (MLC's Opening Brief) at 10 (disavowing argument that a "meaningful price increase" is "necessary" to establish the product or service being bundled with a music streaming service of "more than token value").

Moreover, MLC's amended complaint effectively concedes that audiobooks have more than token value to consumers.  MLC suggests (inaccurately) that other services offering more hours of access to a less desirable list of audiobooks offers greater relative value to consumers than does the audiobooks access offered through Spotify Premium, *see, e.g.*, Dkt. 88 ¶ 87 (pointing to

---

[6] *See* Dkt. 74 at 5-6 (rejecting this argument on motion for reconsideration).

other services charging roughly $8 a month). But the salient point is that MLC's amended complaint reinforces the robustness of the audiobook market, and its value to consumers. Having made these factual allegations, MLC cannot maintain that the question of whether audiobooks access carries more than token value is "particularly difficult."

Fundamentally, therefore, MLC fails to show that the questions it identifies present "particularly difficult" questions of law about which there are "substantial grounds for difference of opinion." *Hart*, 73 F. Supp. 3d at 393 (S.D.N.Y. 2014). Where, as here, a claim presents a "straightforward application" of law to fact, and a party "has not shown substantial doubt as to the correctness of the Court's Dismissal Order," the "exceptional circumstances" warranting certification are lacking. *Netrebko v. Metro. Opera Ass'n, Inc.*, No. 23-CV-6857 (AT), 2025 WL 2161448, at *5–6 (S.D.N.Y. July 29, 2025) (Torres, J.) (internal citation omitted).

### 3. Interlocutory appeal is not warranted just because an issue is one of first impression

MLC also argues that certification is warranted because the interpretation of the regulations at issue here presents a question of first impression. But the Second Circuit has decidedly foreclosed that argument: "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d at 284. Instead, even as to an issue of first impression, certification is only appropriate where the district court determines that "there is a *substantial* ground for dispute." *Id.* (internal citation omitted). As discussed, MLC fails to make that showing. And that sets this case far apart from the cases on which MLC tries to rely. *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, 2010 WL 10078354, at *7 (S.D.N.Y. Sept. 23, 2010) (certifying order that "resolved a difficult, dispositive legal question of first impression" which the judge "forthrightly acknowledged" was "controversial" and arguably contrary to the reasoning of prior

14

cases); *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (recognizing that "undefined juristic nature" of party created legal question that was "difficult and of first impression"); *Riverkeeper, Inc. v. EPA*, 514 F. Supp. 2d 565, 567 (S.D.N.Y. 2007) (finding "substantial ground for difference of opinion" on threshold jurisdictional question where reviewing court could readily "view the matter differently").

Unable to point to any regulatory language or judicial decisions creating "substantial ground for difference of opinion" with this Court's decision, MLC reaches far afield. MLC first cites a June 2024 letter from two Congressmen and one Senator who, according to MLC, were members of the committee which "originated" the Music Modernization Act. *See* Dkt. 105 at 3 n.1. But that letter does not establish *any* ground for difference of opinion—let alone a substantial ground—for purposes of § 1292(b). This case does not involve a dispute about the meaning of the Music Modernization Act of 2018, but rather the meaning of Copyright Royalty Board regulations, which were adopted in December 2022 following a negotiated settlement; a settlement that included Spotify, but not MLC nor the authors of the cited letter. The letter takes no position on the regulations. And even if it did, MLC cites no case law and no authority for the proposition that a "substantial ground for difference of opinion" can be established by pointing to a *post hoc* letter sent by a few legislators to the Director of the Copyright Office. For similar reasons, the fact that MLC points to the personal opinion of a former Spotify employee—who currently "serves as a highly trusted and sought after strategic advisor to numerous music rightsholders"[7]—is of no moment.[8]

---

[7]     Adam     Parness,     *Guest     Column*,     Billboard     (May     22,     2024), https://www.billboard.com/business/streaming/spotify-pay-songwriters-fair-share-guest-column-1235689545/.

