May 13, 2026

The Honorable Katharine H. Parker
United States District Court for the Southern District of New York
500 Pearl Street, New York, NY 10007

> Re:    *Mechanical Licensing Collective* v. *Spotify USA Inc.*, No. 1:24-cv-03809

Dear Judge Parker:

In accordance with Your Honor's Individual Practices in Civil Cases § II(b), the parties in the above-captioned action write jointly to identify discovery disputes the parties would like to discuss at the May 20, 2026 status conference. The parties are continuing to meet and confer about the issues raised in this letter, including with respect to Spotify's Volume 9 Privilege Log produced on May 12, 2026, and will work to resolve as many as possible in advance of the next status conference.

## 1. Spotify's Privilege Log

**MLC's Position**: The MLC has identified several deficiencies in Spotify's privilege logs. Spotify's privilege logs repeatedly fail to identify an attorney whose involvement gives rise to the claimed privilege. For example, Category 4 of Spotify's First Amended Volume 5 Privilege Log initially identified Chris Bonavia as the relevant attorney for SPOTIFY_00003786 and SPOTIFY_00003787 even though he holds a business role. Although Spotify subsequently claimed his being identified as attorney was "inadvertent," it has continued to withhold these documents on privilege grounds without identifying an applicable attorney. The same deficiency goes for Category 7 of the Second Amended Volume 5 Privilege Log, which identifies five documents described as "prepared at the direction of counsel." The only individuals identified—Josephine Speranza and David Kaefer—are not attorneys, and no directing attorney is named. Spotify's Volume 8 Privilege Log has this same deficiency across Categories 8, 11, 12, and 14—none of which identifies the attorney(s) responsible for directing the preparation or providing the advice at issue.

Spotify also asserted privilege over communications in which the only attorney involvement shown is that counsel is merely copied on, or is a participant in, the communication, including Categories 5 and 10 in its Volume 8 Privilege Log. In a May 10, 2026 letter, Spotify asserted that the metadata in the privilege log reflects only the "last-in-time email" in a thread and that attorneys who appear on the "CC" line purportedly provided legal advice earlier in the chain. Even if that explanation accounts for why attorneys appear in the "CC" field, it does not establish that the withheld email chains are privileged in their entirety. If these categories include non-privileged business communications to which legal advice was later added, or on which counsel was later copied, then Spotify must produce the non-privileged portions with appropriate redactions.

Spotify's privilege logs further assert privilege over categories that are described in terms so vague and overbroad that the MLC cannot meaningfully assess whether the communications are in fact privileged, or whether they reflect ordinary business activities

improperly cloaked in privilege.  Specifically, several categories of Spotify's Volumes 5 and 8 Privilege Logs contain insufficient substantive information to allow the MLC to meaningfully assess Spotify's privilege assertions—they purport to reflect legal advice regarding "structure," "operation," and "infrastructure" of Spotify's offerings.  Several category descriptions identify what appear to be ordinary business activities rather than legal advice, and none explains what legal question, if any, was at issue in the relevant communications.

**Spotify's Position:**  MLC's attempt to raise issue with Spotify's privilege log in this letter is, like certain other issues it presents below, premature.  In an effort to resolve MLC's complaints, Spotify yesterday informed MLC it would provide further information with respect to SPOTIFY_00003786 and SPOTIFY_00003787 (two documents postdating May 16, 2024 that do not need to be logged per the ESI Order) and would supplement its log to provide both updated category descriptions and identify relevant attorneys if necessary and where missing.  Spotify continues to work in good faith to address these complaints, among others, and does not believe this is an appropriate issue for the Court at this time.

Spotify believed MLC's complaints regarding whether attorneys appear in the "CC" line in a last-in-time email was resolved based on the parties' May 11, 2026 conferral when Spotify confirmed it made an email-by-email assessment when determining whether to log privileged email threads.  In any event  Spotify's categorical privilege log comports with the ESI protocol's metadata requirements as applied to threaded email communications.  MLC's speculative assertions that logged emails may involve counsel being "later added" or "later copied" do not justify its assertion that there are deficiencies in Spotify's log or that Spotify withheld non-privileged communications.  Nonetheless, Spotify will continue to confer with MLC in good faith to minimize any disputes.  Similarly, MLC's assertion that certain log entries do not identify lawyers does not mean a document is improperly logged.  Of course, the fact that an author of a document is not an attorney does not necessarily prevent a privilege assertion.  But, again, Spotify will continue to confer with MLC in good faith in order to resolve disagreements where possible.

