**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MECHANICAL LICENSING COLLECTIVE,<br><br>          *Plaintiff*,<br><br>    v.<br><br>SPOTIFY USA INC.,<br><br>          *Defendant*. | Case No. 1:24-cv-03809-AT-KHP |

**DEFENDANT SPOTIFY USA INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>PLAINTIFF MECHANICAL LICENSING COLLECTIVE'S MOTION TO COMPEL</u>**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND ........................................................................................................ 3

III.  LEGAL STANDARD ................................................................................................ 7

IV.   ARGUMENT ............................................................................................................. 8

    A.    Spotify should not be compelled to search for additional documents from Google Drive workspace ........................................................................................ 9

        1.    MLC has not demonstrated the relevance of additional documents in the Google Drive workspace............................................................................ 11

        2.    The burden of searching Google Drive and producing the documents at this stage is too high.................................................................................. 16

    B.    It would be overly burdensome and unnecessary for Spotify to produce KJ Flyborg's custodial documents or deposition ........................................................ 17

        1.    MLC has failed to demonstrate that KJ Flyborg's testimony or documents would provide unique relevant information not already available to MLC ................................................................................................................ 17

        2.    Making KJ Flyborg a custodian or deposing him is disproportionate to the needs of the case and burdensome ........................................................ 22

    C.    Ben Kung should not be deposed......................................................................... 24

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Collens v. City of New York*,
222 F.R.D. 249 (S.D.N.Y. 2004) ..............................................................................8

*Edmondson v. RCI Hosp. Holdings, Inc.*,
2018 WL 4112816 (S.D.N.Y. Aug. 29, 2018)...........................................................8

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
297 F.R.D. 99 (S.D.N.Y. 2013) ...................................................................... *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
2023 WL 4447869 (S.D.N.Y. July 11, 2023).........................................................11

*Lightsquared Inc. v. Deere & Co.*,
2015 WL 8675377 (S.D.N.Y. Dec. 10, 2015) ........................................................17

*Ravazzani v. Shop PO, LLC*,
2025 WL 3274223 (S.D.N.Y. Oct. 7, 2025)..............................................................8

*Trilegiant Corp. v. Sitel Corp.*,
275 F.R.D. 428 (S.D.N.Y. 2011) ...........................................................................7, 8

*United States v. Anthem, Inc.*,
2026 WL 1906193 (S.D.N.Y. July 2, 2026) (Parker, J.) ........................................10

**RULES**

Fed. R. Civ. P. 26(b)(1), (2)(C)..................................................................................8

Fed. R. Civ. P. 26(b)(2)(C)(i) ....................................................................................7

Fed. R. Civ. P. 26(b)(2)(C)(ii) ..............................................................................7, 10

ii

## I.    INTRODUCTION

The competing motions in this case are a study in contrasts.  Spotify's motion comes closely on the heels of the depositions of MLC's two most important witnesses, CEO Kris Ahrend and General Counsel Rick Marshall (MLC's 30(b)(6) designee on all topics), which MLC scheduled for the tail end of the fact discovery period.  Upon the conclusion of those depositions, it became apparent that MLC's discovery in the case has been deficient.  Spotify raised those deficiencies with MLC within the week, and obtained permission from the Court to move to compel after the close of fact discovery, in the event the parties could not resolve the issues.  Dkt. 157 (Order).  Spotify's motion narrowly targeted the deficiencies that it had identified in those trailing depositions.

MLC has seized the opportunity granted by the Court to raise issues that should have been addressed and resolved long ago.  And, in sharp contrast to Spotify's targeted and narrow requests, MLC seeks to force Spotify to add a new document custodian, schedule additional depositions, and expand document discovery to include an expensive, burdensome, and unproductive search of materials that are already largely encompassed within existing productions—*long* after the parties negotiated the scope of collection, agreed to a relevant list of custodians, and spent months implementing that plan.  MLC's request would blow up the schedule in this case, notwithstanding that this Court has admonished against any further extensions.  *See*, *e.g.*, Dkt. 141 (Scheduling Order); Dkt. 174 (same).  There is no basis for this burdensome and long-belated demand.

*First*, and most alarmingly, MLC asks that Spotify conduct an entirely new document collection and production by searching its custodians' Google Drive files and Spotify's overall Google Workspace.  It makes this remarkable last minute request despite the fact that Spotify clarified its approach and scope of collection with MLC in *January*, and MLC agreed—or at a minimum, did not object.  MLC's request for that expansive relief also ignores that—as Spotify

1

has repeatedly explained—such a search is highly unlikely to turn up relevant documents beyond those that were already pulled into the production already made to MLC of documents linked via email, as well as Google Docs email notifications (which alone account for nearly half of the twenty thousand documents Spotify produced), and would be incredibly expensive and burdensome. *Second*, MLC asks that Spotify designate as a custodian Karl-Johan ("KJ") Flyborg, its Senior Vice President, Business Strategy, Propositions, & Insights, re-run the full scope of search terms across his files, and have him sit for a deposition—despite the fact that Flyborg was not one of the 10 custodians carefully negotiated and agreed upon, and despite the fact MLC has identified no unique information in Flyborg's possession relevant to this case and beyond the scope of other custodians' productions and testimony. *Third*, MLC renews its request that Spotify Vice President Ben Kung sit for a deposition—again notwithstanding the fact that MLC cannot identify any unique, non-duplicative information to which Kung could testify. *See* Dkt. 153 (Letter Motion for Protective Order); Dkt. 156 (Letter Response in Opposition).