[8] MLC does not allege (because it cannot) that that former employee was working at Spotify, any other music streaming service, or any music publisher or music publisher representative at the time

Finally, because it appreciates it cannot meet the legal test for justifying an interlocutory appeal, MLC also devotes significant space to arguing that an immediate appeal is necessary to ensure "fair" results for MLC's constituents. *See, e.g.*, Dkt. 105 at 1, 7, 11. Those arguments are misplaced. The Bundle regulations (which MLC's constituents negotiated and agreed to in the first place) ensure that royalties are adequately allocated to other rightsholders supplying content that consumers are paying for. *See supra* at 4. MLC's present dissatisfaction with the regulations does not alter their unambiguous language, nor overcome MLC's failure to meet the high standards for justifying an interlocutory appeal.

Because MLC fails to establish there is a substantial ground for difference of opinion, it fails to meet this necessary prong of the § 1292(b) test and its motion should be denied.

**B.     Immediate appeal would not "materially advance the termination of the litigation"**

MLC also fails to show that an interlocutory appeal would materially advance the termination of this litigation. To the contrary, certification at this stage of the case would force the parties to simultaneously litigate two related issues before two different courts, exacerbating the burden on party and judicial resources for no tangible benefit. At the same time, it would risk the kind of piecemeal litigation that the final judgment rule is intended to avoid—culminating in two separate appeals to two separate panels involving closely related facts.

MLC principally argues that "it would be much more efficient to certify an interlocutory appeal now so that all claims can be tried together in the event of a reversal at the Second Circuit." Dkt. 105 at 13. But that premise rests on sheer speculation. To begin with, it is extremely unlikely that the Second Circuit would issue a decision before substantial further proceedings are completed

_____

that those parties participated in and settled the *Phonorecords IV* rate proceeding that resulted in the governing regulations. So his speculation as to what may have been intended by the parties to the *Phonorecords IV* settlement is exactly that: speculation.

in this case on the new claims that MLC chose to add and pursue—including the completion of discovery (currently set to close this spring), as well as dispositive motions practice and even trial. Thus, even "[a]ccepting [MLC's] premise that the dismissed claim[] will one day be revived by the Second Circuit, even under the most optimistic projections, this will come after discovery and, perhaps, dispositive motions practice or even trial on the surviving claims, making separate or continued proceedings inevitable." *Netrebko*, 2025 WL 2161448, at *6 (internal citation and alterations omitted).[9]

Should the Second Circuit affirm this Court's original decision, moreover, it would result in exactly the kind of piecemeal litigation that the final judgment rule is intended to avoid—potentially culminating in two separate appeals to two separate panels involving closely related facts. In no sense, therefore, would immediate appellate review "avoid protracted and expensive litigation." *Mills*, 771 F. Supp. 2d at 273 (citation omitted). Instead, by creating overlapping and piecemeal proceedings across two different courts, while imposing additional burdens on party and judicial resources, certification would disserve "'the institutional efficiency of both the district court and the appellate court.'" Dkt. 105 at 3 (quoting *SEC v. Rio Tinto PLC*, 17-CV-7994, 2021 WL 1893165, at *2–3 (S.D.N.Y. May 11, 2021)).

MLC relies on *In re Dynex Cap., Inc. Sec. Litig.* for the proposition that, absent interlocutory review, "[s]ubstantial resources may be expended in vain both by the parties and this Court if [the Court's] initial conclusion proves incorrect." *Id.* at 12 (quoting No. 05-CV-1897, 2006 WL 1517580, at *3 (S.D.N.Y. June 2, 2006)). But the contrast between this case and *In re*

---

[9] MLC suggests that certification of an interlocutory appeal would not slow proceedings in this Court because MLC would seek an expedited appeal. But it identifies no reason why MLC's claim for monetary relief would warrant expedition even were the Second Circuit to accept an interlocutory appeal. And even an expedited appeal would not prevent overlapping proceedings from continuing in both courts for the foreseeable future.

*Dynex* is stark. There, the court's "*denial* of Dynex's motion to dismiss turned on" the question Dynex sought to certify. 2006 WL 1517580, at *3 (emphasis added). If the Second Circuit reversed, it would immediately have resulted in the termination of the litigation, making it so that "substantial resources may be expended in vain both by the parties and this Court if [the court's] initial conclusion proves incorrect." *Id.* That is not the case here, however. Because MLC seeks only to *add* issues to this case, interlocutory appeal will not advance the termination of litigation nor remove any issues from this litigation.[10]