Similarly, although Spotify disagrees that its category descriptions are vague, Spotify has agreed to supplement the Category 6, 8, and 10 descriptions that MLC claims "appear to be ordinary business activities rather than legal advice" in order to minimize the disputes requiring the Court's attention.

## 2.  <u>Spotify's Document Production</u>

**MLC's Position**:  Notwithstanding Spotify's representation regarding substantial completion of its document production, the MLC has identified critical categories of documents that Spotify appears not to have produced.  For example, Spotify has failed to produce documents concerning how and why Spotify chose $9.99 as the value of the audiobooks component of Premium, including any documents reflecting the factors Spotify considered in reaching that decision (MLC RFP No. 3).  Further, Spotify has failed to produce documents concerning whether royalties must be calculated or reported separately for Audiobooks Access and Spotify Free pursuant to 37 C.F.R. § 385.21 (MLC RFP No. 9).  While

the MLC has received certain documents in which Spotify attempts to justify the $9.99 valuation after the fact, it has not received documents showing how Spotify arrived at that valuation in the first instance.  Spotify's production practices—waiting until the last day of substantial completion (and in fact, even after) to produce 97% of its documents (approximately 19,500 documents)—has hampered the MLC's ability to raise these disputes earlier.  The MLC's review of Spotify's recent productions is ongoing, and the MLC reserves its rights to identify additional deficiencies.

**Spotify's Position:**    MLC's characterization of the completeness of Spotify's document production—raised for the first time today—is unfounded.  MLC admittedly has not finished reviewing Spotify's document productions, which include over 20,100 documents, so it has no basis to claim that Spotify's production is deficient.  MLC has not conferred with Spotify regarding its assertions that Spotify has failed to produce responsive documents, leaving its vague claims of deficiency altogether unclear.   Nor has MLC substantiated its characterizations of documents showing Spotify "attempt[ing] to justify the $9.99 valuation after the fact" or not including discussion of "how Spotify arrived at the valuation in the first instance."  Spotify has, in fact, produced documents concerning the value of the audiobooks component of Premium.  *See, e.g.*, SPOTIFY_00008428 (memo predating the launch of audiobooks in Premium); SPOTIFY_00160621(document related to pricing decisions for Audiobooks Access Tier).

Similarly misplaced is MLC's complaint that Spotify has not produced documents concerning "whether royalties must be calculated or reported separately for Audiobooks Access and Spotify Free pursuant to 37 C.F.R. § 385.21."  Plainly, documents concerning how royalties must be reported pursuant to a governmental regulation implicate legal matters, so it is not clear why MLC expected to see more nonprivileged documents on this subject.

MLC's attempt to justify its declaration of production deficiencies before finishing its review of Spotify's documents by blaming Spotify's production of documents on the substantial completion date is also meritless and misleading.  Spotify agreed to a substantial completion date as an accommodation to MLC, notwithstanding that MLC belatedly served a second round of requests for production in the middle of Spotify's document review, expanding the contours of a previously agreed-upon scope of discovery.

Moreover, MLC's complaints regarding Spotify's alleged document production deficiencies ring hollow given the significant disparity between the parties' respective productions. Spotify has produced over 20,000 documents, whereas MLC has produced approximately 1,557 documents and identified only 269 additional documents on its privilege logs.  MLC's production is notably deficient on subjects central to the Amended Complaint, such as MLC's position on the proper value of the audiobooks component of Premium, MLC's determination that Spotify's valuation was inaccurate, or the regulatory terms MLC itself invokes in support of its claims.