Apparently dissatisfied that it has been unable to support its narrative despite the extensive discovery taken to date, MLC asks this court for a do-over: to expand the list of custodians to which it agreed and reopen discovery to search for the proverbial needle in a haystack—at significant burden to Spotify, and unnecessary delay to this case. This Court should deny MLC's requests. Not only do these far-reaching requests come far too late, but MLC at every turn fails to meet its burden to establish that these broad additional collections would result in the discovery of *unique* information justifying the substantial burden to Spotify. Because MLC cannot meet its burden to demonstrate that these eleventh-hour requests would result in relevant, unique information, and because the burden of conducting these extensive searches is considerable, MLC's motion to compel should be denied.

2

## II.    BACKGROUND

Discovery in this case has been ongoing for years, but has been proceeding in earnest since MLC filed its Amended Complaint in fall of 2025.  Throughout the process, Spotify has been consistently accommodating, meeting with MLC early on; negotiating as to custodians, search terms, and sources; producing many thousands of documents; and making a number of senior executives available for depositions, including the former and current global heads of Spotify's audiobook business.

As this Court is well aware, the principal remaining claim in this case concerns the validity of Spotify's use of the $9.99 retail price for the audiobooks component of its Premium product. *See* Dkt. 165 (Mem.) at 2-4 (setting out procedural background).[1]  MLC has therefore sought documents and depositions from the principal witnesses involved in that pricing decision.  To that end, Spotify designated David Kaefer, who headed up audiobooks at Spotify during the relevant period, as its 30(b)(6) witness to testify as to those and other topics, and also made Kaefer a custodian.  Additionally, in December 2025, MLC requested 15 document custodians from Spotify, including Kaefer but not including Flyborg.  After the parties came to an agreement concerning six custodians, this Court ordered the parties to agree to four more, for a total of ten. *See* Dkt. 115 (Post-Conference Order).  Again, none of these custodians included KJ Flyborg.  But the list of agreed-upon custodians did include Kaefer, as well as Winston Wu, Senior Director, Financial Planning and Analysis, and Felicitas Jorge, Director, Monetization Strategy.  Together, these custodians encompassed both the principal individuals at Spotify responsible for and those

---

[1] MLC, for its part, agrees that "the central questions in this case" are "whether Spotify's $9.99 valuation of the audiobooks component of its Premium Offering complies with Section 115 and whether Spotify, as a result, has underpaid the mechanical royalties owed" to songwriters and publishers.  MLC Mot. to Compel at 1.  This admission underscores the importance of granting Spotify's own motion to compel, which asks this Court to compel MLC to provide information central to MLC's allegations concerning the $9.99 valuation. *See* Dkts. 159, 165 (Spotify Mot. to Compel and Mem. in Support).

with ultimate decisional authority regarding Spotify's pricing of its Audiobooks Access tier ("AAT") at $9.99 and use of the $9.99 price in its royalty calculations.

In January, Spotify shared with MLC its approach to document collection. Specifically, in response to MLC's queries about which sources Spotify would collect and how Spotify would approach the issue of "modern attachments" (i.e., links in emails to other documents), Spotify informed MLC that it would collect all emails from the agreed upon custodians, as well as all Google Drive documents (including presentations and spreadsheets) linked from those emails. Decl. of Franco Benyamin in Support of Opp. to Mot. to Compel ("Benyamin Decl.") ¶ 2. Spotify also agreed to collect those custodians' Slack communications. *Id.* MLC raised no concerns with that stated approach. This resulted in the collection of over 3.5 terabytes of documents. *Id.* ¶ 3. Spotify then ran the agreed-upon search terms across that universe and reviewed for responsiveness and privilege. *Id.* In May 2026, pursuant to those parameters, Spotify produced over 20,000 documents to MLC. That same month, MLC took the depositions of four of the ten custodians, including Kaefer and Wu.

On June 3, 2026, MLC wrote to Spotify, requesting for the first time that it produce custodial documents of Flyborg. MLC purported to justify that late request based on statements in the Kaefer and Wu depositions agreeing that Flyborg was amongst those generally involved in pricing decisions. Spotify objected, explaining that while Flyborg had been mentioned regarding his involvement in the pricing decisions, Jorge—Flyborg's direct report—had more direct and substantive involvement in the relevant decisions concerning AAT's $9.99 price point and had yet to be deposed, while Kaefer (not Flyborg) had been the ultimate decisionmaker. In a subsequent conference, this Court agreed, and directed MLC to revisit the topic only if, following Jorge's deposition, there was still information that MLC was missing. *See* Dkt. 150 (Post-Conference

Order).  Judge Parker explained: "So if, in fact, it turns out that Flyborg's role was different than what you originally understood, and Jorge is saying something different from what counsel has understood to be the case, then there may be good cause, but you may not really need it." Benyamin Decl., Ex. 1 (June 24, 2026 Status Conference Hearing Tr.) at 86:6-11.

MLC deposed Jorge on June 30, 2026.  In the deposition, Jorge testified, *inter alia*, that she led the audiobooks project for Flyborg and that he would not "know the specifics" of relevant pricing details.  Benyamin Decl., Ex. 2 (Jorge Dep. Tr.) at 143:15-21; *id.* at 132:23-24 ("[W]hen it came to audiobooks, I was leading that project for KJ . . . .").  Jorge further testified that she led one of five sub-groups that reported to Flyborg—one in which "all of the work that was done for audiobooks . . . happened under" her at the time Spotify "launched audiobooks." *Id.* at 20:13-23, 25:4-15.  Three of the remaining sub-groups performed no audiobooks work, while a fifth's work did involve audiobooks but was limited to data scientists who supported Shaela Greenfield's audiobooks growth team. *Id.* at 20:24-21:21, 22:2-23:12, 24:3-10.  Although Jorge testified as to the "bigger scope" of Flyborg's responsibilities, she was referring to his work *outside* of audiobooks. *Id.* at 27:22-28:10.  MLC also asked Jorge about a tracker document with Flyborg on it (which Spotify had produced well before the deposition), but did not request the production of any specific hyperlinks from that document either before or soon after the deposition.  Indeed, MLC waited until over a week after the close of fact discovery to request any specific hyperlinks in this tracker (as discussed below).