MLC argues that an interlocutory appeal is warranted because if this case proceeds to trial and the Second Circuit overturns the Order, a second trial would become necessary. Dkt. 105 at 12. This, of course, is an issue of MLC's own making because it chose to add and pursue new claims *after* its initial complaint was dismissed. It also proves too much, for that is true in *any* case in which a court dismisses some claims while allowing others to proceed. Yet interlocutory appeal is very much the exception, not the rule. Although MLC tries to analogize to this Court's decision in *Rio Tinto*, that was a complex case in which the Government sought interlocutory

---

[10] Indeed, in most of the cases that MLC cites, a district court certified an order for interlocutory appeal where—as in *In re Dynex*—reversal by the Second Circuit would have conclusively *ended* the litigation by establishing the court lacked jurisdiction or the claim was otherwise infirm. *See Tantaros*, 465 F. Supp. 3d at 392-93 (S.D.N.Y. 2020) (granting § 1292(b) certification to resolve controlling issue of court's subject matter jurisdiction); *Ferring B.V. v. Allergan, Inc.*, 343 F. Supp. 3d 284, 288-89 (S.D.N.Y. 2018) (granting § 1292(b) certification to resolve dispositive question of court's standing); *Consub Delaware LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 313 (S.D.N.Y. 2007) (granting § 1292(b) certification to resolve threshold issue in attachment case); *Riverkeeper, Inc.*, 514 F. Supp. 2d at 570–71 (sua sponte certifying interlocutory appeal where court concluded Court of Appeals' jurisdiction over administrative appeal was not exclusive); *Herbert v. Lando*, No. 74-CV-434, 1985 WL 463, at *2 (S.D.N.Y. Mar. 26, 1985) ("[I]f defendants prevail in the Court of Appeals, obtaining a ruling that the complaint should have been dismissed in its entirety on summary judgment, the first trial will have been unnecessary."); *Transp. Workers Union*, 358 F. Supp. 2d at 351-52 ("If the Court of Appeals reverses . . . the litigation will end."); *see also Transp. Workers Union of Am., Loc. 100, AFL-CIO*, 505 F.3d at 229 (noting Second Circuit "denied the petition and dismissed the interlocutory appeal").

appeal on a legal question of widespread importance under the Securities Act on which there was actual "conflicting authority," specifically, a new Supreme Court decision with unclear reach that generated a "cloud of legal uncertainty" over the proceedings. 2021 WL 1893165, at *2-3 (internal citation omitted). While the Court found it more efficient to allow the Second Circuit to consider whether all of the SEC's claims were actionable, such that the parties could resolve all actionable claims at one trial, this Court emphasized that the "efficiency concerns" on which it relied were "greatest in large, complex cases" like the one before it, which involved twelve claims. *Id.* at *3.

MLC asserts that "[n]ow is the optimal time for an appeal of the Order" because a motion for interlocutory appeal would not have been "appropriate or efficient" before this Court permitted MLC to file an amended complaint. Dkt. 105 at 12-13. That misses the mark. MLC could have pursued an immediate appeal after this Court entered final judgment close to a year ago. MLC chose instead to seek reconsideration of the order, seek leave to amend its complaint, and pursue discovery on its new claims before changing its mind and backtracking.

For all these reasons, MLC cannot show that an immediate appeal will materially advance the termination of litigation. The far better course is to permit MLC to file an appeal in the normal course after the additional claims it chose to add and pursue are resolved, which will permit a single appeal of all issues presented in this case. "This orderly and customary process will, in turn, permit a single panel of the Second Circuit to resolve, in one decision, the open legal issues." *Netrebko*, 2025 WL 2161448, at *7 (internal quotation marks and citation omitted); *see also LoCurto v. AT&T Mobility Servs. LLC*, No. 13-CV-4303, 2019 WL 2491248, at *3 (S.D.N.Y. June 13, 2019) (denying motion for certification where "reversal of the Order would not terminate the litigation," certification "could further delay this action," and there was no prejudice in waiting to appeal).

**C.    Permitting MLC to take an interlocutory appeal at this stage in the litigation is prejudicial and unwarranted**

Even if MLC could somehow demonstrate it has met the prongs of the § 1292(b) test (which it has not, and cannot), "it is still within the discretion of the Court to deny a request to certify a question for interlocutory appeal." *Tantaros*, 465 F. Supp. 3d at 389 n.3.  In light of MLC's litigation conduct, the Court should exercise its discretion to deny the request to certify.