### 3.  Spotify's Supplemental Interrogatory Responses

**MLC's Position:** MLC Interrogatories Nos. 9, 11, 13-22 and 25 sought the identification of "all persons involved in discussions, analyses and/or decisions" or "each person involved in reaching that decision" or "each person involved in" certain specific analyses/projections, all with respect to specific issues.  In response to most of these interrogatories, Spotify identified only a single person (David Kaefer) who "made decisions regarding" each issue.  For two of the interrogatories, Spotify identified Mr. Kaefer as the person who "made the final decision."  Both formulations fail to identify who else at Spotify was involved in those discussions/decisions.  Spotify suggested that it would amend its responses to these interrogatories to identify additional individuals who were substantively involved in those discussions/decisions, but "substantively" is inherently ambiguous and gives Spotify too much leeway to decide who to identify and who not to identify.

**Spotify's Position:** Spotify has responded to these overbroad Interrogatories—asking for information about every Spotify employee "involved" in certain decisions—by identifying the relevant decision maker for each topic, which was Mr. Kaefer, Spotify's Global Head of Audiobooks and Music.  During the meet and confer process, Spotify further offered to identify any person that had substantive involvement in the relevant decisions, by which it meant, those individuals that substantively weighed in on those decisions.  The MLC rejected that compromise, instead demanding Spotify to "identify individuals substantively involved in the relevant topic(s) *and Daniel Ek, Gustav Söderström, and any document custodian to the extent they were involved to any degree in the relevant topic*."  5/12/2026 Email from Jack Ligon (emphasis added).  MLC never backed down from that demand.

MLC's demand is patently disproportionate. MLC demands that, for each custodian, as well as the Chairman of Spotify's Board and Spotify's Co-CEO, who are not custodians, Spotify say whether or not the person was "involved to any degree" in these broad subjects, regardless of how limited or tangential their involvement was.  If one of these individuals was cc'd on an email, or had looked at a document, or were at a meeting where some subject was discussed, it appears MLC's view is that would qualify as being "involved" to a degree, even where    the individual did not substantively weigh in on the subject.  It would obviously be burdensome to comprehensively identify that level of involvement of these individuals.  Moreover, MLC has failed to explain the relevance of this aspect of the demand.  Indeed, this is not a question that is being asked at the outset of discovery, where the information might be useful to shaping the remainder of discovery.  In the current posture, MLC now has the benefit of Spotify's document production, which includes numerous non-privileged documents in which participants in the discussions at issue are readily identifiable. Additionally, depositions are imminent, affording MLC a further opportunity to examine the involvement of various individuals in the subject matter of these Interrogatories. Should MLC, after completing its review of Spotify's production and deposing Spotify's witnesses, continue to maintain that supplementation is required, Spotify is willing to continue discussing supplementing its responses at that time.

### 4.  Spotify's Withholding of Parent Documents

**MLC's Position:** The MLC made Spotify aware of instances where it produced email attachments but withheld the entire cover email(s) as privileged, and simply produced a blank slipsheet in its place.  That is not appropriate because information such as who sent an email, who received an email, on what date and the subject of the email are not privileged.  The MLC requested that, given the first witness is set to be deposed six days from now, Spotify re-produce those cover emails in redacted form that includes all of the above information as well as any portions within the body of the email(s) that are not privileged by Sunday, May 17.  The suggestion that this information is apparent from Spotify's privilege log is simply not true.  Because Spotify has provided categorical privilege logs, which include broad categories with many documents, many senders, many recipients, and many different dates, it is impossible to discern from the log who sent and received any specific email and on what date.

**Spotify's Position**: MLC raised this issue for the first time this afternoon and did not identify any Bates numbers for the "instances" in which it claims Spotify has not properly withheld a document on privilege grounds.  Spotify will confer with MLC regarding its complaint.  Spotify notes that MLC's suggestion that an email may never be withheld is inaccurate and, in any event, information regarding email participants and sent date is included on Spotify's privilege log.  *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 2019 WL 1259382, at *18 (S.D.N.Y. Mar. 19, 2019) (Parker, J.) (email chain properly withheld).