In a July 2 status letter following Jorge's deposition, MLC continued to maintain that Spotify should produce Flyborg's custodial documents and present him for a deposition.  Dkt. 154 (Joint Letter) at 3.  But MLC did not separately move to compel.  Indeed, as Spotify noted in the

5

same joint letter, MLC had failed to identify any unique information that Flyborg possessed that either Jorge or Kaefer had not been able to provide. *Id.*

In a July 8 email to Spotify, MLC for the first time raised an additional concern that Spotify "may not have searched for and produced documents stored in the Google cloud independent of its searches of emails and slack messages." MLC Mot., Ex. 12 (J. Benvenisty email to Spotify Counsel) at 6. Spotify responded that it had no such obligation, and that, as Spotify had explained to MLC at the outset of fact discovery and document collection efforts in January, the most relevant documents stored in Google Drive were already pulled in through email collections because of the way Google Docs works: namely, an email is generated and sent every time there is substantive engagement with a document, so that the documents actually used by the custodians were already identified and linked within the email files searched and produced to MLC. And in fact, Spotify had produced over 7,900 documents from Google Drive storage, almost half of Spotify's total production of over 20,000 documents. MLC has introduced many of these documents as exhibits during depositions, and MLC had not at any point during discovery taken issue with Spotify's stated approach to document collection.

On July 20, at MLC's request, the parties met and conferred on Google Drive, among other issues, but were not able to reach an agreement. Following the meet and confer, MLC provided Spotify, for the first time, with a list of documents it maintained "would have been produced, had Spotify searched Google Drive locations independently of searches of its custodians' emails and slacks." MLC Mot., Ex. 15 (Email from D. Smith to A. Stillman), at 2. Spotify investigated each of the approximately 31 documents requested by MLC, and determined that, for the most part, the documents requested either *already had been produced*, or the information *did not exist*. Benyamin Decl., Ex. 3 (July 20-29, 2026 Emails) at 2-11; MLC Mot., Ex. 15 (Email from D. Smith

6

to A. Stillman), at 1. Specifically, 19 documents were already produced or did not exist following a reasonable investigation. Benyamin Decl., Ex. 3 (July 20-29, 2026 Emails) at 3-6. As to 12 hyperlinked documents that existed and had not been produced—most of which were outside of the review population because they did not hit on search terms or had already been reviewed and determined not to be responsive—Spotify confirmed to MLC that one was privileged, seven were not responsive, and Spotify agreed to produce the remaining four in the interest of resolving this dispute. *Id.* These four documents that Spotify agreed to produce (out of the over 20,000) do not move the needle as they are not critical to the core issue in this matter—whether the audiobooks component of Premium can be valued at $9.99—and in one instance, largely duplicative of information already produced. Spotify emphasized that these updates "confirm, again, that there is no meaningful discovery deficiency, despite MLC's belated attempt to manufacture one." *Id.* at 7.[2]

After Spotify obtained leave to file its own narrow motion to compel MLC to address specific discovery deficiencies at the core of the parties' dispute, MLC filed this motion.

## III.    LEGAL STANDARD

The Federal Rules require courts to "limit the frequency or extent of discovery" that might be "otherwise allowed under these rules" where (as relevant here) "the discovery sought is unreasonably cumulative or duplicative" or "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(2)(C)(i), (ii). Accordingly, while relevance "for purposes of discovery[] is an extremely broad concept," it is "not unlimited." *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y. 2011). Indeed,

---

[2]  Additionally, in Exhibit 1 to its Motion to Compel, MLC included a new request for information not included in its previous correspondence. On July 29, Spotify confirmed this information had already been produced or did not exist. *Id*. at 1.

"disclosure should not be directed simply to permit a fishing expedition." *Edmondson v. RCI Hosp. Holdings, Inc.*, 2018 WL 4112816, at *1 (S.D.N.Y. Aug. 29, 2018) (internal citations and alteration omitted); *see also Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) (same). "The burden of demonstrating relevance is on the party seeking discovery." *Trilegiant Corp.*, 275 F.R.D. at 431. "[T]he moving party must articulate a concrete linkage between the discovery sought and the claims or defenses asserted in the case," and where a plaintiff "fail[s] to point to any specific information that is relevant to their claims and would be found solely in the produced documents," a motion to compel should be denied. *RCI Hosp. Holdings, Inc.*, 2018 WL 4112816, at *1 (internal citation omitted); *see also Ravazzani v. Shop PO, LLC*, 2025 WL 3274223, at *1 (S.D.N.Y. Oct. 7, 2025) ("[D]iscovery inquiries should be accompanied by objective support rather than mere speculation.").

And even where relevance can be shown, "'[t]he court must limit the frequency or extent of discovery' where[] the discovery sought is unreasonably cumulative or duplicative," "can be obtained from some other source that is more convenient, less burdensome, or less expensive," "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action," or "the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* (quoting Fed. R. Civ. P. 26(b)(1), (2)(C)).