First, the fact that MLC waited almost a year to pursue an appeal from this Court's original decision vitiates any claim that the circumstances here are extraordinary, and provides independent justification for this Court to deny MLC's motion.  While § 1292(b) does not "specify a time in which a party must move for [an] order[] to be certified for interlocutory appeal, 'courts have held that any delay in seeking . . . certification must be reasonable.'" *Xue v. Koenig*, No. 19-CV-07630, 2025 WL 897046, at *4 (S.D.N.Y. Mar. 24, 2025) (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 371 (S.D.N.Y. 2008)).  Courts in this circuit routinely deny requests for interlocutory appeal that come even a month too late, much less ten.  *See, e.g.*, *id.* (delay of "over a month after the Court set a briefing schedule" was unreasonable); *Kogut v. Cnty. of Nassau*, No. 06-CV-6720, 2010 WL 844745, at *2 n. 1 (E.D.N.Y. March 8, 2010) (two-month gap reflected "unreasonabl[e] delay"); *Century Pac., Inc.*, 574 F. Supp. 2d at 371 (delay of "almost four months" weighed against certification); *Martens v. Smith Barney, Inc.*, 238 F. Supp. 2d 596, 600 (S.D.N.Y. 2002) (observing interlocutory appeal motion "should be denied on the basis of untimeliness alone" based on unexplained five-month delay); *In re Bank of Am.  Corp.  Sec., Derivative, & Emp.  Ret.  Income Sec.  Act (ERISA) Litig.*, No. 10-CV-275, 2012 WL 1308993, at *1 (S.D.N.Y. Apr. 16, 2012) (six-month delay "weigh[ed] strongly against certification").  This practice makes good sense, given that "the institutional efficiency of the federal court system is among the chief concerns underlying § 1292(b)," and delays in seeking certification can suggest parties are merely

"attempt[ing] to forestall" the next steps before the trial court while also subjecting the Courts of Appeals to piecemeal appeals. *In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 49 (S.D.N.Y. 2002).[11]

This case, moreover, presents a scenario far more egregious than one of simple delay. MLC's belated request for certification here comes nearly a year after MLC made the strategic choice to *forego* an appeal as of right in favor of asking this Court to permit it to litigate alternative theories that it could have—but did not—present in its original complaint. *See* Dkt. 87 at 3-4. The parties and this Court devoted most of this year to litigating MLC's request to pursue those alternative theories—at great expense—and are now engaged in discovery concerning the same.[12] MLC has led the parties and this Court to devote substantial resources to the path MLC pursued. Permitting MLC to reverse course at this stage is prejudicial and unwarranted. MLC's self-inflicted delay entirely undermines its argument that this is the "rare" case in which certification is necessary to "avoid protracted litigation." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865-

---

[11] MLC's citations are not to the contrary. In each of MLC's cited cases, there was a sound reason for the delay in seeking interlocutory appeal, and most cases involved requests for certification that came only days or weeks after the relevant order. In fact, MLC points to no case in which a delay of nearly a year was excused. *See United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*, 521 F. Supp. 3d 265, 274 (E.D.N.Y. 2021) (motion for interlocutory appeal filed eleven days after relevant decision timely); *Rothstein v. GMAC Mortg., LLC*, No. 12-CV-3412, 2014 WL 1329132, at *3 (S.D.N.Y. Apr. 3, 2014) (52-day delay in seeking interlocutory appeal did not weigh against certification where plaintiffs filed motion for interlocutory appeal "promptly" after decision casting doubt on district court's legal conclusions); *Stevens v. HMSHost Corp.*, No. 10-CV-3571, 2015 WL 926007, at *1, 3 (E.D.N.Y. Mar. 4, 2015) (six-week delay did not weigh against certification but motion for certification failed on the merits); *Salinas v. U.S. Xpress Enters., Inc.*, No. 1:13-CV-245, 2016 WL 11745101, at *2 (E.D. Tenn. Dec. 13, 2016) (ten-week delay reasonable where party seeking certification had to contend with "over forty arbitration actions" related to current action); *Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.*, No. CV-11-6521, 2013 WL 12306438, at *6 (C.D. Cal. July 11, 2013) (eight-month delay excusable where motion for interlocutory appeal filed 33 days after intervening Second Circuit decision which plaintiff contended changed applicable law).