### 5.  Spotify's 30(b)(6) Topics

**Spotify's Position:**  MLC has refused to designate a witness for roughly half of the noticed Topics while artificially constraining the scope of testimony on many others, ultimately agreeing to only three of Spotify's twenty-five Topics as written.  These objections are particularly unavailing where, as here, the Topics track the core factual allegations of MLC's own Amended Complaint.  Specifically, MLC alleges that $9.99 is not a good faith, reasonable measure of the market value of Premium's audiobooks component, First Am. Compl. ¶¶ 96-103, but refuses to designate a witness to speak to its current and past policies, processes, procedures, practices, and methods for assessing and determining the standalone value of each product or service in a Bundle (Spotify Topic 2).  MLC also alleges that Spotify's Audiobooks Access product cannot supply the standalone retail price of Premium's audiobook component because it provides users with fifteen monthly hours of audiobooks listening and access to Spotify's free music listening experience, First Am. Compl. ¶¶ 82-85, but refuses to designate a witness to speak to its treatment of Bundles or Mixed Service Bundles that include a product or service independently available to consumers for no charge and/or a product or service involving audiobooks (Spotify Topic 6).  Spotify has similar concerns with MLC's refusal to designate a witness for Topics 1, 4-5, 7-9, 12, 14, and 21-22, all of which ask about the MLC's own internal policies, processes, and analyses.  These topics go to the heart of this dispute and would remain relevant even if Spotify's unclean hands affirmative defense were stricken.  How MLC evaluates Bundles, determines an acceptable

valuation for Bundle components, and identifies compliance concerns is relevant principally because it will give the fact-finder an understanding of what MLC considers a proper Bundle, and a proper manner of the valuation of Bundle components.  MLC cannot bring detailed allegations that Spotify underpaid royalties and failed to apply a "good faith, reasonable measure of market value" and then refuse to explain its own policies, processes, and procedures for evaluating the very conduct it challenges.  Nor can Spotify adequately defend itself against allegations of improper valuation and misclassification where the Plaintiff bringing those allegations refuses to disclose its own standards for these very questions.

**MLC's Position:**  The MLC served its responses and objections on March 13, 2026.  Spotify did not raise any concerns with those responses and objections until nearly two months later, on the parties' meet and confer call.  Moreover, on that call and in its subsequent email confirming what was discussed on that call, Spotify said it "will re-visit the 30(b)(6) Topics MLC has rejected or narrowed to determine whether any potential compromises exist."  Spotify never followed up with any potential compromises or proposed amended topics.  Moreover, Spotify mischaracterizes the topics it served and the MLC's responses thereto.  Spotify claims the topics "track the core factual allegations of MLC's own Amended Complaint," but that is only true for a small number of the topics, in response to which the MLC has, in fact, agreed to produce a witness.  Spotify's other proposed topics are either entirely irrelevant, in which case the MLC has not agreed to provide a witness, or mischaracterize the allegations in the Amended Complaint, in which case the MLC has responded by quoting the relevant allegations from the Amended Complaint and agreeing to provide a 30(b)(6) witness with respect to that allegation.

### 6. Parties' Request to Amend Schedule

The parties have agreed to take depositions after the current close of fact discovery and respectfully request that the case schedule be amended to reflect that agreement.  In conjunction, the parties also request that the remaining deadlines be moved back accordingly.  The parties will submit a proposed order amending the schedule in advance of the May 20 status conference.

### 7. May 20 Case Management Conference

Spotify respectfully requests that the Court adjourn the conference currently scheduled for May 20 to May 22.  Counsel for Spotify has a prior out-of-town professional obligation on that date that cannot be rescheduled.  In the alternative, should the Court prefer to retain the May 20 date, Spotify respectfully requests the accommodation of permitting counsel to appear by videoconference.  Counsel for MLC does not object to these requests.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP                                                    **7**

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

*/s/ Jay Cohen*
Jay Cohen
Darren W. Johnson
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
jaycohen@paulweiss.com
djohnson@paulweiss.com

*Attorneys for Plaintiff Mechanical Licensing Collective*

**LATHAM & WATKINS LLP**

*/s/ Sarang V. Damle*
Allison L. Stillman
Cory D. Struble
Grace McLaughlin
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-906-1200
alli.stillman@lw.com
cory.struble@lw.com
grace.mclaughlin@lw.com

Sarang Vijay Damle
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
Telephone: 202-637 2200
sy.damle@lw.com

*Attorneys for Defendant Spotify USA, Inc.*