## IV.    ARGUMENT

MLC's broad motion to compel should be denied. *First*, well past the eleventh hour, MLC asks Spotify to conduct a broad search against an enormous data repository in the hopes of identifying some additional stray responsive documents. Specifically, MLC has asked Spotify to review its custodians' Google Drive workspaces, despite Spotify's having already collected documents from these very workspaces, via the collection of custodians' Gmail accounts and linked attachments. As Spotify has repeatedly explained to MLC, searching custodians' email

accounts already allowed for the more effective collection and production of custodians' relevant Google documents, including documents that a standalone search of Google Drive workspaces may have missed. MLC fails to establish that its belated request will turn up relevant information, and the burden and delay that would result far outweighs any marginal benefit.

*Second*, MLC seeks documents and deposition testimony from a new custodian—KJ Flyborg—without demonstrating that Flyborg has any additional, unique information to which MLC has not already gained access via documents collected from custodians including David Kaefer, Winston Wu, and Felicitas Jorge, as well as their depositions. In the absence of any showing that Flyborg possesses unique information, MLC's late request to add an additional custodian should be denied as disproportionate. Collecting, searching, and producing documents from Flyborg, as well as making Flyborg—who is a Senior Vice President of the global company and lives in Sweden—available for a deposition at this late stage would be extremely burdensome. That burden far outweighs any marginal relevance of additional information that Flyborg could provide.

*Third and finally*, MLC renews its opposition to Spotify's motion for a protective order as to Ben Kung, Spotify's Vice President, Finance. But for all the reasons set out in Spotify's letter motion, Mr. Kung qualifies as an apex witness, and MLC cannot meet the high bar of showing he possesses any unique, additional relevance that could possibly justify his deposition.

MLC's motion must be denied.

### A.    Spotify should not be compelled to search for additional documents from Google Drive workspace

MLC has asked, for the first time, *at the close of discovery*, for Spotify to take a different approach to the collection and search of documents than the one the parties had discussed in January, at the outset of discovery. MLC now requests that Spotify run the full set of search terms

against its custodians' *entire* Google Drives as well as "any shared folders containing any documents accessible/viewable, created, or edited by any of its custodians," and make additional productions. Mot. at 17-18. This late request comes despite the fact that Spotify clarified at the *beginning* of discovery how it would collect the universe of documents against which it would run search terms. MLC did not object, but instead allowed the entire document discovery period to pass without indicating that it would request a do-over after discovery had already closed and depositions had been completed. MLC has already had "ample opportunity to obtain [relevant] information," Fed. R. Civ. P. 26(b)(2)(C)(ii), and the untimeliness of this request alone warrants its denial. As this Court recently recognized, "the timing of discovery" is relevant to "a Court's decision to grant further discovery." *United States v. Anthem, Inc.*, 2026 WL 1906193, at *3 (S.D.N.Y. July 2, 2026) (Parker, J.) (citing Fed. R. Civ. P. 26(b)(2)(C)(ii)). And as in that case, "fact discovery needs to come to an end." *Id*.

In any event, MLC's request is not just too late, it is unwarranted. As Spotify has explained to MLC in multiple meet-and-confers, relevant documents stored in custodians' Google Drive were identified and collected through Spotify's search of the emails and Slack messages due to the functionality of Google Docs and modern attachments. Under the company's default Google settings, custodians receive a notification *via email* when a document in Google Drive is shared with them, a comment to their attention is made within a document, a task is assigned within the document, or a suggestion is made to the text of the document. Benyamin Decl. ¶¶ 3, 6; *see*, *e.g.*, *id*., Exs. 7-11 (produced Google Documents notification emails). Indeed, Spotify produced notification emails from each of its custodians. *Id*. ¶ 6. Therefore, relevant documents would have already been pulled into the review set through searches of the custodians' Gmail files; any remaining files in Google Drive that were not flagged in email notifications are highly unlikely to

10

be relevant. *Id.* But Spotify went further, and conducted targeted collections (called "go-gets") from Google Drive as needed to respond to specific discovery requests, closing any gap that might have existed. *Id.* ¶ 4. There is simply no deficiency in Spotify's collection and production of documents. As one example, only four out of the 31 documents MLC requested last week were responsive, not privileged, and had not already been produced. Benyamin Decl., Ex. 3 (July 20-29, 2026 Emails). MLC cannot establish that additional search would result in production of non-duplicative responsive documents to justify the extremely high burden of this exercise at this late juncture.

### 1. MLC has not demonstrated the relevance of additional documents in the Google Drive workspace

This Court has recognized that where parties have "met and conferred" on an ESI process, and in particular have negotiated a search protocol, a party will have "complied with its obligations to conduct a reasonable search for documents throughout the litigation" where it offers a "reasonable" explanation for the process and why certain documents were not produced. *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 645-46 (S.D.N.Y. 2019); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 4447869, at *2-3 (S.D.N.Y. July 11, 2023) (similar). That is particularly appropriate given the time and expense associated with electronic searches and "in light of the costs and realities of the eDiscovery process that the parties agreed to undertake." *Id.* The standard for evaluating whether a party took a reasonable approach is not whether there exists a document not produced that in theory could be responsive, but whether a party produced all responsive, non-privileged documents identified in a "reasonable" search and collection designed to identify the most relevant documents given the inherent constraints of time and money attendant upon electronic document collection. *See id.*