[12] As this Court is well aware, the Amended Complaint was only filed after two full rounds of briefing on motions to reconsider and a contested motion for leave to amend. *See* Dkt. 72 (Spotify's Opp'n to Mot. for Recon.); Dkt. 79 (Opp'n to Mot. to Am.); Dkt. 82 (Spotify's Mot. for Recon.); Dkt. 83 (Mem.); Dkt. 86 (Reply).

66 (2d Cir. 1996). The protracted litigation MLC now claims to want to avoid is the one it *insisted* on pursuing over Spotify's objection (and the Court's initial skepticism). This Court should not reward MLC's strategic about-face by further multiplying and delaying these proceedings.

### D.    Rule 54(b) certification is inappropriate

Although this case (now, because of MLC's strategic choices) involves multiple claims and one of those claims has been finally decided, it does not present the rare circumstances that would justify certification under Rule 54(b). *See* Fed. R. Civ. P. 54(b) (providing entry of a partial final judgment is only appropriate where "the court expressly determines that there is no just reason for delay"). As with § 1292(b) certification, "no just reason for delay" is a difficult standard to meet due to the strong "policy against piecemeal appeals." *Novick*, 642 F.3d at 310; *see also Burrell v. State Farm and Cas. Ins. Co.*, 226 F. Supp. 2d 427, 432 (S.D.N.Y. 2002) ("Rule 54(b) motions should not be granted routinely."). A party seeking a Rule 54(b) certification must demonstrate that immediate appeal is in "the interest of sound judicial administration." *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 232 F.R.D. 173, 175 (S.D.N.Y. 2005) (quoting *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1095 (2d Cir. 1992)). This is not such a case. Where a plaintiff's "arguments for entry of partial judgment are limited to contentions that the Court erred in some of its rulings and that these allegedly erroneous rulings may have consequences with regard to some of the claims raised in the . . . Amended Complaint," "there is no basis for entry of a partial judgment." *Burrell*, 226 F. Supp. 2d at 433.

Here, the record particularly counsels against entry of a partial final judgment. Courts have made clear that where a dismissed claim "arise[s] out of the same facts and circumstances as those raised in the . . . Amended Complaint and are sufficiently intertwined with these new claims . . . an immediate appeal is not justified." *Id.*; *see also Novick*, 642 F.3d at 311 (noting district courts "generally should not grant a Rule 54(b) certification if the same or closely related issues remain

to be litigated") (internal citation omitted).  The interests of sound judicial administration and efficiency are undermined by "piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case in successive appeals . . . on interrelated issues." *Id.*

MLC cited the same allegations in seeking reconsideration and vacatur of the original order dismissing its claims.  Dkt. 71.  MLC's own pleadings also establish that its dismissed theory and its newly pled theories are sufficiently related and therefore make Rule 54(b) certification inappropriate.  Both MLC's dismissed and new theory make claims about the value of the audiobooks component of Spotify's Premium service.  *See supra* at 6.  Moreover, although MLC now claims that its two theories are "independent," Dkt. 105 at 16, MLC has previously admitted that its original and amended claims are closely related, *see* Dkt. 71 at 3 ("The Court's holding that Premium qualifies as a Bundle *does not resolve, but rather confirms*, the sufficiency of the MLC's Audiobooks Access claim.") (emphasis added).

Given that overlap, it would make little sense to sanction separate appeals.  *Cf. Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343, 352-53 (S.D.N.Y. 2013) (partial final judgment appropriate where claims were unconnected and could have been brought in separate actions); *see Novick*, 642 F.3d at 311.  Fundamentally, it makes sense for the same appellate panel to evaluate the value of 15 hours of audiobook listening—a question relevant both to MLC's dismissed claim and MLC's newly added claim that the parties continue to litigate today.  These "closely intertwined" claims are entirely inappropriate for separate appeals.  *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F. Supp. 3d 173, 190 (S.D.N.Y. 2014) (internal citation omitted).[13]

---

[13] MLC also argues that entry of a partial final judgment is warranted because it could facilitate settlement of the remaining claims.  *See* Dkt. 105 at 16; *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 n.2 (1980).  Based on its experience to date, Spotify believes the opposite to be true here.