11

Here as in *Brown*, Spotify negotiated with MLC in good faith and produced tens of thousands of responsive documents, after searching from sources (including Gmail and Slack) that it identified to MLC early in discovery. Benyamin Decl. ¶¶ 2-5. While MLC has implied that there is some massive, unsearched trove of relevant documents in Google Drive (or the "Google cloud," Mot. at 9) this argument misunderstands Spotify's document storage—which Spotify has explained to MLC in multiple meet-and-confers. Spotify flagged at the beginning of discovery that it was searching Slack and Gmail, and specifically expected this search protocol to capture documents maintained on Google Drive for which automated notifications are generated when the documents are shared or edited. *See* MLC Mot. to Compel, Ex. 27 (Email from C. Amanze to J. Ligon) at 1-2 (Ligon: "Please let us know what data source you intend to collect from for Spotify's custodians." Amanze: "We are collecting from our custodians' Gmails and Slacks. For Gmail, we are collecting both traditional and modern attachments (understood as any document hyperlinked into an email). This includes automated Gmail notifications that take place whenever a document is shared, edited, etc." Ligon: "Thanks, Chinyere. . . . We also agree to collect modern attachments to the extent they are used.").

As a result, Spotify has already collected and produced most, if not all, relevant documents in Google Drive that MLC now belatedly seeks as a separate production. Benyamin Decl. ¶¶ 3-5. The reason this production would be duplicative has to do with how default Google notifications work because these are, by design, tools used for collaboration.[3] In Google Drive, the default setting is that the owner of a Google document receives a notification via email each time a comment is made, suggestions are made, or a task is assigned within the document, flagging both

---

[3] Spotify produced Google notification emails and associated attachments from each of its custodians. Benyamin Decl. ¶ 6.

the name of the commenter/suggestion maker and the name of the document. *Id.* ¶ 6. Additionally, every time a Google document is shared, the person with whom it has been shared receives an email notification with the name of the Google document. Because of this extensive email notification system, the names of Google documents that potentially contain relevant information were identified when Spotify searched its custodians' emails using the agreed-upon search terms. *Id.* While MLC asserts that this process would "not capture broad swaths of documents likely to contain relevant information," including "instances where a custodian created, deleted, edited, relocated, or merely viewed a Google document, or where the custodian deleted the Google notification email," Mot. at 21, MLC is (baselessly) hypothesizing edge-case scenarios, ignoring that any relevant documents necessarily would have been shared with other Spotify employees. Indeed, Spotify's production was particularly expansive as it included many documents from other custodians, beyond those to which the parties had agreed, and specific go-gets.[4] Any remaining uncollected documents, if any, are unlikely to be responsive.[5] This process was, therefore, the most efficient way to ensure that Spotify's collections encompassed relevant Google Drive documents that were shared by or with and/or edited by or for Spotify's custodians. *See* Benyamin Decl. ¶¶ 3, 6. All of this was negotiated and agreed to early in discovery—as ordered by this Court—so that discovery could proceed in an orderly fashion. And MLC never came back to Spotify to question why it did not separately search Google Drive until the day before discovery closed, despite being aware *since January* that this was how Spotify would search and collect its documents. *See* MLC Mot., Ex. 27.

---

[4] The reference to hypothetical deletion of emails is purely speculative. There is nothing in the record to suggest that any custodian deleted emails concerning Google Docs prior to the imposition of the legal hold; to the contrary, Spotify produced thousands of these email notifications and associated documents from Google Drive, demonstrating that the opposite is true.

[5] Moreover, Spotify conducted targeted collections (called "go-gets") from Google Drive as needed to respond to specific discovery requests, closing any gap that might have existed. Benyamin Decl. ¶ 4.

13

Therefore, MLC's late request for an additional search of Google Drive is simply unlikely to turn up further responsive documents, and MLC's motion does not suggest otherwise. While MLC asserts that "key documents on its $9.99 valuation are still missing from its production" because Spotify "fail[ed] to search the Google Drive," this is incorrect. Mot. at 18. As a single example, MLC identifies a single slide deck—which Spotify produced—that identifies hyperlinks to further documents maintained on Google Drive. Mot. at 18-19 (citing Ex. 14). But the parties have already discussed the specific documents linked within that slideshow, most were already produced, and although they are of limited relevance, Spotify agreed to produce the few linked documents that were arguably responsive and not privileged, which had not been produced. Benyamin Decl., Ex. 3 (July 20-29, 2026 Emails) at 3-5. If anything, this slide deck underscores that Spotify's methodology of searching Gmail and Slack has not resulted in the omission of large swaths of relevant information.

MLC's related contention that Spotify has "failed to produce relevant financial projections" is not a failure of Spotify's search process, but rather implicates a disagreement as to why certain documents were withheld for privilege. *See* Mot. at 19-20. While MLC asserts that "the reason Spotify has not yet produced the requested analyses . . . and projections is because it did not independently search Spotify's Google Workspace or its custodians' Google Drives for relevant documents," Mot. at 20, that is inaccurate. Indeed, given that MLC's motion identifies specific documents as to which Spotify has asserted privilege, Spotify's collection *did* identify such documents–over which Spotify appropriately asserted privilege. To the extent MLC contends that Spotify wrongly asserted privilege over the documents, however, it fails to assert that argument directly.