Finally, Rule 54(b) motions may also be granted "in the *infrequent harsh case* where there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 271-72 (S.D.N.Y. 2013) (citing *Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005)) (emphasis added). But where, as here, a plaintiff "fail[s] to identify any danger of hardship or injustice that would result from delaying the immediate appeal," entry of a partial final judgment under Rule 54(b) is not generally warranted. *Id.*

This case is not the kind of "infrequent harsh case" in which partial final judgment is necessary.[14] Indeed, MLC is pursuing claims for monetary relief. A delay in the award of damages is not the kind of special circumstance presenting danger or hardship: "there is no prejudice to [a] plaintiff[] due to a delay in recovering a monetary award" absent a showing a defendant "might lack the monetary resources and/or liquidity necessary to satisfy a large judgment." *In re Vivendi Universal, S.A., Sec. Litig.*, No. 02-CV-5571, 2012 WL 362028, at *4 (S.D.N.Y. Feb. 6, 2012) (internal citations omitted). And district courts in this circuit consistently deny Rule 54(b) motions where plaintiffs "fail to make any showing of hardship that would necessitate an immediate appeal." *Uni-Rty Corp. v. Guangdong Bldg., Inc.*, 249 F.R.D. 149, 152 (S.D.N.Y. 2008); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 964 F. Supp. 2d 299, 318 (S.D.N.Y. 2013); *Samtani v.*

---

[14] Danger of hardship or injustice typically involves urgent timing concerns which MLC does not identify here. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Frosty Bites, Inc.*, 350 F. Supp. 2d 508, 514 (S.D.N.Y. 2004) (entering partial final judgment to establish plaintiff's duty to indemnify defendant in separately pending litigation); *Raffles Tree Apparel Pte. Ltd. v. A Base IX Co. LLC*, No. 18-CV-05791, 2019 WL 2117643, at *2 (S.D.N.Y. Apr. 29, 2019) (entering partial final judgment because of "acknowledged risk" that defendant "might declare bankruptcy" and impair plaintiff's ability to collect on judgment following appeal); *Lankler Siffert & Wohl, LLP v. Rossi*, No. 02-CV-10055, 2004 WL 541842, at *4-5 (S.D.N.Y. Mar. 19, 2004), *aff'd*, 125 F. App'x 371 (2d Cir. 2005) (entering partial final judgment as to subset of plaintiffs who could be afforded "full relief" and cease pursuing related claims).

*Cherukuri*, No. 11-CV-2159, 2013 WL 2181037, at *4 (E.D.N.Y. May 20, 2013) (denying Rule 54(b) motion where plaintiff "identifie[d] no hardship other than the fact that he will have to wait").[15]

Ultimately, MLC's motion is based on its disagreement with this Court's decision. But "[a] losing party's dismay alone (common and understandable as it is) is not proper grounds for an expedited appeal." *Cornwell v. Credit Suisse Grp.*, 270 F.R.D. 145, 147 (S.D.N.Y. 2010). And permitting separate appeals of closely related issues is incompatible with principles of "sound judicial administration." *Id.* Accordingly, MLC's request for partial final judgment should likewise be denied.

---

[15] To the extent MLC argues that the risk of multiple trials constitutes prejudice, "the desire to 'avoid a second trial . . . is one the Second Circuit has explicitly rejected' as a basis for entry of a partial judgment, 'particularly in cases where the dismissed and surviving claims are closely interrelated.'" *FAT Brands Inc. v. PPMT Cap. Advisors, Ltd.*, No. 19-CV-10497, 2021 WL 1392849, at *3 (S.D.N.Y. Apr. 13, 2021) (quoting *Adrian v. Town of Yorktown*, 210 F. App'x 131, 133 (2d Cir. 2006)).

Dated: January 9, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*

Allison L. Stillman
Grace McLaughlin
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
alli.stillman@lw.com
grace.mclaughlin@lw.com

Sarang V. Damle
Michael E. Bern (*pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (212) 637-2200
sy.damle@lw.com
michael.bern@lw.com

*Attorneys for Spotify USA Inc.*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby state that the foregoing Opposition to Plaintiff's Motion for Reconsideration was prepared on a computer using Microsoft Word. The total number of words in this brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 8,747. In preparing this certificate, I relied on the word count program in Microsoft Word.

 Dated: January 9, 2026

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*

Allison L. Stillman
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
Email: alli.stillman@lw.com