14

MLC's request also comes far too late.  To the extent MLC now asserts that it "did not understand" that Spotify "would collect and search only its custodians' emails and Slack messages" based on communications early in discovery, and because it had not yet received any documents "with Google Drive file path," that is facially not credible, especially given the many conversations between the parties regarding modern attachments from May through after the close of fact discovery.  For example, on June 19, 2026, in response to multiple inquiries from MLC, Spotify went above and beyond to help MLC understand what hyperlinks corresponded to what produced documents and created a "crosswalk" mapping this out.  Benyamin Decl., Ex. 4 (June 19, 2026 Spotify Production Letter).  Spotify was crystal clear early on about the sources it was searching, including its approach to collecting Google Docs, and MLC did not dispute it (likely because it was clearly reasonable).  Benyamin Decl. ¶ 4; *see* MLC Mot., Ex. 27 (email from C. Amanze to J. Ligon clarifying sources to be searched).  The parties also mutually agreed to search terms.  Dkt. 119 (Joint Letter).  MLC has no basis to ask for these materials on the eve of the close of fact discovery after receiving tens of thousands of documents, making multiple follow-up document requests (to which Spotify promptly responded), propounding and receiving extensive written discovery responses, and deposing all of Spotify's key witnesses.

As this Court has recognized, because collection and review of electronic data can be expensive, it is "imperative that reviewer time not be wasted by having to repeatedly redo searches and reviews of documents," and that parties regularly meet and confer about the parameters of electronic document production "mindful of the costs and time associated with ESI production." *Brown*, 474 F. Supp. 3d at 645.  Here, Spotify has communicated with MLC from the beginning about the sources it would search, and has conducted a "reasonable search for documents throughout the litigation." *Id.* at 646.  To the extent MLC has identified particular documents it

15

contends Spotify should have produced, Spotify remains willing to discuss and investigate, as it has done consistently (often confirming that the documents had already been produced).  But a wholesale search of Spotify's custodians' Google Drives and Spotify's Google Workspace *after the close of discovery* is, for the reasons explained above, highly unlikely to result in non-duplicative, relevant information, and—as explained below—far too burdensome.

### 2. The burden of searching Google Drive and producing the documents at this stage is too high

Even if MLC could establish some marginal relevance to additional searches and productions from Google Drive, the burden of this additional, broad collection would far outweigh any marginal incremental value.  An additional document collection from the sources MLC seeks would require counsel to collect, host, and process Spotify's *entire* Google Workspace before the search terms can be run.  Search terms could not reasonably be applied prior to collecting the entire workspace due to limitations in Google Workspace's search functionality and because it does not provide the reporting needed to validate the results.  Benyamin Decl. ¶¶ 8-10.  This alone is a time-consuming and expensive process that would take months, as the discovery timelines in this case demonstrate.  Next, after running the search terms, the documents would have to be reviewed and examined for privilege.  Asking Spotify to essentially repeat this process *after* the close of fact discovery is unwarranted where MLC has failed to identify missing documents beyond "relevant financial projections" that it asserts exist and "would have been found in independent Google Drive searches."  Mot. at 19.

Given that MLC has not established that there are likely to be relevant, non-duplicative documents within Google Workspace, the massive undertaking required to collect and search the Google Workspace in this way is a burden that far outweighs the possibility of any marginal relevance this additional production could contain.  Benyamin Decl. ¶¶ 7-10, 14.  Spotify has

16

"complied with its obligations to conduct a reasonable search for documents throughout the litigation," and this Court should not reward MLC's attempt to fish for additional documents at this late stage in the litigation. *Brown*, 474 F. Supp. 3d at 646.  MLC's motion must be denied.

> **B.      It would be overly burdensome and unnecessary for Spotify to produce KJ Flyborg's custodial documents or deposition**

Despite deposing David Kaefer, Spotify's former head of audiobooks, for two full days, as well as Felicitas Jorge, who was intimately involved in the pricing decisions surrounding AAT, MLC now insists it must also collect documents from and depose KJ Flyborg.  Because MLC has not met its burden to demonstrate Flyborg possesses additional, relevant, unique information, and because the burden of making Flyborg a custodian and deposing him at this late stage is significant, MLC's motion must be denied.

> **1.      MLC has failed to demonstrate that KJ Flyborg's testimony or documents would provide unique relevant information not already available to MLC**

Where a party has already offered relevant custodians, a party moving to compel discovery from additional custodians "must demonstrate that the additional requested custodians would provide *unique* relevant information not already obtained," specifically by "providing [] evidence that there are unique responsive documents being missed in the current search scheme." *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013) (emphasis added); *see also Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 2021 WL 5299238, at *1 (S.D.N.Y. Oct. 18, 2021) (A "party moving to compel additional proposed custodians must demonstrate that the additional requested custodians would provide unique relevant information not already obtained.") (internal citation omitted).  Courts will not compel the search of additional custodians where the party seeking to compel offers only "unsupported assertions concerning the individuals it has identified." *Lightsquared Inc. v. Deere & Co.*, 2015 WL 8675377, at *5

17

(S.D.N.Y. Dec. 10, 2015). In particular, where a proposed custodian only "attended . . . meetings" but "relied on others" for "strategy or analysis," this Court has recognized that "[a]ny marginal utility of obtaining internal communications involving [the proposed custodians] would be outweighed by the burden of pulling, searching, processing and producing several years of these senior executives' emails." *Allianz Glob. Invs. GmbH*, 2021 WL 5299238, at \*1; *see also id.* at \*2 (attendance at "high-level meetings" without specific focus on the relevant issue is not enough to justify adding additional custodians).

Pursuant to those standards, MLC has failed to demonstrate that adding Flyborg as an additional custodian is justified. While Flyborg is involved in pricing for Spotify generally in his role, Jorge's testimony clarified—as Spotify has maintained all along—that David Kaefer was the final decisionmaker as to audiobooks pricing. Jorge's testimony further clarified that Winston Wu provided substantial input concerning valuation of certain components, and that Jorge herself ran the audiobooks project for Flyborg, and Flyborg would not "know[] the specifics" of her pricing work beyond what she testified to, as he "doesn't micromanage [his team]." Benyamin Decl., Ex. 2 (Jorge Dep. Tr.) at 143:19-21. As far as the specific pricing decision for AAT was concerned, Jorge testified that while she would have "discussed" the issue with Flyborg, "[i]n connection with choosing a price . . . [t]he recommendation was made to David Kaefer," not Flyborg. *Id.* at 68:4-12.

Jorge testified that the same was true with respect to other decisions pertaining to audiobooks. Thus, when MLC asked Jorge whether Flyborg would know about certain issues ███████████████████████████████████████████████████████████████ *Id.* at 123:4-20 ███████████████████ ███████████████████████████████████████████████ *see also id.* at 124:3-20

18



And as for the decision regarding ███████████████████████████ Jorge testified that ███████████████████████████████████████████████████████████ ████████████████████████████████ she testified that she would have been "very surprised" if Kaefer and Flyborg met on the subject without her, because "I was leading that project for [Flyborg]."  *Id.* at 132:4-133:2. ██████████████████████████████████ ███████████████████████████████████ Jorge testified that ██████████████ ███████████████████████████████ *Id.* at 160:19-161:20; *id.* at 163:10-13 ██ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████ .

Given these specific deposition answers, and given that Kaefer, Wu, and Jorge are all custodians and have all been deposed, MLC cannot meet its burden to show relevance: "as [Spotify has] already included custodians from certain business units . . . [MLC] must demonstrate that the additional requested custodian[] would provide *unique* relevant information not already obtained." *Fort Worth Emps. Ret. Fund*, 297 F.R.D. at 107.  MLC's only real argument to the contrary is that Jorge herself is only the custodian of eight documents out of 1,109 that "refer to Flyborg," so Flyborg must have further information.  MLC Mot. to Compel at 15.  But of those 1,109 purported documents, MLC identifies only *two* that supposedly show Flyborg has any unique, relevant information: a Slack message █████████████████████████ and Flyborg's presence on a "steering circle" that Jorge was not in.  To the extent MLC has specific questions about the Slack conversation, "this limited communication is more appropriately the target of a specific discovery request" rather than an overbroad demand to add Flyborg wholesale as a custodian.  *Fort Worth Emps. Ret. Fund*, 297 F.R.D. at 107.  Moreover, in this conversation, ███████████████████

19

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████ *See* MLC Mot. to Compel, Ex. 24 (SPOTIFY_00319933), at 6 ██████████

██████████████████████████████████████████████████████

████. This shows Flyborg was not the key decision-maker on audiobooks pricing.

And as for Flyborg's role on the "steering circle," Kaefer testified that Flyborg was there in his capacity as being "in charge of a business intelligence and pricing organization," specifically because "his team would be focused on what the price of subscriptions might be." Benyamin Decl., Ex. 5 (Kaefer Dep. Tr. 5-28) at 38:2-19, 39:14-17. Kaefer also explained that steering circles in general "meet at different cadences and with different levels of active participation," and specifically as to the audiobooks circle, while Flyborg had input along with Nir Zicherman, Kaefer himself made the ultimate decision to launch the audiobooks product in Premium after conferring with them. *Id.* at 40:25-41:10, 42:2-13 ("I had ultimate business authority."). Again, to the extent MLC has further questions about the steering circle beyond what Kaefer was able to testify to in detail, those questions are more properly the target of a limited discovery request rather than adding Flyborg as a custodian for a wholesale duplicative search and production. MLC has come nowhere close to meeting its burden to establish that Flyborg "would be a non-duplicative custodian." *Fort Worth Emps. Ret. Fund*, 297 F.R.D. at 107.

In short, neither of MLC's two examples of documents that mention Flyborg indicates that he was a key decision maker on audiobooks pricing or possesses specific, unique, relevant knowledge about the $9.99 price of AAT that MLC could not have learned from extensively questioning the key witnesses: Kaefer, Wu, and Jorge. They only stand for the unremarkable observation that Flyborg, who leads pricing and business intelligence *generally* at Spotify, was

20

included on certain communications and messages on topics that many other custodians and deponents have already been available for questioning about. *See also Ft. Worth Emps. Ret. Fund*, 297 F.R.D. at 107 (noting that a proposed custodian's presence on documents alone is not sufficient to establish that a proposed custodian would be non-duplicative."). MLC has identified no *unique*, non-duplicative information regarding the narrowed, remaining issues in the case that could possibly justify adding Flyborg as a custodian or deponent at this late stage.

*Fort Worth Employees' Retirement Fund*, on which MLC relies, does not support MLC's request for Flyborg's custodial files here. *See* Mot. at 13-14. That case was a class action securities fraud case that centered on particular mortgage-backed securities offerings, and custodians were specifically chosen by defendants "based on their . . . their appearance on a significant number of working group lists for the offerings at issue." 297 F.R.D. at 105. In that *specific* context, the court held that "[t]he presence of these proposed custodians on the working group list [wa]s sufficient" to warrant including them as custodians. *Id.* at 106. But the case does not stand for the general proposition that presence in a specific working group is sufficient to make a proposed custodian's information relevant and non-duplicative. Crucially, the *Fort Worth* court *refused to add* proposed custodians because the plaintiffs had not established their information would be non-duplicative of other custodians. *Id.* at 106-07. In particular, where a specific subgroup was already "represented by two current custodians," and the plaintiffs "[did] not attempt to distinguish these currently designated custodians from their proposed custodians nor suggest what unique information the proposed custodians might possess," the plaintiffs failed to meet their burden of showing "that the additional requested custodians would provide unique relevant information not already obtained" given that "defendants [had] already included custodians from certain business units." *Id.* The court further noted that to the extent a custodian was proposed based on "limited

21

communication[s]," that information was "more appropriately the target of a specific discovery request" rather than adding an additional custodian. *Id.* at 107.[6]  The same is true here.

At bottom, MLC has failed to meet its burden to demonstrate that Flyborg possesses unique, specific, relevant information that other custodians lacked.  Its motion should be denied on that basis alone.

### 2. Making KJ Flyborg a custodian or deposing him is disproportionate to the needs of the case and burdensome

Even if MLC could somehow demonstrate Flyborg possesses unique information beyond what Jorge, Wu, and Kaefer provided both as custodians and deponents, the burden of collecting and producing documents from Flyborg, as well as making him available for a deposition, is far too high in comparison to any marginal benefit that MLC could obtain from Flyborg.

To begin with, MLC is simply wrong that "the parties' stipulated de-duplication procedure would eliminate any burden associated with the review."  Mot. at 14.   De-duplication is not a panacea given the documents MLC seeks here.  Benyamin Decl. ¶¶ 11-16.  As discussed, Spotify collected information from two sources: Slack messages and Gmail.  Neither is susceptible to easy deduplication.

As an initial matter there is no way to automatically deduplicate documents maintained on Slack.  *Id*. ¶ 16.  Because Slack documents are processed such that they generate *representations* of the underlying data rather than the original source content, they cannot be easily deduplicated the way a traditional document could.  Instead, the process would require running a Textual Near Duplicate Analysis, which would identify documents with similar text and provide a similarity

---

[6] In fact, where MLC has made specific and targeted follow-up document requests (and it has made many such requests), Spotify has accommodated it at each and every turn, undertaking the burden of chasing down requested documents only to have to confirm, with few exceptions, that they had already been produced to MLC, did not exist, or were not responsive. *See*, *e.g.*, MLC Mot. to Compel, Ex. 16 (Email from A. Nakamura) at 1-2; Benyamin Decl., Ex. 3 (July 20-29, 2026 Emails); *id.*, Ex. 6 (F. Benyamin email to J. Ligon, April 17, 2026).

percentage. *Id.* But because this process would not take metadata into account, it is only recommended as a review and quality control method but not for deduplication because the false positive rate is too high. *Id.* Accordingly, deduplication of Slack data would provide no meaningful reduction in the volume of documents requiring review and associated burden. *Id.*

Moreover, deduplication would not eliminate the burden of producing documents from Google data, including modern attachments. *Id.* ¶ 11. While deduplication is possible to a point for Google data, it can only be performed at the family level rather than the individual level. *Id.* ¶ 13. Unless an entire family is duplicative, the documents will not be removed through deduplication, resulting in the same attachment being repeated many times. *Id.* Extensive additional work and processing would therefore be required to review and remove duplicate documents. *Id.*

In short, deduplication would not be a straightforward process for the relevant data here; rather, it would be a very time-consuming process to collect, deduplicate, and then run the agreed-upon search terms on Flyborg's documents. *Id.* ¶¶ 11-16.

Finally, even the process of collecting the documents from Flyborg to run search terms would be highly burdensome and result in meaningful delay. Because Flyborg was not among the 10 custodians negotiated with MLC at the beginning of discovery, Spotify has never collected Flyborg's documents. *Id.* ¶ 15. The process of document collection itself requires transferring the entirety of custodial emails and Slacks to a review platform, hosting the documents, and then running search terms, even before the laborious effort of attempting to de-duplicate and manually review for responsiveness (and privilege). *Id.* ¶¶ 7-16. This process is time-consuming and expensive, and there is no reason to expect the volume of Flyborg's files to be anything less than for the other custodians, especially because Jorge testified that all of Flyborg's information would

23

be duplicative. *Id.* The burden of collecting documents and requiring Flyborg, who is a Senior Vice President of the global company, to sit for a deposition is only compounded by the fact that Flyborg lives in Sweden.

In short, the collection, processing, de-duplicating, and review of an entirely new custodian's documents at this late stage is highly burdensome and unwarranted, especially given that MLC has not met its burden to demonstrate that Flyborg possesses unique information that would justify the undertaking. MLC's motion to compel Spotify to produce documents from Flyborg and make him available as a deponent should accordingly be denied.

## C.     Ben Kung should not be deposed

For the reasons articulated in Spotify's motion for protective order, Ben Kung is an apex witness, whose knowledge is duplicative of witnesses the MLC has already had the chance to depose. *See* Dkt. 153 (Letter Motion for Protective Order).

24

Dated: July 30, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*

Allison L. Stillman
Cory D. Struble
Franco Benyamin
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-906-1200
alli.stillman@lw.com
cory.struble@lw.com
franco.benyamin@lw.com

Sarang Vijay Damle
Leah A. Wisser (*pro hac vice*)
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
Telephone: 202-637-2200
sy.damle@lw.com
leah.wisser@lw.com

*Attorneys for Defendant Spotify USA, Inc.*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby state that the foregoing Opposition to Plaintiff's Motion for Reconsideration was prepared on a computer using Microsoft Word. The total number of words in this brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 7,690. In preparing this certificate, I relied on the word count program in Microsoft Word.

Dated: July 30, 2026

LATHAM & WATKINS LLP

*/s/ Allison L. Stillman*

Allison L. Stillman
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
Email: alli.stillman@lw.com

26